1

2

                    **UNITED STATES DISTRICT COURT**
                    **WESTERN DISTRICT OF NEW YORK**

3                                                        VOL. I

4   LORETTA GREASLEY,                )
    AS EXECUTOR OF THE ESTATE OF     )
5   MICHAEL J. MARRANCO,             ) Case No. 1:15-CV-00642
                                     )                (RJA)(JJM)
6                   Plaintiff,       )
                                     )
7   vs.                              ) August 20th, 2019
                                     )
8   UNITED STATES OF AMERICA,        )
                                     )
9                                    )
                    Defendant.       )
10

11

                **TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
12              **BEFORE THE HONORABLE RICHARD J. ARCARA**
                 **SENIOR UNITED STATES DISTRICT JUDGE**
13

14
    APPEARANCES:
15
    For the Plaintiff:   CONNORS LLP
16                        BY:  JOSEPH MORATH, ESQ.
                          1000 Liberty Building
17                        Buffalo, NY 14202

18  For the Defendant:   U.S. ATTORNEY'S OFFICE
                          BY:  MARY PAT FLEMING, ESQ.
19                             ADAM KHALIL, ESQ.
                          138 Delaware Avenue
20                        Buffalo, NY 14202

21  Court Reporter:      MEGAN E. PELKA, RPR
                          Robert H. Jackson Courthouse
22                        2 Niagara Square
                          Buffalo, NY 14202
23

24

25

**I N D E X**

WITNESSES                                                        PAGE

PLAINTIFF'S

LORETTA GREASLEY
        Direct Examination by Mr. Morath                          40
        Cross-Examination by Ms. Fleming                          84
        Redirect Examination by Mr. Morath                       113
KEVIN HENNESSY
        Direct Examination by Mr. Morath                         116
        Cross-Examination by Mr. Khalil                          145
        Redirect Examination by Mr. Morath                       169

**E X H I B I T S**

JOINT

        Exhibits 7, 8, 9, 22, 24, 27, 29, 30, 31, 32, 33,
                 34, 35, 36, 37, 38, 39, 44, 45, 47, 47A,
                 47B, 47C, 48, 49, 50, 51, 52, 53, 54, 55,
                 56, 57, 58                                       40

10:35AM

10:39AM
10:40AM
10:40AM
10:41AM

| | | |
|---|---|---|
| 08:54AM | 1 | THE CLERK:  Civil action 2015-642A.  Greasley v. |
| 09:28AM | 2 | United States of America.  Bench trial.  Counsel, please state |
| 09:28AM | 3 | your name and the party you represent for the record. |
| 09:28AM | 4 | MR. MORATH:  Joseph Morath for the plaintiff, Loretta |
| 09:29AM | 5 | Greasley. |
| 09:29AM | 6 | MS. FLEMING:  Mary Pat Fleming on behalf of the |
| 09:29AM | 7 | defendant. |
| 09:29AM | 8 | THE COURT:  All right. |
| 09:29AM | 9 | MR. KHALIL:  Adam Khalil on behalf of the defendant. |
| 09:29AM | 10 | THE COURT:  What is your name, sir? |
| 09:29AM | 11 | MR. KHALIL:  Adam Khalil. |
| 09:29AM | 12 | THE COURT:  Are you involved in this case? |
| 09:29AM | 13 | MR. KHALIL:  Yes, Your Honor.  I appeared for a |
| 09:29AM | 14 | motion to strike with Ms. Fleming. |
| 09:29AM | 15 | THE COURT:  All right.  Are we all set?  Let's go. |
| 09:29AM | 16 | MR. MORATH:  Before we begin, I do believe there's a |
| 09:29AM | 17 | number of Joint Exhibits we agreed to stipulate into evidence. |
| 09:29AM | 18 | We could do that now. |
| 09:29AM | 19 | THE COURT:  Let's hear the openings first. |
| 09:29AM | 20 | MR. MORATH:  Okay.  May I begin, Your Honor? |
| 09:29AM | 21 | Good morning, Your Honor.  As you certainly know, |
| 09:29AM | 22 | there are rules that apply to almost everything we do in our |
| 09:30AM | 23 | lives.  And not surprisingly, when someone else's health and |
| 09:30AM | 24 | someone else's safety is in your hands, those doctors, those |
| 09:30AM | 25 | nurses, those caregivers are required to follow a lot of |

09:30AM  1    rules.  And some of them are very simple and should go without

09:30AM  2    saying, like taking the necessary steps to prevent somebody

09:30AM  3    from being injured and taking the appropriate steps to treat

09:30AM  4    somebody who is injured.  These rules, you will learn, apply

09:30AM  5    to hospitals.  They apply to nursing homes.  It doesn't matter

09:30AM  6    the level of care.  There are basic, simple common sense

09:30AM  7    rules.

09:30AM  8         For example, if you are caring for a person who is at

09:30AM  9    a high risk for falling and you fail to put a proper falls

09:30AM  10   protection plan in place, you are responsible if that person

09:30AM  11   falls and is injured.  Likewise, when a person does fall,

09:30AM  12   anyone examining that person, they're required to provide a

09:30AM  13   certain level of care to both diagnose an injury and to take

09:31AM  14   necessary steps to prevent further injury.  If that's not done

09:31AM  15   properly, the person failed to take those steps is

09:31AM  16   responsible.  These are two very simple, common sense rules

09:31AM  17   that I think we can all agree upon.

09:31AM  18        Let me tell you the story of what happened in this

09:31AM  19   case, what you will learn from the witnesses who take that

09:31AM  20   witness stand and from the other evidence we will present

09:31AM  21   throughout the course of this trial.  And to do that, we need

09:31AM  22   to go back a couple of years.

09:31AM  23        So, typically, let me take you to September 4th, the

09:31AM  24   year 2013.  On September 4th, one of the defendant's nurses

09:31AM  25   visited a veteran at his home.  And part of the reason for

09:31AM  1  that visit was to determine if that veteran was appropriate

09:31AM  2  for a two-week stay at a respite care facility by the name of

09:31AM  3  Pine Lodge.

09:31AM  4       And during that examination, the nurse found that the

09:31AM  5  veteran ambulated without assistance.  He was able to fully

09:31AM  6  bear his own weight.  In simple terms, he could walk and he

09:32AM  7  could stand under his own power.  He was independent in almost

09:32AM  8  all of his daily activities of living.  He could dress

09:32AM  9  himself.  He could feed himself.  He could go to the bathroom

09:32AM  10  himself.  He could get in and out of bed or a chair by

09:32AM  11  himself; all under his own power and his own strength.

09:32AM  12       Furthermore, you will learn that while he was at

09:32AM  13  home, the veteran did not take any prescription pain

09:32AM  14  medication at all and never required the use of supplemental

09:32AM  15  oxygen.  During that examination, the veteran was determined

09:32AM  16  to be medically stable and he was cleared for admission into

09:32AM  17  Pine Lodge.

09:32AM  18       Now, we know the next day, on September 5th of 2016,

09:32AM  19  the veteran slid down some carpeted stairway in the back hall.

09:32AM  20  Now, his son and daughter and his wife --

09:32AM  21       THE COURT:  You said 2013?

09:32AM  22       MR. MORATH:  2013.

09:32AM  23       THE COURT:  The first date you gave was 2013.  Now

09:32AM  24  you're talking 2016?

09:32AM  25       MR. MORATH:  I may have misspoke, Your Honor.  2013.

09:33AM    1   I apologize.

09:33AM    2        THE COURT:  Please.

09:33AM    3        MR. MORATH:  Slip of the tongue.  Apologize.

09:33AM    4        THE COURT:  All right.

09:33AM    5        MR. MORATH:  September 5th, 2013, the veteran slipped

09:33AM    6   down some stairs in his back hall.

09:33AM    7        THE COURT:  '13 or '16?

09:33AM    8        MR. MORATH:  '13, Judge.  It's all 2013 we're talking

09:33AM    9   about.

09:33AM   10        THE COURT:  Everything is 2013?

09:33AM   11        MR. MORATH:  Right now, it's all 2013, yes.

09:33AM   12        THE COURT:  You just mentioned 2016.

09:33AM   13        MR. MORATH:  That was what the slip of the tongue

09:33AM   14   was, Judge, because September 6th was the next day I'm talking

09:33AM   15   about and I think I simply misspoke.  I apologize.

09:33AM   16        THE COURT:  All right.

09:33AM   17        MR. MORATH:  The veteran had no signs or symptoms of

09:33AM   18   injury when he slipped down the stairs on September 5th.  In

09:33AM   19   fact, the very next day, on September 6th, 2013, he was again

09:33AM   20   seen at home by one of the defendant's nurses.  The veteran's

09:33AM   21   son and the veteran's daughter told him about the slip on the

09:33AM   22   stairs.  The nurse looked him over.  The nurse had him stand,

09:33AM   23   had him stretch, had him sit up, had him sit down.  And he

09:33AM   24   deemed that the veteran was not injured at all in that slip

09:34AM   25   down the stairs.

09:34AM  1          Three days later, on the morning of September 9th,

09:34AM  2    2013, the veteran arrived at Pine Lodge for what was supposed

09:34AM  3    to be a two-week respite stay.  He arrived in no acute

09:34AM  4    distress and he walked through the doors of Pine Lodge under

09:34AM  5    his own power.  The veteran was admitted at 10:49 on

09:34AM  6    September 9th of 2013.  The initial physical exam, from that

09:34AM  7    day at 12:03, states no history of fracture with any recent

09:34AM  8    fall, no imaging consults were ordered, no precautions were

09:34AM  9    taken for any suspected fracture or any other serious injury.

09:34AM  10         The records will show that at the time of his

09:34AM  11   admission to Pine Lodge, the veteran was still able to walk

09:34AM  12   75 feet with a walker, was independent with bed mobility, was

09:34AM  13   independent with transfers.  Some of the earliest records from

09:34AM  14   that day, at the time of admission, reflect a pain assessment

09:35AM  15   of zero.  No pain.

09:35AM  16         When asked directly during his admission physical if

09:35AM  17   he was having any pain by Jamie Kowalski, the veteran said he

09:35AM  18   was not.  The records reflect that he had no signs and

09:35AM  19   symptoms of pain at that examination.  Accordingly, Pine Lodge

09:35AM  20   deemed that he was medically stable for admission and the

09:35AM  21   medical director signed off on his admission to the facility.

09:35AM  22         But later that day, Pine Lodge staff also conducted a

09:35AM  23   consult for physical therapy and at that point, the records do

09:35AM  24   note that the veteran was complaining of back pain.  However,

09:35AM  25   those same records also note that the veteran was still able

09:35AM 1  to walk 75 feet with a rolling walker.  He was still

09:35AM 2  independent with transfers and absolutely nothing was done to

09:35AM 3  evaluate the cause of back pain at the time.  He was simply

09:35AM 4  provided with non-prescription-strength Tylenol.

09:36AM 5       The evidence will show, Your Honor, that at the time

09:36AM 6  of admission, the veteran had some waxing and waning back

09:36AM 7  pain.  It came and went.  But the veteran was able to move all

09:36AM 8  his limbs freely, get in and out of bed and still get in and

09:36AM 9  out of a chair.  The evidence will show the veteran was, by no

09:36AM 10  stretch of the imagination, in any acute pain when he was

09:36AM 11  admitted.

09:36AM 12       Now, on September 10th, Pine Lodge conducted what was

09:36AM 13  called a falls risk assessment, which revealed that the

09:36AM 14  veteran was at high risk for falls and that fall prevention

09:36AM 15  interventions had to be instituted.  At that same time, the

09:36AM 16  veteran was medicated with benzodiazepine and opiates.  Two

09:36AM 17  classes of drugs, you will learn, that are known to cause

09:36AM 18  adverse effects on the central nervous systems, including

09:36AM 19  dizziness and confusion.  The veteran was not on either one of

09:36AM 20  those medications before being admitted to Pine Lodge.

09:36AM 21       You will learn that those medications are known to be

09:37AM 22  very high-risk medication for elderly people.  In fact,

09:37AM 23  they're both what are called consensus list drugs, which are

09:37AM 24  to be avoided at all cost in the elderly.

09:37AM 25       Indeed, you will learn that the government's own

09:37AM   1   expert will tell us that gen -- that those medications are

09:37AM   2   generally not to be given to the elderly because they increase

09:37AM   3   the risk for falling.

09:37AM   4       Less than 15 hours after being admitted to Pine

09:37AM   5   Lodge, the veteran fell for the first time in his room.  A

09:37AM   6   nurse heard the bed alarm, but by the time she reached his

09:37AM   7   room halfway down the hall, it was too late.  She found him

09:37AM   8   lying on the floor and noted a long red area on the back of

09:37AM   9   his upper arm.

09:37AM   10       After the fall, the nurse assessed the veteran's

09:37AM   11   injuries.  She put hip protectors on him and transferred him

09:37AM   12   back to bed.  Even at that time, the veteran was still able to

09:37AM   13   move to the sitting position on his own and still able to move

09:37AM   14   all his extremities without any pain.  According to their own

09:38AM   15   records, the veteran slept the rest of that night with no

09:38AM   16   complaints of back pain.

09:38AM   17       By 10:51 the follow morning, the nurse noted that the

09:38AM   18   veteran now had complaints of increased low back pain with

09:38AM   19   moaning with any movement and was now complaining of pain upon

09:38AM   20   palpation of his low back.  Staff reported much difficulty

09:38AM   21   with transferring him due to pain at the time.

09:38AM   22       Through the afternoon of September 10th, staff

09:38AM   23   continued to medicate the veteran with Ativan and Lortab, now

09:38AM   24   a powerful narcotic pain medication.  That night, at 2259, it

09:38AM   25   was noted that the veteran refused all three meals and was

09:38AM   1   incontinent.  He continued to experience hypertension, had a

09:38AM   2   rapid heart rate and rapid respirations.  His blood oxygen

09:38AM   3   saturation began to deteriorate and he was switched to

09:38AM   4   hydrocodone, an even stronger pain medication.  And the

09:38AM   5   records will show that now, for the first time, he required

09:39AM   6   the use of supplemental oxygen.

09:39AM   7           You will learn that the next day, on September 11th,

09:39AM   8   at 1:30, the veteran was again noted to be moaning and

09:39AM   9   grimacing with pain.

09:39AM  10           THE COURT:  Is this a.m. or p.m.?

09:39AM  11           MR. MORATH:  This is -- 1330 is p.m., Your Honor.

09:39AM  12           In addition, for the first time, presence of purple

09:39AM  13   discoloration was noted on his toes.  The record, at that

09:39AM  14   time, reflects that the veteran was lethargic, had diminished

09:39AM  15   breath sounds and had visible bruises.  The morning care staff

09:39AM  16   noted that the veteran was grimacing and moaning in pain all

09:39AM  17   day.  Narcotics were repeatedly given, but nonetheless, he

09:39AM  18   continued to moan and said his back hurt for the remainder of

09:39AM  19   that day.

09:39AM  20           Because of these worsening back complaints, at 1434

09:39AM  21   on September 11th, a nurse ordered a four-view x-ray of the

09:40AM  22   veteran's lumbar spine.  We will learn that the radiologist

09:40AM  23   read that x-ray as showing no evidence of a fracture and no

09:40AM  24   other signs of traumatic injury.  The radiologist will tell us

09:40AM  25   that the vertebral spaces were normal, with the exception of

09:40AM  1  an old surgery.  The curvature of his spine was normal.  There

09:40AM  2  was no retropulsion, which means none of the vertebrae were

09:40AM  3  slipped out of place.  Other than degenerative disc disease

09:40AM  4  and the prior surgery, the radiologist said it was a normal

09:40AM  5  study.

09:40AM  6          That x-ray, Your Honor, you will learn, was ordered

09:40AM  7  because of back pain; yet, the technician ordered that a

09:40AM  8  pelvis x-ray be added simply because of the level of the

09:40AM  9  veteran's back pain.  Now, the radiologist read the first

09:40AM  10  pelvic x-ray showing a fracture.  However, a second x-ray was

09:40AM  11  taken that did not show a fracture.  It was because of these

09:41AM  12  conflicting hip x-rays that the veteran was transferred to the

09:41AM  13  VA Hospital for a CT scan of his hip.

09:41AM  14          By the time the veteran was transferred to the

09:41AM  15  emergency room, he was unable to get out of bed without help.

09:41AM  16  He was unable to walk and now unable to sit in a chair without

09:41AM  17  pain.  Staff at Pine Lodge will testify that they told the ER

09:41AM  18  that the veteran's chief complaint was low back pain and that

09:41AM  19  the veteran had been experiencing back pain for days.

09:41AM  20          The ER will testify, on the other hand, their

09:41AM  21  staff -- that they did not know anything about the lower back

09:41AM  22  pain or that he had ongoing complaints of back pain.  They

09:41AM  23  were under the impression that the chief complaint was hip

09:41AM  24  pain.

09:41AM  25          And you will learn that this is in spite of the fact

09:41AM  1   that the veteran never complained of hip pain.  But as a

09:41AM  2   result, the ER focused solely on the veteran's hip.  According

09:41AM  3   to the nurse's report, the only thing that was done to

09:41AM  4   evaluate the veteran's back at the hospital was to check for

09:42AM  5   tenderness or deformity by palpating or pressing on his lower

09:42AM  6   back and nothing was found.  Based on that examination and the

09:42AM  7   negative CT of the hip, the veteran was cleared back to Pine

09:42AM  8   Lodge.

09:42AM  9        Now, when Rural Metro arrived at the emergency room,

09:42AM  10  the paramedics, you will see from their records, were very

09:42AM  11  concerned that the veteran was not stable enough for transport

09:42AM  12  back to Pine Lodge.  At the emergency room's insistence, the

09:42AM  13  veteran was transported 35 miles back to Pine Lodge, where he

09:42AM  14  arrived at 03, still groaning in pain.

09:42AM  15       When he returned to the Pine Lodge from the ER, staff

09:42AM  16  put the veteran back in the very same room that he was in

09:42AM  17  before he fell, down the hall and out of the view of the

09:42AM  18  nursing station.  They again immediately give him oxycodone,

09:42AM  19  another stronger narcotic.  You will learn that no additional

09:42AM  20  protections were put in place.  The veteran's room was not

09:43AM  21  changed. He had not had floor mats added.  He did not have a

09:43AM  22  lower bed added.  He did not have a curved mattress added.

09:43AM  23  They did not even put him back in the hip protectors.

09:43AM  24       And at 5:35 a.m. that morning, barely three hours

09:43AM  25  after being put back in his room, the veteran fell for a

09:43AM  1   second time.  Following the second fall, he had a large

09:43AM  2   hematoma and swelling on the left side of his forehead.  He

09:43AM  3   was alert and confused and complaining again of back pain.

09:43AM  4   They noted a red, bruised area on his shoulder blade from the

09:43AM  5   first fall.  He now required a Maxilift, a machine to lift him

09:43AM  6   and three people to get him back into bed.  Soon after this

09:43AM  7   fall, he was again transferred back to the ER.  By 0753 on

09:43AM  8   September 12th, the veteran was back in the ER with complaints

09:43AM  9   of 10 out of 10 back pain.

09:43AM  10       He had a large hematoma on his forehead and severe

09:44AM  11  complaints of neck pain.  And upon his admission, numerous

09:44AM  12  fractures were identified.  That admission began an

09:44AM  13  excruciating decline in his condition.  And by September 12th,

09:44AM  14  after two falls, the record will show that the veteran was now

09:44AM  15  completely unable to move secondary to pain -- secondary to

09:44AM  16  back pain.

09:44AM  17       By September 13th, at 1318, the records reflect that

09:44AM  18  the veteran was experiencing excruciating low back pain, so

09:44AM  19  much that he was unable to move his legs.  And there was a

09:44AM  20  concern about a possible spinal cord lesion.  By

09:44AM  21  September 16th, at 11:35, records show that the veteran

09:44AM  22  remained in severe pain involving his back and that a recent

09:44AM  23  MRI revealed acute compression deformities with edema,

09:44AM  24  swelling, which the neurologist described as a very painful

09:44AM  25  condition.

09:44AM  1          The notes reflect that the pain was so severe they

09:44AM  2   could not control it with the current pain medication.  A few

09:45AM  3   hours later, the records from September 16th state clearly

09:45AM  4   that the compression fractures at L-1 and L-3 were causing

09:45AM  5   acute uncontrollable pain.  The veteran was switched to the

09:45AM  6   powerful pain medication Dilaudid and Lidocaine patches were

09:45AM  7   applied directly to his lumbar spine.

09:45AM  8          At that time, the records tell us, the pain was so

09:45AM  9   severe that they couldn't even do an MRI of his hip because he

09:45AM  10  couldn't stand to be in the machine.  He was now completely

09:45AM  11  bedridden and unable to move because of the pain.  The records

09:45AM  12  will also show, by this point, that he developed two stage II

09:45AM  13  pressure ulcers from being immobile.

09:45AM  14         Soon after, the veteran's blood oxygen levels

09:45AM  15  desaturated even further and he was found to have a pulmonary

09:45AM  16  embolism.  By 1659 on the 16th of September, the records note

09:45AM  17  that the veteran was imminently dying from hypoxia related to

09:46AM  18  his pulmonary embolisms and in acute pain from the lumbar

09:46AM  19  compression fractures.

09:46AM  20         That same day, it was noted that, in addition to the

09:46AM  21  CT, x-rays of the shoulder and foot were obtained because of

09:46AM  22  the falls.  The x-ray of the shoulder revealed a suspected

09:46AM  23  non-displaced glenoid fracture.  The foot x-ray revealed

09:46AM  24  highly suspicious toe fractures.

09:46AM  25         Earlier the next morning, on September 17th, the

09:46AM    1    veteran who walked into Pine Lodge under his own power one

09:46AM    2    week earlier, was dead.  His death certificate notes that a

09:46AM    3    contributing cause of death was blunt force trauma from a

09:46AM    4    fall.  That veteran, that man, that father, that husband was

09:46AM    5    Michael Marranco.  His daughters, Loretta and Connie, are here

09:46AM    6    with us today.  Michael was seriously and permanently injured

09:46AM    7    and suffered in pain for eight days, ultimately dying in agony

09:46AM    8    because the defendants ignored some simple rules.

09:47AM    9           You will learn that after Michael's death,

09:47AM    10   Dr. Maller, the medical director at Pine Lodge, spoke with the

09:47AM    11   family and acknowledged the events at Pine Lodge and he

09:47AM    12   apologized on the facility's behalf.  And that is why we're

09:47AM    13   here today.  We're suing the defendant because the staff at

09:47AM    14   Pine Lodge and the emergency room chose to violate the rules.

09:47AM    15   We're suing the defendant because, as a result of their

09:47AM    16   negligence and malpractice, Michael Marranco suffered and died

09:47AM    17   unnecessarily.

09:47AM    18          But before we'd ask this Court to take a look and

09:47AM    19   hear Michael's case, we had to determine a few things

09:47AM    20   ourselves, Your Honor.  The first thing we had to determine,

09:47AM    21   was Pine Lodge negligent for allowing Michael to fall twice in

09:47AM    22   less than three days?  We had to determine if the fall

09:47AM    23   protection plan that the staff at Pine Lodge put in place was

09:47AM    24   appropriate.

09:47AM    25          Well, how did we decide that?  Well, we retained an

09:47AM  1   expert in the field.  And you will hear from Mr. Mark Levine.

09:47AM  2   Mr. Levine has been a licensing nursing home administrator for

09:48AM  3   nearly 30 years and has a broad range of knowledge and

09:48AM  4   experience with both state and federal nursing homes, short

09:48AM  5   and long-term care facilities and every facility across the

09:48AM  6   continuum of care.  He has extensive experience in managing

09:48AM  7   facilities that offer multiple levels of care, which is very

09:48AM  8   important in this case.

09:48AM  9        He served as an administrator for a 120-bed nursing

09:48AM  10  home, which included a subacute care facility.  He has been

09:48AM  11  the CEO of numerous senior care organizations responsible for

09:48AM  12  over 600 elderly people and he's participated and managed full

09:48AM  13  back-to-back compliance initiatives and federal

09:48AM  14  recertification surveys for newly found facilities.

09:48AM  15       So, Mr. Levine, he reviewed all of the fall

09:48AM  16  protection plans.  He reviewed the process that Pine Lodge

09:48AM  17  used to evaluate veterans upon admission.  He reviewed the

09:48AM  18  admission criteria and he reviewed the specific steps that

09:49AM  19  were taken to evaluate and care for Mr. Marranco.

09:49AM  20       And what we discovered and what you will learn

09:49AM  21  throughout the course of the trial, is that there were

09:49AM  22  numerous errors made by the facility at the very time of

09:49AM  23  admission that affected the ultimate level of care that

09:49AM  24  Mr. Marranco received.

09:49AM  25       In addition, you will learn that the original fall

09:49AM    1    protection plan was minimal at best and did not take into

09:49AM    2    account at all the recent fall that Mr. Marranco had at home,

09:49AM    3    the new medications that he was on that were known to increase

09:49AM    4    dizziness and risk of falls, the fact that he was now being

09:49AM    5    catheterized for the first time and the fact that he was now

09:49AM    6    in a new, unfamiliar environment.  It failed to consider that

09:49AM    7    he was experiencing breakthrough pain and it failed to

09:49AM    8    consider the level of his dementia.

09:49AM    9         You will see it relied on too many passive

09:49AM   10    protections, such as a light, without even considering whether

09:50AM   11    a resident with dementia could properly understand or utilize

09:50AM   12    such a device.  It failed to contain some of the most commonly

09:50AM   13    available and simplest fall protections available.

09:50AM   14         Mr. Levine will also explain that the staff failed to

09:50AM   15    determine what was causing Mr. Marranco's agitated and

09:50AM   16    confused state in the first place; anything from hunger,

09:50AM   17    confusion, fear, infections require attention.  Simply

09:50AM   18    prescribing additional drugs and additional narcotics without

09:50AM   19    a detailed assessment as to what's going on was improper.

09:50AM   20         With respect to the fall protection plan put in place

09:50AM   21    after Michael returned from the ER, Judge, you will learn that

09:50AM   22    one is a no-brainer.  The staff at Pine Lodge did not change a

09:50AM   23    single thing.  Even after the fall at home, even after the

09:50AM   24    first fall at Pine Lodge, the evidence will show that when he

09:50AM   25    returned from the ER at 3 o'clock in the morning, not a single

09:51AM  1  additional precaution was added to his plan.

09:51AM  2          Contrary to the standard of care that requires the

09:51AM  3  intensification of a fall plan, once it proves unsuccessful,

09:51AM  4  you will see that nothing additional was done to prevent that

09:51AM  5  second fall.  It's really that simple.  You will find out that

09:51AM  6  even the defendant's own expert has already testified that

09:51AM  7  more fall protections were indicated when he returned from the

09:51AM  8  ER.  They were indicated, but they were not put in place.

09:51AM  9          Once we determined, through our investigation, that

09:51AM  10  the defendant was 100 percent responsible for the falls, we

09:51AM  11  had to, of course, decide on our own, was he injured in these

09:51AM  12  falls?  And after you see and hear the proof, Your Honor, I

09:51AM  13  think you will agree that the answer to the question is

09:51AM  14  probably the simplest one of all.  Of course he was injured

09:51AM  15  when he fell.

09:51AM  16          The first step we had to determine, the first thing

09:51AM  17  we had to look at, Your Honor, was what injury, if any, did

09:51AM  18  Michael Marranco have when he arrived at Pine Lodge?  We know

09:52AM  19  he slipped on some stairs on September 5th.  And we needed to

09:52AM  20  figure out, on our own, was there a serious injury and were

09:52AM  21  there any problems because of it?

09:52AM  22          Now, to do that, you will see we need to look no

09:52AM  23  further than the defendant's very own records and the

09:52AM  24  testimony of their own expert.  And what we discovered and

09:52AM  25  what you will learn throughout the course of this trial, is

09:52AM  1   that Mr. Marranco had no serious injury as a result of the

09:52AM  2   slip down the stairs.  When you hear from Paul and Loretta,

09:52AM  3   you will discover that the day after that fall Mr. Marranco

09:52AM  4   was seen by a nurse on the 6th.  They checked him out

09:52AM  5   completely and made no mention of injury.  Of course, Paul and

09:52AM  6   Loretta both asked their father repeatedly over the course of

09:52AM  7   the next four days -- they saw him every day -- if he was

09:52AM  8   having any problems, any pain, any injuries and their father

09:52AM  9   assured them that he was not.

09:52AM  10       Of course, you're also going to see the evidence that

09:52AM  11  he walked into Pine Lodge four days after the fall on his own

09:53AM  12  with no pain medications, that the initial assessment of pain

09:53AM  13  was zero and that no signs and symptoms were appreciated

09:53AM  14  during the exam.

09:53AM  15       Now, on a subsequent initial pain assessment note by

09:53AM  16  Pamela Stadler, it noted Mr. Marranco was experiencing mild

09:53AM  17  back pain.  Mild.  Far from the pain you're going to see

09:53AM  18  Mr. Marranco experienced after the two falls at Pine Lodge.

09:53AM  19  Even at that time, the records will clearly show, with the

09:53AM  20  waxing and waning pain, he was able to ambulate and still

09:53AM  21  independent with mobility.

09:53AM  22       Now, it's true, you will see, there is one note; one

09:53AM  23  note at the time of admission, a physical rehabilitation

09:53AM  24  consult that indicated, at that time, Mr. Marranco had 10 out

09:53AM  25  of 10 back pain and was complaining of back pain during

| | | |
|---|---|---|
| 09:53AM | 1 | transfer and when touched by staff.  So, yes, it would appear |
| 09:53AM | 2 | that on that particular exam, Mr. Marranco had some pain from |
| 09:54AM | 3 | the fall, but that pain clearly came and went, a fact proven |
| 09:54AM | 4 | by the defendant's own records.  We know that the next set of |
| 09:54AM | 5 | records you will see, he's back to zero pain.  We know that he |
| 09:54AM | 6 | was still medically stable, still able to walk, still able to |
| 09:54AM | 7 | move, still able to get in and out of bed and certainly not |
| 09:54AM | 8 | bedridden in uncontrollable acute pain. |
| 09:54AM | 9 | What else will the defendant's own records show us at |
| 09:54AM | 10 | this trial?  On September 9th, before the two falls at Pine |
| 09:54AM | 11 | Lodge, he was able to ambulate on his own with supervision. |
| 09:54AM | 12 | After the second fall at Pine Lodge, he was bedridden and |
| 09:54AM | 13 | never walked again.  On September 9th, before the two falls at |
| 09:54AM | 14 | Pine Lodge, he was independent with bed mobility and |
| 09:54AM | 15 | transfers.  After the two falls at Pine Lodge, he was unable |
| 09:54AM | 16 | to move, secondary to pain. |
| 09:54AM | 17 | On September 9th, before the two falls at Pine Lodge, |
| 09:54AM | 18 | he was on over-the-counter aspirin.  After the two falls at |
| 09:55AM | 19 | Pine Lodge, his pain could not be controlled with Dilaudid or |
| 09:55AM | 20 | Lidocaine patches, two of the strongest narcotic pain |
| 09:55AM | 21 | medications available.  On September 9th, before the two falls |
| 09:55AM | 22 | at Pine Lodge, he was full weight bearing and walked himself |
| 09:55AM | 23 | into the facility.  After the two falls, he never stood again, |
| 09:55AM | 24 | let alone walked.  That is the proof that you will see; not |
| 09:55AM | 25 | from an expert, from the defendant's own records.  Black and |

GREASLEY v US -- 8/20/19 -- PROCEEDINGS

| | | |
|---|---|---|
| 09:55AM | 1 | white. |
| 09:55AM | 2 | But perhaps, more telling, Your Honor, is |
| 09:55AM | 3 | Dr. Naughton, the defendant's own expert, testified that he |
| 09:55AM | 4 | did not feel that Mr. Marranco was seriously injured in the |
| 09:55AM | 5 | fall at home.  In fact, he testified that the fall at home on |
| 09:55AM | 6 | the steps did not represent a significant decline in his |
| 09:55AM | 7 | function.  You will hear that he felt, "It did not have much |
| 09:55AM | 8 | impact on his condition" and that before his admission to Pine |
| 09:56AM | 9 | Lodge, Dr. Naughton testified that Mr. Marranco's pain waxed |
| 09:56AM | 10 | and waned, but the pain did not compromise his function, his |
| 09:56AM | 11 | social interaction or his capacity to eat and drink until |
| 09:56AM | 12 | after he was admitted to the hospital. |
| 09:56AM | 13 | In other words, you're going to hear that the |
| 09:56AM | 14 | defendant's own expert will testify that the pain did not |
| 09:56AM | 15 | compromise Mr. Marranco's abilities until he fell twice at |
| 09:56AM | 16 | Pine Lodge.  So, the proof will clearly show that Michael |
| 09:56AM | 17 | Marranco's sudden and rapid deterioration and the cause of |
| 09:56AM | 18 | those excruciating five days were clearly the result of the |
| 09:56AM | 19 | two falls at Pine Lodge and not a trivial fall at home more |
| 09:56AM | 20 | than a week earlier. |
| 09:56AM | 21 | The next thing that we had to determine, Your Honor, |
| 09:56AM | 22 | before we came here and before we made allegations directly |
| 09:56AM | 23 | against the emergency room staff, was did the emergency room |
| 09:57AM | 24 | meet the standard of care when they saw Mr. Marranco after the |
| 09:57AM | 25 | first fall at Pine Lodge.  And what we discovered and what you |

09:57AM   1   will learn is that they simply did not.

09:57AM   2         You will hear from Dr. Schurr, who has spent his

09:57AM   3   entire career in and around emergency rooms.  Since 2004, he

09:57AM   4   has been the attending physician at the Department of

09:57AM   5   Emergency Medicine at Memorial Hospital in Rhode Island, at

09:57AM   6   Yale New Haven Hospital and Brigham and Women's Hospital in

09:57AM   7   Faulkner.  He is a faculty member at the Medical Schools at

09:57AM   8   Brown, Yale and Harvard, where he teaches in the Department of

09:57AM   9   Emergency Medicine.

09:57AM   10        And he will testify that the treatment that

09:57AM   11  Mr. Marranco received at the Buffalo emergency room deviated

09:57AM   12  from the standards of care for several reasons.  First, the

09:57AM   13  evaluation on September 11th was incomplete.  It was limited.

09:57AM   14  It missed several differential diagnoses and did not even

09:57AM   15  assess Mr. Marranco's safety to be returned to Pine Lodge,

09:58AM   16  which was a respite facility, not a skilled nursing facility,

09:58AM   17  not even a nursing home.  They did not have 24-hour medical

09:58AM   18  care available.

09:58AM   19        What the proof will show is that the emergency

09:58AM   20  department's evaluation for a hip fracture itself was also not

09:58AM   21  consistent with the standard of care.  Most importantly, the

09:58AM   22  standard of care required that the source of Mr. Marranco's

09:58AM   23  pain be identified before he is sent back to Pine Lodge.  The

09:58AM   24  standard of care required that his sudden inability to walk

09:58AM   25  had to be identified before transporting him back to Pine

09:58AM    1   Lodge.

09:58AM    2         The examination performed at the emergency room did

09:58AM    3   neither of those.  It was inappropriately narrow and focused

09:58AM    4   solely on the hip, a body part that Mr. Marranco never even

09:58AM    5   complained was bothering him.  The staff merely did the tests

09:58AM    6   that they were told to do, or that they thought they were

09:58AM    7   supposed to do and closed the case out.

09:59AM    8         And Dr. Schurr will tell us that, short of admitting

09:59AM    9   Mr. Marranco to the hospital, the standard of care required,

09:59AM   10   at the very least, that he be admitted to a skilled nursing

09:59AM   11   facility with specific orders to evaluate his breathing, his

09:59AM   12   pain and his ambulation safety.

09:59AM   13         In fact, you will learn, Your Honor, that the

09:59AM   14   defendant's own physician's assistant agrees.  When you hear

09:59AM   15   from Sean Metz, he was the physician's assistant that did the

09:59AM   16   phone consult with the nurse on the 11th when Mr. Marranco was

09:59AM   17   in the emergency room.  And Physician Assistant Metz will tell

09:59AM   18   us that had he been aware that Mr. Marranco had persistent low

09:59AM   19   back complaints for three days, he would not have agreed to

09:59AM   20   send him back to Pine Lodge.

09:59AM   21         He will testify that if Mr. Marranco's records, in

09:59AM   22   fact, document ongoing complaints of back pain and not hip

09:59AM   23   pain, which we know they do, Mr. Marranco should have been

09:59AM   24   sent to neurology or rehabilitation before going back to Pine

10:00AM   25   Lodge.  That's the defendant's own treating physician.

10:00AM   1          Now, PA Metz will testify that when he spoke with

10:00AM   2   Nurse Kowalski from Pine Lodge, he was never told that the

10:00AM   3   issue was Michael's back or that there was even a lumbar x-ray

10:00AM   4   and that the chief complaint was back pain.  Not surprisingly,

10:00AM   5   when you hear from Nurse Kowalski, she (sic) will tell you the

10:00AM   6   opposite; that, of course, she (sic) told the emergency room

10:00AM   7   about the back pain and of course she (sic) told the emergency

10:00AM   8   room about the x-ray.

10:00AM   9          Now, clearly, both of those versions cannot be

10:00AM  10   correct.  If Mr. Marranco's properly admitted to the ER, he

10:00AM  11   doesn't go back to Pine Lodge and he doesn't suffer that

10:00AM  12   second fall.

10:00AM  13          And that brings us to the last thing that we had to

10:00AM  14   look at before presenting this case to you, Your Honor.  We

10:00AM  15   had to look and decide what is full and fair compensation for

10:00AM  16   Michael Marranco's pain and suffering and I touched on this

10:00AM  17   briefly, but if you'll allow me, I'd like to take a few more

10:00AM  18   minutes to share some more about what you will hear during

10:01AM  19   this trial about the pain and suffering Michael endured for

10:01AM  20   his final seven days.

10:01AM  21          Despite the seriousness of his injuries, the records

10:01AM  22   clearly establish that he was conscious, fully aware and able

10:01AM  23   and did, in fact, acknowledge pain up until a few hours before

10:01AM  24   his death on the 17th.  The first fall at Pine Lodge was at

10:01AM  25   0130 on the 10th.  He died at 0140 on the 17th.  The records

10:01AM  1   note that, despite excruciating pain, Mr. Marranco remained

10:01AM  2   alert, awake, his eyes were reflective of the light, he was

10:01AM  3   able to follow commands.  Even in the late hours of

10:01AM  4   September 16th, just before his death, he was still able to

10:01AM  5   open his eyes, respond to verbal commands and still expressed

10:01AM  6   his pain to the nurses.

10:01AM  7        And this, Your Honor, was at a time when his treating

10:02AM  8   physicians and the defendant's own records state the

10:02AM  9   following:  Unable to move secondary to back pain,

10:02AM  10  excruciating low back pain, unable to move his legs due to the

10:02AM  11  severity of pain, pain so severe that the pain is not relieved

10:02AM  12  with current pain medications, in acute pain from the lumbar

10:02AM  13  compression fractures.  And in the same notes, we see those

10:02AM  14  descriptions by the defendant's own doctors, we see the

10:02AM  15  defendant's own doctors acknowledging that he's awake and

10:02AM  16  alert and complaining.

10:02AM  17       The proof will not only show that the rapid decline

10:02AM  18  in Michael's health following the two falls at Pine Lodge, it

10:02AM  19  will clearly demonstrate the severe and excruciating nature of

10:02AM  20  the suffering he endured as a result of those two falls.

10:02AM  21       Perhaps one of the most important people you will

10:02AM  22  hear from, Your Honor, will be the first witness this morning,

10:02AM  23  Loretta.  She was with her father in the end.  She will

10:03AM  24  describe what she saw, how her father expressed his pain and

10:03AM  25  suffered.  His final words to her, honey, they hurt me bad.

10:03AM 1    But she will also tell you how her father was before he left

10:03AM 2    for Pine Lodge, even after that trivial fall at home.  And at

10:03AM 3    the end of this case, you will realize, based on the proof,

10:03AM 4    there is simply no comparison between his condition on

10:03AM 5    September 9th and when he was dying in a bed eight days later.

10:03AM 6         There is simply no other credible explanation for

10:03AM 7    that rapid decline, other than the two falls in three days at

10:03AM 8    Pine Lodge.  And at the end of this trial, Your Honor, after

10:03AM 9    you have heard all the evidence, I will come back and I will

10:03AM 10   ask for an amount of money that right now may sound high, but

10:03AM 11   by the time you hear the proof, I truly believe you will feel

10:03AM 12   that it is the proper amount for this type of case.  Thank

10:03AM 13   you.

10:04AM 14        MS. FLEMING:  Good morning.  May it please the Court,

10:04AM 15   Ms. Greasley and counsel.

10:04AM 16        Michal J. Marranco was 87 years old at the time of

10:04AM 17   his admission to Pine Lodge, which is a VA community living

10:04AM 18   center in Batavia, New York.  Pine Lodge is a secure dementia

10:04AM 19   unit where most of its residents remain long term, at least in

10:04AM 20   that same 2013.  Four of the beds were designated for respite

10:04AM 21   care, which provides families of veterans such as Mr. Marranco

10:04AM 22   with a break from caregiving.

10:04AM 23        Mr. Marranco was diagnosed with what is known as

10:04AM 24   frontal temporal dementia, which made him act impulsively at

10:05AM 25   times and increased his risk for falls.  He also had had a

| | | |
|---|---|---|
| 10:05AM | 1 | number of illnesses which required him to take 11 medications |
| 10:05AM | 2 | and also increased his risk for falls. |
| 10:05AM | 3 | Mr. Marranco had multiple falls before he was ever |
| 10:05AM | 4 | admitted to Pine Lodge.  The first known fall caused a |
| 10:05AM | 5 | compression fracture in Mr. Marranco's spine at L-3 and |
| 10:05AM | 6 | required him to undergo what is known as kyphoplasty surgery |
| 10:05AM | 7 | back in 2007.  The second known fall occurred in July of 2013, |
| 10:05AM | 8 | while Mr. Marranco was vacationing in Florida.  Mr. Marranco |
| 10:05AM | 9 | fell in the bathroom while showering.  He took the shower |
| 10:05AM | 10 | curtain down when he fell and he sustained an injury to his |
| 10:05AM | 11 | flank.  911 was called and Mr. Marranco was evaluated by |
| 10:06AM | 12 | emergency medical personnel.  He refused further treatment. |
| 10:06AM | 13 | You will hear testimony from one of his home health |
| 10:06AM | 14 | care providers, NP -- nurse practitioner Kevin Hennessy.  He |
| 10:06AM | 15 | will testify that he performed an annual physical of |
| 10:06AM | 16 | Mr. Marranco on July 25, 2013.  At that annual physical, Nurse |
| 10:06AM | 17 | Practitioner Hennessy learned, for the first time, that -- of |
| 10:06AM | 18 | the fall in Florida that had occurred three weeks earlier and |
| 10:06AM | 19 | involved the injury to Mr. Marranco's flank side. |
| 10:06AM | 20 | Mr. Marranco, at that time, three weeks later, still had |
| 10:06AM | 21 | bruising from the accident in that area. |
| 10:06AM | 22 | The third known fall occurred the day prior to |
| 10:06AM | 23 | admission at Pine Lodge and involved Mr. Marranco's back.  The |
| 10:06AM | 24 | fall occurred at the Marranco home on Linden Avenue in |
| 10:07AM | 25 | Buffalo, in the area of the side door.  After you enter the |

10:07AM   1    home, there are three to four steps that lead up to the

10:07AM   2    kitchen and then, there are steps on the left of the stairway

10:07AM   3    that lead down to the basement.  Mr. Marranco, at the time,

10:07AM   4    lived in the home with his wife, his daughter Loretta and her

10:07AM   5    husband at the time Mark and his son Paul.

10:07AM   6         While no family member witnessed the fall on the day

10:07AM   7    preceding his admission to Pine Lodge, the proof will show

10:07AM   8    that Mr. Marranco fell either walking up the stairs to the

10:07AM   9    kitchen and fell backward, landing with his back against the

10:07AM   10   side door, or he fell down the stairs, after exiting the

10:07AM   11   kitchen, landing in the same fashion.  Mr. Marranco was found

10:07AM   12   with his back against the door, leaning, squatting or sitting

10:07AM   13   against the door and may have had to remain in this position

10:07AM   14   for a period of time until either Paul or Loretta's husband

10:08AM   15   Mark was able to lift him.

10:08AM   16        Paul Marranco testified that Mr. -- that his father

10:08AM   17   had a mark on his back after this fall.  Mr. Marranco was not

10:08AM   18   taken for medical treatment after this fall, but his family

10:08AM   19   took him to Pine Lodge the next day.  Mr. Marranco was

10:08AM   20   admitted to Pine Lodge on September 9th, 2013.

10:08AM   21        You will hear testimony from Nurse Practitioner Jamie

10:08AM   22   Kowalski, who admitted Mr. Marranco.  When Nurse Practitioner

10:08AM   23   Kowalski evaluated Mr. Marranco for admission, he was told for

10:08AM   24   the very first time about the fall that Mr. Marranco had right

10:08AM   25   before admission.  NP Kowalski was told by Mr. Marranco's son

10:08AM    1    Paul that Mr. Marranco was unable to get himself up after the

10:08AM    2    fall and had to lay on the floor until he was picked up.

10:08AM    3         NP Kowalski was also told that Mr. Marranco had, at

10:09AM    4    that time, an increase in urinary incontinence, wheezing with

10:09AM    5    exertion and complained of back pain after the fall.  NP

10:09AM    6    Kowalski prescribed Tylenol or acetaminophen what is known as

10:09AM    7    PRN, or when needed, for Mr. Marranco's back pain and an

10:09AM    8    inhaler for the wheezing.

10:09AM    9         Mr. Marranco was admitted to Pine Lodge for a two-

10:09AM   10    week respite period.  Pine Lodge has 24/7 nursing care

10:09AM   11    available.  Pine Lodge has a medical doctor, a psychologist,

10:09AM   12    mid-level providers such as a nurse practitioner, registered

10:09AM   13    nurses, occupational therapist, physical therapist, dietician,

10:09AM   14    social worker, recreational therapist, as well as licensed

10:09AM   15    practical nurses and home health care aides.

10:09AM   16         While Pine Lodge does not have the capability to

10:09AM   17    provide all of the health care services a hospital can

10:09AM   18    provide, it has nursing staff on duty at all times.  Pine

10:10AM   19    Lodge is not an unskilled facility.  Pine Lodge also does not

10:10AM   20    have the requirement to write progress notes as frequently as

10:10AM   21    a hospital provider does.  Pine Lodge providers are not

10:10AM   22    required to write daily progress notes unless there is a

10:10AM   23    change in the resident's condition or other notable events.

10:10AM   24         While Mr. -- when Mr. Marranco was admitted to Pine

10:10AM   25    Lodge, he was evaluated for fall risk and was immediately

10:10AM   1   identified as being at high risk for falls.  He was placed on

10:10AM   2   a fall risk prevention program, which included his bed being

10:10AM   3   placed in the low position, use of a call light, bed and chair

10:10AM   4   alarms, conducting hourly surveys on rounds, monitoring him

10:10AM   5   closely and assisting him with ambulation as needed, among

10:10AM   6   other fall risk prevention measures.

10:10AM   7        Defendant's expert, Dr. Bruce Naughton, a Board-

10:10AM   8   Certified Internal Medicine physician with a certificate of

10:11AM   9   added qualification in geriatric medicine will opine that the

10:11AM  10   VA fall risk prevention program was reasonable and appropriate

10:11AM  11   and met the standard of care.

10:11AM  12        You will hear testimony today from registered nurses

10:11AM  13   Sherry Webster and Pamela Stadler, who evaluated Mr. Marranco

10:11AM  14   for fall risk and were treating Mr. Marranco on September 9th.

10:11AM  15   Nurse -- before any fall occurred at Pine Lodge.  Nurse

10:11AM  16   Stadler will testify that on September 9, 2013, Mr. Marranco

10:11AM  17   was guarding, grimacing and moaning as a result of pain in his

10:11AM  18   lower back and that the pain was new and began on September 8,

10:11AM  19   2013 because of a fall.

10:11AM  20        The VA medical records from September 9 will reveal

10:11AM  21   that Mr. Marranco was complaining of back pain, at times 10

10:11AM  22   out of 10 and he yelled out even when touched.  All of these

10:12AM  23   complaints occurred before any fall at Pine Lodge.

10:12AM  24        The proof will show that Mr. Marranco's condition of

10:12AM  25   frontal temporal dementia may not make him the best evaluator

10:12AM  1  of pain and that he was unable, on many occasions, to describe

10:12AM  2  his pain.  So, the notation 99 was often used by nursing staff

10:12AM  3  to reflect this inability.  The VA medical records will also

10:12AM  4  reveal that Mr. Marranco was unable to bear his weight and

10:12AM  5  required a two-person assist when transferring before any fall

10:12AM  6  occurred at Pine Lodge.

10:12AM  7          Unfortunately, Mr. Marranco had a fall on

10:12AM  8  September 10, 2013, which was witnessed by Registered Nurse

10:12AM  9  Barbara Crispell, who was the RN on duty during under the

10:12AM  10  overnight shift at Pine Lodge.  Mr. Marranco's bed alarm went

10:12AM  11  off and he fell on his right side on some urine.  After the

10:13AM  12  fall, Mr. Marranco asked Registered Nurse Crispell, why is

10:13AM  13  that man in my room?  Mr. Marranco, at the time, was in a four

10:13AM  14  bedroom at Pine Lodge.

10:13AM  15          RN Crispell will testify that she observed a long red

10:13AM  16  area on the back of his upper right arm, but no other injuries

10:13AM  17  were noted.  Mr. Marranco was able to move to a sitting

10:13AM  18  position independently and was able to move all extremities

10:13AM  19  without pain.  Hipsters were added to his fall risk prevention

10:13AM  20  measures.  After the fall, when Mr. Marranco continued to

10:13AM  21  complain of pain, lumbar spine and hip x-rays were done in an

10:13AM  22  attempt to determine the source of Mr. Marranco's pain.

10:13AM  23          You will watch the videotaped testimony of

10:13AM  24  Dr. Michele Cook, a former VA radiologist, regarding the hip

10:13AM  25  and lumbar spine x-rays.  No fracture was observed on the

10:13AM  1    lumbar spine x-rays and the hip x-rays were inconclusive as to

10:14AM  2    fracture -- as to whether or not Mr. Marranco had a fracture

10:14AM  3    in his left hip.  Dr. Cook observed that Mr. Marranco had

10:14AM  4    degenerative disc disease, which is chronic and long standing.

10:14AM  5          Because of these inconclusive hip x-rays, orthopedic

10:14AM  6    Physician's Assistant Sean Metz, who will be testifying at

10:14AM  7    this trial, was asked by Nurse Practitioner Kowalski whether

10:14AM  8    Mr. Marranco should be transferred to the Buffalo VAMC for

10:14AM  9    what is known as computerized tomography, also known as a CT

10:14AM  10   scan of the hip.  A CT scan is better than an x-ray to

10:14AM  11   determine a fracture.  PA Metz will -- Physician's Assistant

10:14AM  12   Metz will testify at this trial that he recommended a CT scan

10:14AM  13   be done of Mr. Marranco's left hip due to the conflicting

10:14AM  14   x-rays of the hip.

10:14AM  15         When Mr. Marranco arrived at the Buffalo VAMC

10:15AM  16   emergency room, he was treated by Nurse Practitioner Nancy

10:15AM  17   Arbeiter.  She will also be testifying at this trial.  Nurse

10:15AM  18   Practitioner Arbeiter will testify that she has an independent

10:15AM  19   recollection of Mr. Marranco.  She recalls that he was sitting

10:15AM  20   up, hungry and not acutely ill appearing.  His vital signs

10:15AM  21   were stable and when his back was palpated, she noted that he

10:15AM  22   had no bony tenderness or deformity.  Mr. Marranco made no

10:15AM  23   complaint of pain to Nurse Practitioner Arbeiter and

10:15AM  24   therefore, he was given no pain medications by her.

10:15AM  25         After the CT scan showed no hip fracture, the

10:15AM    1    decision was made by PA Metz and NP Arbeiter to send

10:15AM    2    Mr. Marranco back to Pine Lodge, where there was round-the-

10:15AM    3    clock nursing care available.

10:15AM    4         Unfortunately, the ambulance crew took two hours to

10:16AM    5    arrive.  The ambulance crew expressed some concern about

10:16AM    6    transporting Mr. Marranco and whether he was medically stable.

10:16AM    7    Ultimately, their concerns were addressed and the transport

10:16AM    8    commenced without incident.  The ambulance crew noted that

10:16AM    9    Mr. Marranco's vital signs returned closer to normal upon

10:16AM   10    arrival at Pine Lodge.  Mr. Marranco did not arrive back to

10:16AM   11    Pine Lodge until 3 a.m. on September 12th.

10:16AM   12         Both of the defendants experts, Dr. John Leddy, a

10:16AM   13    Board-Certified Internal Medicine physician with a

10:16AM   14    subspecialty in sports medicine and Dr. Bruce Naughton will

10:16AM   15    opine that the decision to transfer Mr. Marranco back to Pine

10:16AM   16    Lodge was reasonable and appropriate, since Mr. Marranco had

10:16AM   17    no hip fracture, was stable and was being transferred back to

10:16AM   18    a facility with 24/7 nursing care.

10:17AM   19         Registered Nurse Barbara Crispell was the nurse on

10:17AM   20    duty at the time Mr. Marranco arrived back at Pine Lodge.

10:17AM   21    Mr. Marranco was again determined to be at high risk for a

10:17AM   22    fall and all of the previous fall risk prevention measures

10:17AM   23    were put in place, including hipsters.  Unfortunately,

10:17AM   24    Mr. Marranco fell again two and a half hours later.

10:17AM   25    RN Crispell heard the bed alarm and by the time she arrived in

10:17AM  1    Mr. Marranco's room, he had already fallen and was found on

10:17AM  2    his right side.

10:17AM  3          He had bruises also on his left upper forehead.

10:17AM  4    Mr. Marranco had a small abrasion on his right upper armpit

10:17AM  5    and a small pinpoint area on his left upper leg, near his

10:17AM  6    groin.  The defendant's expert, Dr. Bruce Naughton will

10:17AM  7    concede that more could have been done by the VA to reduce

10:17AM  8    Mr. Marranco's fall risk when he returned to Pine Lodge.

10:17AM  9          The decision was then made to transfer Mr. Marranco

10:17AM  10   to the Buffalo VA Hospital on September 12, 2013.  Nobody

10:18AM  11   argues that the transfer back to the Buffalo VAMC was

10:18AM  12   inappropriate.  He was treated by a number of treating

10:18AM  13   physicians, including Dr. Sherry Withiam-Leitch, who is a

10:18AM  14   Board-Certified Neurologist and Chief of Neurology at the

10:18AM  15   Buffalo VAMC.  Dr. Withiam-Leitch was not disclosed as an

10:18AM  16   expert by the plaintiff and is testifying as a fact witness

10:18AM  17   only at this trial.

10:18AM  18         Dr. Withiam-Leitch was consulted to evaluate whether

10:18AM  19   Mr. Marranco has what is known as normal pressure

10:18AM  20   hydrocephalus, which is a swelling of the ventricles in the

10:18AM  21   brain.  She determined that he did not, after performing a

10:18AM  22   number of neurological tests and reviewing a CT of his head.

10:18AM  23   She will testify that she was able to test Mr. Marranco's gait

10:18AM  24   and that he was able to walk but he had many neurological

10:19AM  25   issues, which increased his risk for falling.

10:19AM   1          You will also hear testimony from Dr. Jaclyn

10:19AM   2   Schneider, who is a Board-Certified physician in Internal

10:19AM   3   Medicine and Hospice Palliative Care Medicine and the Chief of

10:19AM   4   Palliative Medicine at the Buffalo VAMC.  On September 16,

10:19AM   5   2013, Dr. Schneider treated Mr. Marranco for end-of-life

10:19AM   6   issues.  Again, Dr. Schneider was not disclosed as an expert

10:19AM   7   for the plaintiff and will be testifying as a fact witness

10:19AM   8   only.

10:19AM   9          Dr. Schneider will testify that she met with

10:19AM   10  Mr. Marranco's family on September 16, 2013 and who -- and the

10:19AM   11  family determined that the goals of any treatment should be

10:19AM   12  comfort-oriented.  Dr. Schneider ensured that Mr. Marranco was

10:19AM   13  as comfortable as possible.  Neither of these treating

10:19AM   14  physicians, Dr. Schneider or Dr. Witham-Leitch, formed any

10:19AM   15  opinion as to the cause of Mr. Marranco's injuries, including

10:20AM   16  the compression fracture and will testify to this.

10:20AM   17          You will hear testimony about a magnetic resonance

10:20AM   18  imaging, MRI, that was performed on September 14, 2013, which

10:20AM   19  showed a mild compression fracture in Mr. Marranco's spine at

10:20AM   20  L-1.  Plaintiff asserts that because Mr. Marranco's earlier

10:20AM   21  lumbar spine x-ray showed no fracture on September 11, 2013,

10:20AM   22  this compression fracture must have occurred as a result of

10:20AM   23  one of the two falls at Pine Lodge.  Expert testimony will not

10:20AM   24  support this conclusion, however.

10:20AM   25          Plaintiff's experts, Dr. Jeremiah Schurr and Mr. Mark

10:20AM  1  Levine, nursing home administrator, have been precluded from

10:20AM  2  testifying as to causation in this case.

10:20AM  3  Defendants' expert Dr. John Leddy will testify to the

10:20AM  4  following:  That a mild compression fracture may not be

10:21AM  5  visible on a plain x-ray, that a person can ambulate with a

10:21AM  6  mild compression fracture.  So, even though Mr. Marranco could

10:21AM  7  ambulate on admission, he could have had a compression

10:21AM  8  fracture at that time; that a person such as Mr. Marranco

10:21AM  9  could be asymptomatic and experience little or no pain with a

10:21AM  10  mild compression fracture; that a mild compression fracture

10:21AM  11  can be missed on palpation.

10:21AM  12  So, when NP Arbeiter palpated Mr. Marranco's back on

10:21AM  13  September 11, 2013, he could have had a mild compression

10:21AM  14  fracture.  And finally, it's impossible to determine exactly

10:21AM  15  when the L-1 compression fracture occurred, based upon the MRI

10:21AM  16  alone, particularly when Mr. Marranco suffered four falls

10:21AM  17  within days to several weeks of his admission to Pine Lodge.

10:21AM  18  Therefore, the plaintiff will not be able to establish the

10:22AM  19  cause of Mr. Marranco's L-1 compression fracture and his

10:22AM  20  lumbar spine pain.

10:22AM  21  Throughout the time Mr. Marranco was admitted to Pine

10:22AM  22  Lodge, into the Buffalo VAMC, Mr. Marranco's pain was treated

10:22AM  23  by medication, including Tylenol, Lortab, hydrocodone and

10:22AM  24  oxycodone.  You will hear about some of these medications

10:22AM  25  increasing Mr. Marranco's risk for falls.  However, you will

10:22AM  1    also hear testimony that Mr. Marranco's pain was reasonable

10:22AM  2    and -- that treating Mr. Marranco's pain was reasonable and

10:22AM  3    appropriate and that pain management was a paramount concern

10:22AM  4    for the VA providers.

10:22AM  5         While plaintiff alleges that Mr. Marranco suffered

10:22AM  6    two fractured toes and a fractured shoulder socket, x-rays

10:22AM  7    taken of Mr. Marranco's toes and shoulders do not confirm

10:22AM  8    these fractures.  And Mr. Marranco had few, if any, complaints

10:22AM  9    of pain regarding his toes and shoulder.

10:22AM  10        You will hear testimony from four experts;

10:22AM  11   plaintiff's experts Dr. Jeremiah Schurr and Mark Levine,

10:23AM  12   nursing home administrator, have been precluded from rendering

10:23AM  13   opinions on medical causation.  Mr. Levine is not a medical

10:23AM  14   doctor and has admitted that he does not have the professional

10:23AM  15   background to render any standard of care opinions as they

10:23AM  16   relate to the clinical care provided by the medical

10:23AM  17   professionals in this case.

10:23AM  18        You will also hear testimony from the defendant's

10:23AM  19   experts, Dr. Leddy and Dr. Naughton.  All of these experts

10:23AM  20   agree that preventing or reducing the number of falls in a

10:23AM  21   health care facility such as Pine Lodge is a challenge and

10:23AM  22   that falls can occur in the absence of negligence.

10:23AM  23        Finally, plaintiff's counsel has indicated that he

10:23AM  24   was calling a witness Dr. Mark Maller, who is the community

10:23AM  25   living center section chief and medical doctor.  Dr. Maller,

| 10:23AM | 1 | again, is being called as a fact witness on behalf of the |
| 10:23AM | 2 | plaintiff and not as an expert.  Dr. Maller did not |
| 10:24AM | 3 | participate directly in Mr. Marranco's care. |
| 10:24AM | 4 | Plaintiff's counsel has indicated that Dr. Maller may |
| 10:24AM | 5 | testify about a partially tape-recorded call made by Loretta |
| 10:24AM | 6 | Greasley and Paul Marranco to him after Mr. Marranco died. |
| 10:24AM | 7 | The proof will show that Dr. Maller's off-the-cuff comment was |
| 10:24AM | 8 | made without the benefit of a careful review of the entire |
| 10:24AM | 9 | medical record and was outside of his care and treatment. |
| 10:24AM | 10 | The proof will further show that the remark is not a |
| 10:24AM | 11 | reliable admission as to the cause of Mr. Marranco's mild |
| 10:24AM | 12 | compression fracture at L-1.  The proof will show that there |
| 10:24AM | 13 | was no deviation from the standard of care or legal duty -- or |
| 10:24AM | 14 | breach of legal duty.  Even if there was a deviation, the |
| 10:24AM | 15 | proof will show that this deviation or breach did not cause |
| 10:24AM | 16 | Mr. Marranco's injuries. |
| 10:24AM | 17 | While you will hear testimony from Dr. Schuur |
| 10:25AM | 18 | regarding alleged deviations from the standard of care on the |
| 10:25AM | 19 | part of the VA, he will not be testifying as to whether any of |
| 10:25AM | 20 | those deviations caused Mr. Marranco's injuries.  Simply |
| 10:25AM | 21 | because Mr. Marranco had pain in his lumbar spine and he |
| 10:25AM | 22 | compensated after his arrival at Pine Lodge does not mean that |
| 10:25AM | 23 | the VA's negligence caused Mr. Marranco's unfortunate downward |
| 10:25AM | 24 | spiral, Mr. Marranco's pre-existing degenerative joint or disc |
| 10:25AM | 25 | disease, which was chronic and not the result of any fall at |

| | | |
|---|---|---|
| 10:25AM | 1 | Pine Lodge and plaintiffs simply have no proof as to the cause |
| 10:25AM | 2 | of Mr. Marranco's underlying L-1 compression fracture. |
| 10:25AM | 3 | There will be proof that Mr. Marranco was in pain at |
| 10:25AM | 4 | times, sometimes severe, during the course of his stay at Pine |
| 10:25AM | 5 | Lodge and subsequent hospitalizations.  In fact, the proof |
| 10:25AM | 6 | will show that when Mr. Marranco arrived on September 9 at |
| 10:25AM | 7 | Pine Lodge and before he ever fell at Pine Lodge, he had |
| 10:26AM | 8 | complaints of pain as high as 10 out of 10, difficulty |
| 10:26AM | 9 | supporting his own weight and ambulating and difficulty |
| 10:26AM | 10 | breathing. |
| 10:26AM | 11 | Therefore, plaintiff will fail to prove to |
| 10:26AM | 12 | demonstrate how the defendant's actions caused or contributed |
| 10:26AM | 13 | to Mr. Marranco's pain and suffering.  As a result, at the |
| 10:26AM | 14 | close of the plaintiff's proof, we will ask for judgment in |
| 10:26AM | 15 | favor of the defendant.  Thank you, Your Honor. |
| 10:26AM | 16 | THE COURT:  All right.  We'll take a 10-minute recess |
| 10:26AM | 17 | and then we'll call the first witness.  Court will be in |
| 10:26AM | 18 | recess. |
| 10:26AM | 19 | THE CLERK:  All rise. |
| 10:37AM | 20 | (Brief recess) |
| 10:37AM | 21 | THE CLERK:  All rise.  You may be seated. |
| 10:39AM | 22 | THE COURT:  All right.  First witness, please. |
| 10:39AM | 23 | MR. MORATH:  Your Honor, may we put the stipulated |
| 10:39AM | 24 | exhibits in first? |
| 10:39AM | 25 | THE COURT:  All right. |

| 10:39AM | 1 | MR. MORATH:  This is all off of the Joint Exhibit |
|---|---|---|

10:39AM 1 MR. MORATH:  This is all off of the Joint Exhibit

10:39AM 2 list and the following exhibits counsel have agreed to

10:39AM 3 stipulate into evidence:  Exhibit Number 7, Exhibit Number

10:39AM 4 8 --

10:39AM 5 THE COURT:  These are Joint Exhibits?

10:39AM 6 MR. MORATH:  Correct, Judge.

10:39AM 7 THE COURT:  Just a minute.  All right.

10:39AM 8 MR. MORATH:  7, 8, 9, 22, 24, 27, 29, 30, 31, 32, 33,

10:40AM 9 34, 35, 36, 37, 38, 39, 44, 45, 47, 47A, 47B, 47C, 48 for the

10:40AM 10 following dates, 9/11/13, 9/12/13, 9/13/13.

10:40AM 11 THE COURT:  9/11.  What's the other one?

10:40AM 12 MR. MORATH:  The 11th, the 12th, 13th, the 14th and

10:40AM 13 the 15th of September, 2013.  Those are dates of films.

10:41AM 14 Exhibit 49, 50, 51, 52, 53, 54, 55, 56, 57 and 58.

10:41AM 15 THE COURT:  Just for the record, what are all these

10:41AM 16 exhibits?  What are they?

10:41AM 17 MR. MORATH:  Did you want to know --

10:41AM 18 THE COURT:  Well, just generally, just so I have

10:41AM 19 some --

10:41AM 20 MR. MORATH:  Mostly medical records, Your Honor.

10:41AM 21 THE COURT:  These are all medical records?  Okay.

10:42AM 22 MR. MORATH:  Mostly medical records and radiology

10:42AM 23 notes and reports.  The only thing that really is not medical

10:42AM 24 is the experts' CVs and --

10:42AM 25 THE COURT:  The what?

| 10:42AM | 1 | MR. MORATH:  The experts' resumes and then a couple |
| 10:42AM | 2 | procedure manuals from the facility, a pain management manual |
| 10:42AM | 3 | and a falls protection manual.  The rest of it is medical |
| 10:42AM | 4 | related. |
| 10:42AM | 5 | THE COURT:  All right. |
| 10:39AM | 6 | (Joint Exhibits 7, 8, 9, 22, 24, 27, 29, 30, 31, 32, 33, 34, |
| 10:40AM | 7 | 35, 36, 37, 38, 39, 44, 45, 47, 47A, 47B, 47C, 48 49, 50, 51, |
| 10:41AM | 8 | 52, 53, 54, 55, 56, 57 and 58 were received in evidence.) |
| 10:42AM | 9 | |
| 10:42AM | 10 | MR. MORATH:  The plaintiff calls Loretta Greasley. |
| 10:42AM | 11 | THE CLERK:  Please state your full name and spell |
| 10:42AM | 12 | your last name for the record. |
| 10:42AM | 13 | THE WITNESS:  Loretta Greasley, G-R-E-A-S-L-E-Y. |
| 10:43AM | 14 | THE CLERK:  And is Loretta, L-O-R-E-T-T-A? |
| 10:43AM | 15 | THE WITNESS:  Yes. |
| 10:43AM | 16 | THE CLERK:  Thank you. |
| 10:43AM | 17 | (The witness was sworn at 10:43 a.m.) |
| 10:43AM | 18 | MR. MORATH:  May I proceed, Your Honor? |
| 10:43AM | 19 | THE COURT:  Yes, please. |
| 10:43AM | 20 | |
| 10:43AM | 21 | DIRECT EXAMINATION |
| 10:43AM | 22 | |
| 10:43AM | 23 | BY MR. MORATH: |
| 10:43AM | 24 | Q.  Good morning, Loretta. |
| 10:43AM | 25 | A.  Good morning. |

GREASLEY -- MR. MORATH -- 8/20/19

41

| | | |
|---|---|---|
| 10:43AM | 1 | Q.  Loretta, was Michael Marranco your father? |
| 10:43AM | 2 | A.  Yes, he was. |
| 10:43AM | 3 | Q.  Can you tell us your father's full name? |
| 10:43AM | 4 | A.  Michael Jerry Marranco. |
| 10:43AM | 5 | Q.  And where was your father born? |
| 10:43AM | 6 | A.  Pittston, Pennsylvania. |
| 10:43AM | 7 | Q.  How old was he when he passed away? |
| 10:44AM | 8 | A.  Eighty-seven. |
| 10:44AM | 9 | Q.  My understanding, your father was in the Navy during |
| 10:44AM | 10 | World War II? |
| 10:44AM | 11 | A.  Yes, he was. |
| 10:44AM | 12 | Q.  Did he serve in combat? |
| 10:44AM | 13 | A.  Yes. |
| 10:44AM | 14 | Q.  What did he do after the military? |
| 10:44AM | 15 | A.  He worked at the Chevy plant in Buffalo. |
| 10:44AM | 16 | Q.  And how long did he work there? |
| 10:44AM | 17 | A.  Forty years. |
| 10:44AM | 18 | Q.  Is that where he retired from? |
| 10:44AM | 19 | A.  Yes. |
| 10:44AM | 20 | Q.  And when did he retire? |
| 10:44AM | 21 | A.  Many, many years ago.  I don't remember the date. |
| 10:44AM | 22 | Q.  Was it a significant period of time before -- |
| 10:44AM | 23 | A.  Way before. |
| 10:44AM | 24 | Q.  -- before September 2013? |
| 10:44AM | 25 | A.  Oh, yes. |

GREASLEY  --  MR. MORATH  --  8/20/19

| | | |
|---|---|---|
| 10:44AM | 1 | Q.  What's your mom's name? |
| 10:44AM | 2 | A.  Josephine Marranco. |
| 10:44AM | 3 | Q.  And how long were mom and dad married? |
| 10:44AM | 4 | A.  67, 68 years. |
| 10:44AM | 5 | Q.  Sixty-eight years? |
| 10:44AM | 6 | A.  Yes. |
| 10:44AM | 7 | Q.  How many children did they have? |
| 10:44AM | 8 | A.  Four. |
| 10:44AM | 9 | Q.  Can you tell us their names? |
| 10:44AM | 10 | A.  My oldest sister is Josie, Josephine Nila; my sister |
| 10:45AM | 11 | Connie, Concetta Grant; my brother Paul Marranco and myself. |
| 10:45AM | 12 | Q.  And Connie is here with us today? |
| 10:45AM | 13 | A.  Yes. |
| 10:45AM | 14 | Q.  Now, I understand your brother Paul was the original |
| 10:45AM | 15 | executor of your father's estate? |
| 10:45AM | 16 | A.  Yes, he was. |
| 10:45AM | 17 | Q.  And when did Paul pass away? |
| 10:45AM | 18 | A.  Last year, November 29th. |
| 10:45AM | 19 | Q.  At that point, you were substituted as executor of the |
| 10:45AM | 20 | estate? |
| 10:45AM | 21 | A.  Yes. |
| 10:45AM | 22 | Q.  In 2013, where did mom and dad live? |
| 10:45AM | 23 | A.  643 Linden. |
| 10:45AM | 24 | Q.  Is that in Buffalo? |
| 10:45AM | 25 | A.  Yes. |

GREASLEY  --  MR. MORATH  --  8/20/19

43

10:45AM   1   Q.  Did they own that home?

10:45AM   2   A.  Yes, that was our family home.

10:45AM   3   Q.  How long had they owned it?

10:45AM   4   A.  Probably about 50 years.

10:45AM   5   Q.  Is that the home you grew up in?

10:45AM   6   A.  Yes.

10:45AM   7   Q.  And Paul grew up there with you as well?

10:45AM   8   A.  Yes.

10:45AM   9   Q.  Were you living with your parents in 2013?

10:45AM   10   A.  Yes.

10:45AM   11   Q.  And how long had you been living with your parents?

10:46AM   12   A.  I moved there in 2007.

10:46AM   13   Q.  And who else lived there in 2007?

10:46AM   14   A.  My husband Mark, my brother Paul and my parents.

10:46AM   15   Q.  Okay.  Can you explain to us how the house was set up

10:46AM   16   where you lived?

10:46AM   17   A.  Sure.  It's a double.  And it was -- the first floor was

10:46AM   18   my parents, the basement apartment was my brother and I had

10:46AM   19   the apartment on the second floor with my husband.

10:46AM   20   Q.  And why did you move in in 2007?

10:46AM   21   A.  To help take care of them.

10:46AM   22   Q.  Your mom and dad?

10:46AM   23   A.  Yes.

10:46AM   24   Q.  Now, how involved were you in your dad's life from 2007

10:46AM   25   up to 2013?

10:46AM 1   A.  I was very involved, see him every day.  We lived in the

10:46AM 2   house.  We lived there.

10:46AM 3   Q.  You said you see him every day?

10:46AM 4   A.  Yes.  Every day.

10:46AM 5   Q.  And how was your relationship with your dad?

10:46AM 6   A.  It was wonderful.

10:46AM 7   Q.  And did the frequency of seeing your dad, did it change

10:47AM 8   at all?  Did you still see him every day in 2013?

10:47AM 9   A.  Yes.

10:47AM 10  Q.  And how was it that you'd see him every day?

10:47AM 11  A.  We lived in the same home, so I took care of, you know, I

10:47AM 12  went down there, made sure they ate their meals, their

10:47AM 13  medicine, just, you know, being we were very close.  We were

10:47AM 14  always together.

10:47AM 15  Q.  And how often did the family -- everybody was living in

10:47AM 16  the home all together?

10:47AM 17  A.  Well, we had dinner every night for sure.  That was

10:47AM 18  something that we took pride in, my brother, myself and my

10:47AM 19  mom and dad.

10:47AM 20  Q.  And based upon your observations of your dad and being

10:47AM 21  around your dad so often, was he open with you about the way

10:47AM 22  he was feeling?

10:47AM 23  A.  Oh, yeah.  He told me everything.

10:47AM 24  Q.  Could you tell, based on your familiarity with him, if

10:47AM 25  something was bothering him?

10:47AM   1   A.   Yes.

10:47AM   2   Q.   And how could you tell if something was bothering him?

10:47AM   3   A.   He would tell me.

10:47AM   4   Q.   In the event that he didn't tell you, was there anything

10:48AM   5   you could see that would let you know that something was

10:48AM   6   wrong?

10:48AM   7   A.   Yeah.  I mean, if he had a stomach ache, he would tell

10:48AM   8   me.  If he had a headache, I could tell.  You know, he would

10:48AM   9   be a little different, but he --

10:48AM  10   Q.   How could you tell on your own if there was something

10:48AM  11   bothering him?

10:48AM  12   A.   By his expression, the way he, you know, he sat on his

10:48AM  13   chair and sat at the kitchen table.

10:48AM  14   Q.   And if your dad was experiencing any pain, were you able

10:48AM  15   to tell?

10:48AM  16   A.   Yes.

10:48AM  17   Q.   How could you tell if he was experiencing pain?

10:48AM  18   A.   He would tell me if he was in pain and he would just, you

10:48AM  19   know -- if someone is in pain, you can tell by their facial

10:48AM  20   expression.

10:48AM  21   Q.   What type of facial expression would you see that let you

10:48AM  22   know something was going on with your dad?

10:48AM  23   A.   He would hold his head or, you know, be sad.

10:49AM  24   Q.   Were you familiar with his general medical conditions and

10:49AM  25   his general health in 2013?

10:49AM    1    A.   Yes.  I was the -- his main caregiver.

10:49AM    2    Q.   And what do you mean by that?

10:49AM    3    A.   I took him to all his doctors' appointments.  I was there

10:49AM    4    for his doctors' appointments.  I took care of his -- if he

10:49AM    5    needed batteries for his hearing aids, if he needed a

10:49AM    6    prescription.  I set up the prescriptions all the time, like

10:49AM    7    in a weekly container.

10:49AM    8    Q.   And how would you describe his general health in 2013?

10:49AM    9    A.   He was great.  He was fine.

10:49AM   10    Q.   What do you mean by that?

10:49AM   11    A.   He did all his chores.  He was -- he had a routine.  He

10:49AM   12    would throw out the garbage.  He was a happy man.  I mean, he

10:49AM   13    watched his sports.  He loved my mother.  He was -- nothing

10:49AM   14    changed.  He was just a happy man.

10:50AM   15    Q.   You said he had his routine.  Can you tell us a little

10:50AM   16    bit about your dad's daily routine in 2013?

10:50AM   17    A.   Sure.  He would -- well, from having breakfast, he would

10:50AM   18    eat by himself and lunch and dinner.  You know, he would --

10:50AM   19    he'd -- I'd probably get his breakfast, lunch and dinner and

10:50AM   20    he would eat them.  He didn't need help feeding himself or

10:50AM   21    anything like that.  He would watch TV.  He would watch his

10:50AM   22    game shows in the afternoon and at night he would watch

10:50AM   23    his -- anything that played sports, he loved to watch.

10:50AM   24         He had to vacuum every day.  My mother insisted on it.

10:50AM   25    And he also had a thing about the garbage.  He had to throw

| | | |
|---|---|---|
| 10:50AM | 1 | the garbage out.  He didn't want any garbage in the back |
| 10:50AM | 2 | hall.  So, that was his chore.  He'd take the garbage out |
| 10:50AM | 3 | every day. |
| 10:50AM | 4 | Q.  Your dad vacuumed the house every day? |
| 10:50AM | 5 | A.  My mother was obsessed with it. |
| 10:50AM | 6 | Q.  And you mentioned a little bit of his abilities, his |
| 10:51AM | 7 | physical abilities.  Were you familiar with the things that |
| 10:51AM | 8 | your dad could physically do in 2013? |
| 10:51AM | 9 | A.  Yes. |
| 10:51AM | 10 | Q.  Can you tell us some of the things he was able to do |
| 10:51AM | 11 | physically?  You mentioned the vacuuming.  What else could he |
| 10:51AM | 12 | do physically? |
| 10:51AM | 13 | A.  He took care of himself totally independently.  He was |
| 10:51AM | 14 | brushing his teeth, washing up every day, combing his hair, |
| 10:51AM | 15 | getting dressed and there wasn't much he couldn't do.  He did |
| 10:51AM | 16 | everything independently. |
| 10:51AM | 17 | Q.  Now, your father was diagnosed with dementia? |
| 10:51AM | 18 | A.  Yes. |
| 10:51AM | 19 | Q.  Do you remember when that was he was originally |
| 10:51AM | 20 | diagnosed? |
| 10:51AM | 21 | A.  No, I don't. |
| 10:51AM | 22 | Q.  And in the year 2013, did you observe any changes in his |
| 10:51AM | 23 | mental status, in his dementia? |
| 10:51AM | 24 | A.  He -- his mental -- his dementia was getting a little |
| 10:51AM | 25 | worse, but he was physically fine. |

10:52AM    1   Q.  So, the time period, let's say of 2013, you mentioned his

10:52AM    2   dementia was getting a little worse.  What, if any, changes

10:52AM    3   did you notice to his physical abilities in 2013?

10:52AM    4   A.  There weren't any.  He didn't have any.

10:52AM    5   Q.  Now, you mentioned you took your dad to the doctors?

10:52AM    6   A.  Yes.

10:52AM    7   Q.  And where did he go for his appointments in 2013?

10:52AM    8   A.  He went to the VA.

10:52AM    9   Q.  Do you know how long he had been going to the VA for his

10:52AM   10   medical care?

10:52AM   11   A.  Probably about five, six years.

10:52AM   12   Q.  For these five, six years, did he receive medical care

10:52AM   13   anywhere that you're aware of outside of the VA?

10:52AM   14   A.  No.  Once we started going to the VA, it was all we had.

10:52AM   15   Q.  And I understand that your dad also had some nurses and

10:52AM   16   perhaps others from the VA visit him at his home?

10:52AM   17   A.  Yes.

10:52AM   18   Q.  And how often did that occur?

10:53AM   19   A.  A couple times a month.

10:53AM   20   Q.  And can you tell us how that process worked?  Did he have

10:53AM   21   scheduled appointments?  Did he call?  How did you --

10:53AM   22   A.  He would schedule appointments.  We had -- yeah.  He had

10:53AM   23   like, a calendar that we put the doctors' appointments on.

10:53AM   24   And if we needed them for anything else, we would call.

10:53AM   25   Q.  So, they came a couple times a month, but if you needed

GREASLEY  --  MR. MORATH  --  8/20/19

49

10:53AM   1   something additional, you would call them?

10:53AM   2   A.   Yes.

10:53AM   3   Q.   And was there specific nurses that routinely came there?

10:53AM   4   A.   There were mainly just two that came.

10:53AM   5   Q.   And who were the two that mainly came?

10:53AM   6   A.   Kevin Hennessy and Theo -- I can't recall his last name.

10:53AM   7   Q.   Theo?

10:53AM   8   A.   Theo.

10:53AM   9   Q.   Were you there for the visits?

10:53AM  10   A.   Yes.  And if I couldn't be there, I was -- I tried to be

10:53AM  11   there for every one of them.  My brother and I would be

10:53AM  12   there.

10:53AM  13   Q.   And what types of things would they do at those visits?

10:54AM  14   A.   They would always take his blood pressure, make him walk

10:54AM  15   a little bit, have him bend over towards his toes, sit in a

10:54AM  16   chair, get up and down.

10:54AM  17   Q.   And that would be done at every visit that you were there

10:54AM  18   for?

10:54AM  19   A.   That's right.

10:54AM  20   Q.   And did your dad ever have one of those visits without

10:54AM  21   either you or your brother being present?

10:54AM  22   A.   Not of my knowledge, no.

10:54AM  23   Q.   I want to focus specifically on the few weeks, say three

10:54AM  24   weeks, leading up to your father's admission into Pine Lodge.

10:54AM  25   A.   Okay.

GREASLEY -- MR. MORATH -- 8/20/19

50

| | | |
|---|---|---|
| 10:54AM | 1 | Q.  Based on what you saw in the three weeks leading up to |
| 10:54AM | 2 | his admission, how would you describe his mobility? |
| 10:54AM | 3 | A.  He was fine.  He was active.  He was vacuuming.  He was, |
| 10:54AM | 4 | you know, socializing, loving my mom and he was just the |
| 10:54AM | 5 | same. |
| 10:54AM | 6 | Q.  How was his ability to walk? |
| 10:55AM | 7 | A.  He walked fine.  There was no problems. |
| 10:55AM | 8 | Q.  Did he have a chair or a couch that he watched his sports |
| 10:55AM | 9 | shows in? |
| 10:55AM | 10 | A.  He would sit at the kitchen table and he would watch it |
| 10:55AM | 11 | because the TV was closer in the kitchen than it would be in |
| 10:55AM | 12 | the living room. |
| 10:55AM | 13 | Q.  And in the three weeks leading up to his admission, did |
| 10:55AM | 14 | you observe any changes in his ability to get in and out of |
| 10:55AM | 15 | that kitchen chair? |
| 10:55AM | 16 | A.  No. |
| 10:55AM | 17 | Q.  Was your father able to go to the bathroom by himself? |
| 10:55AM | 18 | A.  Yes. |
| 10:55AM | 19 | Q.  And both physically able to get in and out and up and on |
| 10:55AM | 20 | the toilet by himself? |
| 10:55AM | 21 | A.  Yes. |
| 10:55AM | 22 | Q.  And the three weeks leading up to his admission to Pine |
| 10:55AM | 23 | Lodge, did you notice any changes in his ability to dress |
| 10:55AM | 24 | himself? |
| 10:55AM | 25 | A.  No. |

10:55AM   1   Q.   And could he get all of his clothes on alone?

10:55AM   2   A.   Yes.  He needed help with his socks that were tight and I

10:55AM   3   would help with his socks.

10:55AM   4   Q.   Other than his socks, did he need assistance?

10:55AM   5   A.   He -- only if we were going out, he had trouble with his

10:55AM   6   dress shoes, but his house slippers he would put on every day

10:56AM   7   by himself.

10:56AM   8   Q.   Did your dad use a walker?

10:56AM   9   A.   Only if we went on vacation, or like, long periods of

10:56AM   10  time and only because it had like, a little chair on it, so

10:56AM   11  if he got tired, he could sit.

10:56AM   12  Q.   Did he use a walker or a cane while he was in his home?

10:56AM   13  A.   No.  Never.

10:56AM   14  Q.   At any point in the three weeks leading up to respite,

10:56AM   15  did he suddenly start using a walker or a cane?

10:56AM   16  A.   Never.  No.

10:56AM   17  Q.   And his ability to carry out his daily routine, the daily

10:56AM   18  activities that you described earlier, did you notice any

10:56AM   19  changes with that in the three weeks leading up to his

10:56AM   20  admission into Pine Lodge?

10:56AM   21  A.   No, I did not.

10:56AM   22  Q.   Okay.  We heard a little bit this morning about a back

10:56AM   23  injury your father had way back in 2007.  Do you recall your

10:57AM   24  dad having an injury to his back in 2007?

10:57AM   25  A.   Yes.

10:57AM   1   Q.   Okay.  Tell me what you remember about that.

10:57AM   2   A.   I remember that he had to have like, a cement procedure

10:57AM   3   done where they just had a little incision and they put --

10:57AM   4   they said -- they called it cement at the time, but maybe

10:57AM   5   that's how they were explaining it to me, but that's what --

10:57AM   6   the procedure they did.

10:57AM   7   Q.   And do you remember why he needed that?

10:57AM   8   A.   Yes.  He fell in the front hall.

10:57AM   9   Q.   And you had already been living with mom and dad in 2007?

10:57AM   10   A.   Yes.

10:57AM   11   Q.   Did you live there from 2007 all the way to 2013?

10:57AM   12   A.   I think I moved away for -- I can't remember, honestly.

10:57AM   13   I moved away for a little bit.

10:57AM   14   Q.   And when was that?

10:57AM   15   A.   I don't remember the date.

10:57AM   16   Q.   And after your father's surgery in 2007, based on your

10:58AM   17   observations of him, did he have any problems from that

10:58AM   18   surgery by 2011, 2012?

10:58AM   19   A.   No.  Once he got -- he was healed from that surgery, he

10:58AM   20   was fine, walking to Kmart and doing his --

10:58AM   21   Q.   Did you say walking to Kmart?

10:58AM   22   A.   Yeah.  It was close.  It was just around the block.

10:58AM   23   Q.   So, based on your observations, once your dad recovered

10:58AM   24   from that surgery, did you see any additional limitations

10:58AM   25   because of it?

10:58AM  1   A.   No.

10:58AM  2            THE COURT:  What kind of surgery did he have?

10:58AM  3            MR. MORATH:  It's a kyphoplasty.  They basically put

10:58AM  4   a little bit of cement between two vertebral bodies that have

10:58AM  5   collapsed.

10:58AM  6            THE COURT:  Two what?

10:58AM  7            MR. MORATH:  Two vertebral bodies of the vertebrae of

10:58AM  8   the spine, the bones in your spine.

10:58AM  9            THE COURT:  This is spinal surgery?

10:58AM  10           MR. MORATH:  Well, it's not a spinal surgery.  It's

10:58AM  11  the -- it's not the spinal cord.  It's to the bones that

10:58AM  12  surround the spinal cord.  We have the vertebrae, then a disc,

10:58AM  13  then another vertebrae.  So, that's how your back is.

10:58AM  14           THE COURT:  All right.

10:59AM  15           MR. MORATH:  And they put some cement in between the

10:59AM  16  two bones.

10:59AM  17           THE COURT:  You don't call that spinal surgery?

10:59AM  18           MR. MORATH:  Well, it's not to the spinal cord.  I

10:59AM  19  just wanted to be clear, it wasn't to the cord.

10:59AM  20           THE COURT:  All right.  It was some type of back

10:59AM  21  surgery?

10:59AM  22           MR. MORATH:  Correct.

10:59AM  23           THE COURT:  All right.  That's fine.

10:59AM  24  BY MR. MORATH:

10:59AM  25  Q.   And as far as you know, did your father ever have to

10:59AM   1   return to a doctor to have anything additional done because

10:59AM   2   of that surgery?

10:59AM   3   A.   No.

10:59AM   4   Q.   And we heard about another fall your father had in the

10:59AM   5   shower in July of 2013?

10:59AM   6   A.   Yes.

10:59AM   7   Q.   Do you remember that?

10:59AM   8   A.   Yes, I do.

10:59AM   9   Q.   That was in Florida?

10:59AM  10   A.   Yes.

10:59AM  11   Q.   Can you tell us what you remember about that?

10:59AM  12   A.   Sorry.  We were on vacation, all of us.  There was

10:59AM  13   probably 15 of us on vacation and he was going to take a

10:59AM  14   shower.  And he said that he went to shut the, you know,

11:00AM  15   shower curtain and the shower curtain fell on him and he

11:00AM  16   slipped.

11:00AM  17   Q.   And were you in the -- was it a condo?

11:00AM  18   A.   It was a hotel room.  So, my hotel room was different

11:00AM  19   than his.  We were all in separate ones.  My parents had

11:00AM  20   their own, my sisters.

11:00AM  21   Q.   And what happened after that, you found out that he fell?

11:00AM  22   A.   My mother called for me.  We went down to help him.  And

11:00AM  23   I didn't want to hurt him, so we called the paramedics to

11:00AM  24   make sure he was okay and they picked him up and he was fine.

11:00AM  25   Q.   And who responded?  Was it an ambulance?

11:00AM    1    A.  It was paramedics.

11:00AM    2    Q.  And did they come into the hotel room and check your

11:00AM    3    father out?

11:00AM    4    A.  Yes.

11:00AM    5    Q.  Who was in the hotel room at that point?

11:00AM    6    A.  My brother.

11:00AM    7    Q.  Paul?

11:00AM    8    A.  Yes.

11:00AM    9    Q.  And do you remember what type of examination the

11:00AM   10    paramedics did?

11:00AM   11    A.  No, I don't remember.  I wasn't there in the room.

11:00AM   12    Q.  And did you -- was Paul in the room when the paramedics

11:00AM   13    were checking him out?

11:00AM   14    A.  Yes.

11:00AM   15    Q.  And did your father leave with the paramedics?

11:01AM   16    A.  No.

11:01AM   17    Q.  What was your understanding --

11:01AM   18        THE COURT:  Let's go back a second.  You indicated

11:01AM   19    that your father had two nurses that came over and took care

11:01AM   20    of him once in a while, I guess, but then you indicated that

11:01AM   21    he was okay.  What were the nurses -- what was their purpose

11:01AM   22    of being there?

11:01AM   23        THE WITNESS:  It was a regular thing that was set up

11:01AM   24    through the VA, they would come check on him.

11:01AM   25        THE COURT:  It was a regular practice of the VA, as

11:01AM    1    you understand it, to have nurses go and visit?

11:01AM    2            THE WITNESS:  And it was home care instead of us

11:01AM    3    always going to the VA for doctors' appointments.

11:01AM    4            THE COURT:  As far as you know, what was the home

11:01AM    5    care for?

11:01AM    6            THE WITNESS:  Just to check on him, make sure he was

11:01AM    7    okay.

11:01AM    8            THE COURT:  Nothing specific?

11:01AM    9            THE WITNESS:  No.  They would check with the -- you

11:01AM   10    know, like his ears and if he -- all I know, it was if he

11:01AM   11    needed some medicine, they could order it for him.

11:01AM   12            THE COURT:  Why would they come to the house, rather

11:01AM   13    than he go to the VA?

11:02AM   14            THE WITNESS:  It was just something they offered.

11:02AM   15            THE COURT:  All right.

11:02AM   16    BY MR. MORATH:

11:02AM   17    Q.  What was your understanding of your father's condition

11:02AM   18    after the fall in Florida?

11:02AM   19    A.  That he was fine.

11:02AM   20    Q.  Did he receive any further medical care related to that

11:02AM   21    fall?

11:02AM   22    A.  No, he did not.

11:02AM   23    Q.  Did you notice any issues that your father was having

11:02AM   24    with his back or any other part of his body?

11:02AM   25    A.  No, I didn't notice anything.

11:02AM   1   Q.  Were there any complaints of pain made to you?

11:02AM   2   A.  No.

11:02AM   3            THE COURT:  When was that in 2013?

11:02AM   4            MR. MORATH:  July, Your Honor.

11:02AM   5            THE COURT:  Is that what she said?

11:02AM   6            MR. MORATH:  July of 2013.

11:02AM   7            THE COURT:  That's what she said?

11:02AM   8            MR. MORATH:  Yes.

11:02AM   9            THE COURT:  Okay.

11:02AM   10  BY MR. MORATH:

11:02AM   11  Q.  Now, Loretta, it's my understanding that your father

11:02AM   12  slipped on the stairs at home on September 5th, so four days

11:03AM   13  before his admission to respite?

11:03AM   14  A.  Yes.

11:03AM   15  Q.  Now, before we talk about that, I want to read something

11:03AM   16  to you.  This is part of Exhibit 47C and it's page 532.  And

11:03AM   17  if we -- right near the center of the page there, this is a

11:03AM   18  record from September 9th, 2013, in evidence, as part of 47C.

11:03AM   19  And it says --

11:03AM   20            THE COURT:  This is 47C?

11:03AM   21            MR. MORATH:  Yes.  Page --

11:03AM   22            THE COURT:  What did you say the date is?

11:03AM   23            MR. MORATH:  Page 532.

11:04AM   24            THE COURT:  Well, what am I looking at?  I'm looking

11:04AM   25  at 47C.  I don't see the page that you're --

11:04AM   1        MR. MORATH:  Yeah.  The easiest way to find anything
11:04AM   2   in the VA record, Judge, is the page number.
11:04AM   3        THE COURT:  Well, what page is that?
11:04AM   4        MR. MORATH:  532.
11:04AM   5        MS. FLEMING:  Mr. Morath, I think we're using the
11:04AM   6   Bates numbers down below, the 1891.
11:04AM   7        THE COURT:  What page are we talking about?
11:04AM   8        MR. MORATH:  It's page 532, Bates number 1891.
11:04AM   9        THE COURT:  Page 18 -- I'm getting the wrong page.
11:04AM  10   What's the page?
11:04AM  11        MR. MORATH:  The page is 532, but the Bates number
11:04AM  12   underneath is 1891.
11:04AM  13        THE COURT:  1891?
11:04AM  14        MR. MORATH:  Correct.
11:04AM  15        THE COURT:  Wait a second.  So, it's page 532.  But
11:05AM  16   what's the other number represent?
11:05AM  17        MR. MORATH:  They're Bates stamped.
11:05AM  18        THE COURT:  They're what?
11:05AM  19        MR. MORATH:  It's called a Bates stamp.  They have a
11:05AM  20   sequential Bates stamp number on the entire file, basically.
11:05AM  21   So, it would be 1891.  It's right under page 532.
11:05AM  22        THE COURT:  Does it make any difference which one we
11:05AM  23   use?  It gets kind of confusing.
11:05AM  24        MR. MORATH:  We'll go with the Bates numbers.
11:05AM  25   Probably the safer way to use the bates numbers.

11:05AM    1           THE COURT:  Go with the page number.

11:05AM    2           MR. MORATH:  Sure, Your Honor, page number.

11:05AM    3           THE COURT:  That's 532.

11:05AM    4           MR. MORATH:  Correct.

11:05AM    5           THE COURT:  All right.  I'm on the right page.  Let's

11:05AM    6   go from there.

11:06AM    7           MR. MORATH:  Thank you, Your Honor.

11:06AM    8   BY MR. MORATH:

11:06AM    9   Q.  Directing your attention to the Exhibit in front of you,

11:06AM   10   Ms. Greasley.  This is something that Ms. Fleming mentioned a

11:06AM   11   number of times in her opening statement.  The resident fell

11:06AM   12   down three steps yesterday.

11:06AM   13           THE COURT:  Wait a minute.  Where are you reading

11:06AM   14   from?

11:06AM   15           MR. MORATH:  We have it blown up on the screen, Your

11:06AM   16   Honor, if you'd like.

11:06AM   17           THE COURT:  No.  I want to use the page.

11:06AM   18           MR. MORATH:  It's the -- just past the midpoint of

11:06AM   19   the page, under patient demonstrates.  And then the last

11:06AM   20   sentence in that paragraph says, resident fell.

11:06AM   21           THE COURT:  All right.  This is September what?

11:06AM   22           MR. MORATH:  September 9, 2013.

11:06AM   23           THE COURT:  I thought it says September -- I see fell

11:06AM   24   on September 5th.

11:06AM   25           MR. MORATH:  Correct.  The record date is

| | | |
|---|---|---|
| 11:06AM | 1 | September 9th. |
| 11:06AM | 2 | THE COURT:  All right. |
| 11:06AM | 3 | MR. MORATH:  Proceed? |
| 11:06AM | 4 | THE COURT:  Yeah.  Go ahead. |
| 11:06AM | 5 | BY MR. MORATH: |
| 11:06AM | 6 | Q.  So, Ms. Greasley, this says that the resident fell down |
| 11:06AM | 7 | three steps yesterday at home before admission; in other |
| 11:07AM | 8 | words, that he fell on September 8th, is that correct? |
| 11:07AM | 9 | MS. FLEMING:  Okay.  I'm going to object to this, |
| 11:07AM | 10 | Your Honor.  I'm going to object.  First of all, he didn't -- |
| 11:07AM | 11 | Ms. Greasley was not present when this record was made. |
| 11:07AM | 12 | THE COURT:  Well, the exhibit is in evidence, right? |
| 11:07AM | 13 | MS. FLEMING:  It is in evidence. |
| 11:07AM | 14 | THE COURT:  She can read the exhibit, what's on the |
| 11:07AM | 15 | exhibit. |
| 11:07AM | 16 | MS. FLEMING:  But I don't think there's been any |
| 11:07AM | 17 | foundation laid that she has any knowledge as to any of this |
| 11:07AM | 18 | record. |
| 11:07AM | 19 | THE COURT:  Anybody can read what is here.  Does it |
| 11:07AM | 20 | make any difference?  All she's doing is reading what's in the |
| 11:07AM | 21 | record. |
| 11:07AM | 22 | MS. FLEMING:  Okay.  That's fine, Your Honor. |
| 11:07AM | 23 | THE COURT:  What difference does it make?  Okay.  Go |
| 11:07AM | 24 | ahead. |
| 11:07AM | 25 | |

| | | |
|---|---|---|
| 11:07AM | 1 | BY MR. MORATH: |
| 11:07AM | 2 | Q.  Ms. Greasley, the question is pretty simple.  Did your |
| 11:07AM | 3 | father fall on September 8th? |
| 11:07AM | 4 | A.  No, he did not. |
| 11:07AM | 5 | Q.  And did he fall down three steps? |
| 11:07AM | 6 | A.  No.  He slid up it.  I mean, he went to go up the first |
| 11:07AM | 7 | step, it's three carpeted stairs in the hall.  It's a very |
| 11:08AM | 8 | tight little corridor.  So, you know, it -- |
| 11:08AM | 9 | THE COURT:  Just one second.  Again, I don't mean to |
| 11:08AM | 10 | keep interrupting.  I got to make sure I'm following this. |
| 11:08AM | 11 | The question was, did your father fall on September 8th?  No, |
| 11:08AM | 12 | he did not. |
| 11:08AM | 13 | THE WITNESS:  No. |
| 11:08AM | 14 | MR. MORATH:  Your Honor, I can -- |
| 11:08AM | 15 | THE COURT:  He fell on September 5th, right? |
| 11:08AM | 16 | MR. MORATH:  That's what -- Your Honor, that's what |
| 11:08AM | 17 | I'm clarifying is the position taken this morning and a number |
| 11:08AM | 18 | of records I'm going to show you state that he fell on the |
| 11:08AM | 19 | 8th, the day before admission, but that's simply not true. |
| 11:08AM | 20 | THE COURT:  All right.  It was three days before? |
| 11:08AM | 21 | MR. MORATH:  He fell a number of days before. |
| 11:08AM | 22 | THE COURT:  So, it's clear it was September 5th? |
| 11:08AM | 23 | MR. MORATH:  That's our position, correct. |
| 11:08AM | 24 | MS. FLEMING:  That's the plaintiff's position.  It's |
| 11:08AM | 25 | not ours, Your Honor.  There's a real question as to when he |

| 11:08AM | 1 | fell. |
| 11:08AM | 2 | THE COURT:  All right.  Okay.  This is -- the record |
| 11:08AM | 3 | says what it says. |
| 11:08AM | 4 | MS. FLEMING:  Sure. |
| 11:08AM | 5 | THE COURT:  Okay.  Go ahead.  The record says what |
| 11:08AM | 6 | the record says.  Okay.  Go ahead. |
| 11:08AM | 7 | BY MR. MORATH: |
| 11:09AM | 8 | Q.  How do you know that he didn't fall the day before he was |
| 11:09AM | 9 | admitted? |
| 11:09AM | 10 | A.  Because on the 6th, they came to check.  He had some |
| 11:09AM | 11 | problems with the airways, so, we had an appointment set |
| 11:09AM | 12 | up -- on the 6th for that to be removed and for that to be |
| 11:09AM | 13 | looked at.  And we told him -- we told the nurse that day |
| 11:09AM | 14 | that he fell the day before. |
| 11:09AM | 15 | Q.  And that was on the 6th and you told them on the 6th |
| 11:09AM | 16 | that -- |
| 11:09AM | 17 | A.  On the 6th. |
| 11:09AM | 18 | Q.  You told the nurses that he fell the day before, being |
| 11:09AM | 19 | the 5th? |
| 11:09AM | 20 | A.  Yes, sir. |
| 11:09AM | 21 | Q.  And were you there for that visit on the 6th? |
| 11:09AM | 22 | A.  Yes. |
| 11:09AM | 23 | Q.  Do you remember who came to the house? |
| 11:09AM | 24 | A.  I don't remember, either Kevin or Theo. |
| 11:09AM | 25 | Q.  And you mentioned you told them about the fall the day |

11:09AM  1   before?

11:09AM  2   A.  Yes.

11:09AM  3   Q.  And did they do anything that you saw in response to what

11:09AM  4   you told them?

11:09AM  5   A.  They checked him out and they made him touch his toes,

11:10AM  6   sit and stand and walk a little bit.

11:10AM  7   Q.  Ms. Greasley, I want to show you another exhibit that's

11:10AM  8   in evidence as part of page 122, part of Exhibit 50,

11:10AM  9   page 122.  I'm sorry.  121.

11:10AM  10      THE COURT:  Page 50?  What exhibit number are we

11:10AM  11  talking about?

11:10AM  12      MR. MORATH:  Exhibit 50.

11:10AM  13      THE COURT:  Hang on.

11:10AM  14      MR. MORATH:  And it's page 123, Your Honor.

11:11AM  15      THE COURT:  Not easy to turn these pages.  Page 50?

11:11AM  16      MR. MORATH:  Page 123, Exhibit 50, Your Honor.  It's

11:11AM  17  a radiology report.  It will say radiology report real big at

11:12AM  18  the top.

11:12AM  19      THE COURT:  Okay.  I have the page.

11:12AM  20      MR. MORATH:  Okay to continue?

11:12AM  21      THE COURT:  Yes.

11:12AM  22      MR. MORATH:  Okay.

11:12AM  23  BY MR. MORATH:

11:12AM  24  Q.  Now, Ms. Greasley, the exhibit in front of you, there's a

11:12AM  25  section that states clinical history.  And part of that

11:12AM  1   history, nurses state that he fell at home down cellar stairs

11:12AM  2   prior to being admitted to respite.  Is that accurate?

11:12AM  3   A.  No, it is not.

11:12AM  4   Q.  What's inaccurate about that?

11:12AM  5   A.  He never fell down the cellar stairs.

11:12AM  6   Q.  Did the home have cellar stairs?

11:12AM  7   A.  It did.

11:12AM  8   Q.  And did your father ever fall -- let me ask you this.

11:12AM  9   Tell us about the fall on September 5th.

11:12AM  10  A.  He was -- I believe he was coming in from outside and it

11:12AM  11  was three carpeted stairs and he just -- I feel like he

11:12AM  12  slipped on the first one and went into a squatting position

11:12AM  13  with his back to the door.  The door led outside, not the

11:12AM  14  basement.  So, it was not near the cellar.

11:12AM  15          THE COURT:  How did you know where he fell?

11:13AM  16          THE WITNESS:  When they -- we found him like that.

11:13AM  17          THE COURT:  Were you there, ma'am?

11:13AM  18          THE WITNESS:  Yes.

11:13AM  19          THE COURT:  You saw him fall?

11:13AM  20          THE WITNESS:  No.  I saw him seconds after, when he

11:13AM  21  called for help.

11:13AM  22          THE COURT:  Well, who would have put in there or told

11:13AM  23  persons that he fell down the stairs?

11:13AM  24          THE WITNESS:  Nobody told anybody that he fell down

11:13AM  25  the basement stairs, the cellar stairs.  It's not true.

11:13AM  1          THE COURT:  Well, where do you think this came from?

11:13AM  2          THE WITNESS:  I don't know, but my husband was there,

11:13AM  3    my brother was there, my mom and I and he was not in the

11:13AM  4    cellar.  He was in the hallway, a very small area.  Where you

11:13AM  5    walk in the front door, there was a little landing and three

11:13AM  6    steps into the kitchen.

11:13AM  7          THE COURT:  Okay.

11:13AM  8    BY MR. MORATH:

11:13AM  9    Q.  Tell us, how did you first find out about that fall on

11:13AM  10   the 5th?

11:13AM  11   A.  My mother.  My mother yelled for us to come and help.

11:13AM  12   Q.  Who was home at the time?

11:13AM  13   A.  My husband Mark, my brother Paul and my mom and I.

11:14AM  14   Q.  And how long after your mom called you for help did you

11:14AM  15   arrive to see your father?

11:14AM  16   A.  Seconds.  Within -- as soon as I could fly down the

11:14AM  17   stairs, I was there.

11:14AM  18   Q.  The final exhibit I'd like to show you, ma'am, is

11:14AM  19   Exhibit 47A and it's page 196.

11:14AM  20          THE COURT:  Hang on.  All right.  It's the first page

11:15AM  21   of that exhibit?

11:15AM  22          MR. MORATH:  Correct, Your Honor.

11:15AM  23          THE COURT:  All right.  I have it.

11:15AM  24   BY MR. MORATH:

11:15AM  25   Q.  Exhibit 47A, Loretta, states, in part, that on admission,

11:15AM  1   patient's son reported that patient had a fall the other day

11:15AM  2   and --

11:15AM  3           THE COURT:  Wait.  Where are you reading?

11:15AM  4           MR. MORATH:  Little past halfway down.

11:15AM  5           THE COURT:  All right.  I see it.  Go ahead.

11:15AM  6   BY MR. MORATH:

11:15AM  7   Q.  -- was unable to get himself up.  He, therefore, had to

11:15AM  8   lay on the floor until he got to the resident's house to pick

11:16AM  9   him up.  Is that accurate?

11:16AM  10  A.  No.  That is not.

11:16AM  11  Q.  What is wrong with that note?

11:16AM  12  A.  We were home.  And he was never on the floor like, laying

11:16AM  13  on the floor, that's for sure.  He was squatting.  And -- no,

11:16AM  14  it's not true.

11:16AM  15  Q.  Did your father ever have to wait for someone to get --

11:16AM  16  A.  No, we were home.  No --

11:16AM  17  Q.  Okay.

11:16AM  18  A.  -- we were home.

11:16AM  19  Q.  And how long after he fell was he tended to?

11:16AM  20  A.  Within seconds.

11:16AM  21          THE COURT:  What's not accurate here; that he did not

11:16AM  22  get up -- did not have to get himself up?

11:16AM  23          MR. MORATH:  No, Judge, that the -- just pointing out

11:16AM  24  the repeated -- not only the different versions in their own

11:16AM  25  records, but they're repeating inaccuracies that he somehow

11:16AM    1   laid on the floor until someone had to come to the house to

11:16AM    2   pick him up.  There were four people in the house that picked

11:16AM    3   him up immediately.

11:16AM    4            THE COURT:  All right.

11:16AM    5            MR. MORATH:  Just yet another version in their

11:16AM    6   records.

11:16AM    7   BY MR. MORATH:

11:16AM    8   Q.  So, after you and your brother and your husband got to

11:17AM    9   dad in the hallway, I imagine you brought him in the house.

11:17AM   10   What happened next?

11:17AM   11   A.  We asked him if he was okay and if he needed any help or

11:17AM   12   if we should call anybody, you know, to check him.

11:17AM   13   Q.  And what did you decide to do?

11:17AM   14   A.  We didn't call anybody.  He said he was fine.

11:17AM   15   Q.  Did you observe him being in any pain or discomfort?

11:17AM   16   A.  No, we didn't.

11:17AM   17   Q.  Did you see anything that made you think he was injured?

11:17AM   18   A.  No, I did not.

11:17AM   19   Q.  Did you see any physical signs of injury at all?

11:17AM   20   A.  No, I didn't.

11:17AM   21   Q.  Did he express any pain in any way?

11:17AM   22   A.  No.  He said he was okay.

11:17AM   23   Q.  Did you see him holding his back?

11:17AM   24   A.  No.

11:17AM   25   Q.  And that day, did you notice any change in his physical

11:17AM  1  ability?

11:17AM  2  A.  No, I did not.

11:17AM  3  Q.  How about his ability to move around, walk around, do the

11:17AM  4  things you described?

11:17AM  5  A.  No.  He did everything like normal.

11:17AM  6  Q.  And based upon what you saw, did you have any reason to

11:17AM  7  believe he suffered any type of serious injury?

11:18AM  8  A.  No, he did not.

11:18AM  9  Q.  Now, so, he was home for the next couple of days.  He was

11:18AM  10  home the 5th -- I'm sorry, the 6th, the rest of the day, the

11:18AM  11  5th, the 6th, the 7th and the 8th, before he leaves for Pine

11:18AM  12  Lodge on the 9th, correct?

11:18AM  13  A.  Correct.

11:18AM  14  Q.  How often did you see him over those four days?

11:18AM  15  A.  Every day.

11:18AM  16  Q.  Did you have your normal routine interaction with your

11:18AM  17  dad over those four days?

11:18AM  18  A.  Yes.

11:18AM  19  Q.  And during that time, did you notice any changes in your

11:18AM  20  father's physical abilities?

11:18AM  21  A.  No.

11:18AM  22  Q.  Did you notice any change in his ability to walk or move

11:18AM  23  around?

11:18AM  24  A.  He was walking just fine.

11:18AM  25  Q.  Was he still vacuuming every day?

11:18AM  1  A.  Yes.

11:18AM  2  Q.  How about his ability to care for himself, did it change

11:18AM  3  at all in those four days?

11:18AM  4  A.  No.  He was still washing up and combing his hair,

11:18AM  5  brushing his teeth.

11:18AM  6  Q.  Did he require any pain medication?

11:18AM  7  A.  No.

11:18AM  8  Q.  And when your father left, when is the last time you saw

11:18AM  9  your dad before he left?

11:18AM  10  A.  Well, we left the same day.  I left for Florida.  He left

11:19AM  11  for the respite.  So, it was the night before I said goodbye

11:19AM  12  to him.

11:19AM  13  Q.  So, the 8th?

11:19AM  14  A.  Yes.

11:19AM  15  Q.  When you said good-bye to him on the 8th, did you have

11:19AM  16  any concerns about his physical ability because of that slip

11:19AM  17  down the stairs?

11:19AM  18  A.  No.  I would have never left if I had a concern.

11:19AM  19          THE COURT:  Ma'am, you left for Florida on the 8th?

11:19AM  20          THE WITNESS:  The 9th.

11:19AM  21          THE COURT:  9th.  That would be September 9th?

11:19AM  22          THE WITNESS:  Yes.

11:19AM  23          THE COURT:  And your father was -- at that time was

11:19AM  24  okay?

11:19AM  25          THE WITNESS:  Yes.  He was okay.  He went to respite

11:19AM   1    that day.

11:19AM   2            THE COURT:  All right.

11:19AM   3    BY MR. MORATH:

11:19AM   4    Q.  Let's talk a little bit about the decision to put dad in

11:19AM   5    respite.  How did that all come about?

11:19AM   6    A.  My brother had surgery and my mom and I were going to

11:19AM   7    take a break and go see the kids, my children in Florida, my

11:19AM   8    grandchildren.  And we thought -- Kevin had told us about

11:19AM   9    respite, that it was a nice little place for a break for the

11:20AM  10    family and we went from there.

11:20AM  11    Q.  And you say Kevin.  Kevin Hennessy?

11:20AM  12    A.  Yes.

11:20AM  13    Q.  So, Paul needed a surgery of his own?

11:20AM  14    A.  Yes.

11:20AM  15    Q.  And you were simply going to visit the family in Florida?

11:20AM  16    A.  Yes.

11:20AM  17    Q.  And the decision to put your dad into respite, did it

11:20AM  18    have anything to do with a decline in his physical condition?

11:20AM  19    A.  No.  It was like a break, a place where we could all take

11:20AM  20    a break.

11:20AM  21    Q.  Did it have anything to do with your ability to no longer

11:20AM  22    care for him?

11:20AM  23    A.  No.

11:20AM  24    Q.  Tell me about the process of once Kevin Hennessy tells

11:20AM  25    you about respite, what was the process that you had to go

| | | |
|---|---|---|
| 11:20AM | 1 | through to get it set up, get it scheduled and get him into |
| 11:20AM | 2 | the facility. |
| 11:20AM | 3 | A. There was a lot of phone calls; like, interviews with -- |
| 11:20AM | 4 | my brother took care of a lot of it. |
| 11:20AM | 5 | Q. You said interviews with people that come to the house? |
| 11:20AM | 6 | A. On the phone. |
| 11:20AM | 7 | Q. Do you recall Kevin or anybody else coming to the home in |
| 11:21AM | 8 | the days leading up to respite, to evaluate him to see if he |
| 11:21AM | 9 | was stable enough to -- |
| 11:21AM | 10 | A. Yes. I remember -- |
| 11:21AM | 11 | MS. FLEMING: Objection to the form. Leading. |
| 11:21AM | 12 | THE WITNESS: -- someone coming on the 4th and on the |
| 11:21AM | 13 | 6th. |
| 11:21AM | 14 | THE COURT: Okay. I'm going allow it. |
| 11:21AM | 15 | BY MR. MORATH: |
| 11:21AM | 16 | Q. You recall them coming on the 4th? |
| 11:21AM | 17 | A. Yes. |
| 11:21AM | 18 | Q. What do you remember about that visit? |
| 11:21AM | 19 | A. I just remember them coming and checking him and kind of |
| 11:21AM | 20 | doing like, a physical thing but -- |
| 11:21AM | 21 | THE COURT: Did you say coming on the 4th? |
| 11:21AM | 22 | MR. MORATH: They came on the 4th as well. |
| 11:21AM | 23 | THE COURT: Fourth of what? |
| 11:21AM | 24 | MR. MORATH: September. |
| 11:21AM | 25 | THE COURT: We're talking about September 9th, aren't |

11:21AM    1    we?

11:21AM    2              MR. MORATH:  He was admitted on September 9th, Your

11:21AM    3    Honor.

11:21AM    4              THE COURT:  So, what's the 4th?

11:21AM    5              MR. MORATH:  What we're talking about now, Your

11:21AM    6    honor, is the -- they were at the home a number of times in

11:21AM    7    the days leading up to --

11:21AM    8              THE COURT:  So, you're going back to the 4th?

11:21AM    9              MR. MORATH:  Right.  We're talking about --

11:21AM   10              THE COURT:  I thought we were at the 9th.  We were

11:21AM   11    taking care to have him admitted to the hospital.

11:21AM   12              MR. MORATH:  Correct.  We're talking about the

11:21AM   13    process of admitting him to respite now and that process began

11:21AM   14    with, he was seen on the 4th, the 5th and the 6th at home.

11:21AM   15              THE COURT:  Ma'am, he was doing all right from what

11:21AM   16    you told me.  He was vacuuming.  He was -- this was after he

11:22AM   17    had the fall outside.  Why did you want to bring him to the

11:22AM   18    hospital?

11:22AM   19              THE WITNESS:  No.  It wasn't the hospital.  It was

11:22AM   20    respite.  It was like a -- he was fine.  So, it was a place

11:22AM   21    where he could go when my brother was recuperating and I took

11:22AM   22    my mother to Florida for vacation.

11:22AM   23              THE COURT:  You have to clear this up, because I'm

11:22AM   24    not following.

11:22AM   25              MR. MORATH:  Sure.  The plan, Your Honor, was to put

11:22AM   1   him in a two-week respite --

11:22AM   2           MS. FLEMING:  Your Honor, I'm going to object to

11:22AM   3   this.  Mr. Morath is testifying.

11:22AM   4           THE COURT:  I understand that.  You're absolutely

11:22AM   5   right.

11:22AM   6           MS. FLEMING:  He can't --

11:22AM   7           THE COURT:  You can't testify.  What you say is not

11:22AM   8   evidence.

11:22AM   9           MR. MORATH:  I understand that.

11:22AM  10           THE COURT:  What the witness says is evidence.  So,

11:22AM  11   somehow or other, we'll take a five-minute break and see if we

11:22AM  12   could get this straightened out, because I'm confused.

11:25AM  13           THE CLERK:  All rise.

11:26AM  14   (Brief recess)

11:31AM  15           THE CLERK:  All rise.  You may be seated.

11:31AM  16           THE COURT:  All right.  Mr. Morath, go ahead.

11:31AM  17           MR. MORATH:  Thank you, Your Honor.

11:31AM  18   BY MR. MORATH:

11:31AM  19   Q.  Ms. Greasley, let's back up just for a moment, so we can

11:31AM  20   try to clarify a few things.  When did the process and the

11:32AM  21   discussions to put your father in respite begin?

11:32AM  22   A.  Long before September 4th, because they came on the 4th

11:32AM  23   to look at my father, to make sure he was okay.

11:32AM  24   Q.  So, the decision to put him in respite was made before he

11:32AM  25   had that fall at home?

11:32AM   1   A.  Yes, long before.

11:32AM   2   Q.  And why did you and your family decide to put dad in

11:32AM   3   respite?

11:32AM   4   A.  Because it was supposed to be a fun place for him to go,

11:32AM   5   like a break for everybody, a break for him, a break for us.

11:32AM   6   They had lots of things for him to do.  It sounded like fun,

11:32AM   7   you know?  I was going to see my grandchildren, taking my

11:32AM   8   mother away for her to catch a little break.  My brother

11:32AM   9   needed rest.  So, I thought it was, you know, it was told to

11:32AM  10   me -- it was highly recommended that it was a nice place for

11:32AM  11   him to go, for everybody, for a family break.

11:33AM  12   Q.  So, the decision to put him in respite was made well

11:33AM  13   before the fall at home?

11:33AM  14   A.  That had nothing to do with the fall.  It was because we

11:33AM  15   all needed a break.

11:33AM  16   Q.  And I believe you said the -- did they start the process

11:33AM  17   of examining your father around September 4th?

11:33AM  18   A.  They did.

11:33AM  19   Q.  And it was the following day, you testified, the 5th,

11:33AM  20   that he fell?

11:33AM  21   A.  Yes, sir.

11:33AM  22   Q.  And then they were there again on the 6th?

11:33AM  23   A.  Yes.

11:33AM  24   Q.  Okay.  Now, when you were -- was this the first time that

11:33AM  25   you had scheduled the visit to respite or had you thought

GREASLEY  --  MR. MORATH  --  8/20/19

75

11:33AM   1   about doing it before?

11:33AM   2   A.   We -- it was for the same stay, amount of stay, but we

11:33AM   3   canceled it at one point because my father had never been

11:33AM   4   without us and I was concerned about him being sad or missing

11:33AM   5   us.

11:34AM   6   Q.   So, then you have already told us that, following the

11:34AM   7   examinations on the 4th, 5th and the 6th, we get on the 9th,

11:34AM   8   you're headed to Florida, dad is heading to respite?

11:34AM   9   A.   That's right.

11:34AM  10   Q.   How did your father get to the respite facility?

11:34AM  11   A.   My brother-in-law Peter, my nephew Peter and my brother

11:34AM  12   Paul.  My brother-in-law drove.

11:34AM  13   Q.   Did you ever go to the Pine Lodge facility yourself?

11:34AM  14   A.   No.  I was never there.

11:34AM  15   Q.   Now, when -- did you arrive into Florida on the 9th as

11:34AM  16   well?

11:34AM  17   A.   Yes.

11:34AM  18   Q.   And did you speak with Paul at all on the phone while you

11:34AM  19   were down there?

11:34AM  20   A.   I did.

11:34AM  21   Q.   How often?

11:34AM  22   A.   Daily.

11:34AM  23   Q.   How did you first find out that your dad fell at Pine

11:34AM  24   Lodge?

11:34AM  25   A.   My brother told me.

11:34AM  1   Q.  Do you remember if it was after the first fall, if it was

11:34AM  2   after the second fall?

11:34AM  3   A.  It was after it all happened, all of the falls.

11:34AM  4   Q.  And what do you remember finding out?

11:34AM  5   A.  That my brother told me that --

11:35AM  6           THE COURT:  Ma'am, I didn't know -- you said that it

11:35AM  7   was after it all happened.  The question was, do you remember

11:35AM  8   whether it was the first fall or the second fall, I guess is

11:35AM  9   what you're saying.

11:35AM  10          THE WITNESS:  Yes, after the second fall.

11:35AM  11          THE COURT:  After the second fall?

11:35AM  12          THE WITNESS:  Yes, Your Honor.

11:35AM  13          THE COURT:  So, you didn't know anything about the

11:35AM  14   first fall?

11:35AM  15          THE WITNESS:  Not at the time, no.

11:35AM  16          THE COURT:  All right.

11:35AM  17   BY MR. MORATH:

11:35AM  18   Q.  So, when you came back, did you come back after you

11:35AM  19   received that phone call?

11:35AM  20   A.  Yes.  When I talked to my brother, he said that we need

11:35AM  21   to bring mom home because dad wasn't doing well.  He was

11:35AM  22   really bad.

11:35AM  23   Q.  And this was after both falls at Pine Lodge?

11:35AM  24   A.  Yes.

11:35AM  25   Q.  And did you and mom come right home from Florida?

11:35AM   1   A.  Yes.

11:35AM   2   Q.  And when did you get back from Buffalo -- I mean to

11:35AM   3   Buffalo?

11:35AM   4   A.  The night of the 12th.

11:35AM   5   Q.  September 12th?

11:35AM   6   A.  Yes.

11:35AM   7   Q.  So, when was the first time you saw your father?

11:36AM   8   A.  The next day.

11:36AM   9   Q.  So, you saw your father on September 13th?

11:36AM   10   A.  Yes.

11:36AM   11   Q.  And where did you see him?

11:36AM   12   A.  At the VA Hospital in Buffalo.

11:36AM   13   Q.  Was he in a room?

11:36AM   14   A.  Yes.

11:36AM   15   Q.  Can you describe what you saw when you got there?

11:36AM   16   A.  I saw my father in pain, like I have never seen him

11:36AM   17   before.  I've never seen anybody in pain like that.  He had a

11:36AM   18   terrible big black and blue mark, like on the whole -- the

11:36AM   19   side of his -- the left side of his face.  And it was at the

11:36AM   20   top of his head, like all the way down here (indicating).

11:36AM   21   Q.  You are describing with your hand from the top of your

11:36AM   22   forehead down to where?

11:36AM   23   A.  To around his -- the top of his hair, like that.

11:36AM   24   Q.  It was described this morning as a goose bump.  Was it a

11:36AM   25   goose bump?

| | | |
|---|---|---|
| 11:36AM | 1 | A.  No, it was the size of my hand. |
| 11:36AM | 2 | Q.  And did you -- was it bruised? |
| 11:36AM | 3 | A.  It was black. |
| 11:37AM | 4 | Q.  Did you see any other -- setting aside the pained |
| 11:37AM | 5 | expression, which we'll talk about in a minute -- did you see |
| 11:37AM | 6 | any other physical signs of injuries, bruises, scrapes, stuff |
| 11:37AM | 7 | like that? |
| 11:37AM | 8 | A.  He couldn't move.  He couldn't move his arms or his legs. |
| 11:37AM | 9 | He couldn't get comfortable. |
| 11:37AM | 10 | Q.  And this was on the 13th? |
| 11:37AM | 11 | A.  Yes. |
| 11:37AM | 12 | Q.  And could he talk to you on the 13th? |
| 11:37AM | 13 | A.  Yes. |
| 11:37AM | 14 | THE COURT:  Just one second.  Hang on one second. |
| 11:38AM | 15 | All right.  Go ahead. |
| 11:38AM | 16 | BY MR. MORATH: |
| 11:38AM | 17 | Q.  So, this is September 13th.  It's the first time you've |
| 11:38AM | 18 | seen your father since you saw him on the 8th? |
| 11:38AM | 19 | A.  Yes. |
| 11:38AM | 20 | Q.  Based on your observations, how did you compare his |
| 11:38AM | 21 | condition on the 13th to when you last saw him on the 8th? |
| 11:38AM | 22 | A.  There is no comparison.  He was broken.  He was in so |
| 11:38AM | 23 | much pain and moaning.  And when I walked in the room, I |
| 11:38AM | 24 | said, look, we're here, Dad.  Mom is here.  And he said that, |
| 11:38AM | 25 | they hurt me, honey.  And he was just moaning and couldn't |

11:38AM   1   move at all.

11:38AM   2   Q.   Your dad said to you, they hurt me, honey?

11:39AM   3   A.   They hurt me, honey.

11:39AM   4   Q.   And we know your father passed away on the early morning

11:39AM   5   on the 17th.  How many of the days between the 13th and the

11:39AM   6   17th did you go see dad at the hospital?

11:39AM   7   A.   Every day.

11:39AM   8   Q.   And how long were you there?

11:39AM   9   A.   Hours.  I took my mother every day to see my dad and we'd

11:39AM  10   spend time with him.

11:39AM  11   Q.   And can you describe how his condition changed at all

11:39AM  12   during those -- it would be almost four days?

11:39AM  13   A.   He just kept getting worse and we couldn't control the

11:39AM  14   pain.

11:39AM  15   Q.   What do you mean he kept getting worse?

11:39AM  16   A.   His moaning and just the facial expressions.  His eyes

11:39AM  17   were so wide open sometimes and he would be so scared

11:39AM  18   looking.  And the moaning.  And he couldn't really tell me

11:40AM  19   what hurt.  He was just moaning.

11:40AM  20   Q.   And based on what you saw, could he tell you were there?

11:40AM  21   A.   Yes.

11:40AM  22   Q.   How do you know that?

11:40AM  23   A.   Because he called me honey.  And he told me that, you

11:40AM  24   know, they hurt me, honey.  He knew who I was.

11:40AM  25   Q.   Did that change at all --

11:40AM   1   A.  He told me he loved me.  Like, he would breathe -- like,

11:40AM   2   he would say, I love you and where is mom?  So, he knew who

11:40AM   3   we were, sure.

11:40AM   4   Q.  Did there come a point in time when that stopped, where

11:40AM   5   he no longer seemed conscious to you?

11:40AM   6   A.  No.

11:40AM   7   Q.  When is the last time you saw him before he passed away?

11:40AM   8   A.  That morning when he passed away.

11:40AM   9   Q.  Were you there when he passed away?

11:40AM  10   A.  I was down the hall.  We were all in the room all

11:40AM  11   together with him and two nurses came in and said that they

11:40AM  12   were going to wash him and you know, do something to him.

11:40AM  13   Not quite sure what they were going to do.  Mom -- but I took

11:40AM  14   mom out of the room while they were going to clean him and I

11:41AM  15   went down the hall with her.  My brother went outside, I

11:41AM  16   think, to make a phone call.

11:41AM  17   Q.  And now, at some point, there was a decision -- the

11:41AM  18   family made a decision to provide end-of-life care; in other

11:41AM  19   words, stop trying to fix or help your dad and simply make

11:41AM  20   him comfortable.  Do you remember when that decision was

11:41AM  21   made?

11:41AM  22   A.  On the 16th.

11:41AM  23   Q.  And why was that decision made by the family?

11:41AM  24   A.  Because they couldn't control his pain and trying to make

11:41AM  25   him comfortable.

11:41AM  1   Q.  And the last time you saw your father alive, was he still

11:41AM  2   conscious?

11:41AM  3   A.  Yes.

11:41AM  4   Q.  And did you still observe him experiencing pain?

11:41AM  5   A.  Yes.  Oh, yes.

11:41AM  6   Q.  After your father passed away, did you have any further

11:42AM  7   interaction with anybody from Pine Lodge?

11:42AM  8   A.  No.

11:42AM  9   Q.  Did you have any further conversation about getting your

11:42AM  10  dad's stuff back or getting his belongings or anything of

11:42AM  11  that nature?

11:42AM  12  A.  Yes.

11:42AM  13  Q.  Was that all by phone?

11:42AM  14  A.  Yes, by phone.

11:42AM  15  Q.  And did you have any other phone calls with anybody from

11:42AM  16  Pine Lodge?

11:42AM  17  A.  Yes?  We talked -- my brother was on the phone and talked

11:42AM  18  to them.

11:42AM  19  Q.  Who did they talk to?

11:42AM  20  A.  I'm not quite sure who it was.

11:42AM  21  Q.  You heard something this morning from Ms. Fleming about a

11:42AM  22  recorded conversation?

11:42AM  23  A.  Yes.

11:42AM  24  Q.  Do you recall that?  Can you tell us about that?

11:42AM  25  A.  Yes.  My brother -- I'm not sure if they called us or we

11:42AM  1   called them, because I was not downstairs when the

11:42AM  2   conversation started.  I came downstairs and -- probably in

11:42AM  3   the middle of the conversation, not quite sure.  And one of

11:43AM  4   the doctors was on the phone with my brother when I walked

11:43AM  5   into the room.

11:43AM  6   Q.  And who decided to record that call?

11:43AM  7   A.  My brother asked me to.

11:43AM  8   Q.  And do you have any understanding why?

11:43AM  9   A.  Because my sister was out of town and everybody wanted

11:43AM  10  answers.  Everybody wanted to know what in the world happened

11:43AM  11  to my father.

11:43AM  12  Q.  So, you recorded it so the other family members could

11:43AM  13  hear it?

11:43AM  14  A.  Yes.

11:43AM  15          THE COURT:  When was this?  What is the date on this

11:43AM  16  ma'am?

11:43AM  17          MR. MORATH:  This phone conversation, Judge --

11:43AM  18          MS. FLEMING:  No.  Objection.

11:43AM  19          THE COURT:  Ma'am, when --

11:43AM  20          THE WITNESS:  It was after my father passed.  I'm not

11:43AM  21  sure of the day.

11:43AM  22          THE COURT:  Okay.  It was after he passed away?

11:43AM  23          THE WITNESS:  Yes, sir.

11:43AM  24          THE COURT:  Okay.  Thank you.

11:43AM  25

11:43AM  1   BY MR. MORATH:

11:43AM  2   Q.  And do you remember anybody who was on that call, besides

11:43AM  3   you and your brother?

11:43AM  4   A.  There were -- I recall hearing three voices on the phone.

11:43AM  5   Q.  Do you know if an individual by the name of Dr. Maller

11:43AM  6   was on the phone?

11:43AM  7   A.  Yes.

11:43AM  8   Q.  Who is Dr. Maller?

11:44AM  9   A.  The doctor from the respite.

11:44AM  10  Q.  And what do you recall about that conversation?

11:44AM  11  A.  I remember him saying that he was sorry.

11:44AM  12          MS. FLEMING:  Objection, Your Honor.  This is

11:44AM  13  hearsay.  She's talking about a doctor and an out-of-court

11:44AM  14  statement.

11:44AM  15          MR. MORATH:  Your Honor, it's a --

11:44AM  16          THE COURT:  She's on the telephone?

11:44AM  17          MR. MORATH:  Yeah --

11:44AM  18          MS. FLEMING:  She's on --

11:44AM  19          THE COURT:  With the doctor?

11:44AM  20          MS. FLEMING:  Well, it's unclear, but yes.

11:44AM  21          THE COURT:  The doctor works for the VA --

11:44AM  22          MS. FLEMING:  Correct.

11:44AM  23          THE COURT:  -- or works for the -- okay.

11:44AM  24          MS. FLEMING:  Correct.

11:44AM  25          THE COURT:  Overruled.

11:44AM   1   BY MR. MORATH:

11:44AM   2   Q.  Tell me about that conversation.

11:44AM   3   A.  He was very sorry.  He was apologizing to us for my

11:44AM   4   father hurting or breaking his back at the VA.

11:44AM   5   Q.  Did he say to you that he believed your father broke his

11:44AM   6   back at the VA?

11:44AM   7   A.  Yes, he said that.

11:44AM   8          MR. MORATH:  No further questions, Your Honor.

11:45AM   9          THE COURT:  Can I have the spelling of that doctor?

11:45AM  10          MR. MORATH:  Sure, Your Honor.  M-A-L-L-E-R.

11:45AM  11          THE COURT:  M-A what?

11:45AM  12          MR. MORATH:  M-A-L-L-E-R.

11:45AM  13          THE COURT:  Maller?

11:45AM  14          MR. MORATH:  Yes.

11:45AM  15          THE COURT:  Okay.

11:45AM  16

11:45AM  17               CROSS-EXAMINATION

11:45AM  18

11:45AM  19   BY MS. FLEMING:

11:45AM  20   Q.  Good morning, Ms. Greasley.

11:45AM  21   A.  Good morning.

11:45AM  22   Q.  Now, your father had fallen and fractured his back a few

11:45AM  23   years ago, correct?

11:45AM  24   A.  Yes.

11:45AM  25   Q.  And that was -- and you were in the house when the fall

GREASLEY  --  MS. FLEMING  --  8/20/19

85

11:45AM  1   occurred, correct?

11:45AM  2   A.  Yes.

11:45AM  3   Q.  And your mother was present in the house at the time,

11:45AM  4   correct?

11:45AM  5   A.  Yes.

11:45AM  6          THE COURT:  Just one second.  What do you mean by

11:45AM  7   broke his back?  What does that -- I don't know what she

11:46AM  8   means.

11:46AM  9          THE WITNESS:  Me?

11:46AM  10          MS. FLEMING:  Yes.

11:46AM  11          THE WITNESS:  I'm sorry.

11:46AM  12          THE COURT:  Well, you asked the question.  You used

11:46AM  13   the phrase broke his back.

11:46AM  14          MS. FLEMING:  Correct.

11:46AM  15          THE COURT:  Do you know what that means, ma'am?

11:46AM  16          THE WITNESS:  You talking to me?  Your Honor, I'm not

11:46AM  17   sure if he broke his back, but he needed a procedure to fix

11:46AM  18   what was hurt, that cement procedure I was talking about

11:46AM  19   earlier.

11:46AM  20   BY MS. FLEMING:

11:46AM  21   Q.  So, the fall occurred at the home, correct?

11:46AM  22   A.  Yes.

11:46AM  23   Q.  You were present?

11:46AM  24   A.  Yes.

11:46AM  25   Q.  Did you witness the fall?

| | | |
|---|---|---|
| 11:46AM | 1 | A.  No. |
| 11:46AM | 2 | Q.  You were present for the aftermath of the fall? |
| 11:46AM | 3 | A.  Yes. |
| 11:46AM | 4 | Q.  Did your mother witness the fall? |
| 11:46AM | 5 | A.  I'm not sure. |
| 11:46AM | 6 | THE COURT:  When was this fall?  When, the date on |
| 11:46AM | 7 | that, ma'am? |
| 11:46AM | 8 | MS. FLEMING:  Do you remember? |
| 11:46AM | 9 | THE COURT:  Approximately. |
| 11:46AM | 10 | THE WITNESS:  No. |
| 11:46AM | 11 | THE COURT:  Would he have done it in a year? |
| 11:46AM | 12 | BY MS. FLEMING: |
| 11:46AM | 13 | Q.  You know -- you testified previously in a deposition, do |
| 11:46AM | 14 | you remember that, Ms. Greasley? |
| 11:46AM | 15 | A.  Yes. |
| 11:46AM | 16 | Q.  And you testified that your father had kyphoplasty |
| 11:46AM | 17 | surgery as a result of this fall in 2007, correct? |
| 11:47AM | 18 | A.  Yes. |
| 11:47AM | 19 | Q.  Is that still your testimony today? |
| 11:47AM | 20 | A.  Yes. |
| 11:47AM | 21 | Q.  Did the fall occur then shortly before he had the |
| 11:47AM | 22 | kyphoplasty surgery? |
| 11:47AM | 23 | A.  That happened -- he fell and then he had surgery -- the |
| 11:47AM | 24 | procedure, yes. |
| 11:47AM | 25 | Q.  And so, the fall occurred in 2007? |

11:47AM    1    A.  Yes.

11:47AM    2    Q.  You don't recall the exact date, however?

11:47AM    3    A.  I don't.

11:47AM    4    Q.  Okay.  And the fall occurred in the front hall of your

11:47AM    5    home, correct?

11:47AM    6    A.  Yes.

11:47AM    7    Q.  But you did not witness what happened?

11:47AM    8    A.  No.

11:47AM    9    Q.  Did your father ever tell you what happened?

11:47AM   10    A.  No.

11:47AM   11    Q.  Did your mother ever tell you what happened?

11:47AM   12    A.  No.

11:47AM   13    Q.  Did your father complain of pain after that fall?

11:47AM   14    A.  Yes.

11:47AM   15    Q.  And he ended up having surgery, correct?

11:47AM   16    A.  Yes.  He had the procedure done.

11:47AM   17    Q.  And that was on his lumbar spine, correct?

11:47AM   18    A.  His lower back, yes.

11:47AM   19    Q.  But do you remember if it was at L-3?

11:47AM   20    A.  I don't remember.

11:47AM   21    Q.  Okay.  Now, your brother Paul testified at -- before he

11:48AM   22    passed -- and he was sworn to tell the truth at that time.

11:48AM   23    Your brother testified that your father also --

11:48AM   24         THE COURT:  Just one second.  You're going to cross-

11:48AM   25    examine her on the testimony of her brother?

11:48AM   1        MS. FLEMING:  No.  I'm going to ask her whether she's

11:48AM   2   aware, Your Honor.  I think it's absolutely appropriate.  I'm

11:48AM   3   not trying to impeach her, I'm just asking.  Is that okay,

11:48AM   4   Your Honor?  May I proceed?

11:48AM   5        THE COURT:  No.

11:48AM   6   BY MS. FLEMING:

11:48AM   7   Q.  Okay.  Do you recall whether or not your father ever had

11:48AM   8   shoulder surgery prior to 2013?

11:48AM   9   A.  No, I don't.

11:48AM   10  Q.  Do you recall whether or not your father ever had neck

11:48AM   11  surgery?

11:48AM   12  A.  Yes, I do.

11:48AM   13  Q.  Okay.  And was that the result of a work injury?

11:48AM   14  A.  Yes.

11:48AM   15  Q.  And that was done prior to 2007, correct?

11:48AM   16  A.  Many years prior.

11:48AM   17  Q.  Okay.  And were you -- and do you know anything about the

11:48AM   18  circumstances of your father's neck surgery?

11:48AM   19  A.  I don't know.

11:48AM   20  Q.  Okay.  Now, you testified that you moved back with your

11:49AM   21  parents in 2007 today?

11:49AM   22  A.  Yes.

11:49AM   23  Q.  Okay.  Were you -- are you correct in that year or was it

11:49AM   24  a different timeframe?  I think you -- well, I'm going to

11:49AM   25  wait for you to answer.

11:49AM    1    A.   I thought it was 2007.

11:49AM    2    Q.   Now, if I told you that you were sworn at your

11:49AM    3    deposition, you indicated you moved --

11:49AM    4         THE COURT:  Do me a favor.

11:49AM    5         MS. FLEMING:  -- in 2012.

11:49AM    6         THE COURT:  If you have a deposition that's

11:49AM    7    inconsistent with what she says here, show her the deposition

11:49AM    8    and ask her about whether or not it was accurate then or is it

11:49AM    9    accurate now.

11:49AM   10         MS. FLEMING:  Okay.  Lisa, will you please pull up

11:49AM   11    deposition -- Joint Exhibit 12 and page 6?  Thank you.  I'm

11:50AM   12    going to need page 5 as well, the bottom.

11:50AM   13         THE COURT:  Any way we can make that clearer?  Okay.

11:50AM   14    BY MS. FLEMING:

11:50AM   15    Q.   Okay.  So, do you remember being asked these questions?

11:50AM   16    A.   Yes.

11:50AM   17    Q.   Question.  Okay.  So, tell me, when you -- when did you

11:50AM   18    live at 643 Linden Avenue prior to a week ago?

11:50AM   19         About 10 years.  I moved there when my sister was ill.

11:50AM   20    I stayed for about five years --

11:50AM   21         MR. MORATH:  Judge, I'm just going to object because

11:50AM   22    I -- she's just reading a deposition.  She's not trying to

11:50AM   23    refresh her --

11:50AM   24         THE COURT:  Well, she's setting it up.

11:50AM   25         MR. MORATH:  She hadn't found any inconsistency.

11:50AM    1          MS. FLEMING:  Well, I'm getting there.

11:50AM    2          THE COURT:  Go ahead.

11:50AM    3   BY MS. FLEMING:

11:50AM    4   Q.  I stayed for about five years, moved back to Florida and

11:51AM    5   then I moved back again to help take care of my dad and mom.

11:51AM    6      Question:  And when was that?

11:51AM    7      Three years ago.

11:51AM    8      Question:  So, that would have been 2013?

11:51AM    9      Answer:  I think it was 2012 when I moved back.

11:51AM   10      Okay.  So, when you -- does that refresh your

11:51AM   11   recollection as to when you moved back to Linden Avenue?

11:51AM   12   A.  Yes.

11:51AM   13   Q.  So, it was 2012, correct?

11:51AM   14          MR. MORATH:  Your Honor -- that's incorrect, Your

11:51AM   15   Honor.  Objection.  She's trying to impeach the witness with

11:51AM   16   an answer that is not inconsistent.  The witness testified

11:51AM   17   that she lived there in 2007, moved out for a time being and

11:51AM   18   then came back.

11:51AM   19          THE WITNESS:  Yes.

11:51AM   20          MR. MORATH:  She came back in 2012.  That's not an

11:51AM   21   inconsistent statement.

11:51AM   22          THE COURT:  Well, I'll make that decision.  That's my

11:51AM   23   prerogative.

11:51AM   24   BY MS. FLEMING:

11:51AM   25   Q.  Now, Ms. Greasley, you -- where do you live currently?

11:52AM   1   A.   In Buffalo.

11:52AM   2   Q.   You live in Buffalo currently?

11:52AM   3   A.   Mm-hmm.

11:52AM   4   Q.   You had previously lived in Florida, correct?

11:52AM   5   A.   Yes.

11:52AM   6   Q.   And your children and grandchildren live in Florida,

11:52AM   7   correct?

11:52AM   8   A.   That's right.

11:52AM   9   Q.   Okay.  And they still do today?

11:52AM   10  A.   Yes.

11:52AM   11  Q.   And do you travel back and forth between Florida and

11:52AM   12  Buffalo with some frequency?

11:52AM   13  A.   Yes.

11:52AM   14  Q.   And back in 2013, you were also doing that, correct?

11:52AM   15  A.   I took my mother there, yes.

11:52AM   16  Q.   Okay.  And was that in July of 2013 when you took your

11:52AM   17  mother or were there other occasions?

11:52AM   18  A.   We did take -- I took my mother quite a few times to

11:52AM   19  Florida.

11:52AM   20  Q.   So, you took her quite a few times to Florida during that

11:52AM   21  year.  And one of these occasions was in July 2013 or was

11:52AM   22  that the vacation?

11:52AM   23  A.   That was a vacation.

11:52AM   24  Q.   And that was in Florida?

11:52AM   25  A.   Yes.

GREASLEY  --  MS. FLEMING  --  8/20/19

92

| | | |
|---|---|---|
| 11:52AM | 1 | Q.  Okay.  And that was the occasion in which your father |
| 11:53AM | 2 | fell, correct? |
| 11:53AM | 3 | A.  Yes. |
| 11:53AM | 4 | Q.  Okay.  And you had indicated that there were |
| 11:53AM | 5 | approximately 15 people on vacation at that time, correct? |
| 11:53AM | 6 | A.  Yes. |
| 11:53AM | 7 | Q.  And your father fell while in the shower? |
| 11:53AM | 8 | A.  Yes. |
| 11:53AM | 9 | Q.  And you were not there to witness that fall, correct? |
| 11:53AM | 10 | A.  My father showered by himself. |
| 11:53AM | 11 | Q.  And after the fall, did you come into the hotel room and |
| 11:53AM | 12 | observe your father? |
| 11:53AM | 13 | A.  Yes. |
| 11:53AM | 14 | Q.  And did he appear to be injured? |
| 11:53AM | 15 | A.  No. |
| 11:53AM | 16 | Q.  He made no complaint of pain? |
| 11:53AM | 17 | A.  No. |
| 11:53AM | 18 | Q.  Yet, you called emergency medical personnel? |
| 11:53AM | 19 | A.  Yes. |
| 11:53AM | 20 | Q.  And why is that? |
| 11:53AM | 21 | A.  I wanted to be sure he was okay. |
| 11:53AM | 22 | Q.  Okay. |
| 11:53AM | 23 | A.  And to help him get up.  It was slippery and -- |
| 11:53AM | 24 | Q.  So, you're -- it's your testimony that he sustained no |
| 11:53AM | 25 | injury as a result of this fall? |

GREASLEY  --  MS. FLEMING  --  8/20/19

| | | |
|---|---|---|
| 11:53AM | 1 | A.  Yes. |
| 11:53AM | 2 | Q.  Now, your father had home-based -- VA home-based care |
| 11:54AM | 3 | back in 2013, correct? |
| 11:54AM | 4 | A.  Yes. |
| 11:54AM | 5 | Q.  And that had been in place for quite some time, correct? |
| 11:54AM | 6 | A.  Yes. |
| 11:54AM | 7 | Q.  And there were a number of services that your father |
| 11:54AM | 8 | received as a result of this home-based care, correct? |
| 11:54AM | 9 | A.  Yes. |
| 11:54AM | 10 | Q.  And the reason why the VA personnel came to his home was |
| 11:54AM | 11 | because your father had difficulty getting outside of the |
| 11:54AM | 12 | home, correct? |
| 11:54AM | 13 | A.  It was easier for them to come there, yes. |
| 11:54AM | 14 | Q.  And do you recall that he had a home health care aide |
| 11:54AM | 15 | that came to the house twice a week? |
| 11:54AM | 16 | A.  Yes. |
| 11:54AM | 17 | Q.  And do you remember his or her name? |
| 11:54AM | 18 | A.  No, I don't. |
| 11:54AM | 19 | Q.  Do you remember that he had a registered nurse who came |
| 11:54AM | 20 | to his home on a monthly basis? |
| 11:54AM | 21 | A.  From the VA? |
| 11:54AM | 22 | Q.  Yes. |
| 11:54AM | 23 | A.  Yes. |
| 11:54AM | 24 | Q.  And do you remember his name? |
| 11:54AM | 25 | A.  Kevin Hennessy. |

11:54AM   1   Q.   He was the registered nurse?

11:54AM   2   A.   Yes.

11:54AM   3   Q.   Do you remember that there was also a nurse practitioner

11:54AM   4   who came to the home at least once a year but more likely

11:55AM   5   more than once a year to render care to your father?

11:55AM   6   A.   Yes.

11:55AM   7   Q.   And do you remember his name or her name?

11:55AM   8   A.   I'm not sure if that was Theo.   I'm not sure -- no, I'm

11:55AM   9   not sure about him.

11:55AM  10   Q.   And your father also had a physical therapist and an

11:55AM  11   occupational therapist, a dietician and a social worker who

11:55AM  12   would come to the home on at least an annual basis to care

11:55AM  13   for your father.   Do you recall that?

11:55AM  14   A.   I don't recall that.

11:55AM  15   Q.   Okay.   Do you recall the names of any of those care

11:55AM  16   providers?

11:55AM  17   A.   No, I don't.

11:55AM  18   Q.   Now, you had indicated that your father was in good

11:55AM  19   health before he was admitted to respite care.   You will

11:55AM  20   agree, however, your father had dementia, correct?

11:55AM  21   A.   I agree.   Yes, he did.

11:55AM  22   Q.   And you will agree that --

11:55AM  23   A.   It was dementia.

11:55AM  24   Q.   I'm sorry.   I don't mean to interrupt you.   And you will

11:56AM  25   agree that he had frontal temporal dementia?

11:56AM    1   A.  I didn't know what it was called.  I know he had slight

11:56AM    2   dementia.

11:56AM    3   Q.  Now, you had characterized his dementia as slight

11:56AM    4   previously?

11:56AM    5   A.  Right.

11:56AM    6   Q.  But you will agree that your father's dementia was

11:56AM    7   worsening as time went on, correct?

11:56AM    8   A.  Yes.

11:56AM    9   Q.  Okay.  And it was getting worse before he was admitted to

11:56AM   10   respite, correct?

11:56AM   11   A.  Yes.

11:56AM   12   Q.  And you will agree that your father was, at times,

11:56AM   13   combative, correct?

11:56AM   14   A.  Not with me.

11:56AM   15   Q.  He was with your mother?

11:56AM   16   A.  My brother.

11:56AM   17   Q.  Okay.  Your brother.  And then he would steal things such

11:56AM   18   as silverware, correct?

11:56AM   19   A.  Correct.

11:56AM   20   Q.  He was verbally abusive at times?

11:56AM   21           THE COURT:  What do you mean that he would steal

11:56AM   22   things?

11:56AM   23           THE WITNESS:  Um --

11:56AM   24           MS. FLEMING:  He would steal like -- and we'll have

11:56AM   25   her answer.

11:56AM    1    BY MS. FLEMING:

11:56AM    2    Q.  Would you describe what he would steal?

11:56AM    3    A.  He would steal silverware from like, if we went to my

11:57AM    4    aunt's house for dinner or like from Denny's, we would come

11:57AM    5    home and find a spoon in his pocket and packets of sugar.

11:57AM    6    Q.  So, he would steal small --

11:57AM    7    A.  Very small.  And little things, like anything he could

11:57AM    8    fit in his pocket that was little and shiny.

11:57AM    9    Q.  And at times, your father was verbally abusive, correct?

11:57AM   10    A.  No.  I don't agree with that.

11:57AM   11    Q.  He wasn't verbally abusive with your mother or brother?

11:57AM   12    A.  To my brother.

11:57AM   13    Q.  Okay.  So, he was verbally abusive to your brother?

11:57AM   14    A.  Yes.

11:57AM   15    Q.  What about, was he ever physically abusive with either

11:57AM   16    your mother or your brother?

11:57AM   17    A.  No.

11:57AM   18    Q.  And he had a history of acting out towards your mother,

11:57AM   19    correct?

11:57AM   20    A.  Yes.

11:57AM   21    Q.  He did?

11:57AM   22            THE COURT:  What do you mean by acting out?

11:57AM   23            THE WITNESS:  Like, yelling at her.

11:57AM   24            THE COURT:  Oh, all right.

11:57AM   25            THE WITNESS:  Like, raising his voice.

11:58AM    1    BY MS. FLEMING:

11:58AM    2    Q.  And you had indicted that your father was independent

11:58AM    3    with activities of daily living, correct?

11:58AM    4    A.  Could you repeat that?  I'm sorry.

11:58AM    5    Q.  You had indicated that he was independent with activities

11:58AM    6    of daily living?

11:58AM    7    A.  Yes.

11:58AM    8    Q.  But your father refused to shower and needed help with

11:58AM    9    bathing, correct?

11:58AM   10    A.  He needed encouragement to shower, but he washed up every

11:58AM   11    day.

11:58AM   12    Q.  Now, you indicated that you took care of your father's

11:58AM   13    medications, correct?

11:58AM   14    A.  That's right.

11:58AM   15    Q.  And do you remember what his various diagnoses were prior

11:58AM   16    to September 2013?

11:58AM   17    A.  I know that he had blood pressure issues.

11:58AM   18    Q.  Anything else?

11:58AM   19    A.  No.  I don't remember what his diagnoses were.

11:58AM   20    Q.  And if the medical record indicates he was on 11

11:58AM   21    medications at the time of his admission to Pine Lodge, would

11:59AM   22    you disagree with that?

11:59AM   23    A.  That sounds high.  Maybe he was on like, one in the

11:59AM   24    morning, one at night of the same medicine.  So, he took

11:59AM   25    like, four in the morning and four at night.

11:59AM    1    Q.   Okay.  So, you're not exactly sure how many pills he was

11:59AM    2    given each day, correct?

11:59AM    3    A.   Around eight.

11:59AM    4    Q.   Around eight pills each day, you think?

11:59AM    5    A.   Mm-hmm.

11:59AM    6    Q.   And you were responsible for that?

11:59AM    7    A.   My brother and I.

11:59AM    8    Q.   Now, you also testified that your father was mobile,

11:59AM    9    correct?  He could walk?

11:59AM   10    A.   Yes.

11:59AM   11    Q.   And what sort of distance would he walk prior to

11:59AM   12    September 2013?

11:59AM   13    A.   He could walk the whole length of the house, up and down

11:59AM   14    the stairs.  If we went out, he would come with us.  So, he

11:59AM   15    was -- yeah, he did everything normally like he always did.

12:00PM   16    Q.   And when he was outside the home, did he use the walker?

12:00PM   17    A.   He only used the walker on long trips or long -- if we

12:00PM   18    were going some place that we were going to be walking far.

12:00PM   19    Q.   So, if the medical records indicated that -- the VA

12:00PM   20    medical records that your father used a walker when he was

12:00PM   21    outside the home, that would be incorrect?

12:00PM   22    A.   Well, maybe they told him to, but he wouldn't use it and

12:00PM   23    he'd use the cane like when he went to doctors' appointments.

12:00PM   24    Q.   Okay.  Now, you also testified that your father fell five

12:00PM   25    days before going to Pine Lodge, correct?

12:00PM   1   A.  On the 5th.

12:00PM   2   Q.  And you were not there when -- you did not witness the

12:00PM   3   fall that occurred at that time, correct?

12:00PM   4   A.  I did not witness it.

12:00PM   5   Q.  And at that time, you were present in the home, correct?

12:00PM   6   A.  That's right.

12:00PM   7   Q.  Your husband at the time, Mark, was present, correct?

12:00PM   8   A.  Yes.

12:00PM   9   Q.  And your brother Paul was present?

12:01PM   10  A.  Yes.

12:01PM   11  Q.  And your mother was present?

12:01PM   12  A.  Yes.

12:01PM   13  Q.  And were you on the second floor of the home where you

12:01PM   14  were living?

12:01PM   15  A.  Yes.

12:01PM   16  Q.  And was your husband at the time up there on the second

12:01PM   17  floor with you?

12:01PM   18  A.  Yes.

12:01PM   19  Q.  Do you recall where your mother was?

12:01PM   20  A.  In the kitchen.

12:01PM   21  Q.  Your mother was in the kitchen?

12:01PM   22  A.  Mm-hmm.

12:01PM   23  Q.  And where was your brother Paul?

12:01PM   24  A.  In the basement, in his apartment.

12:01PM   25  Q.  Okay.  So, at your home on Linden Avenue in Buffalo, can

12:01PM   1   you describe the area where he fell?  Is this a side door?

12:01PM   2   A.  Yes.  It's a side door.

12:01PM   3   Q.  And when you enter the door, is there a landing?

12:01PM   4   A.  Yes.

12:01PM   5   Q.  And then are stairs leading directly in front of you up

12:01PM   6   to the kitchen?

12:01PM   7   A.  Yes.

12:01PM   8   Q.  And how many stairs are there?

12:01PM   9   A.  Three.

12:01PM  10   Q.  And then there's a stairway leading to the basement,

12:01PM  11   correct?

12:01PM  12   A.  Yes, but there's a closed door that you have to open to

12:01PM  13   get down to the basement.

12:02PM  14   Q.  And is that to the left or the right of the stairway

12:02PM  15   leading to the kitchen?

12:02PM  16   A.  To the left.

12:02PM  17   Q.  When you heard your mother yell, do you remember what she

12:02PM  18   yelled?

12:02PM  19   A.  Just for help.

12:02PM  20   Q.  Did you know what the issue was at that point in time?

12:02PM  21   A.  No.  I ran down the stairs and saw him.

12:02PM  22   Q.  And when you saw him, describe his position.

12:02PM  23   A.  He was like, squatted with almost his fanny to the floor

12:02PM  24   and his feet facing the steps in front of him.

12:02PM  25   Q.  So, his feet were facing the steps in front of him?

| | | |
|---|---|---|
| 12:02PM | 1 | A.  It looked like he was going up the steps. |
| 12:02PM | 2 | Q.  Okay. |
| 12:02PM | 3 | A.  The three steps. |
| 12:02PM | 4 | Q.  And his back was -- |
| 12:02PM | 5 | A.  He was scooted to the -- |
| 12:02PM | 6 | Q.  -- against the door? |
| 12:02PM | 7 | A.  Yes. |
| 12:02PM | 8 | Q.  And he was squatted down almost -- or to the floor? |
| 12:02PM | 9 | A.  Almost.  Yes. |
| 12:02PM | 10 | Q.  So, you -- even though you didn't witness it, you presume |
| 12:02PM | 11 | that he was walking up the stairs and fell backwards? |
| 12:02PM | 12 | A.  That's what it looked like, yeah. |
| 12:03PM | 13 | Q.  And you said the stairs were carpeted, correct? |
| 12:03PM | 14 | A.  Mm-hmm. |
| 12:03PM | 15 | Q.  Was the landing carpeted? |
| 12:03PM | 16 | A.  Yes. |
| 12:03PM | 17 | Q.  Is there cement or some hard surface underneath the |
| 12:03PM | 18 | flooring? |
| 12:03PM | 19 | A.  I'm not sure. |
| 12:03PM | 20 | Q.  What type of surface is the doorway?  What is the door |
| 12:03PM | 21 | made of? |
| 12:03PM | 22 | A.  Wood. |
| 12:03PM | 23 | Q.  Okay.  Now, your father, at the time, when you -- he was |
| 12:03PM | 24 | not able to get up after the fall, correct? |
| 12:03PM | 25 | A.  No. |

| 12:03PM | 1 | Q.  He needed assistance? |
| 12:03PM | 2 | A.  Yes. |
| 12:03PM | 3 | Q.  And someone helped him get up after the fall? |
| 12:03PM | 4 | A.  Yes. |
| 12:03PM | 5 | Q.  And who was that? |
| 12:03PM | 6 | A.  My husband, Mark. |
| 12:03PM | 7 | Q.  Okay.  And what occurred then? |
| 12:03PM | 8 | A.  There was nothing for him to hold onto to get up. |
| 12:03PM | 9 | There's no like, railing all the way up to the end.  So, Mark |
| 12:03PM | 10 | helped him get up. |
| 12:04PM | 11 | Q.  Helped him get up and then what happened? |
| 12:04PM | 12 | A.  He walked up the three steps and went and sat in the |
| 12:04PM | 13 | kitchen. |
| 12:04PM | 14 | Q.  Okay.  Now, you testified that your father was fine after |
| 12:04PM | 15 | this fall? |
| 12:04PM | 16 | A.  Yes. |
| 12:04PM | 17 | Q.  That he made no complaints of pain? |
| 12:04PM | 18 | A.  Mm-hmm. |
| 12:04PM | 19 | Q.  If the medical records indicate that upon admission to |
| 12:04PM | 20 | Pine Lodge he was experiencing back pain, would you disagree |
| 12:04PM | 21 | with that? |
| 12:04PM | 22 | A.  One hundred percent. |
| 12:04PM | 23 | Q.  Okay. |
| 12:04PM | 24 | A.  He was fine.  I would have never left him if he was in |
| 12:04PM | 25 | pain. |

12:04PM   1   Q.  So, you are saying that on no occasion between the time

12:04PM   2   that the fall occurred, which you claim occurred on

12:04PM   3   September 5th and the time he was admitted on September 9th,

12:04PM   4   he never made any complaints of back pain?

12:04PM   5   A.  No.

12:04PM   6   Q.  He never made any complaints of anything else?

12:04PM   7   A.  He said he was fine.

12:04PM   8   Q.  Did you make any observations of any injury to his --

12:04PM   9   any -- note any mark on his body?

12:04PM  10   A.  I did not.

12:04PM  11   Q.  Okay.  Do you know if anyone else did?

12:04PM  12   A.  My brother said he had a scrape.  I'm not sure if it was

12:05PM  13   his elbow or --

12:05PM  14   Q.  Now, you haven't been asked this.  Was your father having

12:05PM  15   trouble with incontinence prior to September 9th when he was

12:05PM  16   admitted?

12:05PM  17   A.  He would have trouble going pee.

12:05PM  18   Q.  Yeah.  So, he had some problems controlling his

12:05PM  19   urinating?

12:05PM  20   A.  He didn't -- well, he didn't pee himself.

12:05PM  21   Q.  Okay.  So, he didn't -- wasn't having difficulty with

12:05PM  22   incontinence?

12:05PM  23   A.  He was having some like, the urgency to go.

12:05PM  24   Q.  And did -- okay.  And other than that, there were no

12:05PM  25   accidents, it's your testimony?

| | | |
|---|---|---|
| 12:05PM | 1 | A.  He would have like, a little bit of like, dribble when he |
| 12:05PM | 2 | would go, like couldn't get it all out. |
| 12:05PM | 3 | Q.  Okay.  Was that condition worsening before he went to |
| 12:05PM | 4 | Pine Lodge, to your knowledge? |
| 12:06PM | 5 | A.  I don't remember. |
| 12:06PM | 6 | Q.  Now, you also indicated that your father walked and could |
| 12:06PM | 7 | walk.  Did your father walk -- when he walked, did he wheeze |
| 12:06PM | 8 | ever, that you recall? |
| 12:06PM | 9 | A.  If he was walking far, he would. |
| 12:06PM | 10 | Q.  Okay.  And when you say far, what do you mean by that? |
| 12:06PM | 11 | A.  Like, if we were going out of the house, like on a |
| 12:06PM | 12 | long -- not in the house, long periods if he was walking far. |
| 12:06PM | 13 | Q.  Okay.  So, what do you mean by walking far, though? |
| 12:06PM | 14 | A.  Don't know.  Maybe 100 feet, 200 feet.  I'm not quite |
| 12:06PM | 15 | sure.  In the house, he was okay. |
| 12:06PM | 16 | Q.  Okay.  So, you understand that your father was prescribed |
| 12:06PM | 17 | an inhaler, an Asmanex inhaler, prior to his admission to |
| 12:07PM | 18 | Pine Lodge, correct? |
| 12:07PM | 19 | A.  Yes.  He had a little puffer. |
| 12:07PM | 20 | Q.  So, did he use it on occasion? |
| 12:07PM | 21 | A.  He never really used it. |
| 12:07PM | 22 | Q.  And you said, though, that when he walked outside he |
| 12:07PM | 23 | would -- and he walked far, you described it as 100 feet, he |
| 12:07PM | 24 | would wheeze? |
| 12:07PM | 25 | A.  I'm not sure how hard it was for him to walk from my |

| | | |
|---|---|---|
| 12:07PM | 1 | house to Denny's.  We were like, five houses or six houses |
| 12:07PM | 2 | from there. |
| 12:07PM | 3 | Q.  Okay.  And it's your testimony that he could walk there? |
| 12:07PM | 4 | A.  Yeah.  He walked there all the time. |
| 12:07PM | 5 | Q.  He walked? |
| 12:07PM | 6 | A.  To Denny's. |
| 12:07PM | 7 | Q.  Five or six houses down to Denny's for breakfast? |
| 12:07PM | 8 | A.  Or dinner. |
| 12:07PM | 9 | Q.  And he didn't wheeze at any point? |
| 12:07PM | 10 | A.  Well, he would wheeze a little bit when he did that. |
| 12:07PM | 11 | That was a far walk for him. |
| 12:07PM | 12 | Q.  Yeah. |
| 12:07PM | 13 | A.  Yeah. |
| 12:07PM | 14 | Q.  And he -- when he walked, was his gait wide? |
| 12:07PM | 15 | A.  It was normal. |
| 12:07PM | 16 | Q.  It was a normal gait? |
| 12:07PM | 17 | A.  Mm-hmm. |
| 12:08PM | 18 | Q.  Now, you testified that you did not go to Pine Lodge when |
| 12:08PM | 19 | your father was admitted there, correct? |
| 12:08PM | 20 | A.  I did not go. |
| 12:08PM | 21 | Q.  You had left for Florida that day, correct? |
| 12:08PM | 22 | A.  Yes. |
| 12:08PM | 23 | Q.  And you said that you did not visit your father at Pine |
| 12:08PM | 24 | Lodge because you were in Florida, correct? |
| 12:08PM | 25 | A.  I was in Florida. |

12:08PM    1    Q.  Yet, you said that you spoke to your brother Paul every

12:08PM    2    day, correct?

12:08PM    3    A.  Yes.

12:08PM    4    Q.  Yet, you also testified that you didn't find out about

12:08PM    5    any fall until after the second fall, correct?

12:08PM    6    A.  Yes.

12:08PM    7    Q.  Did you realize that the first fall occurred on

12:08PM    8    September 10th?  Yes or no?

12:08PM    9    A.  Yes, but --

12:08PM   10    Q.  And the second fall occurred on September 12th, correct?

12:09PM   11    A.  I don't know.  I don't remember.

12:09PM   12    Q.  So, is it your testimony that your brother never told you

12:09PM   13    about the first fall?

12:09PM   14    A.  I don't think my brother knew about the first fall until

12:09PM   15    the next day.  They tried to call my brother-in-law Peter and

12:09PM   16    they didn't call my brother.

12:09PM   17    Q.  So, it's not -- it's your testimony that, even though you

12:09PM   18    spoke to your brother each day, he never told you about the

12:09PM   19    first fall until the second fall occurred?

12:09PM   20    A.  Yes.

12:09PM   21    Q.  Now, you testified that you came back from Florida to

12:09PM   22    Buffalo on September 12th, correct?

12:09PM   23    A.  Yes.

12:09PM   24    Q.  And that was after your brother told you about the second

12:10PM   25    fall, correct?

| | | |
|---|---|---|
| 12:10PM | 1 | A.  Yes. |
| 12:10PM | 2 | Q.  And you testified that you saw your father every day |
| 12:10PM | 3 | while he was at the Buffalo VA Hospital, correct? |
| 12:10PM | 4 | A.  Yes. |
| 12:10PM | 5 | Q.  And is that true and accurate testimony? |
| 12:10PM | 6 | A.  Yes. |
| 12:10PM | 7 | Q.  Do you recall being deposed previously about this matter? |
| 12:10PM | 8 | A.  Yes. |
| 12:10PM | 9 | MS. FLEMING:  And I'm going to ask, Lisa, can you |
| 12:10PM | 10 | bring up Joint Exhibit 11 -- Joint Exhibit 12?  I'm sorry.  On |
| 12:10PM | 11 | page 61.  Okay. |
| 12:10PM | 12 | BY MS. FLEMING: |
| 12:11PM | 13 | Q.  At line 3 through 5:  Okay.  How many times did you go to |
| 12:11PM | 14 | the Buffalo VA, then, if you recall? |
| 12:11PM | 15 | Answer:  I don't remember. |
| 12:11PM | 16 | So, is it your testimony that you did go to the hospital |
| 12:11PM | 17 | every day, even though, at that time, you didn't remember how |
| 12:11PM | 18 | many times you went? |
| 12:11PM | 19 | A.  I can't imagine not going every day. |
| 12:11PM | 20 | MR. MORATH:  Objection, Your Honor.  Again, it's not |
| 12:11PM | 21 | inconsistent.  The question isn't, did you go every day?  It's |
| 12:11PM | 22 | how many times did she go.  She could have went three times in |
| 12:11PM | 23 | one day or four times in one day.  That's not a question that |
| 12:11PM | 24 | was asked. |
| 12:11PM | 25 | THE COURT:  All right.  No speeches.  Just rephrase |

12:11PM   1    your question, please.

12:11PM   2    BY MS. FLEMING:

12:11PM   3    Q.  Now, you had testified that you were -- your family --

12:11PM   4    you had decided to put, on September 16, 2013, to institute

12:12PM   5    comfort care measures for your father, correct?

12:12PM   6    A.  Yes.

12:12PM   7    Q.  And do you recall, did you make that decision -- did you

12:12PM   8    delay in making that decision until September 16th?

12:12PM   9    A.  It was September 16th.  They came earlier in the day and

12:12PM   10   were telling us that they thought that we should do that.

12:12PM   11   And we put it off for a little while that day, because I was

12:12PM   12   scared that once we did that, he was not going to be able to

12:12PM   13   talk to us anymore.

12:12PM   14   Q.  So, there was a delay of some hours before comfort care

12:12PM   15   measures were instituted, correct?

12:12PM   16   A.  Yes.

12:12PM   17   Q.  And that was because of the family decision, correct?

12:12PM   18   A.  Yes.

12:12PM   19   Q.  Now, you testified that your father was, you know, on

12:12PM   20   pain medication, correct, during the time he was

12:13PM   21   hospitalized?

12:13PM   22   A.  At respite?

12:13PM   23   Q.  At respite or -- no.  I'm talking about Buffalo VA, both

12:13PM   24   facilities, but at the Buffalo VA Hospital.

12:13PM   25   A.  Oh, yes.

109

12:13PM  1   Q.  And do you remember having a conversation with VA

12:13PM  2   providers who were recommending that your father be made more

12:13PM  3   comfortable and be given more potent medications at that

12:13PM  4   time?  Do you remember that?

12:13PM  5   A.  Yes.

12:13PM  6   Q.  And do you remember that you -- the family decided to

12:13PM  7   delay giving more potent medications?

12:13PM  8   A.  Yes.

12:13PM  9   Q.  And that was because why?

12:13PM  10  A.  Because I didn't want him not to communicate with us

12:13PM  11  anymore.  I just didn't want him to, you know, stop looking

12:13PM  12  at us.  I didn't want him to -- I wanted to keep him with us

12:13PM  13  for as long as we could.

12:14PM  14  Q.  Did you understand the pain medication would have helped

12:14PM  15  with his pain when you made that decision?

12:14PM  16  A.  No.  I thought it was just going to make him sleepy.

12:14PM  17  Q.  So, you didn't understand that --

12:14PM  18  A.  I thought it was end-of-life care.  I thought it was

12:14PM  19  going to --

12:14PM  20  Q.  So, you didn't understand that the pain medications would

12:14PM  21  have alleviated some of the pain he was in?

12:14PM  22  A.  We eventually did that day.  That night, we decided to

12:14PM  23  give it to him.

12:14PM  24  Q.  Okay.  So, there was a delay from the morning to the

12:14PM  25  evening?

GREASLEY  --  MS. FLEMING  --  8/20/19

110

12:14PM  1   A.  It was probably the afternoon to the evening, late

12:14PM  2   afternoon, I believe.

12:14PM  3   Q.  Now, you testified that you had one conversation with

12:14PM  4   your father, correct and that was when he told you that he

12:14PM  5   was hurt, correct?

12:14PM  6   A.  Yes.

12:14PM  7   Q.  And you had no other conversations with your father after

12:14PM  8   that?

12:14PM  9   A.  I had a lot of conversations with him and he couldn't --

12:14PM  10  like, I just told him that I loved him all day long and I

12:15PM  11  don't know if you call that, you know.

12:15PM  12  Q.  Did your father respond verbally?

12:15PM  13  A.  He did.  He would breathe I love you back and ask for my

12:15PM  14  mom.  He would lip it, do you know what I mean?  You know,

12:15PM  15  like, I love you.  He couldn't really --

12:15PM  16  Q.  So, he didn't verbalize it, that he --

12:15PM  17  A.  He did when I first got there, but then as the time went

12:15PM  18  on, he was still just mouthing it.

12:15PM  19  Q.  Okay.

12:15PM  20        MS. FLEMING:  Lisa, could you bring up Joint

12:15PM  21  Exhibit 12, page 55?  Okay.

12:15PM  22  BY MS. FLEMING:

12:15PM  23  Q.  Lines 15 through 19:  And why -- you didn't have any

12:16PM  24  further conversations with him?

12:16PM  25        Answer:  No.

12:16PM    1        And why was that?

12:16PM    2        He never answered me.

12:16PM    3        Do you recall that testimony?

12:16PM    4    A.  Yes.

12:16PM    5    Q.  Now, you were asked a few questions about a conversation

12:17PM    6    that was tape recorded after your father died, correct?

12:17PM    7    A.  Yes.

12:17PM    8    Q.  And that was with some VA providers, correct?

12:17PM    9    A.  Yes.

12:17PM   10    Q.  And you -- did you know who those VA providers were?

12:17PM   11    A.  They were the doctors from the VA.

12:17PM   12    Q.  But you never visited your father while he was in respite

12:17PM   13    care, correct?

12:17PM   14    A.  No, I did not.

12:17PM   15    Q.  You never met Dr. Maller, correct?

12:17PM   16    A.  I never -- no, I never met him.

12:17PM   17    Q.  And you probably never even knew who Dr. Maller was,

12:17PM   18    correct?

12:17PM   19    A.  I know my brother mentioned his name.

12:17PM   20    Q.  Were you aware that Dr. Maller never provided direct care

12:17PM   21    to Mr. -- your father?

12:17PM   22    A.  No, I'm not.

12:17PM   23    Q.  Okay.  So, do you know his title or what his status was

12:17PM   24    with respect to the care and treatment of your father?

12:17PM   25    A.  No, I don't.

12:17PM   1   Q.  But yet, you can identify his voice on the tape

12:17PM   2   recording?

12:17PM   3   A.  No.  I know that's who my brother was talking to.

12:17PM   4   Q.  So, how did you know that?

12:17PM   5   A.  That's what he just told me, that was the doctor that was

12:17PM   6   involved.

12:18PM   7   Q.  The doctor that was involved?

12:18PM   8   A.  Yeah.  The doctor that --

12:18PM   9   Q.  And that's what your brother told you?

12:18PM   10  A.  Mm-hmm.

12:18PM   11  Q.  Okay.  Now, you testified today that your brother asked

12:18PM   12  you to do the tape recording, correct?

12:18PM   13  A.  Yes.

12:18PM   14  Q.  Now, do you recall being asked that question at your

12:18PM   15  deposition --

12:18PM   16       MS. FLEMING:  Lisa, can you please bring up Joint

12:18PM   17  Exhibit 12, page 66, lines 8 through 12?

12:18PM   18  BY MS. FLEMING:

12:18PM   19  Q.  And why did you tape the whole conversation or only part

12:18PM   20  of it?

12:18PM   21     You'd have to ask Paul, because he did it.  And I don't

12:19PM   22  know if he did it from the beginning or he just thought about

12:19PM   23  doing it.

12:19PM   24     Do you remember that testimony, Ms. Greasley?

12:19PM   25  A.  Yes, because I wasn't there for the whole conversation.

| 12:19PM | 1 | MS. FLEMING:  May I just ask co-counsel?  Thank you, |
| 12:19PM | 2 | Ms. Greasley, I have no further questions.  Thank you, Your |
| 12:19PM | 3 | Honor. |
| 12:19PM | 4 | MR. MORATH:  Very few, Your Honor. |
| 12:19PM | 5 | |
| 12:20PM | 6 | REDIRECT EXAMINATION |
| 12:20PM | 7 | |
| 12:20PM | 8 | BY MR. MORATH: |
| 12:20PM | 9 | Q.  Ms. Greasley, if I may?  I just want to clear up a few |
| 12:20PM | 10 | things. |
| 12:20PM | 11 | A.  Sure. |
| 12:20PM | 12 | Q.  There was some questioning about when you moved home |
| 12:20PM | 13 | versus when you moved back.  And I believe during my direct |
| 12:20PM | 14 | exam, you had told me that you moved home in 2007 -- |
| 12:20PM | 15 | A.  Yes. |
| 12:20PM | 16 | Q.  -- is that correct? |
| 12:20PM | 17 | A.  Yes. |
| 12:20PM | 18 | Q.  And at some point, you moved out for a period of time? |
| 12:20PM | 19 | A.  I did. |
| 12:20PM | 20 | Q.  Okay.  And you couldn't remember when that was? |
| 12:20PM | 21 | A.  No. |
| 12:20PM | 22 | Q.  And you were showed a portion of your transcript that |
| 12:20PM | 23 | talked about 2012 is when you moved back? |
| 12:20PM | 24 | A.  Okay. |
| 12:20PM | 25 | Q.  Is that the time -- is that when you moved back after you |

GREASLEY  --  MR. MORATH  --  8/20/19

114

| | | |
|---|---|---|
| 12:20PM | 1 | moved out for that short period of time? |
| 12:20PM | 2 | MS. FLEMING:  Objection.  Leading. |
| 12:20PM | 3 | MR. MORATH:  It's redirect, Judge. |
| 12:20PM | 4 | THE COURT:  Overruled.  Go ahead. |
| 12:20PM | 5 | THE WITNESS:  Yes, it is. |
| 12:20PM | 6 | BY MR. MORATH: |
| 12:20PM | 7 | Q.  So, it is true that you moved home in 2007? |
| 12:20PM | 8 | A.  Yes. |
| 12:20PM | 9 | Q.  Now, Ms. Fleming asked you about the conversations that |
| 12:20PM | 10 | Paul had with you on the phone and the fact that he didn't |
| 12:21PM | 11 | tell you about the first fall and told you about both falls |
| 12:21PM | 12 | at once.  And you made a comment that you don't believe that |
| 12:21PM | 13 | Paul knew about the first fall until the following day.  What |
| 12:21PM | 14 | did you mean by that? |
| 12:21PM | 15 | A.  Because they tried to call my brother-in-law Peter and |
| 12:21PM | 16 | not my brother. |
| 12:21PM | 17 | Q.  They called the wrong person? |
| 12:21PM | 18 | A.  Yes, they called the wrong person. |
| 12:21PM | 19 | MS. FLEMING:  Objection, Your Honor.  He's leading. |
| 12:21PM | 20 | THE COURT:  Overruled. |
| 12:21PM | 21 | BY MR. MORATH: |
| 12:21PM | 22 | Q.  Do you know that Dr. Maller is the Medical Director of |
| 12:21PM | 23 | Pine Lodge? |
| 12:21PM | 24 | A.  No. |
| 12:21PM | 25 | MR. MORATH:  No further questions, Your Honor.  Thank |

12:21PM    1    you.

12:21PM    2            THE COURT:  Thank you, ma'am.

12:21PM    3            THE WITNESS:  You're welcome.  Thank you.

12:21PM    4    (Witness excused at 12:21 p.m.)

12:21PM    5            MS. FLEMING:  Nothing further, Your Honor.  Thank

12:21PM    6    you.

12:21PM    7            THE COURT:  We'll take a luncheon break and return at

12:21PM    8    1:30.

12:21PM    9            MS. FLEMING:  1:30, Your Honor?

12:21PM   10            THE COURT:  1:30.

12:21PM   11            MS. FLEMING:  Thank you.

12:21PM   12            THE COURT:  Court will be in recess.

12:21PM   13            THE CLERK:  All rise.

12:21PM   14    (Luncheon recess.)

01:31PM   15            THE COURT:  Okay.  We're going to go from now until

01:31PM   16    about 11:15 and we'll adjourn until tomorrow at 11:15.

01:31PM   17            THE CLERK:  We'll go until 3:15.

01:31PM   18            THE COURT:  3:15.  What did I say, 11:15?  I think

01:31PM   19    that's already passed.  Thank you.

01:31PM   20            MR. MORATH:  Plaintiff calls Nurse Practitioner Kevin

01:31PM   21    Hennessy.

01:31PM   22            THE CLERK:  Please state your full name and spell

01:31PM   23    your last name for the record.

01:31PM   24            THE WITNESS:  Sure.  It's Kevin Lynch Hennessy,

01:31PM   25    H-E-N-N-E-S-S-Y.

01:32PM    1    (The witness was sworn at 1:32 p.m.)

01:32PM    2              MR. MORATH:  May I begin, Your Honor?

01:32PM    3              THE COURT:  Yes, please.

01:32PM    4

01:32PM    5                    DIRECT EXAMINATION

01:32PM    6

01:32PM    7    BY MR. MORATH:

01:32PM    8    Q.  Good afternoon, Mr. Hennessy.

01:32PM    9    A.  Good afternoon.

01:32PM   10    Q.  Sir, you are a registered nurse practitioner in New York

01:32PM   11    State?

01:32PM   12    A.  I am.

01:32PM   13    Q.  And when were you first registered?

01:32PM   14    A.  In 2007.

01:32PM   15    Q.  And have you been continuously registered since then?

01:32PM   16    A.  Yes.

01:32PM   17    Q.  Now, I understand that you worked for the Veteran's

01:32PM   18    Administration in 2013?

01:32PM   19    A.  Yes.

01:32PM   20    Q.  And what was your position at that time?

01:33PM   21    A.  I was a nurse practitioner at that time.

01:33PM   22    Q.  And how long had you been employed with the VA?

01:33PM   23    A.  Since 2005.

01:33PM   24    Q.  And did you work at any particular facilities within the

01:33PM   25    VA system?

01:33PM  1   A.  I did.  I worked at the -- in the emergency room from

01:33PM  2   2005 to 2007.  And then from, 2007 to 2009, I worked in

01:33PM  3   regular primary care.  And then I moved along.  In 2009, I

01:33PM  4   moved into the position of home-based primary care.

01:33PM  5   Q.  So, the ER, was that the Buffalo VA Hospital?

01:33PM  6   A.  Yes.

01:33PM  7   Q.  And then the primary care, is that the two primary care

01:33PM  8   groups; you work in one of those?

01:33PM  9   A.  Yes.  I worked in primary care group 2.

01:33PM  10  Q.  So, from 2009 forward, you worked in the home-based care?

01:33PM  11  A.  Yes.

01:33PM  12  Q.  Can you tell me a little bit about what that home-based

01:33PM  13  care is?

01:33PM  14  A.  Sure.  Home-based primary care is a -- we take care of

01:33PM  15  veterans that live at home because they're too ill to get in

01:34PM  16  for regular primary care appointments anymore.  So, a lot of

01:34PM  17  our veterans suffer from different ailments that they can't

01:34PM  18  physically get in any longer into our regular primary care.

01:34PM  19  Q.  Well, certainly there's times that it's not that they're

01:34PM  20  too ill; they don't drive anymore or it's easier for the

01:34PM  21  family, right?

01:34PM  22  A.  It is.  Like, the vast majority of our patients can't get

01:34PM  23  up and down stairs any longer.  They don't drive.  Yes,

01:34PM  24  that's correct.

01:34PM  25  Q.  So, certainly, there are patients, including

01:34PM   1   Mr. Marranco, that you would visit, home care, who could

01:34PM   2   still get up and down stairs except that they simply didn't

01:34PM   3   drive anymore?

01:34PM   4   A.  He didn't drive but -- he didn't --

01:34PM   5           THE COURT:  That's a compound question.  Will you

01:34PM   6   break that down?

01:34PM   7           MR. MORATH:  Sure, Judge.

01:34PM   8           THE COURT:  And it's very leading.

01:34PM   9           MR. MORATH:  I'm sorry?

01:35PM  10           THE COURT:  Leading.

01:35PM  11           MR. MORATH:  Judge, these are employees of the

01:35PM  12   defendant.  They're adverse by definition, under the rules.

01:35PM  13   I'm trying not to lead too much, but I believe I have the

01:35PM  14   authority, under the law, to do it if I have to.

01:35PM  15           THE COURT:  I'll give you a little latitude.

01:35PM  16           MR. MORATH:  Thank you, Judge.

01:35PM  17           THE COURT:  But I don't want you testifying.

01:35PM  18           MR. MORATH:  Very well.  Thank you.

01:35PM  19   BY MR. MORATH:

01:35PM  20   Q.  Let's talk about the community living center in Batavia.

01:35PM  21   Did you ever actually work at that facility, one of the

01:35PM  22   lodges there?

01:35PM  23   A.  I have not.

01:35PM  24   Q.  Are you familiar with those?

01:35PM  25   A.  I am familiar with the base, but I have never even been

01:35PM    1    out to see them.

01:35PM    2    Q.  Do you understand that one of the lodges there -- they

01:35PM    3    call them one of the lodges -- is Pine Lodge.  It's a respite

01:35PM    4    facility?

01:35PM    5    A.  I have heard of it.

01:35PM    6    Q.  But you have never been out there?

01:35PM    7    A.  I have never physically seen that.

01:35PM    8    Q.  So, it's fair to say you couldn't -- or can you tell me

01:35PM    9    the type of care that facility provides?

01:35PM   10    A.  I cannot.

01:35PM   11    Q.  Now, of course, Michael Marranco was one of the veterans

01:35PM   12    that you performed these home visits for?

01:35PM   13    A.  That's correct.

01:35PM   14    Q.  And so you recall, did you ever see Michael Marranco

01:36PM   15    outside of his home?

01:36PM   16    A.  No.

01:36PM   17    Q.  So, any visit that you had would have been at his home on

01:36PM   18    Linden Avenue in Buffalo?

01:36PM   19    A.  That's correct.

01:36PM   20    Q.  Did you have a chance to look through any of the notes or

01:36PM   21    records from your time caring for Mr. Marranco at his home?

01:36PM   22    A.  I'm sorry.  Can you repeat the question?

01:36PM   23    Q.  Sure.  Did you look at any of your records before coming

01:36PM   24    in here today?

01:36PM   25    A.  I did.

01:36PM   1   Q.  And before you looked at the records to come in here

01:36PM   2   today, when is the last time that you looked at anything that

01:36PM   3   had anything to do with Mr. Marranco?

01:36PM   4   A.  2013.

01:36PM   5   Q.  Do you recall, roughly, the first time you saw

01:36PM   6   Mr. Marranco at his house?

01:36PM   7   A.  I do not.

01:36PM   8   Q.  I have -- I saw your name in some notes that don't

01:36PM   9   necessarily concern the case but were from 2011, 2012.  Does

01:36PM  10   that sound possible, that you saw him as early as 2011?

01:36PM  11   A.  Yes.

01:36PM  12        THE COURT:  We don't deal in possibilities.  You said

01:37PM  13   possible.  We're interested in facts.  Anything is possible, I

01:37PM  14   guess, in this world, but do not phrase the word possible.  I

01:37PM  15   am going to sustain the next time that's used.

01:37PM  16   BY MR. MORATH:

01:37PM  17   Q.  Do you have any reason to dispute that you saw

01:37PM  18   Mr. Marranco as early as 2011?

01:37PM  19   A.  No.

01:37PM  20   Q.  And do you have any idea how many times you saw him at

01:37PM  21   his home?

01:37PM  22   A.  I have no clue.  It was more than at least once a year.

01:37PM  23   That, I can say for a fact.

01:37PM  24   Q.  One or two times a year?

01:37PM  25   A.  Minimally, yes.

01:37PM   1   Q.  That would have been from 2000 -- certainly, 2012, 2013?

01:37PM   2   A.  Correct.

01:37PM   3   Q.  And the two times a year that you would see him, what

01:37PM   4   type of --

01:37PM   5        MR. KHALIL:  Objection.  He said that -- he's

01:37PM   6   mischaracterizing the testimony.  It was, at minimum, one to

01:37PM   7   two times a year.

01:37PM   8        THE COURT:  Rephrase your question, sir.

01:37PM   9   BY MR. MORATH:

01:38PM  10   Q.  The times that you would see him, at minimum, one to two

01:38PM  11   times per year, what kind of visits would these be?

01:38PM  12   A.  They would be -- one was definitely part of the annual

01:38PM  13   physical and the other one would be just follow up, to see

01:38PM  14   how the patient was doing at the time.  Just, you know, it

01:38PM  15   was just -- we tried to get in to see him.

01:38PM  16        But a lot of times, we'd go to see him and we could hear

01:38PM  17   the patient in the house.  We'd schedule visits, but, you

01:38PM  18   know, we'd let the family know we had a scheduled visit.  And

01:38PM  19   then we'd hear the patient and his wife in the house and then

01:38PM  20   we'd ring the doorbell.  Nobody would answer the door.  So,

01:38PM  21   we'd have to reschedule visits after that.

01:38PM  22   Q.  Now, when you say we, who is we?

01:38PM  23   A.  A lot of times the nurse and I would go together in order

01:38PM  24   to kind of consolidate things because, again, it was

01:38PM  25   difficult to get in to see the patient on occasion.

01:38PM  1    Q.   Who was the nurse?

01:38PM  2    A.   Mr. Burzynski.

01:39PM  3    Q.   And focusing just on 2012-2013 timeframe, were you and --

01:39PM  4    is his first name Theo?

01:39PM  5    A.   Thaddeus.

01:39PM  6    Q.   Thaddeus.  Were you and Thaddeus the only two individuals

01:39PM  7    from home care who would visit him at his house?

01:39PM  8    A.   No.  There was -- we have a whole team who sees these

01:39PM  9    cases.  Again, these are very ill patients, so we have a

01:39PM  10   whole team of patients that see them.  We have a dietitian

01:39PM  11   that sees them.  We have physical therapy that sees them.

01:39PM  12   Occupational therapy, dieticians, social workers.

01:39PM  13   Q.   And how many times a year would they go see Mr. Marranco?

01:39PM  14   A.   Everybody was mandated to see the patient at least once a

01:39PM  15   year but, again, it depends on what the situation was and

01:39PM  16   they could go out more frequently as well.

01:39PM  17   Q.   Now, could the family also call you if they had a

01:39PM  18   specific concern?

01:39PM  19   A.   Absolutely and even after hours they could call.  We have

01:40PM  20   a triage phone line that we give all our patients with an 800

01:40PM  21   number.  So, even on the weekends, if there was a problem at

01:40PM  22   home or in the evening hours, they could call the triage line

01:40PM  23   as well.

01:40PM  24   Q.   With respect to nurses, whether registered nurse, nurse

01:40PM  25   practitioner, was it just you and Thaddeus that went and saw

01:40PM    1    Mr. Marranco?

01:40PM    2    A.   Yes.

01:40PM    3    Q.   Okay.  So, no other nurses?

01:40PM    4    A.   No, but let me just clarify that.  If --

01:40PM    5    Q.   Just wait for the next question.

01:40PM    6    A.   Okay.

01:40PM    7    Q.   Now, you mentioned that at least one of those visits per

01:40PM    8    year was an annual physical, right?

01:40PM    9    A.   That's correct.

01:40PM   10    Q.   Did you perform any type of assessment on Mr. Marranco

01:40PM   11    any time you were at his house?

01:40PM   12    A.   Yes.

01:40PM   13    Q.   Tell me what you would perform, whether it was the annual

01:40PM   14    physical or another visit, what would you certainly do on a

01:41PM   15    visit?

01:41PM   16    A.   On an annual physical, they could get maybe a full head

01:41PM   17    to toe.  And on a follow-up visit, it would be more of a

01:41PM   18    focused physical exam.  And certainly, if there was something

01:41PM   19    more problematic going on at that time, they would get looked

01:41PM   20    over for that as well.

01:41PM   21    Q.   And certainly you would always want to examine a patient

01:41PM   22    sufficient enough to see if they had any new injuries?

01:41PM   23    A.   That's correct.

01:41PM   24    Q.   And if you found a new injury, you would make a note of

01:41PM   25    it in your records?

01:41PM    1    A.  That's correct.

01:41PM    2    Q.  Now, you mentioned Mr. Marranco's family.  Did you know

01:41PM    3    Paul Marranco?  You remember Paul?

01:41PM    4    A.  I did.

01:41PM    5    Q.  What about his daughter, Loretta?

01:41PM    6    A.  Yes.  She lived upstairs from the patient.

01:41PM    7    Q.  And when you went to see Mr. Marranco, were you and Theo

01:41PM    8    always together or was it sometimes just you -- not just with

01:41PM    9    the nurses, sometimes just you, sometimes just Theo?

01:41PM   10    A.  There was an occasion when it was -- we would split up

01:41PM   11    and not go together.

01:42PM   12    Q.  So it varied?

01:42PM   13    A.  Yes.

01:42PM   14    Q.  And on the visits that you went to see Mr. Marranco, do

01:42PM   15    you recall either Paul or Loretta being there?

01:42PM   16    A.  Yes.  The patient had dementia and so did the wife.  So,

01:42PM   17    we would want a family member there so that we could

01:42PM   18    communicate with somebody who could give us any pertinent

01:42PM   19    information that we would need.

01:42PM   20    Q.  So, you would ask the questions, how he's doing and have

01:42PM   21    you noted any changes, things of that nature to the family?

01:42PM   22    A.  That's correct.

01:42PM   23    Q.  Living with them, they'd be in the best position to tell

01:42PM   24    you?

01:42PM   25    A.  That's correct.

01:42PM   1   Q.  If the family mentioned any concerns or changes, you'd

01:42PM   2   certainly make a note of that?

01:42PM   3   A.  That's correct.

01:42PM   4   Q.  And would that be your normal practice any time you were

01:42PM   5   at the house to, you know, specifically ask Loretta or Paul

01:42PM   6   if Michael was having any new issues?

01:42PM   7   A.  It is, yes.

01:42PM   8   Q.  And would that be -- if you know, would that be the other

01:43PM   9   nurses' practice as well?

01:43PM  10          MR. KHALIL:  Objection.

01:43PM  11          THE WITNESS:  I can't speak for them.  I don't know.

01:43PM  12          THE COURT:  Overruled.

01:43PM  13          THE WITNESS:  I was -- oh, go ahead.  I'm sorry.

01:43PM  14   BY MR. MORATH:

01:43PM  15   Q.  Would that be the practice of all the nurses at the home

01:43PM  16   care facility?

01:43PM  17   A.  I can't speak for them.

01:43PM  18   Q.  You certainly would ask?

01:43PM  19   A.  I certainly would.

01:43PM  20   Q.  Did you have any -- as an LPN -- I'm sorry -- as a NP,

01:43PM  21   did you have any supervisory position over just the RNs or

01:43PM  22   anyone else who went out there?

01:43PM  23   A.  I would -- we would be in the clinical lead.  And then,

01:43PM  24   you know, the nurse would follow below us and so forth, so

01:43PM  25   on.  We -- we wrote the orders, so that the staff below us

HENNESSY  --  MR. MORATH  --  8/20/19

01:43PM  1  would, you know, follow through with the orders.

01:43PM  2  Q.  And when you were at -- individually, you were personally

01:43PM  3  at Mr. Marranco's house, for any reason, would you always

01:43PM  4  test his gait?

01:43PM  5  A.  He had advanced dementia, so if he allowed us to.  You

01:44PM  6  know, there were times when he would just walk away from the

01:44PM  7  table but, you know, nothing specific.  You know, we couldn't

01:44PM  8  always do a full physical exam, but we did watch him get up

01:44PM  9  and walk away and we would note that.

01:44PM  10  Q.  So, did you always test his gait?  In some fashion, you

01:44PM  11  watched him walk every visit?  Yes?

01:44PM  12  A.  Yes.

01:44PM  13  Q.  Did you always check his blood pressure?

01:44PM  14  A.  Yes.

01:44PM  15  Q.  Did you check any range of motion in his arms, legs?

01:44PM  16  A.  Yes.

01:44PM  17  Q.  Every visit?

01:44PM  18  A.  No.

01:44PM  19  Q.  And would you question the family as to any changes in

01:44PM  20  his ability to do his activities of daily living?

01:44PM  21  A.  Yes.

01:44PM  22  Q.  And if there were any changes, you would make notes of

01:45PM  23  that?

01:45PM  24  A.  Yes.  I know he was getting combative with the son when

01:45PM  25  they were doing ADLs and then, he had a home health aide as

01:45PM  1    well.  And he was not --

01:45PM  2    Q.  Okay.  I'm not -- I promise you you're going to get

01:45PM  3    questions -- this will move along sooner if you just answer

01:45PM  4    the question --

01:45PM  5    A.  Sure.

01:45PM  6    Q.  -- and we'll just keep going.  Now, I'm sure you

01:45PM  7    understand that Mr. Marranco was admitted to Pine Lodge for

01:45PM  8    what was supposed to be a two-week respite stay on September

01:45PM  9    9th?

01:45PM  10   A.  Yes.

01:45PM  11   Q.  Now, I believe, according to the records, you were at his

01:45PM  12   home approximately five days before that, on September 4th?

01:45PM  13   A.  No, that's incorrect.

01:46PM  14   Q.  It was a long-term care admission evaluation though?

01:46PM  15   A.  That's just a report given to the person that's going to

01:46PM  16   take over the care for the patient going into respite.  It's

01:46PM  17   more of a what's been going on.

01:46PM  18   Q.  And where did you get that information from?

01:46PM  19   A.  I took it from -- if you look under vitals in that note,

01:46PM  20   it's -- 7/25 is where I last physically saw the patient

01:46PM  21   myself.

01:46PM  22   Q.  Okay.  So, we're going to look at the note in a second.

01:46PM  23   I just want to be clear.  You were the only nurse

01:46PM  24   practitioner that would see Mr. Marranco at his home?

01:46PM  25   A.  Correct.

01:46PM    1    Q.  And the last time you physically saw him before his

01:47PM    2    admission to respite care was in July?

01:47PM    3    A.  July 25th, 2013.

01:47PM    4    Q.  So, he was not seen -- the process of admitting him to

01:47PM    5    respite facility, he was not seen by an NP?

01:47PM    6    A.  That's correct.

01:47PM    7    Q.  Okay.

01:47PM    8         MR. MORATH:  If we could take a look at Exhibit --

01:47PM    9    part of 47C.  It's page -- begins at page 548.  Sorry.  The

01:47PM   10    first page we're going to look at is 554 is the exact page.

01:48PM   11         THE COURT:  Page 554?

01:48PM   12         MR. MORATH:  Correct, Your Honor.  Ready, Your Honor?

01:49PM   13    I didn't know if you found it yet.  I apologize.

01:49PM   14    BY MR. MORATH:

01:49PM   15    Q.  Can you see that okay?

01:49PM   16    A.  I can.

01:49PM   17    Q.  Okay.  What is the purpose of this note that we're

01:49PM   18    looking at here?  This one that's titled Administrative Note

01:49PM   19    September 4th at 0939?

01:49PM   20    A.  This is a 1010M.  It's a schedule to let the nursing home

01:49PM   21    in Batavia know that this patient is going to be scheduled to

01:49PM   22    be coming out to their facility for his respite stay.

01:49PM   23    Q.  And do you recall how you found out that this was

01:49PM   24    happening?

01:50PM   25    A.  Probably a social worker informed me.

01:50PM  1   Q.  And it has here many diagnoses of dementia and he's

01:50PM  2   heading off to Pine Lodge.  Where it says Pine, I guess?

01:50PM  3   A.  I'm sorry.  Let me just --

01:50PM  4   Q.  Right below date of admission of September 9th.

01:50PM  5   A.  Okay.  Dementia.  Yeah.  And it says check in -- ward,

01:50PM  6   Pine.  Yes.

01:50PM  7   Q.  And then we see attending physician Maller.  Who is

01:50PM  8   Dr. Maller?

01:50PM  9   A.  Dr. Marc Maller is the head of the medical out at

01:50PM  10  Batavia.

01:50PM  11  Q.  So, he's the head of the medical end of the Pine Lodge

01:50PM  12  facility?

01:50PM  13  A.  Correct.  Yes.

01:50PM  14  Q.  Okay.

01:50PM  15        MR. MORATH:  If we can flip to the next page, 555.

01:50PM  16  BY MR. MORATH:

01:51PM  17  Q.  And this is the document we were talking about a moment

01:51PM  18  ago.  It's titled long-term care Admission Evaluation Note.

01:51PM  19        THE COURT:  Where are you reading?

01:51PM  20        MR. MORATH:  Page 555.

01:51PM  21        THE COURT:  Where?

01:51PM  22        MR. MORATH:  Almost last at the top, right below the

01:51PM  23  solid line.

01:51PM  24        THE COURT:  Oh, okay.

01:51PM  25

01:51PM    1    BY MR. MORATH:

01:51PM    2    Q.  And then the date of the note is September 4th, 2013 and

01:51PM    3    it was authorized by you?

01:51PM    4    A.  That's correct.

01:51PM    5    Q.  And what is the purpose of this note?

01:51PM    6    A.  This note is basically a report to the oncoming people to

01:51PM    7    let them know what kind of issues have been going on with the

01:51PM    8    patient as they're entering into somebody else's care.  So,

01:51PM    9    it's like a handoff.

01:51PM   10    Q.  When you say handoff, so, this is intended to inform the

01:51PM   11    people at Pine Lodge of that information?

01:51PM   12    A.  That's correct.

01:52PM   13    Q.  And it's your testimony that the information that you

01:52PM   14    used to inform them of his conditions was back from July?

01:52PM   15    A.  July 25th, 2013.

01:52PM   16    Q.  So, it's not the practice of the -- your practice to go

01:52PM   17    out and see a patient closer in time to when he's going to be

01:52PM   18    admitted to Pine Lodge?

01:52PM   19    A.  It's within 45 days.  It's a reasonable amount of time

01:52PM   20    between the time that he's -- from his annual physical to the

01:52PM   21    time he's going.  And on admission into Pine Lodge, he'd be

01:52PM   22    seen by another provider going in.

01:52PM   23    Q.  So, you're comfortable that the information you've

01:52PM   24    provided to Pine Lodge would have been accurate and up to

01:52PM   25    date?

01:52PM 1  A.  That's correct.

01:52PM 2  Q.  And do you know, is this note -- how is this note

01:52PM 3  physically or electronically transmitted to Pine Lodge?

01:52PM 4  A.  It's uploaded into the patient's medical record.  And

01:52PM 5  then, the person -- anybody who has access to that patient's

01:53PM 6  medical record will be able to access that note.

01:53PM 7  Q.  And was the part of this purpose, this note, was it to

01:53PM 8  make any determination whether or not he was stable enough to

01:53PM 9  go to Pine Lodge?

01:53PM 10  A.  Yes.

01:53PM 11  Q.  And you felt that he was, based off of this information?

01:53PM 12  A.  This is correct.

01:53PM 13  Q.  And I think a little more than halfway down here, you

01:53PM 14  state, pretty well medically stable?

01:53PM 15  A.  I do put medically stable.

01:53PM 16  Q.  Okay.

01:53PM 17  A.  But when I write that, it just means that the patient

01:53PM 18  hasn't had any hospitalizations or anything within the

01:53PM 19  last --

01:53PM 20  Q.  Sure.

01:53PM 21  A.  Okay.

01:53PM 22  Q.  And do you know if you were to deem the person -- if you

01:53PM 23  were to deem Mr. Marranco to be not be medically stable, do

01:53PM 24  you know if he would have been permitted to enter respite?

01:53PM 25  A.  I don't know.

01:53PM    1    Q.  Do you know if respite has the ability to care for

01:53PM    2    somebody who is not medically stable?

01:54PM    3    A.  They have a full team out there, so it's, you know -- I

01:54PM    4    can't really make that determination.

01:54PM    5    Q.  Fair enough.  If we look at the note, right in the middle

01:54PM    6    there, where it says physical or mental limitations, can you

01:54PM    7    see that right in the middle?

01:54PM    8    A.  Does require --

01:54PM    9    Q.  Right before the main paragraph, basically.

01:54PM   10    A.  Recent acute illness.  Primary diagnosis.

01:54PM   11    Q.  For his age.  It says chronic illness, physical or mental

01:54PM   12    limitations.

01:54PM   13    A.  Yes, I do see that.

01:54PM   14    Q.  Now, there you note -- under that title, you note that he

01:54PM   15    did not require supplemental oxygen?

01:55PM   16    A.  That's correct.

01:55PM   17    Q.  Do you ever remember visiting Mr. Marranco at home and

01:55PM   18    seeing him on supplemental oxygen?

01:55PM   19    A.  I do not.

01:55PM   20    Q.  We flip to the next page, 556.  Right at the top there,

01:55PM   21    it says, activity restrictions and then it says, no.  What

01:55PM   22    does that mean?

01:55PM   23    A.  When he got up to Batavia, there would be no activity

01:55PM   24    restrictions for him.  So, if they took him to participate in

01:55PM   25    some type of event, you know, like if they're holding some

01:55PM    1    type of thing going on there, he wouldn't be restricted from

01:55PM    2    going to it.

01:55PM    3    Q.  Next thing we have is weight bearing, full.  What does

01:55PM    4    that mean?

01:55PM    5    A.  Means that he was able to stand up on his own and bear

01:55PM    6    his weight.

01:55PM    7              THE COURT:  Mr. Morath, you're on 556?

01:55PM    8              MR. MORATH:  Yes, Judge.

01:55PM    9              THE COURT:  Where are you reading?

01:55PM   10              MR. MORATH:  Right at the top.

01:56PM   11              THE COURT:  At the top of the page?

01:56PM   12              MR. MORATH:  Yes.  It says activity restrictions, no.

01:56PM   13    And under that it says, weight bearing, full.

01:56PM   14              THE COURT:  Wait a second.  I see where it says

01:56PM   15    activity restrictions.  It says none.  All right.  What else

01:56PM   16    did you just ask?

01:56PM   17              MR. MORATH:  Right underneath it, weight bearing,

01:56PM   18    full.

01:56PM   19              THE COURT:  Okay.

01:56PM   20    BY MR. MORATH:

01:56PM   21    Q.  Once again, can you explain what that means?

01:56PM   22    A.  Sure.  It means the patient was able to stand up on his

01:56PM   23    own weight.

01:56PM   24    Q.  And that was true every time you saw Mr. Marranco?

01:56PM   25    A.  It's hard for me to say.  There might have been a time or

01:56PM   1   two where he didn't stand up.  So, it wouldn't be fair for me

01:56PM   2   to make that statement.

01:56PM   3   Q.  And when you say he did stand up, you mean he simply

01:56PM   4   didn't.  Would you agree with me, you never asked him to

01:56PM   5   stand and he physically couldn't?

01:56PM   6   A.  It's a possibility.

01:57PM   7   Q.  Next thing we have is ambulatory without assistance.

01:57PM   8   A.  It means the patient was ambulating.  He didn't have any

01:57PM   9   assistance, but because of his cognitive dysfunction, even

01:57PM   10  when we gave him stuff to use, he wouldn't use it anyway.  He

01:57PM   11  needed to be physically cued.  And even if he was physically

01:57PM   12  cued doesn't necessarily mean he always uses that as well.

01:57PM   13  Q.  But he could walk, right?

01:57PM   14  A.  I mean, he could walk, but does it mean he was stable,

01:57PM   15  his gait was perfect, that would be to determine.

01:57PM   16  Q.  And do you ever recall, in any of your visits, either

01:57PM   17  through what Mr. Marranco told you or through what the family

01:57PM   18  told you, that he couldn't walk anymore in any fashion?

01:57PM   19  A.  No.

01:57PM   20  Q.  And then you -- a little further down, you review -- or

01:58PM   21  you list the medications he's taking?

01:58PM   22  A.  Yes.

01:58PM   23  Q.  As a nurse practitioner, can you prescribe medications?

01:58PM   24  A.  I can.

01:58PM   25  Q.  So, would you be able to look at that list for me and

01:58PM   1   agree with me that he was not, at this time, taking any

01:58PM   2   narcotic pain medications?

01:58PM   3   A.  I agree.

01:58PM   4   Q.  He was not taking any benzodiazepine?

01:58PM   5   A.  I agree.

01:58PM   6   Q.  And understanding that, on the face of this note, would

01:58PM   7   you agree with me there's no discussion at all of any

01:58PM   8   problems with his back?

01:58PM   9   A.  Based on this note?

01:58PM   10   Q.  Right.

01:58PM   11   A.  Yes.

01:58PM   12   Q.  And there's no discussion about -- or any reference to

01:58PM   13   any issues with his hip?

01:59PM   14   A.  Well, three weeks before --

01:59PM   15   Q.  I'm talking about this note.

01:59PM   16   A.  Okay.  There's nothing written about that.

01:59PM   17   Q.  The note you transmitted to Pine Lodge said nothing about

01:59PM   18   his back, nothing about his hip and nothing about his

01:59PM   19   shoulder?

01:59PM   20        MR. KHALIL:  Objection.

01:59PM   21        MR. MORATH:  This note.

01:59PM   22        THE WITNESS:  Could you just back up, just so I could

01:59PM   23   read what I wrote in my -- in that note?

01:59PM   24   BY MR. MORATH:

01:59PM   25   Q.  What section would you like to see?

01:59PM    1   A.  The physical or right below on -- it was the first page.

01:59PM    2   Q.  Page 555?

01:59PM    3   A.  Yes.

01:59PM    4   Q.  Sure.

01:59PM    5   A.  Thanks.

02:00PM    6   (An off-the-record discussion was held.)

02:01PM    7          THE COURT:  We'll take a five-minute recess.  Take a

02:01PM    8   few minutes.

02:01PM    9          THE CLERK:  All rise.

02:05PM   10   (Brief recess)

02:05PM   11          THE CLERK:  All rise.  You may be seated.

02:07PM   12          THE COURT:  All set?

02:07PM   13          MR. MORATH:  Yes, Your Honor.

02:07PM   14          THE COURT:  Okay.  Is that our equipment's fault or

02:07PM   15   your equipment's fault?

02:07PM   16          MR. MORATH:  Our fault, Judge, I'm sure.

02:07PM   17          THE COURT:  Okay.  Go ahead.

02:07PM   18          MR. MORATH:  May I continue, Your Honor?

02:07PM   19          THE COURT:  Okay.  Where are we now?

02:07PM   20          MR. MORATH:  I'm going to back up to the question and

02:07PM   21   then show Mr. Hennessy the record he wanted to see to answer

02:07PM   22   that.

02:07PM   23          THE COURT:  Okay.

02:07PM   24          MR. MORATH:  So, we're going to be using --

02:07PM   25          THE COURT:  We're on page 555?

02:07PM     1              MR. MORATH:  Correct, Judge.  555.

02:07PM     2   BY MR. MORATH:

02:07PM     3   Q.  Mr. Hennessy, I believe that what -- the question I had

02:07PM     4   asked you was, based on this record, whether there was

02:07PM     5   transmitted to Pine Lodge -- whether there was any indication

02:07PM     6   of any problems with his back, his hip or his shoulder.  And

02:07PM     7   then, you asked to look at -- I think is that the note you

02:07PM     8   wanted to look at?

02:07PM     9   A.  That's correct.

02:07PM    10   Q.  And have you had a chance to look at it?

02:07PM    11   A.  Yes.

02:07PM    12   Q.  And would you agree with me that there's no indication of

02:07PM    13   any problems to his back, to his shoulder or his foot?

02:08PM    14   A.  In this note, yes.

02:08PM    15   Q.  Now, this note, at the end, indicates that it was -- it

02:08PM    16   says receipt acknowledged by Jamie Kowalski.  Who is Jamie

02:08PM    17   Kowalski?

02:08PM    18   A.  He's the NP that's going to take over this patient's care

02:08PM    19   when he enters into respite care.

02:08PM    20   Q.  When it says receipt acknowledged, what does that mean?

02:08PM    21   Does that mean he read the note?

02:08PM    22   A.  He read my note and signed off on it.

02:08PM    23   Q.  And by reading it, you open it electronically, does it

02:08PM    24   automatically throw your signature on there?

02:08PM    25   A.  It automatically read --

02:08PM  1          THE COURT:  Where are you reading from?

02:08PM  2          MR. MORATH:  We're just at the end of the note, Your

02:08PM  3  Honor, on page 557.

02:08PM  4          THE COURT:  557?

02:08PM  5          MR. MORATH:  Yeah.  I apologize.

02:08PM  6          THE COURT:  Just a second.  All right.  Now, I see

02:08PM  7  where you are.

02:08PM  8  BY MR. MORATH:

02:08PM  9  Q.  So, we see a date of 9/4 and a time of 1314.  Does that

02:09PM  10  mean that Jamie opened the note at that date and time and

02:09PM  11  read it, or at least opened it, I should say?

02:09PM  12  A.  I'm sorry.  It's not on my record.  I can't see it.

02:09PM  13  (An off-the-record discussion was held.)

02:10PM  14          MS. FLEMING:  Lisa is going to bring it up for

02:10PM  15  Mr. Morath, Ms. Nowak.

02:10PM  16  (An off-the-record discussion was held.)

02:10PM  17  BY MR. MORATH:

02:10PM  18  Q.  So, there at 557, we see that Kevin Hennessy -- I'm

02:11PM  19  sorry -- Jamie Kowalski acknowledged it on 9/4 at 1334?

02:11PM  20  A.  That's correct.

02:11PM  21  Q.  And that just tells us the time that he opened the note?

02:11PM  22  A.  He opened it and signed it.

02:11PM  23  Q.  Okay.

02:11PM  24          MR. MORATH:  If we could take a look now at

02:11PM  25  Exhibit -- page 550 of Exhibit 47C.

02:11PM   1          THE COURT:  550?

02:11PM   2          MR. MORATH:  Page 550.  Are we ready, Your Honor?

02:12PM   3          THE COURT:  Yes, I got it.

02:12PM   4   BY MR. MORATH:

02:12PM   5   Q.  Mr. Hennessy, this is a document titled HBPC nursing

02:12PM   6   visit note.  What does that stand for?

02:12PM   7   A.  It stands for home-based primary care and it's the --

02:12PM   8   Mr. Burzynski's note.  It's a nursing note.

02:12PM   9   Q.  Is this a note that indicates Mr. Burzynski was

02:12PM  10   physically at Mr. Marranco's home?

02:12PM  11   A.  That's correct.

02:12PM  12   Q.  And this was on September 5th at 1310?

02:12PM  13   A.  That's correct.

02:12PM  14   Q.  And can we tell, by looking at this note, whether you

02:12PM  15   attended this visit with him or not?

02:12PM  16   A.  Yes.  I was not with him at that visit.

02:12PM  17   Q.  What would we see to tell us that you were there?

02:13PM  18   A.  I would have a separate note in there.  I would have my

02:13PM  19   own personal note in there.

02:13PM  20   Q.  Now, is this type of note created any time either you,

02:13PM  21   yourself or Mr. Burzynski would see Mr. Marranco at home?

02:13PM  22   A.  That's correct.

02:13PM  23   Q.  And can you tell, by looking at this note, whether this

02:13PM  24   was one of the prearranged scheduled visits or if it was for

02:13PM  25   something in particular?

02:13PM    1   A.  This was -- no.  It was just his -- so, part of our

02:13PM    2   program, you know, the nurses see -- have a specific

02:13PM    3   timeframe that they see patients on.  So, this is was

02:13PM    4   probably just Ted's -- and I can't speak for Ted, but I'm

02:13PM    5   assuming this was Ted's regular visit to get it in before.

02:13PM    6   Q.  Okay.  And after his vital signs there, we see a pain

02:14PM    7   score on that date of zero?

02:14PM    8   A.  That's right.

02:14PM    9   Q.  And it says, did the patient report any pain?  Answer is

02:14PM   10   no?

02:14PM   11   A.  Yes.

02:14PM   12   Q.  Now, do we know, when you make your notes, is there a way

02:14PM   13   to tell whether it was actually Mr. Marranco who answered the

02:14PM   14   question or whether it was the family?

02:14PM   15   A.  From this note?

02:14PM   16   Q.  Well, first, how would you make your note if you were --

02:14PM   17   A.  We would physically ask the patient those types of

02:14PM   18   questions.

02:14PM   19   Q.  Okay.  So, where it says here, did the patient report any

02:14PM   20   pain, the answer is no, that would have come from him?

02:14PM   21   A.  That's correct.

02:14PM   22   Q.  And then a little further down, we see limitations and

02:14PM   23   functional status due to pain.  If yes, describe.  And

02:14PM   24   there's nothing described there.

02:14PM   25   A.  When you're dealing with patients --

02:14PM   1   Q.  Is there anything described there?

02:14PM   2   A.  No.  There's nothing there.

02:14PM   3   Q.  Under respiratory, little further down, patient reports

02:14PM   4   distress or shortness of breath.  Answer is no?

02:15PM   5   A.  That's correct.

02:15PM   6   Q.  If we can go to the second page, at 551, we see, down

02:15PM   7   near the bottom, it says musculoskeletal.  No weakness.

02:15PM   8   Ambulatory.  Able to complete ADLs with minimal assistance,

02:15PM   9   correct?

02:15PM  10   A.  That's correct.

02:15PM  11   Q.  Is that based on an examination, a physical exam and

02:15PM  12   conversation?

02:15PM  13           MR. KHALIL:  Objection.

02:15PM  14           THE COURT:  Sustained.

02:15PM  15   BY MR. MORATH:

02:15PM  16   Q.  What is that based on?

02:15PM  17   A.  I don't know.  I wasn't there when he did -- but I can

02:15PM  18   see --

02:15PM  19           MR. MORATH:  I can ask it a different way.

02:15PM  20           THE WITNESS:  If they could move the thing so I could

02:15PM  21   see what part of this note -- what part -- if this was the

02:15PM  22   exam part or the subjective part.

02:16PM  23   BY MR. MORATH:

02:16PM  24   Q.  Let me ask it a better way.  When you visit Mr. Marranco

02:16PM  25   at home, do you use that same musculoskeletal examination?

02:16PM   1    A.  Mine would be a version of that, maybe a more advanced

02:16PM   2    version.

02:16PM   3    Q.  What would you do to do the musculoskeletal exam?

02:16PM   4    A.  Range of motion, muscle tone, stuff like that.

02:16PM   5    Q.  And you would ask about the family and perhaps

02:16PM   6    Mr. Marranco himself about his activities of daily living?

02:16PM   7    A.  Yes.

02:16PM   8         MR. MORATH:  And then, if we can look at page 548,

02:17PM   9    please?

02:17PM  10    BY MR. MORATH:

02:17PM  11    Q.  Okay.  So, this is a note --

02:17PM  12         THE COURT:  Let me ask you, these progress notes, are

02:17PM  13    these -- are they made out every day or are they made out when

02:17PM  14    something happens?

02:17PM  15         THE WITNESS:  No, sir.

02:17PM  16         THE COURT:  What's the procedure?

02:17PM  17         THE WITNESS:  Every time the patient is physically

02:17PM  18    saw or if there's a telephone note with the family, if we --

02:17PM  19    any type of contact, that's when a note is put in.  Otherwise,

02:17PM  20    if there's weeks where there's no progress notes put in, so

02:18PM  21    there's not daily progress notes.

02:18PM  22         THE COURT:  So, these all took place on the same day?

02:18PM  23         THE WITNESS:  No, sir.  There's one that -- one from

02:18PM  24    the 4th.  This one, he's -- or one from the 5th, I think.

02:18PM  25    This one is from the 6th.  So, they were two separate days.

02:18PM    1            THE COURT:  Oh, okay.  But there's no set pattern?

02:18PM    2    If there's any contact with the patient at all --

02:18PM    3            THE WITNESS:  Any contact with the patient, there

02:18PM    4    would be some type --

02:18PM    5            THE COURT:  Every single time you see if the person's

02:18PM    6    okay?

02:18PM    7            THE WITNESS:  Yes, sir.  Absolutely.  We want -- we

02:18PM    8    always want to have clear documentation that some type of

02:18PM    9    contact was made with the patient, family, anybody, there's --

02:18PM   10    we put in a note.

02:18PM   11            THE COURT:  You sit down and type these things out?

02:18PM   12            THE WITNESS:  Yes, sir.  There's templates as well.

02:18PM   13            THE COURT:  Oh, okay.  So, you can really have 50 of

02:18PM   14    them in a day?

02:18PM   15            THE WITNESS:  There could be quite a few.

02:18PM   16            THE COURT:  And there could be a lot?

02:18PM   17            THE WITNESS:  Yes, sir.

02:18PM   18            THE COURT:  Oh, okay.  At least I have an idea now.

02:19PM   19    We're on page 548?

02:19PM   20            MR. MORATH:  Correct, Judge.

02:19PM   21            THE COURT:  All right.  Where do we go from here?

02:19PM   22    BY MR. MORATH:

02:19PM   23    Q.  So, Mr. Hennessy, this is another -- we just looked at

02:19PM   24    the home visit note from the 5th.

02:19PM   25    A.  Yes.

02:19PM   1   Q.  Now, it appears that Mr. Burzynski is again at

02:19PM   2   Mr. Marranco's home on the following day, on September 6th?

02:19PM   3   A.  Yes.

02:19PM   4   Q.  And this note, you actually did acknowledge on the next

02:19PM   5   page, 549?

02:19PM   6   A.  Yes.

02:19PM   7   Q.  So, that means you opened and read this note?

02:19PM   8   A.  I did, because I followed up on that date.  The day

02:19PM   9   before, we drew labs on the patient and his potassium was

02:19PM  10   low.  So, that was a follow-up lab draw that we needed to

02:19PM  11   recheck his potassium.  And then, I made contact with the

02:19PM  12   daughter to let her know that the potassium was low, when

02:19PM  13   that -- we got it back to its normal.

02:19PM  14   Q.  So, looking at page 548, for the -- Mr. Burzynski's visit

02:19PM  15   to Mr. Marranco's home on the 6th, so this is three days

02:19PM  16   before when he goes to respite, did you see any reference to

02:19PM  17   any issues with Mr. Marranco's back?

02:20PM  18   A.  No.

02:20PM  19   Q.  Is there any reference with any issues with ambulation?

02:20PM  20   A.  No.

02:20PM  21   Q.  Any reference to any issues with mobility?

02:20PM  22   A.  No.

02:20PM  23   Q.  And in fact, it says that he's more alert and interactive

02:20PM  24   this visit?

02:20PM  25   A.  That's correct.

02:20PM    1    Q.  And safe to assume that you -- there's no separate notes,

02:20PM    2    so you were not there on the 6th?

02:20PM    3    A.  I was not there on the 6th.

02:20PM    4    Q.  And part of the reason for this visit was to follow up on

02:21PM    5    the ear irrigation that was performed on the 5th?

02:21PM    6    A.  More importantly, it was for the potassium.

02:21PM    7    Q.  But part of it was the ear wax removal that they did?

02:21PM    8    A.  He did the irrigation on that day, according to his

02:21PM    9    notes.  I was not there, but according to his notes.

02:21PM   10    Q.  Of course.

02:21PM   11         MR. MORATH:  Okay.  Your Honor, that's all I have for

02:21PM   12    this witness right now.

02:21PM   13

02:21PM   14                    CROSS-EXAMINATION

02:21PM   15

02:22PM   16    BY MR. KHALIL:

02:22PM   17    Q.  Good afternoon, Mr. Hennessy.

02:22PM   18    A.  Good afternoon.

02:22PM   19    Q.  When did you first begin caring for Mr. Marranco?

02:22PM   20    A.  2011.

02:22PM   21    Q.  And did you care for him continuously up until 2013?

02:22PM   22    A.  Yes.

02:22PM   23    Q.  Can you describe his general state of health in that time

02:22PM   24    frame that you cared for him?

02:22PM   25    A.  He was a frail, demented man that needed our care at his

HENNESSY  --  MR. KHALIL  --  8/20/19

146

02:22PM   1  home at this point in his life and --

02:22PM   2  Q.  Why did he need the home-based care program?

02:22PM   3  A.  It was difficult for the family to bring him out and

02:22PM   4  bring him in for appointments any longer.  Very, you know --

02:22PM   5  these frail, dementia guys, it's difficult for these families

02:22PM   6  to get them out, get them into appointments.  And then, you

02:22PM   7  know, even going up and down stairs is very difficult for

02:23PM   8  them, getting them into the car to drive them.  Again, all

02:23PM   9  difficult situations for -- again, these patients that we

02:23PM  10  have in our program, they're very ill.  And they need more

02:23PM  11  care in their home at this point.

02:23PM  12  Q.  Other than the dementia, which you mentioned, did

02:23PM  13  Mr. Marranco have any other type of ailments or conditions

02:23PM  14  during the time frame that you treated him?

02:23PM  15  A.  Yes.  He had hypertension.  He had BPH with incontinence.

02:23PM  16  He had COPD, as well, but those are the big ones that stick

02:23PM  17  out to me the most right now.

02:23PM  18  Q.  Can you, just in laymen's terms, explain what

02:23PM  19  hypertension is?

02:23PM  20  A.  Hypertension is blood pressure.  As the blood pressure

02:23PM  21  goes up in your -- it puts you at high risk for stroke, heart

02:24PM  22  attacks, stuff like that.

02:24PM  23  Q.  Can you explain, in laymen's terns, what COPD is?

02:24PM  24  A.  It's advanced lung disease.  It's when somebody -- a lot

02:24PM  25  of time smokers, previous smokers have a difficult time.

02:24PM  1   Over years, their lungs become less inflated and they require

02:24PM  2   more oxygen to do physical activity.  Sometimes, depending on

02:24PM  3   the severity, they may need to be put on oxygen.

02:24PM  4   Q.  And you mentioned BPH.  Can you explain what that is?

02:24PM  5   A.  Sure.  It's the prostate.  When it becomes enlarged, it

02:24PM  6   presses on the urethra and you have to go several times, you

02:24PM  7   have to urinate.  It happens in males.

02:24PM  8   Q.  Were you aware, during the time you treated Mr. Marranco

02:24PM  9   of his kyphoplasty in 2007?

02:25PM  10  A.  I can't recall.

02:25PM  11  Q.  Do you know what that is?

02:25PM  12  A.  I do.

02:25PM  13  Q.  Can you educate us, in laymen's terms, what a kyphoplasty

02:25PM  14  is?

02:25PM  15  A.  Sure.  It's when somebody has some type of vertebral

02:25PM  16  fracture, something they have that's repaired, they need a

02:25PM  17  neurosurgery, something like that, to have that done.

02:25PM  18       THE COURT:  Say that again.  I didn't understand what

02:25PM  19  you said.

02:25PM  20       THE WITNESS:  Somebody that has a vertebral -- some

02:25PM  21  type of vertebral dysfunction, vertebrae and then they go in

02:25PM  22  and have some type of repair done with the neurosurgeon.

02:25PM  23       THE COURT:  Oh, okay.  Were you objecting?

02:25PM  24       MR. MORATH:  I was going to, Your Honor.

02:25PM  25       THE COURT:  That I asked the question, you were going

02:25PM   1   to object?

02:25PM   2           MR. MORATH:  No, no.  I was going to object when you

02:25PM   3   started asking the question and I certainly don't believe a

02:25PM   4   nurse practitioner is qualified to talk about surgery.  And if

02:25PM   5   he is, he certainly didn't lay any foundation when he said

02:25PM   6   describe a kyphoplasty.

02:25PM   7           THE COURT:  You can cross-examine him on it.

02:25PM   8   BY MR. KHALIL:

02:25PM   9   Q.  The home-based care program, does that have a set time

02:26PM  10   limit or, I guess, what sets the duration for when a patient

02:26PM  11   receives home-based care?

02:26PM  12   A.  A patient could have home-based primary care for their

02:26PM  13   whole life, based on how their functionality is.  If they --

02:26PM  14   improve and they're able to get out and the families are able

02:26PM  15   to get them in for their appointments, we certainly want to

02:26PM  16   keep them more active, but a lot of these patients, you know,

02:26PM  17   by the time they get in our program, they don't -- they're

02:26PM  18   going to need us life long because, again, it's very

02:26PM  19   difficult for them to get in for their appointments.

02:26PM  20   Q.  And speaking of functioning, you were asked about

02:26PM  21   Mr. Marranco's mobility.  Did you ever see him ambulate

02:26PM  22   anywhere beside his own home?

02:26PM  23   A.  No.

02:26PM  24   Q.  Did you see him ambulate anywhere other than his own

02:26PM  25   kitchen and maybe living room or hallway?

| | | |
|---|---|---|
| 02:26PM | 1 | A.  No. |
| 02:26PM | 2 | Q.  In terms of the dementia, what effect does that have, if |
| 02:27PM | 3 | any, on a patient's ability to report his history or |
| 02:27PM | 4 | complaints to you? |
| 02:27PM | 5 | MR. MORATH:  Objection.  Same objection, Your Honor. |
| 02:27PM | 6 | There's been zero foundation that this witness is qualified to |
| 02:27PM | 7 | testify about dementia now. |
| 02:27PM | 8 | THE COURT:  If you know, sir, you can answer that |
| 02:27PM | 9 | question. |
| 02:27PM | 10 | THE WITNESS:  Okay.  Sure.  Can you just repeat?  I'm |
| 02:27PM | 11 | sorry. |
| 02:27PM | 12 | BY MR. KHALIL: |
| 02:27PM | 13 | Q.  Well, I'll step back then.  You treated Mr. Marranco for |
| 02:27PM | 14 | years, correct? |
| 02:27PM | 15 | A.  Yes. |
| 02:27PM | 16 | Q.  And he was diagnosed with dementia? |
| 02:27PM | 17 | A.  Yes. |
| 02:27PM | 18 | Q.  How many dementia patients do you treat? |
| 02:27PM | 19 | A.  Numerous.  The vast foundation of our patients, they have |
| 02:27PM | 20 | dementia, beginning stages all the way to late stage |
| 02:27PM | 21 | dementia.  So, again, the reason they're in our program are |
| 02:27PM | 22 | because of these types of ailments, especially dementia and |
| 02:27PM | 23 | Alzheimer's.  They're one of our highest population of |
| 02:28PM | 24 | patients in our program. |
| 02:28PM | 25 | Q.  With dementia patients, do you ever have difficulty |

02:28PM   1   assessing their pain levels or their conditions?

02:28PM   2   A.  Of course, yes.

02:28PM   3   Q.  Why?

02:28PM   4   A.  They don't have the cognition to, you know, have a

02:28PM   5   straight conversation with you.  You could go up to them and

02:28PM   6   say, are you in any pain?  Although they may be pain, they

02:28PM   7   tell you no.  And other reasons, sometimes, you know, they're

02:28PM   8   fearful to tell you they're in pain because they're wary that

02:28PM   9   maybe the family will want --

02:28PM   10          MR. MORATH:  Objection, Your Honor.  Now he's in the

02:28PM   11   mind of a dementia patient and what they're worried about.

02:28PM   12          THE COURT:  Based on his experience.

02:28PM   13          THE WITNESS:  They'll be worried some about them

02:28PM   14   putting them in nursing homes or sending them out of the

02:28PM   15   house.

02:28PM   16   BY MR. KHALIL:

02:28PM   17   Q.  So, where would you get your information when you perform

02:28PM   18   a home-based care visit?

02:28PM   19   A.  Again, I would -- we would certainly always try to get

02:28PM   20   relevant information from the patient, but a lot of times, we

02:29PM   21   have to get it from their caregivers.

02:29PM   22   Q.  Was this true of Mr. Marranco also in the timeframe that

02:29PM   23   you treated him?

02:29PM   24   A.  Yes.

02:29PM   25   Q.  Now, you were asked about a September 4th note you made

02:29PM   1   that wasn't based on visit to Mr. Marranco --

02:29PM   2             THE COURT:  What page was that one?

02:29PM   3             MR. KHALIL:  I'm sorry, Your Honor.  I have been

02:29PM   4   using the Bates numbers on the documents.  So, for me that's

02:29PM   5   number 1914 of Exhibit 44.  Lisa, can you --

02:29PM   6             THE COURT:  1914, that's the page number?

02:29PM   7             MR. KHALIL:  It's in the very bottom of the right-

02:29PM   8   hand --

02:29PM   9             THE COURT:  The other one is just above it?

02:29PM  10             MR. KHALIL:  Yeah, exactly.

02:29PM  11             THE COURT:  So, it's 555?

02:29PM  12             MR. KHALIL:  Yes.  Some of the records, Your Honor,

02:29PM  13   are going to have duplicative numbering.

02:29PM  14             THE COURT:  All the numbers I'm looking at are all

02:29PM  15   duplicitous numbers?

02:29PM  16             MR. KHALIL:  Yes.

02:29PM  17             THE COURT:  So, we're at page 555?

02:29PM  18             MR. KHALIL:  Yes.  Yes, Your Honor.

02:29PM  19             THE COURT:  That's the one you're referring to?

02:29PM  20             MR. KHALIL:  That's the one I'm referring to.

02:29PM  21             THE COURT:  All right.

02:30PM  22             MR. KHALIL:  Lisa, if you just could highlight from

02:30PM  23   that one bar down to the bottom?  Then, next part?  Perfect.

02:30PM  24   BY MR. KHALIL:

02:30PM  25   Q.  Now, this is a note you were asked about before,

02:30PM    1    Mr. Hennessy?

02:30PM    2    A.   Yes.

02:30PM    3    Q.   Was that based on a visit on September 4th?

02:30PM    4    A.   No.

02:30PM    5    Q.   And when did this visit actually take place that this

02:30PM    6    note is referencing?

02:30PM    7    A.   7/25/2013.

02:30PM    8            MR. KHALIL:  Now, Your Honor, I'm going to go to

02:30PM    9    page 590.

02:30PM   10            THE COURT:  Where do you get that on this page?

02:30PM   11    7/25?

02:30PM   12            MR. KHALIL:  Yes, Your Honor.  If you look at the

02:30PM   13    screen, we blew it up a little bit.

02:30PM   14            THE COURT:  I don't want to look at the screen.

02:30PM   15            MR. KHALIL:  No problem.  About one inch under the

02:30PM   16    bar is an indication about the vitals being taken.

02:30PM   17            THE COURT:  About two inches.

02:30PM   18            MR. KHALIL:  Okay, two inches, Your Honor.  And that

02:30PM   19    is dated 7/25/13, which shows the actual date of -- well, I'll

02:30PM   20    let Mr. Hennessy explain that.

02:30PM   21            THE COURT:  Why would you be doing a progress note on

02:30PM   22    this date?

02:30PM   23            THE WITNESS:  This is a pass down.  So, if I was

02:31PM   24    given a patient, passing down a report to another provider.

02:31PM   25    So, the custody of this patient is going to change hands to

02:31PM  1  another provider.  So, what I did is, I took from my annual

02:31PM  2  physical on that day -- it was within 45 days -- I gave them

02:31PM  3  just a synopsis with what was going on with the patient at

02:31PM  4  that time from that note.

02:31PM  5          THE COURT:  Oh, okay.  Who were you passing it on to?

02:31PM  6  I don't see anybody else's name on the sheet.

02:31PM  7          THE WITNESS:  At the bottom, Your Honor, Mr. Kowalski

02:31PM  8  was the -- he acknowledged it and signed off on it at the

02:31PM  9  bottom of the page.

02:31PM  10          THE COURT:  At the bottom of the page?

02:31PM  11          THE WITNESS:  Oh, no, sir.

02:31PM  12          MR. KHALIL:  I'll get it for you, Your Honor.  One

02:31PM  13  second.

02:31PM  14          THE COURT:  Is it on the next page?

02:31PM  15          MR. KHALIL:  It's on page 557, Your Honor.

02:31PM  16          THE COURT:  So, it's 557.  What happened to 556?  Why

02:32PM  17  is that there?

02:32PM  18          MR. KHALIL:  The page -- well --

02:32PM  19          THE COURT:  Is this all part of one exhibit?

02:32PM  20          MR. KHALIL:  Exactly, Your Honor.

02:32PM  21          THE COURT:  This was all prepared at the same time?

02:32PM  22          MR. KHALIL:  Exactly, Your Honor.

02:32PM  23          THE COURT:  555, 556 and 557?

02:32PM  24          MR. KHALIL:  Yes, Your Honor.

02:32PM  25          THE COURT:  How would I know that from reading this?

02:32PM  1         MR. KHALIL:  You'd have to ask Mr. Hennessy and he

02:32PM  2  would have to explain it.

02:32PM  3         THE WITNESS:  So, the way the progress notes go, they

02:32PM  4  kind of get lumped in -- in our EMR at the VA, it's --

02:32PM  5         THE COURT:  EM --

02:32PM  6         MR. KHALIL:  It's an electronic medical record, sir.

02:32PM  7         THE COURT:  How would I know what that meant?

02:32PM  8         MR. KHALIL:  Yes, that's true.

02:32PM  9         THE COURT:  Okay.

02:32PM  10         MR. KHALIL:  So, they run together and then they --

02:32PM  11  it's -- they're quite long notes.  So, it takes a few pages in

02:32PM  12  order to get to the bottom of that page to see the --

02:32PM  13         THE COURT:  You do a lot of typing every day, don't

02:32PM  14  you?

02:32PM  15         THE WITNESS:  Oh, yes, sir.

02:32PM  16         THE COURT:  Okay.

02:32PM  17  BY MR. KHALIL:

02:33PM  18  Q.  What was the source of the information for your

02:33PM  19  September 4th note?

02:33PM  20  A.  The source of the information, it came from my note from

02:33PM  21  7/25.

02:33PM  22  Q.  Okay.

02:33PM  23         MR. KHALIL:  And Your Honor, I'd like to take a look

02:33PM  24  at that note.  It's on page 590.

02:33PM  25         THE COURT:  590?

02:33PM   1              MR. KHALIL:  Yes, Your Honor.

02:33PM   2              THE COURT:  I haven't seen that one before.

02:33PM   3              MR. KHALIL:  No.  That's a new one.  1949.

02:33PM   4              THE COURT:  How do we go to -- now, this 590, is that

02:33PM   5    on the same date?

02:33PM   6              MR. KHALIL:  No, Your Honor.  We're going to look at

02:33PM   7    the July 25th note that Mr. Hennessy just referenced as being

02:33PM   8    the source of the September 4th information.

02:33PM   9              THE COURT:  Okay.  All right.  I got that, I think.

02:34PM   10   BY MR. KHALIL:

02:34PM   11   Q.  Mr. Hennessy, do you see your note in front of you?

02:34PM   12   A.  I do.

02:34PM   13   Q.  And can you explain to us what this note is?

02:34PM   14   A.  This is the annual history and physical done on

02:34PM   15   Mr. Marranco.  We do -- it's mandated that we do one once a

02:34PM   16   year for his annual physical.

02:34PM   17   Q.  And help us with the acronyms.  What is HBPC?

02:34PM   18   A.  It's the -- HBPC is the home-based primary care.

02:34PM   19   Q.  And what is H plus P?

02:34PM   20   A.  History and physical.

02:34PM   21   Q.  So, can you describe for me the process of performing a

02:34PM   22   history and physical on Mr. Marranco as related in this note?

02:34PM   23   A.  Sure.  So, we schedule an appointment well in advance to

02:34PM   24   get out to see him.  Then, we go into the home.  We go

02:34PM   25   through different things.  The reason for his admission, he

02:35PM   1   lived with dementia, no longer drives and it was very

02:35PM   2   difficult for the family to bring him in for his medical

02:35PM   3   appointments.

02:35PM   4         You know, he lived with his wife.  They lived in the

02:35PM   5   downstairs apartment from the daughter.  He has home health

02:35PM   6   aide services.  We document how often and when.  Down in the

02:35PM   7   interval visit history which tells about what was going on

02:35PM   8   during the past year, we talk about how he was -- he had home

02:35PM   9   health aides three times a week.

02:35PM  10         But because he became combative and that -- they

02:35PM  11   requested to go down to two days a week because he was not

02:35PM  12   compliant with taking showers and doing things like that, his

02:35PM  13   ADLs.

02:35PM  14   Q.  You're referring to HHA?

02:36PM  15   A.  That's correct.  Home health aides, correct.

02:36PM  16   Q.  Right above that, where it says barriers, can you explain

02:36PM  17   what that means, that section?

02:36PM  18   A.  Sure.  These are things that -- reasons why that it's

02:36PM  19   difficult for him to do different things, barriers.  He

02:36PM  20   couldn't prepare his own meals.  He needed to have his family

02:36PM  21   prepare their meals.  He didn't drive.  It -- difficult to

02:36PM  22   get him into appointments, to even get him in the car.  He

02:36PM  23   was not able to do his own finances and his self care, which

02:36PM  24   is related to his activities of daily living as well.

02:36PM  25   Q.  Okay.  And then, during the interval history, can you

02:36PM   1   just describe what that is and what that information is

02:36PM   2   relaying?

02:36PM   3   A.   Sure.  This is a timeframe of things that had been going

02:36PM   4   on with the patient that was relayed to us.  Again, whatever

02:36PM   5   minimum information we could get from the patient and the

02:37PM   6   rest from the family.

02:37PM   7   Q.   The second paragraph in your interval history, do you see

02:37PM   8   that, where it says also some reports?

02:37PM   9   A.   Yes.

02:37PM  10   Q.   Can you describe what information that is relaying?

02:37PM  11   A.   So, apparently the patient was down in Florida with the

02:37PM  12   family and he had sustained a fall while he was there three

02:37PM  13   weeks prior to us seeing him.  And he -- the son had told us

02:37PM  14   that, you know, he hit his flank area and then they called

02:37PM  15   911.  He had some bruising on his flank as well.  They called

02:37PM  16   911.  They came up to evaluate the patient.  But, again, the

02:37PM  17   patient was very resistant to different things and he refused

02:37PM  18   to go to the ER on that case as well.

02:37PM  19   Q.   Is this July 25th -- is July 25th the first time you

02:38PM  20   learned of that fall in Florida?

02:38PM  21   A.   That's correct.

02:38PM  22        THE COURT:  Let's go to the interval history.  It

02:38PM  23   says 87 years old male with PMH.  What is that?

02:38PM  24        THE WITNESS:  That is past medical history.

02:38PM  25        THE COURT:  Okay, what's HTEN?

02:38PM   1          THE WITNESS:  Hypertension.

02:38PM   2          THE COURT:  All right.

02:38PM   3          MR. KHALIL:  I apologize, Your Honor.  I missed

02:38PM   4    those.

02:38PM   5    BY MR. KHALIL:

02:38PM   6    Q.  And then the COPD we already discussed, but can you

02:38PM   7    remind us one more time?

02:38PM   8    A.  Sure.  It's chronic obstructive pulmonary disease.

02:38PM   9    Q.  And then, it says after that, being seen for his annual

02:38PM  10    admission to HBPC.  That's the home-based primary care?

02:38PM  11    A.  Yes.

02:38PM  12    Q.  Your note indicates that he fell three weeks prior to the

02:38PM  13    7/25 date?

02:38PM  14    A.  Yes.

02:38PM  15    Q.  But you were never told of it or were never told of it in

02:38PM  16    those three weeks?

02:38PM  17    A.  No.  We never learned of it until the date of this visit.

02:38PM  18    Q.  Going to the next page --

02:39PM  19          THE COURT:  591?

02:39PM  20          MR. KHALIL:  Correct, Your Honor.  Yeah.

02:39PM  21    BY MR. KHALIL:

02:39PM  22    Q.  That second paragraph there, it begins with CPRS problem

02:39PM  23    list.  Can you tell us what CPRS means?

02:39PM  24    A.  CPRS is our -- is basically the computer system that we

02:39PM  25    use.  I don't know exactly what the acronym stands for.  But

02:39PM  1   it's our computer system that we use to input the notes for

02:39PM  2   the VA.

02:39PM  3            THE COURT:  Where are you reading that?

02:39PM  4            MR. KHALIL:  It's the first full paragraph, Your

02:39PM  5   Honor.  The fourth line or so down, CPRS problem list.

02:39PM  6            THE COURT:  Page 591?

02:39PM  7            MR. KHALIL:  Correct, Your Honor.  Right one inch

02:39PM  8   below the progress notes in big bold.

02:39PM  9            THE COURT:  Oh.  I still don't see where you are.

02:40PM  10  Under the progress notes, it say past medical surgical

02:40PM  11  history.

02:40PM  12            MR. KHALIL:  Yes.  Go down to the next paragraph.

02:40PM  13            THE COURT:  All right.  CPRS problem list.  Is that

02:40PM  14  what you're talking about?

02:40PM  15            MR. KHALIL:  Yes, Your Honor.

02:40PM  16            THE COURT:  All right.

02:40PM  17  BY MR. KHALIL:

02:40PM  18  Q.  So, now we have more acronyms.  HTN, I believe you said

02:40PM  19  was hypertension?

02:40PM  20  A.  Yes.

02:40PM  21  Q.  And what is ICD9CM401.9?

02:40PM  22  A.  They're just billing codes.

02:40PM  23  Q.  Okay.

02:40PM  24  A.  They're just put in.  That's how they bill Medicare or

02:40PM  25  whatever.

02:40PM   1   Q.   Okay.  And who is being billed?

02:40PM   2   A.   I can't tell you that.  Some patients are billed.  Some

02:40PM   3   patients are not billed.  There's a whole structure.  I don't

02:40PM   4   know -- we don't personally bill, so I don't know, but those

02:40PM   5   codes are used for that purpose outside the VA system.

02:40PM   6   Q.   Okay.  Then this list here, what is it?  What's it

02:41PM   7   representing?

02:41PM   8   A.   It's just his problem list of what diagnoses that he has.

02:41PM   9   Q.   Okay.  So, under hypertension, what's the next one?

02:41PM   10  A.   Depression.

02:41PM   11  Q.   And then below that, asymmetrical neural hearing loss.

02:41PM   12  And asymmetrical, that means both sides or one side?

02:41PM   13  A.   One side.

02:41PM   14  Q.   Okay.  Gastroenteritis.  What is that?

02:41PM   15  A.   Inflammation of the -- like, if somebody has --

02:41PM   16  basically, it's diarrhea; a complicated term for diarrhea.

02:41PM   17  Q.   And the next one is the dementia we mentioned.  It says

02:41PM   18  frontal dementia.  Are there different types of dementia?

02:41PM   19  A.   Yes, there are a few.  There's the Alzheimer's type and

02:41PM   20  then you have a frontal dementia, which is patients that have

02:41PM   21  vascular problems and it affects different parts of your

02:41PM   22  brain.  And in frontal, it's -- it affects your personality,

02:42PM   23  things like that.  So, it correlates with his, you know, his

02:42PM   24  behavior issues and stuff like that.

02:42PM   25  Q.   Okay.  Chronic airway obstruction; is that the COPD you

02:42PM   1   talked about before?

02:42PM   2   A.   Yes.

02:42PM   3   Q.   What is hypokalemia?

02:42PM   4   A.   It's low potassium.

02:42PM   5   Q.   Okay.  Based on this list, would you agree that

02:42PM   6   Mr. Marranco was physically fine during this period of July

02:42PM   7   2013?

02:42PM   8   A.   I would say that he was not physically fine.  He was a

02:42PM   9   frail guy with dementia.  Again, these guys wouldn't be in

02:42PM   10   our program if they were in perfectly good health.  Their

02:42PM   11   families would still be able to get them in, get them to

02:42PM   12   their appointments, things like that.

02:43PM   13   Q.   I'm going to go to page 595.  Do you have that in front

02:43PM   14   of you, Mr. Hennessy?

02:43PM   15   A.   I do.

02:43PM   16   Q.   Can you describe what's on the screen before you,

02:43PM   17   Mr. Hennessy?

02:43PM   18   A.   This is a physical examination.  So, this has got the

02:43PM   19   vital signs and you know, different parts of the physical

02:43PM   20   exam that we did on the patient.

02:43PM   21   Q.   And this is all still on the July 25th visit, correct?

02:43PM   22         THE COURT:   July 25th?

02:43PM   23         THE WITNESS:   Yes, it is.  It's -- I believe it's

02:43PM   24   still the -- the date of the vitals signs say that -- there's

02:44PM   25   no date exactly on the chart, but I'm assuming this is from

02:44PM   1   the --

02:44PM   2   BY MR. KHALIL:

02:44PM   3   Q.  And this is the examination that your later September 4

02:44PM   4   note is based on, correct?

02:44PM   5   A.  That's correct.

02:44PM   6   Q.  Okay.  And did you perform this examination yourself?

02:44PM   7   A.  I did.

02:44PM   8   Q.  Okay.  Under constitutional, that second paragraph there,

02:44PM   9   the last line says, oriented one.  What does that mean?

02:44PM  10   A.  It means the patient is oriented to self.  He's no longer

02:44PM  11   to place and time.

02:44PM  12   Q.  And what does that indicate to you?

02:44PM  13   A.  That he suffers from an advanced dementia, that he's only

02:44PM  14   aware of the world that he's living in at this point.

02:44PM  15   Q.  I don't think I asked you yet, but during your timeframe

02:44PM  16   of treating Mr. Marranco, did his dementia get worse?

02:44PM  17   A.  I would say yes, because his behaviors over -- a good

02:45PM  18   indication of a -- patients that are -- is advancing in their

02:45PM  19   you know, their behaviors become morass.  They begin to fall

02:45PM  20   more often, as evidenced by the fall he had in Florida and

02:45PM  21   stuff like that.  So, he was certainly on a tailspin of going

02:45PM  22   downhill.

02:45PM  23   Q.  And what about his general physical health?  Dementia

02:45PM  24   aside, how would you describe that in the timeframe over

02:45PM  25   which you treated him?

02:45PM   1   A.   I'm sorry.  Can you repeat the question?

02:45PM   2   Q.   Sure.  Other than the dementia, Mr. Marranco's physical

02:45PM   3   health in the years you treated him, how would you describe

02:45PM   4   that trajectory?

02:45PM   5   A.   I would still say that he was, you know, frail.  He had

02:45PM   6   multiple medical problems.  He was incontinent, you know,

02:45PM   7   hypertension.  And these guys are -- when they reach the time

02:46PM   8   that they get into -- and I know I keep saying it -- but when

02:46PM   9   they reach the time they get into this program, they're very

02:46PM  10   frail and can, you know -- and they go downhill.  His vitals

02:46PM  11   were, you know, I'm looking at his vitals here.  They're

02:46PM  12   stable and stuff like that, but over all, just because your

02:46PM  13   vitals are stable doesn't necessarily mean that -- you know,

02:46PM  14   I think in this note, I even put his condition was fair.

02:46PM  15           THE COURT:  You said hypertension?

02:46PM  16           THE WITNESS:  Yes, sir.

02:46PM  17           THE COURT:  It says here blood pressure 124/60.

02:46PM  18           THE WITNESS:  His blood pressure was controlled with

02:46PM  19   medications.  He was on lisinopril and furosemide.  They are

02:46PM  20   both antihypertensives.

02:46PM  21           THE COURT:  Oh, okay.  Because that doesn't seem like

02:46PM  22   hypertensive.

02:46PM  23           THE WITNESS:  No.

02:46PM  24   BY MR. KHALIL:

02:46PM  25   Q.   I believe you were asked earlier by the Judge about when

02:46PM   1   progress notes are generated and you indicated any time there

02:46PM   2   is contact with the patient.  Is that accurate?

02:47PM   3   A.   That is correct.

02:47PM   4   Q.   Are there other times that progress notes or nursing

02:47PM   5   notes might be generated?

02:47PM   6   A.   If a patient sustains like, a fall and then we generate a

02:47PM   7   fall note.  So, my nurse will put in an incident report

02:47PM   8   because the VA is very, very, very anal about tracking falls.

02:47PM   9   So, there's an incident report that is put in and my nurse

02:47PM   10   will put in a note.  Then, I'll put in a note and our

02:47PM   11   pharmacists will also put in a note and so will our physical

02:47PM   12   therapist.

02:47PM   13   Q.   Let's go to page 597.  Do you have that up there,

02:47PM   14   Mr. Hennessy?

02:47PM   15   A.   I do.

02:47PM   16   Q.   Now, you just described a fall note.  Are we looking at a

02:48PM   17   fall note here?

02:48PM   18   A.   Yes.  So, this is Ted's fall note from that -- this is --

02:48PM   19   we generated this fall note from the Florida fall.

02:48PM   20   Q.   So, this fall note dated July 25th refers to the fall

02:48PM   21   three weeks prior?

02:48PM   22   A.   Correct.

02:48PM   23   Q.   That you were only told about on July 25th?

02:48PM   24   A.   That's correct.

02:48PM   25   Q.   And even though it happened off VA property, you or your

02:48PM   1   nurse generate a fall report?

02:48PM   2   A.  We still want to track any falls that may have occurred

02:48PM   3   so we can get an idea of what's going on with these falls.

02:48PM   4   Q.  And you referred to him as Ted, but Mr. Burzynski, he was

02:48PM   5   with you on July 25th?

02:48PM   6   A.  That is correct.

02:48PM   7   Q.  And he generated this note?

02:48PM   8   A.  That is correct.

02:48PM   9   Q.  It's common practice whenever a fall occurs to generate a

02:48PM   10  fall note?

02:48PM   11  A.  Every single time, we generate it if we know about a

02:48PM   12  note -- or if we know about a fall.  Again, it has to be

02:48PM   13  known to us that this fall has occurred.  If a note -- if

02:49PM   14  someone has fallen and we were aware of it, an incident

02:49PM   15  report, a nursing note, a provider note and a pharmacy and

02:49PM   16  physical therapy note would have all been generated.

02:49PM   17  Q.  Other than generating this note, what else is done in

02:49PM   18  response to a fall by a patient?  For example, on the next

02:49PM   19  page we have a fall risk score, it looks like?

02:49PM   20  A.  Yes.

02:49PM   21       MR. KHALIL:  And I'm going to the top of page 598,

02:49PM   22  Your Honor.

02:49PM   23  BY MR. KHALIL:

02:49PM   24  Q.  I'm sorry.  You were saying, Mr. Hennessy?

02:49PM   25  A.  So, this generates the high risk of fall so that we know

02:49PM   1   the patient is at high risk for falls.  It's based on the

02:49PM   2   number system.  And greater than -- you know, 45 is an

02:49PM   3   indicator that the patient is high risk for falls.

02:49PM   4   Q.  And do you perform this or does a nurse perform this?

02:50PM   5   A.  This is generated by the nurse.

02:50PM   6        THE COURT:  It says fall risk score of 55.  What does

02:50PM   7   that mean?

02:50PM   8        THE WITNESS:  That means the numbers, Your Honor,

02:50PM   9   is -- are high risk for falls.  Because of the patient falls,

02:50PM  10   we go through each one of those different categories, history

02:50PM  11   of falls, yes.  So, he generated 25 points for that.

02:50PM  12   Secondary diagnosis, yes.  He has dementia, so that generated

02:50PM  13   more points.  So, all these generate points and it will give

02:50PM  14   us an indication of -- if the patient is above 45, he is a

02:50PM  15   high risk of falls.

02:50PM  16        THE COURT:  It says -- oh, okay.  So, all those then,

02:50PM  17   it adds up to 55?

02:50PM  18        THE WITNESS:  Yes, sir.

02:50PM  19        THE COURT:  Oh, okay.

02:50PM  20   BY MR. KHALIL:

02:50PM  21   Q.  And then, below that we see it's signed by Thaddeus

02:50PM  22   Burzynski, the nurse, correct?

02:50PM  23   A.  That's correct.

02:50PM  24   Q.  And now, all this receipt acknowledged by, who are all

02:50PM  25   these people?

02:50PM    1   A.  These are people on the team that's going to follow up on

02:51PM    2   that fall; so, our occupational therapist, myself, our low

02:51PM    3   vision clinic and our physical therapist.

02:51PM    4   Q.  So, all of these people are in some way treating

02:51PM    5   Mr. Marranco or involved in his care?

02:51PM    6   A.  They can be in connection, depending on if it's -- so, we

02:51PM    7   let the low vision guy know that if he was at risk for low

02:51PM    8   vision, that they could follow up on it.  So, we kind of let

02:51PM    9   people know that, you know, we want them to be aware that

02:51PM   10   this gentleman had a fall.  Is there something, from their

02:51PM   11   point of view, that they need to do to do an intervention.

02:51PM   12   Q.  Is there anything that excuses the generating of a fall

02:51PM   13   report?

02:51PM   14   A.  No.

02:51PM   15   Q.  Based on your review of the September 5th and 6th records

02:51PM   16   by Mr. Burzynski, did you see a fall report?

02:52PM   17   A.  There's no fall report.

02:52PM   18   Q.  Had Mr. Burzynski been told that a fall occurred, would

02:52PM   19   he have generated one?

02:52PM   20        MR. MORATH:  Objection, Your Honor, to what somebody

02:52PM   21   else would have done.

02:52PM   22        THE COURT:  Well, is it the practice of the Veterans

02:52PM   23   Hospital to generate one?

02:52PM   24        MR. KHALIL:  Yes, Your Honor.

02:52PM   25        THE COURT:  Is that the practice?

02:52PM    1              THE WITNESS:  Yes, sir.

02:52PM    2              THE COURT:  All right.

02:52PM    3    BY MR. KHALIL:

02:52PM    4    Q.  So, based on the records you reviewed and your treatment

02:52PM    5    of Mr. Marranco, what was the earliest date that he could

02:52PM    6    have fallen prior to his admission to respite care?

02:52PM    7              MR. MORATH:  Objection.  Pure speculation, Your

02:52PM    8    Honor.

02:52PM    9              THE COURT:  Overruled.

02:52PM   10              THE WITNESS:  The only -- three weeks, but the one in

02:52PM   11    Florida is the only one that we have record of happening prior

02:52PM   12    to the last visit on September 6th.  So, any visit prior to

02:52PM   13    September 6th would have generated some type of fall note;

02:52PM   14    definitely would have generated a fall note and our incident

02:53PM   15    report.

02:53PM   16              MR. KHALIL:  Your Honor, if I may have one minute to

02:53PM   17    confer with my co-counsel?

02:53PM   18              THE COURT:  Okay.

02:53PM   19    BY MR. KHALIL:

02:53PM   20    Q.  Mr. Hennessy, based on your review of the records, did

02:53PM   21    any fall occur on September 5th or 6th, after

02:53PM   22    Mr. Burzynski -- or I'm sorry -- prior to Mr. Burzynski

02:53PM   23    seeing Mr. Marranco?

02:53PM   24    A.  No.

02:53PM   25              MR. KHALIL:  No further questions, Your Honor.

02:53PM   1          MR. MORATH:  I'll get this done by 3:15, Your Honor.

02:53PM   2

02:54PM   3                    REDIRECT EXAMINATION

02:54PM   4

02:54PM   5   BY MR. MORATH:

02:54PM   6   Q.  Mr. Hennessy, you seem to have coined the phrase frail,

02:54PM   7   demented, ill old man.  This frail, demented, ill old man,

02:54PM   8   Mr. Marranco, every record you've looked at today, he was

02:54PM   9   able to ambulate on his own, right?

02:54PM  10   A.  Again --

02:54PM  11   Q.  Yes or no, sir.  He was able to ambulate?

02:54PM  12   A.  He was able to ambulate when I saw him, yes.

02:54PM  13   Q.  He was able to bear his own weight when you saw him?

02:54PM  14   A.  Yes.

02:54PM  15   Q.  The family never told you that this frail, demented, ill

02:54PM  16   old man could never bear his weight or could never walk, did

02:54PM  17   they?

02:54PM  18   A.  I can't recall.

02:54PM  19   Q.  He could still perform his activities of daily living

02:54PM  20   when you saw him?

02:54PM  21   A.  That is incorrect.

02:54PM  22   Q.  Other than bathing and cooking his own food, he could

02:54PM  23   dress himself.  Are you aware that he could dress himself?

02:54PM  24          MR. KHALIL:  Objection, Your Honor.

02:54PM  25          THE COURT:  Well, if he knows.

02:54PM    1              THE WITNESS:  I believe the family was helping him

02:54PM    2    get dressed as well.

02:54PM    3    BY MR. MORATH:

02:54PM    4    Q.  Ms. Greasley testified this morning that he dressed

02:54PM    5    himself.  Do you have any reason --

02:55PM    6              MR. KHALIL:  Objection, Your Honor.

02:55PM    7              THE COURT:  I haven't heard a question.  I don't

02:55PM    8    know --

02:55PM    9    BY MR. MORATH:

02:55PM   10    Q.  Ms. Greasley testified this morning that he was able to

02:55PM   11    put his clothes on, other than his dress shoes.  Do you have

02:55PM   12    any reason to disagree with that?

02:55PM   13              MR. KHALIL:  Objection, Your Honor.

02:55PM   14              THE COURT:  Overruled.

02:55PM   15              THE WITNESS:  I only -- no.  I can't tell you.

02:55PM   16    BY MR. MORATH:

02:55PM   17    Q.  And this frail, demented, very sick, ill old man never

02:55PM   18    needed oxygen when you saw him?

02:55PM   19    A.  That's correct.

02:55PM   20    Q.  Never was on any narcotic pain medications?

02:55PM   21    A.  That's correct.

02:55PM   22    Q.  Was able to get out of his kitchen chair by himself?

02:55PM   23    A.  That's correct.

02:55PM   24    Q.  All of these things this individual was able to do before

02:55PM   25    he left for respite on September 9th based on everything you

02:55PM    1    know, right?

02:55PM    2              MR. KHALIL:  Objection, Your Honor.

02:55PM    3              THE COURT:  Overruled.

02:55PM    4              THE WITNESS:  Repeat that.  I'm sorry.

02:55PM    5    BY MR. MORATH:

02:55PM    6    Q.  Sure.  You described him as on the death -- doorsteps of

02:55PM    7    death's -- death's doorstep; this frail, ill, sick old man.

02:55PM    8    Do you know that his daughter testified this morning that he

02:55PM    9    lived his daily life just fine, was able to care for himself,

02:55PM   10    was able to watch TV, was able get in and out of a chair, was

02:56PM   11    able to get in and out of bed, was able to walk across his

02:56PM   12    house, was able to walk five houses down to Denny's?  Did you

02:56PM   13    know any of that?

02:56PM   14    A.  Well, let me --

02:56PM   15    Q.  Yes or no?

02:56PM   16              MR. KHALIL:  Objection, Your Honor.

02:56PM   17              THE COURT:  Overruled.  Go ahead.

02:56PM   18    BY MR. MORATH:

02:56PM   19    Q.  Did you know any of that?

02:56PM   20    A.  I did not, but you can't --

02:56PM   21    Q.  Okay.  Thank you.  Thank you.  And you said the only time

02:56PM   22    you have ever seen him walk was at home.  Well, that kind of

02:56PM   23    makes sense because that's the only place you ever saw him,

02:56PM   24    correct?

02:56PM   25    A.  That's correct.

02:56PM   1   Q.  Now, you talked about these demented, ill people can't

02:56PM   2   tell you when they're hurting; they lie, they're afraid

02:56PM   3   they're going to get sent out to a nursing home.  You talked

02:56PM   4   to Mr. and Mrs. Marranco every time you were there, or at

02:56PM   5   least one of them, didn't you, about his condition?

02:56PM   6   A.  With Mr. Marranco, correct.

02:56PM   7   Q.  With Paul or Loretta Marranco, about their father's

02:56PM   8   condition, correct?

02:56PM   9   A.  That's correct.

02:56PM   10  Q.  And they told you how their father was doing, how their

02:56PM   11  father was feeling, if there was any new injuries, if there

02:56PM   12  was any new pain, did they not?

02:56PM   13  A.  When they were there for the appointment.

02:57PM   14  Q.  They told you.  And nobody was in a better position to

02:57PM   15  know that better than them, was there?  Was there?  They saw

02:57PM   16  him every day?

02:57PM   17          THE COURT:  Do you know what -- can you answer that,

02:57PM   18  sir?

02:57PM   19          THE WITNESS:  When I saw him, they would answer the

02:57PM   20  questions.

02:57PM   21  BY MR. MORATH:

02:57PM   22  Q.  Okay.  You're questioning Mr. Marranco's honesty, Paul --

02:57PM   23  Michael Marranco's honesty, that he may not have told you he

02:57PM   24  was in pain because he was afraid his daughter was going to

02:57PM   25  send him to a nursing home.  They told you everything that

02:57PM  1   you asked them, didn't they?

02:57PM  2           MR. KHALIL:  Objection, Your Honor.  That

02:57PM  3   mischaracterizes the testimony.

02:57PM  4           THE COURT:  Overruled.  Go ahead.

02:57PM  5           THE WITNESS:  I can't recall everything they said,

02:57PM  6   but sure.  I mean --

02:57PM  7   BY MR. MORATH:

02:57PM  8   Q.  And you had no basis to not believe anything they told

02:57PM  9   you, right?  Take that as a yes?

02:57PM  10  A.  Yes.

02:57PM  11          MR. MORATH:  If we could pull up Exhibit 590, please.

02:57PM  12  I'm sorry.  Page 590.

02:57PM  13

02:57PM  14  BY MR. MORATH:

02:58PM  15  Q.  And you read this one part of the note about the fall in

02:58PM  16  Florida, but you conveniently skipped the line where he says

02:58PM  17  everything is okay now, right?  That's what it says?

02:58PM  18          MR. KHALIL:  Objection, Your Honor.  It doesn't say

02:58PM  19  that.

02:58PM  20          THE COURT:  I don't know where you're reading.

02:58PM  21          MR. MORATH:  Which is okay now.

02:58PM  22  BY MR. MORATH:

02:58PM  23  Q.  So, you read that the patient fell in Florida, you read

02:58PM  24  that he hit his flank area.  You read that he ended up with

02:58PM  25  bruising.  You read that 911 was called and you even got into

02:58PM   1   Mr. Marranco's mind and told us why he refused to go to the

02:58PM   2   ER, but you skipped the part that says it's okay now, right?

02:58PM   3   Yes?

02:58PM   4   A.  Yes.

02:58PM   5   Q.  So, you had no problems with that fall, based on your

02:58PM   6   examination?

02:58PM   7   A.  At that time, no.

02:59PM   8   Q.  And certainly, if you thought he had an injury, you would

02:59PM   9   have done something more, you wouldn't ignore it?

02:59PM  10        MR. KHALIL:  Objection, Your Honor.  Is that a

02:59PM  11   question?

02:59PM  12        MR. MORATH:  It is a question.

02:59PM  13   BY MR. MORATH:

02:59PM  14   Q.  You wouldn't ignore it, would you?

02:59PM  15   A.  No.

02:59PM  16   Q.  And he doesn't even say the word back in there.  He had

02:59PM  17   some bruises on his ribs, right?

02:59PM  18   A.  On his flank.

02:59PM  19   Q.  Says ribs.  I'm sorry.  His flank area.  What is the

02:59PM  20   flank?

02:59PM  21   A.  It's the lower part of the back.

02:59PM  22   Q.  Okay.  And does the word back injury appear anywhere on

02:59PM  23   there or suspicion of back injury or questionable back

02:59PM  24   injury?

02:59PM  25   A.  No.

02:59PM   1            MR. MORATH:  If we can go to page 591, the next page.

02:59PM   2    BY MR. MORATH:

02:59PM   3    Q.  I believe you looked at barriers -- is that where it says

02:59PM   4    barriers?  We'll use this page.  When you did this physical,

02:59PM   5    this frail, demented old man, this ill man you said yourself,

03:00PM   6    he was still able to independently transfer, right?  Says it

03:00PM   7    right there.  Yes?

03:00PM   8    A.  He did --

03:00PM   9    Q.  Does it say yes?  Does it say independent with transfers?

03:00PM  10    Yes.

03:00PM  11    A.  I did put yes, but --

03:00PM  12    Q.  Okay.  Does it say independent --

03:00PM  13            THE COURT:  Wait, wait, wait --

03:00PM  14            MR. MORATH:  Trying to explain --

03:00PM  15            THE REPORTER:  Stop.

03:00PM  16            THE COURT:  The witness is going to be able to finish

03:00PM  17    their answer.  Stop cutting him off.  Let him finish the

03:00PM  18    answer.

03:00PM  19    BY MR. MORATH:

03:00PM  20    Q.  The question is, Mr. Hennessy, very simple.  Does that

03:00PM  21    record say independent with transfers?  Yes?  Does the record

03:00PM  22    say that?

03:00PM  23    A.  I'm just --

03:00PM  24            MR. MORATH:  Judge, it's a simple question.

03:00PM  25

03:00PM    1    BY MR. MORATH:

03:00PM    2    Q.  Does the record say yes?

03:00PM    3    A.  Let me explain.  We put yes, because the patient --

03:00PM    4    because of his dementia, we put yes, because he's going to do

03:00PM    5    what he wants anyway.  So, we can't -- these guys, you got to

03:00PM    6    remember, they need to -- they don't listen to what you say.

03:00PM    7    Q.  Mr. Marranco, was he physically capable of transferring

03:00PM    8    himself independently?  Yes?

03:00PM    9    A.  Yes.

03:00PM   10    Q.  Okay.  He was physically capable of ambulating?

03:01PM   11    A.  Yes.

03:01PM   12         MR. MORATH:  Can we go to 592?  Oh, I'm sorry.  591.

03:01PM   13    I'm sorry.  That was the right page.

03:01PM   14    BY MR. MORATH:

03:01PM   15    Q.  And we have the problems listed at the top.  We don't see

03:01PM   16    any chronic issues or chronic concerns with his back up

03:01PM   17    there, do we?

03:01PM   18    A.  No.

03:01PM   19    Q.  We don't see any chronic issues or chronic concerns with

03:01PM   20    his ambulation?

03:01PM   21    A.  No.

03:01PM   22         MR. MORATH:  Go to page 595, please.

03:01PM   23    BY MR. MORATH:

03:01PM   24    Q.  Here you go through his -- what you describe as your

03:01PM   25    physical exam.  All the vitals, constitutional, the chest,

03:01PM    1    the respiratory, cardiovascular, gastrointestinal.  Any

03:01PM    2    concerns with his back in there?

03:02PM    3    A.  None documented.

03:02PM    4    Q.  And you said a lot of things about his dementia was

03:02PM    5    progressing.  His dementia was progressing.  And you made a

03:02PM    6    comment about how you felt he -- physically, he was, in some

03:02PM    7    way, declining as well.  You'd agree with me, every record we

03:02PM    8    looked at, there was no change in his ability to ambulate,

03:02PM    9    was there?

03:02PM   10    A.  With ambulation?  Correct.

03:02PM   11    Q.  No ability to transfer himself?

03:02PM   12    A.  No.

03:02PM   13    Q.  Okay.  And there's no record that the family ever told

03:02PM   14    you he was having a physical decline, is there?

03:02PM   15    A.  Well, he had the falls.

03:02PM   16    Q.  That he had a physical decline, that his physical

03:02PM   17    condition was declining?  Healthy people fall.

03:02PM   18          MR. KHALIL:  Objection.  Argumentative.

03:02PM   19          THE COURT:  Sustained.

03:02PM   20    BY MR. MORATH:

03:02PM   21    Q.  Is there anything in the record that the family reported

03:02PM   22    to you they noticed his physical ability is declining?

03:02PM   23    A.  Physical abilities?  Yeah.  He was going to respite for

03:02PM   24    the reason -- are you asking for ambulation or are you --

03:02PM   25    physically could mean a ton of things --

HENNESSY  --  MR. MORATH  --  8/20/19

178

| 03:02PM | 1 | Q.  Why do you keep -- |
| 03:03PM | 2 | A.  -- that he's not doing the ADLs.  He's not able to shower |
| 03:03PM | 3 | himself.  So -- but if you're asking physically, are you |
| 03:03PM | 4 | asking me about specifically -- |
| 03:03PM | 5 | Q.  I'll ask you -- |
| 03:03PM | 6 | A.  -- about ambulation or are you asking me specifically |
| 03:03PM | 7 | what physically could be -- you know, it's very general.  So, |
| 03:03PM | 8 | if you ask me physically, they were sending him to respite |
| 03:03PM | 9 | because they couldn't care for him any longer or at this time |
| 03:03PM | 10 | they -- excuse me.  Let me clarify that.  They were -- he was |
| 03:03PM | 11 | going to respite because they were having more of a difficult |
| 03:03PM | 12 | time caring for him, so they were sending him away. |
| 03:03PM | 13 | Q.  What on Earth do you base that statement on? |
| 03:03PM | 14 | A.  That's why respite care is there.  They're there for |
| 03:03PM | 15 | caregiver burden or burnout. |
| 03:03PM | 16 | Q.  Okay.  Caregiver burden.  Did you know that Paul Marranco |
| 03:03PM | 17 | had to have neck surgery? |
| 03:03PM | 18 | A.  I did not know. |
| 03:03PM | 19 | Q.  Did you know that Loretta was taking their mother to |
| 03:03PM | 20 | Florida to see her family? |
| 03:03PM | 21 | A.  Well, she was always in Florida, though. |
| 03:03PM | 22 | Q.  Did you know that Loretta was taking her mother to |
| 03:03PM | 23 | Florida to see family, yes or no? |
| 03:03PM | 24 | A.  She was always -- |
| 03:03PM | 25 | Q.  Yes or no? |

03:03PM  1   A.  -- in Florida.

03:03PM  2   Q.  Sir, yes or no?

03:03PM  3   A.  I can't answer that because she was always --

03:03PM  4   Q.  You did know.

03:03PM  5   A.  -- in Florida.

03:04PM  6   Q.  Did you know that Loretta testified --

03:04PM  7        THE COURT:  Wait.  Wait.  Slow down.  Let the witness

03:04PM  8   answer the question --

03:04PM  9        MR. MORATH:  There was --

03:04PM  10       THE COURT:  -- you can't fire five questions at him

03:04PM  11  at one time when he's talking.  It doesn't make any sense.  I

03:04PM  12  can't understand it, so stop it.

03:04PM  13       MR. MORATH:  Thank you, Judge.

03:04PM  14  BY MR. MORATH:

03:04PM  15  Q.  Mr. Hennessy, is it your testimony, right now, that you

03:04PM  16  think that Mr. Marranco was sent to respite for two weeks

03:04PM  17  because his family was having difficulty caring for him?  Is

03:04PM  18  that what you believe?

03:04PM  19  A.  I say for caregiver burden.

03:04PM  20  Q.  Okay.  Did you believe they sent him there because they

03:04PM  21  were having a difficult time caring for him?

03:04PM  22  A.  Again, for caregiver burden.

03:04PM  23  Q.  It's yes or no.

03:04PM  24  A.  Caregiver burden, that's the reason they were -- they

03:04PM  25  were having some difficult time and they were --

03:04PM  1    Q.  What makes you think they were having a difficult time?

03:04PM  2    A.  This is what the respite is there for, caregiver burden.

03:04PM  3    Q.  She testified this morning that it had nothing to do with

03:04PM  4    their ability to care for Mr. Marranco, for their farther, it

03:04PM  5    was because the son needed surgery and she was going to take

03:05PM  6    mom to Florida, it had absolutely nothing to do with their

03:05PM  7    ability to care for him.  Do you have any reason to dispute

03:05PM  8    that?

03:05PM  9    A.  Yes, because she was --

03:05PM  10   Q.  Do you think --

03:05PM  11   A.  -- in Florida.

03:05PM  12        MR. KHALIL:  Objection.

03:05PM  13        THE COURT:  Hold it.  You may answer the question,

03:05PM  14   sir.

03:05PM  15        THE WITNESS:  Thank you, sir.

03:05PM  16        THE COURT:  Continue the question uninterrupted.  Go

03:05PM  17   ahead.

03:05PM  18        THE WITNESS:  Thank you, sir.  We went to the place

03:05PM  19   on multiple times where Loretta was in Florida when we

03:05PM  20   scheduled visits to go there.  So, you know, she traveled back

03:05PM  21   and forth to Florida on multiple times.  So, when you say, oh,

03:05PM  22   she's taking her mother down there, she's going there on

03:05PM  23   multiple occasions.

03:05PM  24   BY MR. MORATH:

03:05PM  25   Q.  Okay.  Now let's focus on the question I asked you.  Do

03:05PM  1  you have any basis to dispute the fact that she testified,

03:05PM  2  under oath today and Mr. Marranco testified at his deposition

03:05PM  3  that the only reason he went to respite was because he needed

03:05PM  4  surgery and she was going to Florida and that it had nothing

03:05PM  5  to do with their ability to take care of him?  Do you any

03:06PM  6  reason to dispute that?

03:06PM  7  A.  Well, sure.  In my records, I noted that he was combative

03:06PM  8  with the son trying to shower him and do things with him, so

03:06PM  9  there was combative behaviors.

03:06PM  10  Q.  You're assuming it, sir?

03:06PM  11  A.  Pardon me?

03:06PM  12  Q.  That's you assuming it?

03:06PM  13  A.  They physically told us that he was combative with them

03:06PM  14  when they would --

03:06PM  15  Q.  You are assuming why he went to respite.  Did Paul

03:06PM  16  Marranco or Loretta Marranco -- or Loretta Greasley ever tell

03:06PM  17  you that he was going to respite because they couldn't care

03:06PM  18  for him anymore?  Did they ever tell you that?

03:06PM  19  A.  They did not physically tell me that, no.

03:06PM  20  Q.  Now, your very frail people theme, you'd agree with me

03:06PM  21  that very frail people need some extra care, don't they?

03:06PM  22  A.  Yes.

03:06PM  23  Q.  You need to be careful when you are caring for a very

03:06PM  24  frail person, don't you?

03:06PM  25  A.  You do.

03:06PM   1   Q.   And when you talk about those fall protections and those

03:06PM   2   fall plans, that's very important that it's done accurately,

03:06PM   3   isn't it?

03:06PM   4   A.   That's correct.

03:06PM   5   Q.   It's very important it's done correctly?

03:06PM   6   A.   Correct.

03:06PM   7   Q.   It's very important that the proper fall protections are

03:06PM   8   put in place?

03:06PM   9   A.   Correct.

03:07PM   10  Q.   Because when frail people fall, frail people get hurt,

03:07PM   11  right?

03:07PM   12  A.   That's correct.

03:07PM   13           MR. MORATH:   That's all I have, Your Honor.

03:07PM   14           MR. KHALIL:   No questions, Your Honor.

03:07PM   15           THE COURT:   Thank you, sir.

03:07PM   16           THE WITNESS:   Thank you, sir.

03:07PM   17  (The witness was excused.)

03:07PM   18           THE COURT:   Okay.   It's almost 3:15.   We'll adjourn

03:07PM   19  for the day and resume tomorrow at 9:30 and we'll probably go

03:07PM   20  until about -- I have a plea at 12, so we'll take a break

03:07PM   21  around 12 and then we'll resume at 1 or 1:30 in the afternoon.

03:07PM   22  Okay.   Thank you, counsel.

03:07PM   23           MR. KHALIL:   Thank you, Judge.

03:07PM   24           MS. FLEMING:   Thank you, Judge.

03:07PM   25           MR. MORATH:   Thank you, Your Honor.

1    (Proceedings adjourned at 3:07 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          *     *     *     *     *     *     *

2

3          I certify that the foregoing is a

4     correct transcription of the proceedings

5     recorded by me in this matter.

6

7

8

9                         s/ Megan E. Pelka, RPR

10                        Court Reporter,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25