UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════

LORETTA GREASLEY, As Executor
of the Estate of Michael J. Marranco,

                    Plaintiff,


              v.


UNITED STATES OF AMERICA,

                    Defendant.

═══════════════════════════════




**DECISION AND ORDER**

15-CV-642-A

## <u>TABLE OF CONTENTS</u>

**I.    LEGAL STANDARDS** ……………………………………………………...3

    **A. Federal Tort Claims Act, Jurisdiction, and Venue**……………………………...3

    **B. Medical Malpractice or Ordinary Negligence**………………………………5

    **C. Medical Malpractice Standard Under New York Law** …………………………9

    **D. Negligence Standard Under New York Law** …………………………………...10

**II.   FINDINGS OF FACT, AND CONCLUSIONS OF LAW AS TO ALLEGED
BREACHES OF THE STANDARD OF CARE** …………………………………11

    **A. Credibility Determinations and Burden of Proof** …………………………11

    **B. Summary Timeline and Trial Abstract** ………………………………………12

        1. <u>Summary Timeline</u>..………………………………………………………...12

        2. <u>Trial Abstract</u> …………………………………………………………15

    **C. The Parties**…………………………………………………………………...16

        1. <u>Plaintiff, Estate of Mr. Marranco</u> ……………………………………………16

            a. *Loretta Greasley* ……………………………………………………16

            b. *Mr. Marranco* ………………………………………………………16

               i. Background ………………………………………………………16

               ii. Dementia …………………………………………………………17

               iii. Physical Issues …………………………………………………19

        2. <u>Defendant, the United States</u> …………………………………………………20

            i. *Pine Lodge, within the Community Living Center* ………………………20

            ii. *The VAMC* …………………………………………………………22

    **D. Falls Before Pine Lodge Admission, and Possible Back Injury**…………...22

**E. Pine Lodge, Before the First Fall** …………………………………………..24

   1. <u>Mark Levine, MHA, NHA</u> ………………………………………………..25

   2. <u>Timing of Pre-Admission Medical Assessment</u> ……………………….27

   3. <u>Condition Upon Admission, and Fluctuating Back Pain</u> …………….…28

   4. <u>Prescribed Medications</u> …………………………………………………..31

   5. <u>Initial Fall Risk Assessments</u> ……………………………………………35

   6. <u>Initial Fall Protection Plan</u> ……………………………………………….36

   7. <u>Incontinence Care and Level of Supervision</u> ……………………………40

   8. <u>Fall and Injury Prevention Devices</u> ……………………………………..44

**F. First Fall at Pine Lodge**……………………………………………………..45

   1. <u>First Fall</u> ………………………………………………………………..45

   2. <u>Post-Fall Condition</u> ……………………………………………………..47

   3. <u>Imaging Studies</u> …………………………………………………………48

**G. Treatment at the VAMC** …………………………………………………….49

   1. <u>Jeremiah Schuur, M.D.</u> …………………………………………………..50

   2. <u>Review of Medical Records and Communication Between</u>
     <u>the VAMC and Pine Lodge</u> …………………………………………….53

   3. <u>Examination in the Emergency Room</u> ………………………………….55

   4. <u>Lack of Emergency MRI</u> ………………………………………………..59

   5. <u>Return of Mr. Marranco to Pine Lodge</u> ………………………………..62

**H. Return to Pine Lodge, Before the Second Fall**……………………………..65

   1. <u>Improper Readmission</u> …………………………………………………..66

   2. <u>"Updated" Fall Protection Plan and Level of Supervision</u> ………………..67

   3. <u>Continued "Updated" Fall Protected Plan and Level of Supervision</u> …….69

**I. Second Fall at Pine Lodge** …………………………………………………..70

   1. Second Fall …………………………………………………………………70

   2. Post-Fall Condition and Events …………………………………………...71

**J. Treatment at the VAMC**…………………………………………………………72

   1. X-Rays …………………………………………………………………………72

   2. Neurology and Orthopedic Consults…………………………………………73

   3. MRI and 9/16/2013 Treatment Note ……………………………………...75

   4. Palliative Care and 9/17/2013 Treatment Note ……………………………78

   5. Observations by Staff and Family …………………………………………80

   6. Do Not Intubate and Pain Control …………………………………………82

**K. Death** ……………………………………………………………………………83

**III.   CONCLUSIONS OF LAW AS TO LIABILITY**…………………………………84

**A. Plaintiff did not establish by a preponderance of the evidence that Defendant is liable for Mr. Marranco's first fall at Pine Lodge.**…………84

**B. Plaintiff established by a preponderance of the evidence that Defendant is liable for Mr. Marranco's second fall at Pine Lodge.**…..……………….87

**C. Plaintiff did not prove by a preponderance of the evidence that Mr. Marranco fractured his lumbar spine while in the care of the VA.**………94

   1. Lumbar Compression Fractures …………………………………………94

   2. Law of the Case Doctrine …………………………………………………99

   3. Notes and Testimony by Treating Physicians ……………………………103

      a. *9/16/13 note by Dr. Witham-Leitch* ……………………………………104

      b. *9/17/13 note by Dr. Schneider*…………………………………………105

   4. Failure to Treat or Diagnose ……………………………………………106

   5. Liability for the Lumbar Compression Fractures …………………………107

iii

**D. Plaintiff proved by a preponderance of the evidence that Defendant caused injury, and pain and suffering to Mr. Marranco, as a result of the second fall at Pine Lodge.** ...............107

**E. Defendant's Motion for Judgment on Partial Findings** ......................111

**IV.   CONCLUSION** .................................................................................................111

APPENDIX ....................................................................................................113

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

===============================

LORETTA GREASLEY, As Executor
of the Estate of Michael J. Marranco,

                Plaintiff,

                                              **DECISION AND ORDER**

     v.                                       15-CV-642-A

UNITED STATES OF AMERICA,

                Defendant.

===============================

       Plaintiff Loretta Greasley, as executrix of the estate of Michael Marranco

("Plaintiff"), brings this medical malpractice and negligence action against the United

States ("Defendant") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b),

and 2671, *et seq.* ("FTCA"),[1] seeking to recover for the injuries of Michael Marranco

("Mr. Marranco") while he was in the care of the Department of Veterans Affairs (the

"VA") from September 9 to 17, 2013, at both the Batavia, New York VA Medical Center

("Pine Lodge") and the Buffalo, New York VA Medical Center (the "VAMC").  Plaintiff

alleges that the negligence and medical malpractice of Defendant's employees and/or

agents caused Mr. Marranco's falls, which resulted in various injuries, and pain and

suffering.

---

[1] A cause of action asserting violation of regulations promulgated by the Department of Health and Human Services was dismissed following Defendant's motion for summary judgment.  *See* Dkt. Nos. 31, 43.  Defendant was later granted summary judgment on the cause of action for wrongful death, pursuant to Fed. R. Civ. P. 56(a), because Plaintiff conceded there were no actionable damages and thus Defendant was entitled to judgment on that cause of action as a matter of law.  *See* Dkt. Nos. 48-50.  As such, only the negligence and medical malpractice causes of action proceeded to trial.

Within hours of his admission to Pine Lodge for a short respite stay, Mr. Marranco, an 87-year-old United States Navy veteran who suffered from dementia and had experienced three falls prior to his admission, fell on his own urine on his way to the restroom at night.  His condition deteriorated, requiring increasingly stronger pain medication and supplemental oxygen and then treatment at the VAMC.

When Mr. Marranco was to be returned to Pine Lodge, ambulance staff balked because of his unstable and concerning vital signs.  Mr. Marranco was nevertheless returned to Pine Lodge from the VAMC and was placed in the same room he had been in previously, with no substantive alterations made to Pine Lodge's plans to prevent him from falling.  And less than three hours after his return, Mr. Marranco fell again. Five days after this second fall at Pine Lodge, Mr. Marranco passed away.

A seven-day bench trial was tried in August 2019,[2] with closing argument regarding liability heard on January 29, 2020.  The parties then submitted Proposed Findings of Fact and Conclusions of Law, and responses thereto.  *See* Dkt. Nos. 100, 101, 104 (Plaintiff's post-trial submissions); Dkt. Nos. 102, 103, 105, 106 (Defendant's post-trial submissions).

Having considered the evidence admitted at trial and reviewed the parties' pre-trial and post-trial submissions, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[3]  To the extent that any findings of fact may be deemed conclusions of law, they shall also be

---

[2] A bench trial was required pursuant to the FTCA because the federal government is the sole defendant in this case.  *See* 28 U.S.C. § 2402.

[3] In pertinent part, the Rule provides, "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).

considered conclusions of law, and vice versa.  *See Marin v. United States*, 2008 U.S. Dist. LEXIS 138597, *2 n.1 (S.D.N.Y. May 29, 2008), citing *Miller v. Fenton*, 474 U.S. 104, 113-114 (1985).  Indeed, "'the distinction between law and fact is anything but clear-cut' and therefore, 'for purposes of appellate review, the labels of fact and law assigned' should not be considered controlling.'"  *Culhane v. United States*, 2020 U.S. Dist. LEXIS 242633, *29 (W.D.N.Y. Dec. 28, 2020).

The Court ultimately concludes, for the reasons set forth below, that Plaintiff did not establish by a preponderance of the evidence Defendant's liability as to the first fall at Pine Lodge, but did establish by a preponderance of the evidence Defendant's liability as to Mr. Marranco's second fall at Pine Lodge.  Therefore, Plaintiff's First Cause of Action against Defendant for medical malpractice is granted, in part, with respect to the VAMC sending Mr. Marranco back to Pine Lodge on September 12, 2013 just prior to his second fall at Pine Lodge without adequate instructions concerning his status and medical needs, but is otherwise denied; and Plaintiff's Second Cause of Action against Defendant for negligence is granted, in part, with respect to Mr. Marranco's second fall at Pine Lodge on September 12, 2013, and injuries relative to that fall, but is otherwise denied.

I.     **LEGAL STANDARDS**

**A. Federal Tort Claims Act, Jurisdiction, and Venue**

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1) (United States as defendant) and 28 U.S.C. §§ 2671-80 (FTCA).  Venue is proper in the Western District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial

part of the events giving rise to Plaintiff's claims occurred in Buffalo, New York, and Batavia, New York, which are both located within this district.

The FTCA waives the federal government's sovereign immunity as to certain tort claims arising out of the conduct of United States employees.  *See* 28 U.S.C. § 1346(b)(1); *see also Devlin v. United States*, 352 F.3d 525, 530 (2d Cir. 2003); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  The exclusive remedy for an individual claiming "personal injury or death arising or resulting from the negligent or wrongful act or omission" of a federal employee acting in the scope of his or her employment is a suit against the United States under the FTCA.  28 U.S.C. § 2679(b)(1).  Indeed, under the FTCA, the United States is liable for the torts of its employees in "the same manner and to the same extent" as a private party, *see* 28 U.S.C. § 2674, and liability is to be determined "in accordance with the law of the place where the act or omission [complained of] occurred", *see* 28 U.S.C. § 1346(b)(1).  Thus, "[u]nder the FTCA, courts are bound to apply the law of the state . . . where the accident [or act of alleged negligence] occurred."  *Makarova*, 201 F.3d at 114; *see Malzof v. United States*, 502 U.S. 301, 305 (1992) ("the extent of the United States' liability under the FTCA is generally determined by reference to state law"); *Taylor v. United States*, 121 F.3d 86, 89 (2d Cir. 1997).  In this action, the substantive law of New York applies in determining whether the VAMC or Pine Lodge committed medical malpractice and/or were negligent.

**B. Medical Malpractice or Ordinary Negligence**[4]

A threshold issue in this case is whether Plaintiff's allegations against Pine Lodge constitute medical malpractice or ordinary negligence.  Only a medical malpractice claim is brought against the VAMC.  Plaintiff maintains in her post-trial reply submission that her claim against Pine Lodge "sounds in negligence, not medical malpractice." (Dkt. No. 104, ¶ 9).  Defendant implicitly argues, however, that Plaintiff's allegations against Pine Lodge sound in medical malpractice and that Plaintiff has failed to proffer sufficient evidence of malpractice.  (*See* Dkt. No. 103, pp. 15-19).

 "In New York, '[a]n action to recover for personal injuries or wrongful death against a medical practitioner or a medical facility or hospital may be based either on negligence principles or on the more particularized medical malpractice standard.'" *Kushner v. Schervier Nursing Care Ctr.*, 2011 U.S. Dist. LEXIS 31240, *14-15 (S.D.N.Y. Mar. 23, 2011), quoting *Friedmann v. New York Hosp.-Cornell Med. Ctr.*, 865 A.D.3d 850, 850-851 (N.Y. App. Div. 2009) (citation omitted).  What complicates matters is that "the distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and 'no rigid analytical line separates the two'".  *Weiner v. Lenox Hill Hosp.*, 88 N.Y.2d 784, 787 (N.Y. 1996), quoting *Scott v. Uljanov*, 74 N.Y.2d 673, 674 (N.Y. 1989).

The Court must determine the nature of the duty to Plaintiff that it is alleged Defendant has breached, whether it (1) "arises from the physician-patient relationship or is substantially related to medical treatment" (medical malpractice) or (2) the provider

---

[4] The parties dispute whether Plaintiff's allegations against Pine Lodge constitute medical malpractice or ordinary negligence.  That issue necessarily impacts the Court's conclusions on liability in this case; thus, the Court sets forth the State legal principles in greater depth than it would in most FTCA decisions.

failed "to fulfill a different duty" (ordinary negligence).  *Gjini v. United States*, 2019 U.S.

Dist. LEXIS 20978, *25, 2019 WL 498350, *9 (S.D.N.Y. Feb. 8, 2019) (internal quotation

marks and citations omitted).  In other words, a claim sounds in medical malpractice

"when the challenged conduct 'constitutes medical treatment or bears a substantial

relationship to the rendition of medical treatment by a licensed physician'".  *Weiner*, 88

N.Y. at 788, quoting *Bleiler v. Bodnar*, 65 N.Y.2d 65, 72 (N.Y. 1985).  "'The distinction . .

. turns on whether the acts or omissions complained of involve a matter of medical

science or art requiring special skills not ordinarily possessed by lay persons or whether

the conduct complained of can instead be assessed on the basis of the common

everyday experience of the trier of the facts.'"  *Gjini*, 2019 U.S. Dist. LEXIS 20978, at

*23-24 (internal quotation marks and citations omitted).

     In determining whether negligence or medical malpractice is alleged against Pine

Lodge, the Court conducted an extensive review of State and Federal case law

addressing this issue,[5] as well as the New York State Pattern Jury Instructions.  *See*

N.Y. Pattern Jury Instr., Civil, 2:149, at 2-9 (3d ed. 2020).

     *LaMarca v. United States*, 31 F. Supp. 2d 110 (E.D.N.Y. 1998) is a FTCA case

where the decedent died from complications arising from a fractured hip he suffered

after he fell from his bed while a patient at a veteran's hospital.  *Id.* at 115-116.  In that

case, the Court held that the action involved medical malpractice and not negligence,

because the plaintiff alleged the decedent's injuries all stemmed from the hospital

---

[5] In New York, there is a shorter statute of limitations for medical malpractice (2 ½ years) as opposed to negligence (3 years).  The New York Court of Appeals has explained, "for policy reasons the Legislature has chosen to affix different Statutes of Limitation to medical negligence (or malpractice) and negligence generally".  *Scott*, 74 N.Y.2d at 674.  There is therefore much case law determining, in the context of motions to dismiss and motions for summary judgment, whether claims are time-barred for sounding in medical malpractice rather than negligence.

nursing staff's improper assessment of his fall risk status. *Id.* at 121-122, citing *Staveley v. St. Charles Hosp.*, 173 F.R.D. 49, 52-53, 1997 U.S. Dist. LEXIS 7995 (E.D.N.Y. June 5, 1997) (discussing New York cases where unsupervised patients fell and were injured, that held the claims sounded in medical malpractice when it was alleged that the patients' medical condition was improperly assessed by hospital staff).

In New York case law delineating this distinction, the appellate courts have determined that it is possible to allege a mixture of medical malpractice and negligence. For example, in *D'Elia v. Menorah Home & Hosp. for the Aged & Infirm*, 51 A.D.3d 848 (N.Y. App. Div. 2008) the decedent fell when trying to reach the bathroom without assistance, after a prior, similar fall prompted the defendant to identify her as being at risk for falls. *Id.* at 849-850. The Court held that the first cause of action based on negligence encompassed allegations of both medical malpractice and ordinary negligence. *Id.* at 851. The "specific allegations sounding in medical malpractice" were those regarding whether restraints, which were not used, would have been medically advised or required. *Id.* The allegations sounding in ordinary negligence, however, were that the defendant "failed to use any available safety devices or tools to protect the frail, elderly decedent from the risk of falls". *Id.* at 851.

There is also the proposition that "[w]hen a risk of harm has been identified through the exercise of medical judgment, a failure to take measures to prevent the harm may constitute actionable ordinary negligence." *Gjini*, 2019 U.S. Dist. LEXIS 20978, at *26 (internal quotations and citations omitted); *see Edson v. Cmty. Gen. Hosp. of Greater Syracuse*, 289 A.D.2d 973, 973-974 (N.Y. App. Div. 2001) (the decedent fell to the floor attempting to get out of bed, and the plaintiff alleged the

7

defendant hospital "was aware of a potential for injury to decedent because of his fever and confusion"); *Halas v. Parkway Hosp., Inc.*, 158 A.D.2d 516, 516-517 (N.Y. App. Div. 1990) (the plaintiff alleged the defendant was negligent in permitting the plaintiff "to remain in a hospital bed which lacked proper and adequate safeguards, and in failing to properly supervise him and/or to render him any assistance" where the 79-year-old, chronically ill and "very weak" plaintiff fell from his bed and broke his hip); *Papa v. Brunswick Gen. Hosp.*, 132 A.D.2d 602-604 (N.Y. App. Div. 1987) (the plaintiff alleged that the negligence of the hospital's employees in failing to provide him with proper and adequate supervision, which did not "involve diagnosis, treatment or the failure to follow a physician's instructions", caused the decedent, a geriatric patient with multiple medical problems who was taking various medications, to fall from his hospital bed).

In this FTCA case, liability is to be determined "in accordance with the law of the place where the act or omission [complained of] occurred."  28 U.S.C. § 1346(b)(1). The impetus is not on the Court to resolve conflicting New York case law.  *See Staveley*, 173 F.R.D. at 52 ("With respect to the cases addressing fact patterns where an unsupervised patient falls and is injured, the result [holding whether the allegations amount to ordinary negligence or medical malpractice] is not entirely consistent."). Rather, the Court must apply the substantive law to the facts of this case as a New York court would, in deciding whether Pine Lodge is liable.

The Court concludes that most of the specific allegations made by Plaintiff against Pine Lodge sound in medical malpractice, other than those pertaining to actions or omissions taken after the first fall but before the second fall.  *See D'Elia*, 51 A.D.3d at

851.  The Court explains its reasoning as to each allegation in detail below.  *See infra*, at II.E and H.

### C.  Medical Malpractice Standard Under New York Law

To establish a medical malpractice claim under New York law, a plaintiff must prove:  "(1) the standard of care in the locality where the treatment occurred; (2) that the defendant breached that standard of care; and (3) that the breach of the standard was the proximate cause of injury."  *Coolidge v. United States*, 2020 U.S. Dist. LEXIS 111922, *3, 2020 WL 3467423 (W.D.N.Y. June 25, 2020) (internal quotation marks and citations omitted); *see generally* N.Y. Pattern Jury Instr., Civil, 2:150 (3d ed. 2020).

"An error in medical judgment by itself does not give rise to liability for malpractice."  *Blake v. United States*, 2017 U.S. Dist. LEXIS 58354, at *4, 2017 WL 1371000 (W.D.N.Y. Apr. 17, 2017), citing *Nestorowich v. Ricotta*, 97 N.Y.2d 393, 398 (N.Y. 2002).  Consequently, Plaintiff must show by a preponderance of the evidence that the medical professionals treating Mr. Marranco failed to conform to accepted community standards of practice.  *Nestorowich*, 97 N.Y.2d at 398.  Not "every instance of failed treatment or diagnosis may be attributable to a doctor's failure to exercise due care."  *Id.*

Each element must be established by expert medical opinion unless the deviation from the proper standard of care is so obvious as to be within the understanding of an ordinary layperson.  *See Sitts v. United States*, 811 F.2d 736, 739-740 (2d Cir. 1987) (noting that "in the view of the New York courts, the medical malpractice case in which no expert medical testimony is required is 'rare'") (citation omitted); *Fiore v. Galang*, 64 N.Y.2d 999, 1000-1001 (N.Y. 1985) ("except as to matters

within the ordinary experience and knowledge of laymen, in a medical malpractice

action, expert medical opinion evidence is required to demonstrate merit").

### D.  Negligence Standard Under New York Law

Negligence is defined as conduct that falls "below that of a reasonably prudent

person under similar circumstances judged at the time of the conduct at issue."  *Holland*

*v. United States*, 918 F. Supp. 87, 89 (S.D.N.Y. 1996).  In other words, "New York

Pattern Jury Instructions define negligence . . . as follows:

> Negligence is lack of ordinary care. It is a failure to use that
> degree of care that a reasonably prudent person would have
> used under the same circumstances. Negligence may arise
> from doing an act that a reasonably prudent person would
> not have done under the same circumstances, or, on the
> other hand, from failing to do an act that a reasonably
> prudent person would have done under the same
> circumstances . . ."

*Hunter v. County of Orleans*, 2013 U.S. Dist. LEXIS 164310, *11, 2013 WL 6081761

(W.D.N.Y. Nov. 19, 2013), quoting N.Y. Pattern Jury Instr., Civil, 2:10 (3d ed. 2013).

In order to establish a *prima facie* case of negligence under New York State law,

a plaintiff must show that: "(1) the defendant owed the plaintiff a cognizable duty of care;

(2) the defendant breached that duty; and (3) the plaintiff suffered damage as a

proximate result of that breach."  *Stagl v. Delta Airlines*, 52 F.3d 463, 467 (2d Cir. 1995),

citing *Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (N.Y. 1985).

10

## II.   FINDINGS OF FACT, AND CONCLUSIONS OF LAW AS TO ALLEGED BREACHES OF THE STANDARD OF CARE[6]

### A.  Credibility Determinations and Burden of Proof

"In a bench trial such as this, it is the Court's job to weigh the evidence, assess credibility, and rule on the facts as they are presented."  *Mann v. United States*, 300 F. Supp. 3d 411, 418 (N.D.N.Y. 2018) (internal quotation marks and citations omitted); *see generally Mathie v. Fries*, 121 F.3d 808, 812 (2d Cir. 1997).  "The Court [is] in the best position to evaluate [each] witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says."  *Mann*, 300 F. Supp. 3d at 418 (internal quotation marks and citations omitted); *see Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 634 (2d Cir. 1996) (same).  "The court is also entitled, just as a jury would be . . . , to believe some parts and disbelieve other parts of the testimony of any given witness."  *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (internal quotation marks and citations omitted).

"At a bench trial on a civil action, as with any civil case, the burden of proof is on the Plaintiff to prove each element of [her] claims by a preponderance of the evidence."  *Hoover v. Wilkie*, 2020 U.S. Dist. LEXIS 3807, *36, 2020 WL 108423 (W.D.N.Y. Jan. 9, 2020).  To establish a fact by a preponderance of the evidence, a plaintiff must "prove that the fact is more likely true than not true."  *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (internal quotation and citations omitted); *see Blake*, 2017 U.S. Dist. LEXIS

---

[6] To more effectively and expeditiously address the multitude of sub-arguments raised by Plaintiff, the Court states its conclusions concerning the alleged deviations from the standard/ duty of care in conjunction with the factual findings relevant to that issue.  The Court's corresponding conclusions about liability are addressed later in this Decision, *see infra* at III, which requires some reiteration of the instant conclusions.

58354, at *4 (same).  By way of illustration, "[i]f the evidence is equally divided . . . the party with the burden of proof loses."  *Mann*, 300 F. Supp. 3d at 419 (internal quotation marks and citations omitted); *see Hoover*, 2020 U.S. Dist. LEXIS 3807, at *36 (characterizing the preponderance standard as a "tie-breaker").

In sum, "[t]he obligations of the court as the trier of fact are to determine which of the witnesses it finds credible, which of the permissible competing inferences it will draw, and whether the party having the burden of proof has persuaded it as factfinder that the requisite facts are proven."  *Cifra v. General Electric Co.*, 252 F.3d 205, 215 (2d Cir. 2001).  The Court assesses the credibility of each of the witnesses who testified at the bench trial based on its observations at trial, including the witness's conduct and demeanor; and the consistency of the witness's testimony with testimony of other witnesses and documentary evidence in the record.

### B. Summary Timeline and Trial Abstract[7]

#### 1. Summary Timeline

Mr. Marranco, an 87-year-old United States Navy veteran who suffered from dementia, received all his medical care through the VA in 2013.  He had been a VA patient for years.  Before his respite admission to Pine Lodge he was receiving VA "home-based primary care"; he also experienced three falls, one just a day prior to his admission.  He was admitted to Pine Lodge in September 2013 for a two-week period of respite care so that a family member could have surgery and recuperate.  Mr. Marranco

---

[7] Citations designated (Tr. __) refer to the page number(s) of the combined trial transcript.  (*See* Dkt. Nos. 93-99).  On the first day of trial, the parties stipulated the exhibits into evidence (Tr. 38-40; *see* Dkt. No. 88 [Joint Trial Exhibit List]), which are designated (Joint Tr. Ex. __).

fell two times at Pine Lodge and required treatment at the VAMC.  He suffered a

pulmonary embolism[8] and five days after the second fall, passed away.

The pertinent events are as follows:[9]

- 2007: fall at home, and subsequent lower back surgery, *i.e.*
  "kyphoplasty"[10]

- Early July 2013: fall in Florida

- September 8, 2013: fall at home

- September 9, 2013, 10:57 a.m.: admission to Pine Lodge

- September 10, 2013, 1:15 a.m.: first fall at Pine Lodge

- September 11, 2013, 7:39 p.m.: arrival at the VAMC

- September 12, 2013, 3:00 a.m.: return to Pine Lodge

- September 12, 2013, 5:35 a.m.: second fall at Pine Lodge

- September 12, 2013, shortly after 6:28 a.m.: return to the VAMC

- September 17, 2013, 1:45 a.m.: pronounced dead

This timeline is generally undisputed, aside from the date of Mr. Marranco's last fall

before he was admitted to Pine Lodge.

---

[8] A pulmonary embolism is an "obstruction of a pulmonary artery or one of its branches that is usually produced by a blood clot which has originated in a vein of the leg or pelvis and traveled to the lungs and that is marked by labored breathing, chest pain, fainting, rapid heart rate, cyanosis, shock, and sometimes death."  Pulmonary embolism, Merriam-Webster.com: Medical Dictionary, https://www.merriam-webster.com/medical/pulmonary%20embolism.

[9] Some of the times are approximations.

[10] A kyphoplasty is "a medical procedure that is similar to vertebroplasty in the use of acrylic cement to stabilize and reduce pain associated with a vertebral compression fracture but that additionally seeks to restore vertebral height and lessen spinal deformity by injecting the cement into a cavity created (as by a mechanical device or by insertion and inflation of a special balloon) in the fractured bone."  Kyphoplasty, Merriam-Webster.com:  Medical Dictionary, https://www.merriam-webster.com/medical/kyphoplasty.

In arguing that the three pre-admission falls were "too remote to be a possible cause of his injuries and decline in condition at Pine Lodge" (Dkt. No. 104, ¶ 86), Plaintiff asserts that the fall just before his admission occurred on September 4th or 5th to bolster her claim that no expert testimony is required to establish causation.[11] Defendant asserts it occurred on September 8th.

Mr. Marranco's daughter testified that the fall occurred on September 5th, while his son testified that Mr. Marranco fell "a couple days previous" to his last VA home-based primary care visit on September 6th.  They both recalled mentioning the fall to the provider who visited on the 6th.  (Tr. 57, 61, 74, 367-368).

This testimony, however, is contradicted by the fact that no post-fall note or incident report was generated on the 6th.  (Tr. 168).  Moreover, medical staff at Pine Lodge testified that upon Mr. Marranco's admission, his son conveyed to them that Mr. Marranco fell "yesterday", or on September 8th, and medical records reflect that date as well.  (Tr. 329-330, 554; Joint Tr. Ex. 9, p. 8; Joint Tr. Ex. 47-C, p. 522).  There is also proof that the policy and practice of the VA required the VA's home-based primary care staff to generate a post-fall note if they had learned of a fall on or before September 6th. (Tr. 164, 167-168; *see* Joint Tr. Ex. 7, p. 6 [VA Western New York Procedure for Home Based Primary Care staff's documentation of falls]).

Considering these competing accounts, the Court credits proof regarding the policy and practice of the VA should home care staff learn of a fall.  The Court concludes that the absence of such a note in Mr. Marranco's VA medical records

---

[11] In the same post-trial submission, Plaintiff argues in the alternative that "Mr. Marranco's condition upon admission to Pine Lodge interrupts the causal chain between earlier falls and his ultimate injuries regardless of when those falls occurred."  (Dkt. No. 104, ¶ 88).

indicates that no fall occurred within the timeframe of September 4th or 5th and that the fall instead occurred on September 8th, the day before Mr. Marranco's admission to Pine Lodge, as originally reported by Mr. Marranco's son.  This conclusion is also supported by testimony about Mr. Marranco's complaints of pain before his first fall at Pine Lodge.

2. <u>Trial Abstract</u>

Fourteen fact witnesses testified at the August 2019 bench trial.  Two family members testified primarily about Mr. Marranco's medical history, the activities he engaged in prior to his admission to Pine Lodge, and the pain and suffering they observed him experience in the days leading to his death.  The other fact witnesses were all medical professionals who treated Mr. Marranco at Pine Lodge and the VAMC, as well as the attending physician for Pine Lodge who had no direct contact with Mr. Marranco during his treatment.  Numerous joint exhibits were stipulated into evidence, consisting primarily of Mr. Marranco's medical records.  Mr. Marranco's two treating physicians who testified, Dr. Witham-Leitch and Dr. Schneider, were not offered as expert witnesses.

The only two experts to testify at trial were Plaintiff's nursing home expert witness, Mark Levine, MHA, NHA, and Plaintiff's emergency room expert witness, Jeremiah Schuur, M.D.  Plaintiff presented this expert testimony on the issues of whether Pine Lodge and the VAMC had departed from the requisite standard of care in the medical community and otherwise.  As is discussed below, neither expert offered an opinion on causation, *i.e.* whether such alleged departures were the proximate cause of Mr. Marranco's falls or injuries.

During opening statements, both parties had referred to Defendant's two experts, Bruce Naughton, M.D., and John Leddy, M.D., who were expected to testify at trial and who had testified during examinations before trial.  (Tr. 7-8, 17, 19-20, 29, 32-33, 35-36).  After Plaintiff rested (Tr. 899), Defendant moved for judgment on partial findings for lack of proof of causation.[12]  Defendant then stated it would not be calling any witnesses, including expert witnesses, on the ground that Plaintiff had not proven her case.  (Tr. 917).

The Court bifurcated arguments on liability and damages.  Closing arguments on liability were heard on January 29, 2020, with the Court postponing damages arguments until the issuance of the instant Decision and Order on liability.

**C.  The Parties**

1.  <u>Plaintiff, Estate of Mr. Marranco</u>

a.  *Loretta Greasley*

Prior to the bench trial, Mr. Marranco's son, Paul Marranco ("Paul), passed away and Loretta Greasley ("Loretta"), Mr. Marranco's daughter, was substituted as the executrix of his estate.  (Tr. 41-42; *see* Tr. 386, Dkt. Nos. 29-30).  Loretta testified at trial.  Paul's deposition transcript, from his deposition taken on June 8, 2016, was read into the record at trial.  (*See* Tr. 346-431).

b.  *Mr. Marranco*

i.  Background

Mr. Marranco was a World War II Navy veteran and in September 2013 he was 87 years old.  (Tr. 41, 356, 358).  He and his wife had four children, including Loretta

---

[12] The Court reserved decision on this motion, which is addressed below.  *See infra*, at III.G.

and Paul.  (Tr. 42, 357).  The couple lived in a house in Buffalo, New York, with Paul,

Loretta, and Loretta's husband.  (Tr. 43, 90-91, 113-114, 349-350).

        ii.    Dementia

The Court brings upfront attention to Mr. Marranco's diagnosis of dementia.  That

medical condition provides a framework for analyzing and understanding the trial

testimony and parts of the record that may otherwise generate confusion or dissonance.

Mr. Marranco's dementia resulted in behavioral changes or idiosyncrasies, cognitive

impairment, difficulty expressing levels and pinpointing areas of pain, and anxiety in

response to new settings.  There was at least some testimony and documentary

evidence concerning each of these matters.

One reason Paul and Loretta were living at home again was to help care for Mr.

Marranco because of his dementia.  (Tr. 43, 361; Joint Tr. Ex. 9, p. 9).  In 2013, his

dementia was worsening.  (Tr. 47-48).  According to Nurse Practitioner Jamie Kowalski

at Pine Lodge, dementia is a progressive disease and Mr. Marranco's was moderate to

severe (7 or 8 on a scale of 1 to 10, with 10 the highest degree of dementia), which

made him "pretty impaired" cognitively.  (Tr. 841-842).

Mr. Marranco had frontotemporal dementia, which is associated with certain

behaviors.  (Tr. 845, 878).  He had some behavioral issues likely related to his

dementia.  Mr. Marranco had to be "persuaded" or "encouraged" to take baths or

showers.  (Tr. 97, 381-383).  He was called the "magpie of the family" because he liked

to steal shiny objects like silverware, take sugar packets from the local *Denny's*

restaurant, and hoard objects or food in the cabinets.  (Tr. 95-96, 104-105, 380-381).

Mr. Marranco had "funny habits" such as having to immediately throw out "any kind of

garbage".  (Tr. 370; *see* Tr. 46-47).  He also had angry outbursts because he was stubborn.  (Tr. 96, 381).

Paul agreed that his relationship with his father was akin to a "role reversal", with Paul as the father and Mr. Marranco as the child.  (Tr. 379-380, 386-387).  He described Mr. Marranco as "very simple minded" and stated that the more his dementia worsened the more "[h]e became a simple man".  (Tr. 379, 387).

Both Loretta and Paul testified that they had initially cancelled Mr. Marranco's respite care because he was used to being at home and they were worried about how he would feel in a new setting.  (Tr. 74-75, 389-390).  Indeed, upon admission to Pine Lodge, Mr. Marranco was prescribed medication to address his increased anxiety after his family left.  The prescribing nurse practitioner testified that Mr. Marranco's anxiety was "acute" and that the medication was meant to address his anxiety, not his dementia.  Even so, the nurse practitioner acknowledged that Mr. Marranco's change in environment, from his home to respite care at Pine Lodge, could have triggered his anxiety because anxiety associated with such a disruption can be expected in dementia patients.  (Tr. 832, 845, 848, 891-892).

A dementia diagnosis is important to consider when devising a fall protection plan, because the dementia patient is unaware of his or her environment, increasing his or her confusion, thereby increasing a risk of falls.  (Tr. 552-553).  Frontotemporal dementia patients present unique challenges for health care workers seeking to reduce patients' risk of falling, due to the behavioral nature of their symptoms and how "medications are often ineffective in controlling symptoms".  (Tr. 876-878).

In addition, patients with dementia have difficulty expressing pain accurately, reporting pain in more than one area of their bodies, and in providing accurate medical histories.  (*See* Tr. 685).  When a dementia resident at Pine Lodge identifies pain on a scale of 1 to 10, the medical provider must sometimes look to other indicators of the resident's pain because dementia patients often do not know what they are describing and sometimes do not even answer when asked.  (Tr. 790; Joint Tr. Ex. 9, p. 8 [Care Plan, noting Mr. Marranco's cognitive impairment and inability to communicate pain on a 1-10 scale, with listed alternatives to assessing his pain, *i.e.* observing his facial expression, physical movements, vocalizations, and physiology]).

The record is replete with Mr. Marranco's complaints of pain or lack thereof, and his pain appears varied or even erratic.  However, the Court finds that his dementia sheds some light on this inconsistency.  For example, as detailed below, Mr. Marranco reported minimal pain on intake his first morning at Pine Lodge but that evening he was yelling in pain before any fall at the facility.  While there was testimony that uncontrolled pain can worsen dementia behaviors and those patients' quality of life (Tr. 887), there was no detailed testimony regarding how Mr. Marranco's dementia did or did not impact his subjective experience of pain or consciousness of pain.

iii.   Physical Issues

Plaintiff contends that Mr. Marranco was "relatively healthy" before he was cared for at Pine Lodge (Dkt. No. 101, ¶ 130), a characterization disputed by Defendant. While Loretta and Paul described Mr. Marranco as physically "fine", and his medical issues as "minor", prior to his admission to Pine Lodge (Tr. 47, 362), this testimony conflicts with the medical evidence of record.  In addition to his dementia, Mr. Marranco

had a medical history of high blood pressure, benign prostate hypertrophy with
incontinence (enlarged prostate pressing on the urethra and causing incontinence),
chronic obstructive pulmonary disease (limited air flow due to obstruction), low
potassium, low cholesterol, depression, hearing problems, a neck surgery prior to 2007
due to a work injury, and a kyphoplasty at L-3 after a fall at home in 2007.  (Tr. 88, 146-
147, 149, 159-161, 361-362, 382-383, 878, 883-884; Joint Tr. Ex. 9, p. 9; Joint Tr. Ex.
47-C, p. 537).  He was already taking about eleven prescribed medications per day
when he was admitted to Pine Lodge.  (Tr. 97-98, 362-363).

     Mr. Marranco was independent in some respects, such as feeding and dressing
himself, walking up and down stairs, getting in and out of his chair, vacuuming the
house every day, and taking out the garbage.  (Tr. 46-47, 50-51, 361, 365, 381-384).
However, he required considerable assistance from Loretta and Paul:  they handled his
meal preparation, grocery shopping, transportation to medical appointments, medication
management, and household finances.  (Tr. 51, 98, 156, 383-388).  If he walked for
100-200 feet or a half block, Mr. Marranco "wheezed".  (Tr. 104-105, 393-395).  He was
physically "able to go to the bathroom on his own" and did not "pee himself" or wear
adult diapers.  However, he began having an intermittent issue with his urinary tract,
"dribbling" urine when he went to the restroom and experiencing urgency to urinate, an
issue Paul communicated to Pine Lodge.  (Tr. 50, 103-104, 378-379, 392-393).

     2.  Defendant, the United States

     i.  *Pine Lodge, within the Community Living Center*

     The Community Living Center ("CLC") in Batavia, New York consists of three
"lodges" with a maximum of 30 residents each:  Maple Lodge and Oak Lodge, which are

long-term care and rehabilitation facilities, and Pine Lodge where the dementia unit is located.  The three lodges are within the same building, with Pine Lodge located on its own floor.  (Tr. 571, 822, 824-825, 872-873).  The CLC is part of the VA system.  (Tr. 610).  It has medical providers, nursing staff, physical therapists, an occupational therapist, dieticians, a social worker, and a psychologist on staff for all three of the lodges.  (Tr. 260-261, 871).  Although a medical doctor (in September 2013, Dr. Marc Maller, the Medical Director of the CLC and the attending physician for Pine Lodge) was not on site at Pine Lodge 24/7, the doctor is on-call to nursing staff 24/7.  If Dr. Maller was unreachable by telephone, staff could contact the "medical officer of the day" at the CLC's "parent facility", the Buffalo VA.  (Tr. 569-570, 871).

All veterans are entitled to up to four weeks of annual respite care at the CLC, which is a short-term, temporary admission with a predetermined discharge date, to provide caregivers relief from burnout.  (Tr. 198, 289, 823).  There were only four respite beds available at any given time in the CLC.  (Tr. 876).  The family's decision to place Mr. Marranco in respite care was solely due to Paul needing time to heal from surgery, and Loretta taking Mrs. Marranco to Florida to visit family.  (Tr. 70, 74, 91, 388-389, 878-880).  Mr. Marranco was under NP Kowalski's care upon his admission; Dr. Maller did not participate directly in Mr. Marranco's care and treatment.  (Tr. 137, 604, 825).

Pine Lodge houses dementia patients.  (Tr. 538, 822-823, 875).  It is a "secure unit", meaning it is locked for safety purposes because of the patients' risk of absconding.  There is a code to enter and exit the unit and patients wear wrist bands that trigger door alarms if they attempt to leave Pine Lodge.  (Tr. 876; *see* Joint Tr. Ex.

9, p. 2 [Mr. Marranco's Care plan noting his "impaired decision making" and risk for elopement, requiring a wrist band in addition to escort services for anything off unit]).

> ii.   *The VAMC*

The Veterans Administration Medical Center in Buffalo, New York has an Emergency Department ("the VAMC").  (Tr. 609, 723-724).  Both the VAMC and Pine Lodge are federal facilities.  (Dkt. No. 1 [Complaint], ¶ 8; Dkt. No. 3 [Answer], ¶ 8).

### D.  Falls Before Pine Lodge Admission, and Possible Back Injury

There were no witnesses to the three falls Mr. Marranco had prior to his admission to Pine Lodge.  (Tr. 85-86, 92, 99, 369, 377).

In 2007, Mr. Marranco fell at home and injured his back.  He had "kyphoplasty" surgery on his lower back at L-3, to repair a vertebral dysfunction.  (Tr. 51-54, 84-87, 147; Cook Tr., 38-40).  He did not receive any additional treatment after the surgery. (Tr. 51-54, 86-87).

In early July 2013, when the family was vacationing in Florida, Mr. Marranco slipped and fell in the shower.  (Tr. 54, 91-92, 376).  Paramedics responded and evaluated him.  (Tr. 54-55).  Mr. Marranco did not receive further medical care and he made no complaints of pain.  (Tr. 56, 92, 376-377; Joint Ex. 47-C, p. 590).  Nurse Practitioner Kevin Hennessy's last home visit before Mr. Marranco's admission to Pine Lodge was on July 25, 2013, which was the first time the VA learned of the fall in Florida three weeks prior.  (Tr. 127-128, 158; Joint Tr. Ex. 47C, pp. 590-597).  Paul conveyed that Mr. Marranco had hit his flank area/ lower part of his back during that fall and had some bruising, and Mr. Marranco "refused" to go to the emergency room.  (Tr. 157, 173-174; Joint Ex. 47-C, p. 590).  Based on his examination of Mr. Marranco on July 25th,

NP Hennessy made no indications of a back injury or suspected back injury. (Tr. 174; Joint Ex. 47-C, p. 590 [progress note stating his flank area was "fine"]). He made no note regarding Mr. Marranco's back, foot, or shoulder. (Tr. 135, 137). Registered Nurse Thaddeus Burzynski prepared a post-fall note. (Joint Ex. 47-C, pp. 597-601).

RN Burzynski then visited Mr. Marranco at his home on September 5 and 6, 2013, to collect a urine sample, draw a blood sample to recheck Mr. Marranco's potassium level, and remove ear wax and perform an ear irrigation. According to notes from those dates, Mr. Marranco did not report any pain or shortness of breath, and he was ambulatory and able to complete activities of daily living with minimal assistance. No back issues or issues with ambulation or mobility were noted, and no fall risk assessments were performed. (Tr. 139-144; Joint Tr. Ex. 47-C, pp. 548, 550-554).

On September 8, 2013, Mr. Marranco slipped and/or fell in the area of a landing adjacent to a side door of his home. There are three, carpeted steps leading from the carpeted landing up to the kitchen. (Tr. 99, 368, 370). Loretta observed Mr. Marranco "seconds" after his fall, and he was tended to immediately. (Tr. 64-65, 99-101, 370-372). She and Paul observed him either sitting or "squatting" on the floor, with his back against the door and his feet facing the steps in front of him. (Tr. 66, 100-101, 371-372). Based on this position, he had either fallen backwards while ascending the stairs or had missed a step. (Tr. 101, 370-372). Mr. Marranco needed assistance getting up; Loretta's husband helped him because there was no railing to hold onto. (Tr. 101-102). Because Loretta and Paul observed Mr. Marranco immediately after the fall, the Court credits their accounts about the location and circumstances of the fall rather than Pine Lodge medical staff's testimony that he fell "down three cement stairs". (Tr. 329-330).

23

Mr. Marranco said he was "fine".  His family did not observe pain or discomfort after the fall; he showed no physical signs of injury other than some "redness" on his lower back that Paul observed.  (Tr. 67, 374-375).  He walked "just fine" and did not require pain medication before his respite care admission.  (Tr. 49-51, 67-69).

Thus, Mr. Marranco's two falls at Pine Lodge were not his first.  Indeed, Defendant fell three times before his admission to Pine Lodge and, as explained further below, upon his admission and before any fall at Pine Lodge, Mr. Marranco verbalized back pain and medical staff observed indicators of severe pain.

### E.  Pine Lodge, Before the First Fall

Mr. Marranco arrived at Pine Lodge on September 9, 2013 at around 10:57 a.m. His first fall at the facility occurred about 14 hours later.

Plaintiff alleges that Pine Lodge breached its duty of care in actions and omissions prior to Mr. Marranco's first fall at Pine Lodge, and that those breaches proximately caused Mr. Marranco's fall and the injuries connected thereto.  She argues, specifically:  (1) a failure to perform a physical examination of Mr. Marranco within 30 days prior to his admission to Pine Lodge, (2) negligence in prescribing two medications that increased Mr. Marranco's fall risk (*i.e.* Lorazepam and Hydrocodone), (3) an inadequate/ inappropriate fall protection plan, (4) a failure to provide adequate assistive devices to prevent falls/ injury, and (5) a failure to provide proper supervision and/or incontinence care.  Plaintiff also asserts, in a conclusory manner and in the alternative, (6) a failure to diagnose and/or improper treatment of certain conditions following each of Mr. Marranco's two falls at Pine Lodge.

The failure to diagnose or treat theory undoubtedly sounds in medical malpractice.  *See e.g. Whitfield v. State of N.Y.*, 162 A.D.3d 1098, 1099 (N.Y. App. Div. 2018) (alleging failure to timely diagnose and treat the claimant's urinary tract infection); *Russo v. Shah*, 278 A.D.2d 474, 475 (N.Y. App. Div. 2000) (alleging failure to diagnose the plaintiff's Lyme disease).  Plaintiff asserts that all of her allegations constitute ordinary negligence and thus, no medical expert testimony was required.  The Court concludes, however, that these allegations sound in medical malpractice and therefore Plaintiff has failed to prove that Defendant breached any standard of care or is liable in this respect.  To the extent certain allegations could possibly be construed as ordinary negligence, the Court substantively analyzes those allegations.

1. Mark Levine, MHA, NHA

Plaintiff's sole expert who testified about Pine Lodge and its alleged deviations from the standard of care was Mr. Levine, who has a Bachelor's degree in Health Science and a Master of Health Administration degree, with a specialty in the management of health care facilities/ operations, including long-term care facilities.  (Tr. 190).  Mr. Levine obtained his license as a Nursing Home Administrator in 1991.  (Tr. 187-188, 194).  Defendant argues that Mr. Levine lacks the qualifications to opine on the applicable standard of care, and that because he is a non-medical expert that is fatal to Plaintiff's case against Pine Lodge.  (Dkt. No. 103, ¶¶ 47-52).

The Court concludes that Mr. Levine cannot testify concerning any allegations that sound in medical malpractice.  Mr. Levine has no medical education, training, licenses, or experience whatsoever.  He admitted that he is not qualified to testify to a medical standard of care.  (*See* Tr. 246-250, 262).

25

Mr. Levine's qualifications could warrant his testimony as an expert in senior care administration and the long-term/ senior care industry. However, the Court concludes that allegations of ordinary negligence against Pine Lodge can be assessed "on the basis of the common everyday experience of the trier of the facts" (*Gjini*, 2019 U.S. Dist. LEXIS 20978, at *23-24 [internal quotation marks and citations omitted]) and thus that Mr. Levine's testimony is unnecessary to that analysis. *See* Fed. R. Evid. 702(a) (district court determines whether an expert's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue").

Plaintiff argues that she has established the standard of care through Mr. Levine's testimony, along with applicable regulations. She argues that a violation of rules or regulations promulgated pursuant to statute may be evidence of negligence, and that certain state and federal regulations should be adopted by the Court as the standard of care. (Dkt. No. 101, ¶¶ 12-15, 23-26, 54; Dkt. No. 104, ¶¶ 14-18). The Court declines to do so. The regulations cited by Plaintiff are either too general (*e.g.* maintaining and enhancing a resident's quality of life) or inapplicable to the arguments made by Plaintiff (*e.g.* Plaintiff cites a regulation regarding a nursing home having "sufficient nursing staff" but makes no claim and sets forth no proof concerning insufficient staffing). (*See* Dkt. No. 104, ¶¶ 14, 17). Moreover, Plaintiff has not established or offered any proof that these regulations apply to Pine Lodge. *See* Dkt. No. 106, ## 13, 14, 15, 23-25, 26, 54 (Defendant argues Plaintiff has not established that the New York States Department of Health regulations are applicable to Defendant's "federal healthcare facility"); *Greasley v. United States*, 2018 U.S. Dist. LEXIS 9113, *12 (W.D.N.Y. Jan. 18, 2018), *adopted by* 2018 U.S. Dist. LEXIS 109106

(W.D.N.Y. June 29, 2018) (dismissing Plaintiff's third cause of action where Defendant contested whether the VA was subject to certain federal regulations).

    2.  Timing of Pre-Admission Medical Assessment

Pine Lodge typically requires an in-person physical examination and review of a patient's medical history within 30 days before the patient's admission to Pine Lodge, to ensure he or she is both medically and behaviorally stable for admission.  (Tr. 575-579, 824).  The last full physical examination before Mr. Marranco's admission, however, was at NP Hennessy's visit on July 25, 2013, outside that 30-day window.  (Tr. 127-128, 578, 824).  NP Hennessy's September 4, 2013 report determining that Mr. Marranco was stable enough for respite care was based on information from his July 25th note.  (Tr. 128-131; Joint Tr. Ex. 47-C, p. 555 ["patient has been pretty well medically stable"]).

Plaintiff alleges that contravening the 30-day requirement was a breach of the standard of care for a "timely, comprehensive assessment of the individual's needs" as close as possible to the time of admission.  She argues that Pine Lodge did not have an accurate, timely understanding of Mr. Marranco's needs and therefore "failed to create and implement an appropriate plan of care and fall protection plan".  Disregarding that it is her burden to prove Defendant's liability by a preponderance of the evidence, Plaintiff contends that because records from Mr. Marranco's admission evaluations exclude any injury (including lumbar fractures) and because there was no "timely" assessment of Mr. Marranco, there is no evidence to support Defendant's position that Mr. Marranco's injuries were all pre-existing.  (Dkt. No. 101, ¶¶ 17-22).

The Court concludes this allegation against Pine Lodge "arises from the physician-patient relationship or is substantially related to medical treatment" (*Gjini*,

27

2019 U.S. Dist. LEXIS 20978, *9), namely, the medical assessment of Mr. Marranco and the provider's determination whether he was medically stable enough for admission to Pine Lodge.  Thus, Plaintiff has failed to establish that Pine Lodge deviated from the standard of care because Plaintiff presents no medical expert testimony on this issue.

In any event, when Mr. Marranco arrived at Pine Lodge for his two weeks of respite care,[13] a hands-on, "head-to-toe" physical assessment was performed by NP Kowalski to determine a "baseline".  (Tr. 290-291, 303, 411, 823-824, 826-829; Joint Tr. Ex. 47-C, pp. 537-540).  Other medical staff also assessed him to some extent, including Registered Nurse Pamela Stadler and Registered Nurse Sherry Webster.

### 3. Condition Upon Admission, and Fluctuating Back Pain

The day Mr. Marranco was admitted to Pine Lodge for his two weeks of respite care, he complained of back pain, complaints that fluctuated in severity, and he was visibly experiencing pain and discomfort.  (*See* Joint Tr. Ex. 9, p. 8 [Mr. Marranco's Care Plan, noting his fall on 9/8/13 at home and associated back pain.]).

During his examination of Mr. Marranco, NP Kowalski became aware that he had recently fallen at home; however, Mr. Marranco said he was in "zero" pain, he did not exhibit any signs or symptoms of pain, and he denied any joint pain or muscle aches. (Tr. 830; Joint Tr. Ex. 47-C, p. 538).  NP Kowalski learned from Paul that Mr. Marranco had complained of back pain after "a fall".  (Tr. 393-394).  He did not test Mr. Marranco's weightbearing or ambulation (ability to walk) during the initial physical.  (Tr. 833, 850).

---

[13] Even though some patients walk into Pine Lodge upon their arrival, Mr. Marranco arrived at Pine Lodge in a wheelchair.  (Tr. 882-883).  Defendant argues that "[t]his is hardly to be expected of a 'fine' or 'healthy' adult."  (Dkt. No. 103, ¶ 123).  However, there was no testimony at trial establishing whether the wheelchair was medically necessary or why Mr. Marranco was in the wheelchair.

Paul, who accompanied Mr. Marranco to Pine Lodge, met with NP Kowalski and a couple of nurses for an admission interview.  Paul provided a list of Mr. Marranco's medications and information about his background; pointed out Mr. Marranco's issue with his prostate; and discussed Mr. Marranco's dementia, wheezing upon walking long distances, and ability to walk and bathe and go to the restroom independently.  (Tr. 392-395, 829).  Paul testified that they did not discuss any fall protocols or prevention measures during this period of admission.  (Tr. 395).

A brief review of Mr. Marranco's systems was conducted by RN Stadler to admit him to the unit.  (Tr. 290-291; Joint Tr. Ex. 47-C, pp. 541-547).  His admission assessment, created at 12:03 p.m., shows on the pain scale of 0 (no pain) to 10 (great pain) he was rated "99", which meant either he did not understand the pain scale or his son, Paul, reported he could not answer the question about his pain level.  (Tr. 291-292; Joint Tr. Ex. 47-C, p. 537-541; *see* Joint Tr. Ex. 8, p. 3 [VA Western New York policy/ procedure on "Pain Screening", *i.e.* what different pain intensity scores mean.  When screening a code "99" patient, staff were directed to note pain behaviors like "crying, guarding, grimacing, irritability, moaning, rubbing" instead of assigning a definite number, as well as potential causes of pain, surrogate reports of pain, and an estimate of pain intensity]).  RN Stadler found no injuries or complaints by Mr. Marranco other than mild, lower back pain.  (Tr. 306-310; Joint Tr. Ex. 47-C, p. 547).  He was assessed as being independent with bed mobility and needing limited assistance with toileting, and grooming and dressing.  (Tr. 297-298).  There was no swelling on his forehead, and he did not require supplemental oxygen.  (Tr. 317-318).  RN Stadler noted some wheezing when he arrived.  (Tr. 324-325, 881-882; Joint Tr. Ex. 47-C, pp. 537-538).

RN Webster also assessed Mr. Marranco upon admission, at 12:54 p.m.  She noted that Mr. Marranco walked occasionally, and his mobility was "slightly limited"—information that most likely came from Mr. Marranco's caregiver.  (Tr. 543-544; Joint Tr. Ex. 47-C, p. 533).  He was noted to have weakness with gait and transferring (getting up and down from a chair, or getting out of bed) and required some assistance such as an ambulatory aid—again, from the family—meaning he could do those activities to some extent.  (Tr. 551-552; Joint Tr. Ex. 47-C, p. 552).  Based on RN Webster's conversations with the family and her review of any records, she had no reason to believe he had a history of fracture with respect to any recent fall.  (Tr. 554-555; Joint Tr. Ex. 47-C, p. 552 [noting "resident fell yesterday at home, abrasions to right elbow Injury but no history of fracture with any recent fall."]).  She removed Mr. Marranco's clothing and checked for bruising, swelling, and cuts, and only noted two abrasions on his right elbow.  (Tr. 545-546).  She further testified that her notation was not a diagnosis and she did not perform any testing on Mr. Marranco's back to rule out a fracture; she was not competent to perform that kind of testing, anyway.  (Tr. 565-567).

RN Stadler prepared a pain initial evaluation note at 12:53 p.m.; Mr. Marranco indicated pain that was new or different from previous pain.  According to him, the primary pain was in his lower, middle back area from his fall at home the day before.  (Joint Tr. Ex. 47-C, p. 534).  At 1:03 p.m., RN Stadler prepared a "pain equals 99" note indicating that Mr. Marranco was experiencing pain and discomfort by "guarding, grimacing, moaning" and the pain was in his lower back.  (Joint Tr. Ex. 47-C, p. 532; *see* Joint Tr. Ex. 8, p. 3).

The medical records reveal that at around 3:19 p.m. on September 9, 2013, Mr. Marranco's first physical therapy assessment was performed and his ambulation was assessed at 75 feet with a rolling walker.  He was independent with all "SPS" transfers, as well as bed mobility and transfers.  (Joint Tr. Ex. 47-C at pp. 527-529).  He had "constant" back pain at a 10/10 intensity.  He was unable to complete therapeutic activities due to complaints of severe pain, and certain tests were not completed due to pain and non-compliance.  (Joint Ex. 47-C, pp. 527-528).

At 3:58 p.m., RN Webster noted a complaint of back pain but could not recall if Mr. Marranco complained or his family told her of this.  (Tr. 555; Joint Tr. Ex. 47-C, pp. 521-522).  A note by Licensed Practical Nurse Jamie Lapp at 7:02 p.m. (about six hours before Mr. Marranoco's first fall at Pine Lodge) stated that he complained of back pain, he was transferred to his bed with two staff assisting him, he had difficulty supporting his own weight, he complained of pain during the transfer, and he "yell[ed] out in pain whenever . . . touched by staff".  (Joint Tr. Ex. 47-C, p. 520).

### 4. Prescribed Medications

Plaintiff argues that Pine Lodge was negligent in prescribing two medications that "dramatically increase[d]" Mr. Marranco's risk for confusion and falls, *i.e.* Lorazepam, which is a benzodiazepine, and Lortab, which an opiate.  (Dkt. No. 101, ¶¶ 53-61).  It is undisputed that Mr. Marranco was not taking prescribed pain medications or benzodiazepines before he was admitted to Pine Lodge.  (Tr. 889-890, 892).[14]

---

[14] For ease of reference, the Court includes an appendix to this Decision setting forth when Mr. Marranco received Lorazepam, Lortab, and other pain medications in relation to his two falls at Pine Lodge.  This information was gathered from trial testimony, and Progress Notes and the Medication Log in the medical record.  The Appendix is intended to be as comprehensive as possible, but it may not capture every single administration of Mr. Marranco's pain and anxiety medications.

The Court concludes that this allegation sounds in medical malpractice, not ordinary negligence.  *See e.g. Santana v. St. Vincent Catholic Med. Ctr. of N.Y.*, 65 A.D.3d 1119, 1120 (N.Y. App. Div. 2009) (allegations sounded in medical malpractice where the plaintiff sought "to impose liability on the defendant for its alleged failure to assess the level of supervision, nursing care, and security required for the decedent after it administered pain medication to him"); *Gage v. Dutkewych*, 3 A.D.3d 629, 629-630 (N.Y. App. Div. 2004) (medical malpractice action where the plaintiff alleged she should not have been administered a particular antibiotic because of her prior medical history and "the fact that there were safer alternative drugs available").

The Court would decline to address this allegation outright due to the lack of a medical expert opinion, were it not for Plaintiff's emergency room expert Dr. Schuur opining at trial whether Pine Lodge's administration of the Lorazepam and Lortab breached a medical standard of care.  Defendant did not object to this line of questioning, thereby waiving any objection whether Dr. Schuur was qualified to testify on this topic.

It is entirely possible that the Lorazepam and Lortab played some role in causing Mr. Marranco's falls, based on the timing of when they were administered to him.  (*See infra*, Appendix).  The question, however, is whether Pine Lodge deviated from the medical standard of care by prescribing them in the first instance.  The Court finds that Plaintiff has not established this by a preponderance of the evidence.

Dr. Schuur testified that it violated the standard of care to prescribe opiates and benzodiazepines immediately upon Mr. Marranco's arrival at Pine Lodge or shortly thereafter, as these medications can cause confusion and falls, especially when

32

prescribed together.  (Tr. 691-692).  He further testified that there should have been

documented "medical decision-making" in deciding to prescribe two drugs that would be

high risk for Mr. Marranco and to attempt alternative treatments first.  (*See* Tr. 691-694).

Defendant now argues that Dr. Schuur's testimony that there was a deviation from the

standard of care is undermined by his own testimony that it was a "judgment call"

whether to prescribe these medications, and NP Kowalski's testimony that he weighs

the risks and benefits when prescribing medications to residents.  (Dkt. No. 102, ¶¶ 361-

362; Dkt. No. 103, ¶¶ 60-61).

With respect to the Lortab, Dr. Schuur testified that Pine Lodge should have first

trialed non-narcotic pain medication before then weighing the benefits and risks of

adding a narcotic pain medication to Mr. Marranco's regimen.  (Tr. 693).  According to

Dr. Schuur, neither measure was taken in this case, which violated the standard of care.

This testimony is contradicted by the medical records that show Tylenol

(Acetaminophen) was first prescribed upon admission "as needed" for Mr. Marranco's

back pain before Lortab was even considered.  NP Kowalski testified that uncontrolled

pain can worsen dementia behaviors and quality of life.  NP Kowalski further testified

that he always weighed "risk versus benefit" when determining whether to prescribe a

medication.  He later discontinued the "as needed" Tylenol prescription, and prescribed

Lortab (a "combination product" of Hydrocodone and Tylenol) instead, a stronger pain

medication, when Tylenol was no longer effective in managing Mr. Marranco's pain.

(Tr. 832, 847, 857, 886-887; *see* Joint Tr. Ex. 47-C, pp. 538-540).

Dr. Schuur acknowledged that it is a "judgment call" whether to prescribe pain

medications even though they may increase risk for falls, and NP Kowalski would have

deviated from the standard of care had he not addressed the pain.  (Tr. 712).  "An error in medical judgment by itself does not give rise to liability for malpractice."  *Blake*, 2017 U.S. Dist. LEXIS 58354, at *4.

As to the Lorazepam, Dr. Schuur testified that the use of a benzodiazepine as a first choice for treating Mr. Marranco's agitation and anxiety deviated from the standard of care because this drug increases the risk of falls in the elderly, and that alternative medications should have been considered and the cause of Mr. Marranco's anxiety evaluated.  NP Kowalski was aware that Lorazepam can increase the risk of falls in elderly people.  (Tr. 832, 845, 848, 890; see Joint Ex. 47-C, pp. 538-540).  He testified that behaviors such as anxiety may be treated with other medications such as atypical antipsychotics or anti-seizure medications, but Pine Lodge avoids those because they increase the risk of "sudden cardiac death" by 1.7 percent—and they can also increase the risk of falling.  It is clear from NP Kowalski's testimony that he evaluated the possible side effects of different medications to treat Mr. Marranco's anxiety after his family left on September 9, 2013.  Indeed, he explained that Pine Lodge seeks to use medication with the least amount of side effects, in this case, Lorazepam (Ativan), and they "always start with the lowest [effective] dose".  (Tr. 845-846, 890).

In addition, Mr. Marranco was already taking approximately eleven different medications when he was admitted to Pine Lodge, several that would increase his risk of falls (affecting his motor ability and maybe cognition), and possibly increase his confusion and urinary incontinence.  For example, he was on Divalproex, an antiseizure medication.  (Tr. 845-847, 885).  NP Kowalski explained, though, that discontinuing Mr. Marranco's medication regimen would have aggravated his depression, mood,

34

hypertension, and hypokalemia (low potassium)—and the objective of respite care is to maintain the status quo for the patient as much as possible. (Tr. 885; Joint Tr. Ex. 47-C, p. 539). The records show that Mr. Marranco was taking his previously prescribed medications (including Divalproex), in addition to Lortab and Lorazepam, within the timeframe of his falls. (*See infra*, Appendix; Joint Tr. Ex. 47, #2447-2501).

Plaintiff has not proven by a preponderance of the evidence that Pine Lodge deviated from the standard of care when NP Kowalski decided to add new medications to Mr. Marranco's regimen that could increase his risk for falls, after weighing the risks and benefits of other possible measures. The prescription of these medications, "as needed", at a lower dose, and in response to Mr. Marranco's fluctuating needs (his increased anxiety and pain), did not breach any standard of care.

### 5. Initial Fall Risk Assessments

Plaintiff takes no issue with assessing Mr. Marranco as a high fall risk. RN Stadler performed the initial fall risk assessment of Mr. Marranco the morning of his admission, using the Morse fall risk assessment ("Morse Fall Scale"). She ultimately found his score to be 90, or at high risk for falls. (Tr. 165-166, 299-300, 320-324; Joint Tr. Ex. 47-C, pp. 543-544; *see* Joint Tr. Ex. 7, pp. 6-7, 9 [VA Western New York procedure for Morse Fall Risk Tool, and Tool itself at Attachment A]). RN Webster likewise used the Morse scale, at 3:58 p.m., and assessed Mr. Marranco at an 80, also at high risk for falls. (Tr. 546-548, 551-552; Joint Tr. Ex. 47-C, pp. 521-522).

Any score greater than 45 is considered high-risk, triggering the institution of fall risk protections. There is no difference in what fall protections are instituted, for example, for a patient who scores a 46 and a patient who scores a 96. (Tr. 324, 548;

*see* Joint Tr. Ex. 7, p. 9 ["Patients/ residents are designated at risk for fall if the Morse

Fall Scale score is 45 or greater or they have a history of falls"]).  Earlier that day, at

12:54 p.m., RN Webster had placed a wristband on Mr. Marranco's wrist indicating that

he was a fall risk.  (Tr. 540; Joint Tr. Ex. 47-C, p. 534; *see* Joint Tr. Ex. 7, pp. 6-7

[nursing staff to place a yellow "S.A.F.E." sign/sticker outside each patient's room who is

identified at risk for falls, and update Patient Safety Barcode Identification wristband

with a yellow square containing an "F" to identify fall risk]).

        6.  <u>Initial Fall Protection Plan</u>

       Plaintiff argues that the initial fall protection plan failed to meet the standard of

care because Pine Lodge "assessed Mr. Marranco as a high risk for falls but

implemented a plan for somebody at a very low risk for falls".  (Dkt. No. 100, Nos. 83-

84; Dkt. No. 101, ¶ 10).  Thus, Plaintiff reasons, Pine Lodge did not provide the

necessary care to Mr. Marranco.  (Dkt. No. 101, ¶¶ 28-29).

       Unlike in *LaMarca*, 31 F. Supp. at 115-116, 121-122, where the Court concluded

the action sounded medical malpractice because the decedent's injuries allegedly all

stemmed from an improper assessment of his fall risk status, there is no dispute that

Mr. Marranco was properly assessed as being at high risk for falls.  Rather, Plaintiff

contests the adequacy of the care plan in light of that assessment.  The Court finds that

Plaintiff's critique of the initial fall risk plan and the measures nurses decided were

medically required sounds in medical malpractice.  The standard of care required to

initially fashion a care plan to protect Mr. Marranco from injury, given his physical

condition and dementia, is not a matter of common knowledge and must be established

through expert testimony from a qualified medical professional.  In other words, crafting

36

Mr. Marranco's care plan required an evaluation of his medical history, current medications, and a confluence of other factors. This is not an analysis that a layperson could engage in alone.

After determining Mr. Marranco was a fall risk, certain risk reduction measures were put in place. (Joint Tr. Ex. 47-C, pp. 522-523). His initial fall protection plan included (1) keeping a call bell within reach, (2) placing him on a safety program ("S.A.F.E."), (3) wearing a hearing aid when out of bed, (4) using bed and chair alarms, (5) monitoring closely and assisting with ambulation as needed, (6) encouraging non-skid footwear, (7) keeping one side rail up for independence with positioning self and use of bed control, and (8) using chair alarm when out of bed to chair. (Tr. 557-558; Joint Tr. Ex. 9, pp. 4-5 [September 9, 2013 Care Plan for Mr. Marranco, "Approach" for potential for injury related to previous falls]).

According to RN Webster, the VA attempts to make the CLC an "unrestricted environment" for patients, and "least restrictive" upon admission. Anyone who scores a 45 on the Morse Fall Scale is automatically provided bed and chair alarms for monitoring. Following a physical therapy and occupational therapy evaluation and recommendation, and an assessment of the patient during his stay, more steps to prevent falls may be taken such as the use of "hipsters". (Tr. 548-549; *see* Joint Tr. Ex. 47-C, p. 523; Joint Tr. Ex. 30, p. 3 [list of Resident Rights includes "Be free from restraints while receiving behavioral care/ acute medical and surgical care unless clinically required."]). General universal precautions are used at Pine Lodge for any individual deemed at high risk for falls (score of 45 or higher) (Tr. 549; *see* Joint Tr. Ex.

37

47-C, pp. 522-523; Joint Tr. Ex. 9, p. 4), although as RN Webster testified, more interventions may be implemented further along during a patient's stay at Pine Lodge.

Plaintiff takes issue with specific items in Mr. Marranco's initial fall protection plan. She critiques the following: keeping one side rail up, using bed and chair alarms, encouraging non-skid footwear, and keeping a call bell within reach. (Dkt. No. 100, Nos. 79-83). There was very limited testimony at trial about these action items. Only the latter two allegations warrant further discussion.[15]

Mr. Marranco's fall risk plan includes "encouraging non-skid footwear"; Plaintiff basically argues that the plan did not go far enough and should have required that footwear. The evidence indicates that Mr. Marranco's feet were bare and he was not wearing "anti-slip socks" at the time of his first fall at Pine Lodge. (Tr. 781; Joint Tr. Ex. 47-C, p. 516 [Mr. Marranco's "feet were bare" as "he had been sleeping"]). Plaintiff also argues, without explanation, that non-slip socks "was an unviable strategy . . . which would not be able to minimize Mr. Marranco's unique risks." (Dkt. No. 100, No. 80).

There was no testimony at trial defining "non-skid footwear" or "anti-slip socks", or explaining if and how they would prevent falls, how Pine Lodge issues this footwear to its residents, or what was done or not done specifically with Mr. Marranco's footwear. Despite Plaintiff's repeated assertions that Mr. Marranco fell on a "hard floor" at Pine Lodge (see Dkt. No. 101, ¶¶ 122, 131), as Defendant points out (see Dkt. No. 106, p.

---

[15] Plaintiff argues that the initial fall protection plan should have included actual fall prevention items instead of being limited to items that aim to minimize injuries from falls. (Dkt. No. 100, No. 101). For example, Plaintiff argues that keeping a "side rail" (bedrail) up is not a fall protection device; rather, it helps with bed re-positioning, while bed and chair alarms are triggered by a resident getting out of bed by himself but it is very rare that they can prevent a fall. However, it appears that some of the action items *could* function to prevent a fall. For example, RN Webster testified that a hearing aid could prevent a fall by helping a patient hear an alarm if it goes off or hear a staff member tell him to wait until he can be assisted. (Tr. 558).

17), there was no proof about what type of flooring was in Mr. Marranco's room.  There was no testimony about whether Mr. Marranco was "encouraged" to wear non-slip socks as stated in the Care Plan or whether he refused to do so.  RN Webster testified only generally that non-skid socks are encouraged but if a patient refuses to wear them, the patient cannot be forced to wear them.  (Tr. 557-558).

Indeed, a photograph of this footwear or the room's flooring, or the footwear itself entered in evidence, could have possibly provided the Court with enough to infer that Pine Lodge deviated from the standard of care in failing to ensure Mr. Marranco was wearing non-skid footwear, considering that Mr. Marranco fell when he slipped on his own urine on the way to the bathroom.  There was also very little detail provided about the circumstances of the first fall as observed by the supervising night nurse, such as the positioning of Mr. Marranco's body as he fell, whether he reached out to grab hold of anything, or how his limbs moved.  There was, frankly, more probing examination about the circumstances of Mr. Marranco's fall on September 8th at home than the two falls at Pine Lodge.  The Court cannot speculate and the evidence on this point was lacking.

Mr. Marranco's fall risk plan also lists "keeping a call bell within reach".  In sum and substance, Plaintiff argues that a call bell is an impractical fall risk reduction measure for any patient with dementia and criticizes it as a "passive intervention".  RN Webster testified that Pine Lodge provides call bells to all its dementia patients.  When asked, "What is done to ensure that a dementia patient even understands or can operate and properly use a call light?", RN Webster responded, "We just remind them consistently."  Only when prompted in a follow-up question, when asked if she does anything "to determine if they actually understand what happens when they push that

button", RN Webster responded, "We do.  We remind them.  We ask them if they can push it to show us how it works, yes."  (Tr. 558-559).

The foregoing testimony does not show that a call bell will prevent a dementia patient's fall, particularly because RN Webster initially only stated that dementia patients are simply "remind[ed]" to use them.  Even if a patient demonstrates that he can push the call bell when a nurse asks him to do so, that does not mean a patient will understand how and when to use the call bell and/or use it independently in the appropriate situation such as when the patient is in distress or awakens in the middle of the night and needs to use the restroom.  Even so, there was no testimony regarding Mr. Marranco's call bell or that he was unable to use one correctly.  There was no testimony whether he failed to use a call bell or that his failure to use one correctly precipitated his fall.

Again, there is no medical expert testimony to allow the Court to conclude that this initial fall protection plan was inappropriate or that it failed to reflect Mr. Marranco's fall risk status.  There is also no testimony from which to conclude that additional interventions were warranted before the first fall at Pine Lodge that did not also contravene residents' rights regarding restraints.

### 7.  Incontinence Care and Level of Supervision

According to Plaintiff, "[t]he nature of Mr. Marranco's falls . . . indicates that Mr. Marranco did not receive adequate supervision."  (Dkt. No. 101, ¶¶ 33-38).  Plaintiff argues that medical staff should have checked on Mr. Marranco "at least every 30 minutes" but they only checked on him once per hour, and that he should have received routine, scheduled incontinence care but did not.  She reasons that the medical staff's

knowledge of Mr. Marranco's recent fall at home should have triggered more frequent

and a greater level of supervision, and that it can be inferred from the location of his

room at Pine Lodge and the timing of his first fall there that supervision provided was

deficient enough to fall below the standard of care.  (Dkt. No. 101, ¶¶ 34-38).

Where a plaintiff alleges that "an improper assessment of the patient's condition

*and the degree of supervision required* . . . led to the subject injuries, the action . . .

sound[s] in medical malpractice rather than ordinary negligence."  *Fox v. White Plains*

*Med. Ctr.*, 125 A.D.2d 538, 538 (N.Y. App. Div. 1986) (emphasis added); *see Bell v.*

*WSNCHS N., Inc.*, 153 A.D.3d 498, 500 (N.Y. App. Div. 2017); *Martuscello v. Jensen*,

134 A.D.3d 4, 12 (N.Y. App. Div. 2015); *Santana v. St. Vincent Catholic Med. Ctr. of*

*N.Y.*, 65 A.D.3d 1119, 1120 (N.Y. App. Div. 2009); *Rey v. Park View Nursing Home,*

*Inc.*, 262 A.D. 2d 624, 626-627 (N.Y. App. Div. 1999).  Such an assessment would

require an analysis of Mr. Marranco's symptoms and medical conditions, and thus a

medical expert to opine on what level of supervision would satisfy the standard of

care.[16]

As such, Plaintiff has not proven this claim by a preponderance of the evidence,

for want of medical expert testimony establishing that the level of supervision or alleged

lack of incontinence care breached the standard of care and caused the first fall.  Even

---

[16] Although in the procedural posture of motions for summary judgment, the following New York State trial court decisions are illustrative of the type of expert testimony that may be required on a failure to supervise theory in this type of case.  *See e.g. Hernandez v. Amsterdam Nursing Home Corp.* (1992), 2019 N.Y. Misc. LEXIS 5127 (Sup. Ct., New York County Sept. 16, 2019) (competing expert testimony on how often the decedent needed to be checked for toileting needs and how frequently she needed monitoring); *Gold v. Park Ave. Extended Care Ctr. Corp.*, 2010 N.Y. Misc. LEXIS 2422, *19-20 (Sup. Ct., Nassau County May 21, 2010) (the defendant's expert opined that the degree of supervision the plaintiff argued was required, "which would be tantamount to continuous 1:1 supervision by a nursing home staff member", was not the applicable standard of care considering the decedent's condition before the falls because that condition did not "pose an immediate risk of harm to themselves or others").

assuming, *arguendo*, that these allegations could be construed as sounding in ordinary negligence, Plaintiff has nevertheless failed to meet her requisite burden.

With respect to the incontinence issue, both Loretta and Paul testified that just prior to admission, Mr. Marranco was able to independently go to the restroom, but he was having greater urgency to go and was "dribbling urine".  Paul brought this issue to the attention of Pine Lodge's staff when he was admitted to Pine Lodge, in the event Mr. Marranco had a urinary tract infection.  (Tr. 50, 103-104, 378-379, 392-393, 697-698). To address that issue, NP Kowalski ruled out infection after testing (urinalysis), and instructed nursing staff to perform a pre- and post-void bladder scan to rule out overflow incontinence.  (Tr. 888).  Mr. Marranco's Care Plan notes an "Approach" on September 9, 2013, to address his incontinence of bladder, *i.e.* to institute a toileting program during waking hours, evaluate and revise toileting program as needed, provide toileting journal, call light available and staff to answer promptly, monitor for increased restlessness to indicate need to eliminate, and monitor for signs and symptoms of infection/ burning on urination/ fever.  (*See* Joint Tr. Ex. 9, pp. 4-5).

Beyond the "Approach" to Mr. Marranco's incontinence as noted in his Care Plan, there was little to no proof at trial about how his incontinence issues were addressed by Pine Lodge, such as a log identifying when and how frequently Mr. Marranco used the restroom, or any related deviations from the standard of care.  No witness explained what a "toileting program" is, how such a program was or was not instituted in this instance, or whether any of the other Care Plan action items were addressed.

The proof reveals that the first fall was not caused by Mr. Marranco falling out of bed.  Rather, Mr. Marranco fell at night on his way to the restroom when he slipped on

his own urine due to incontinence of his bladder.  However, due to the lack of proof on this issue, the Court cannot reasonably infer that Pine Lodge's failure to adequately address Mr. Marranco's incontinence issue is what caused him to fall.  Indeed, Mr. Marranco's issue was addressed to some extent by urinalysis testing upon admission, and there is no proof on the standard of care required to address a patient's incontinence.  Moreover, because Mr. Marranco's first fall occurred on the first evening he was at Pine Lodge for his respite stay, the Court cannot conclude that Pine Lodge could have documented a pattern of Mr. Marranco's nighttime bathroom habits to proactively schedule incontinence care based on his individual needs.

In a similar vein, Plaintiff failed to prove that Mr. Marranco fell because he was not adequately supervised.  Mr. Marranco's room was located about halfway down the hall from the nurses' station.  The nurses were aware that Mr. Marranco had been identified as high risk for falls.  (Tr. 559-560, 774-775).  It was Pine Lodge's policy to check on a high-risk individual hourly while in bed, regardless of whether the patient was assessed at 45 or 90 on the Morse Fall Scale.  (Tr. 553; *see* Joint Tr. Ex. 47-C, p. 523).  However, there was testimony that bed checks may have taken place more frequently than one time per hour.  Mr. Marranco was checked on "quite often", as nurses and staff "were up and down the hallway constantly", and nurses and aides checked on certain patients at least two times every time a medication was administered to verify its effectiveness.  (Tr. 553, 809-810).  No records were taken to track bed checks as that was "routine procedure".  (Tr. 554, 776).  Bed check rounds would have taken place at around 1:00 a.m. on September 10th, and Mr. Marranco fell at around 1:15 a.m.  (Tr. 776-777; Joint Tr. Ex. 47-C, p. 516).

43

The supervising nurse remembered that Mr. Marranco was at high risk for falls but she did not remember being aware that he had fallen in the three months prior to his admission to Pine Lodge, although she had access to that information.  (Tr. 773-774).  She agreed that a recent, prior fall is one indicator of a future fall, and important to know.  (Tr. 774).  However, she did not testify about whether she would have altered the amount or type of supervision provided if she had known of his falls before admission.

In sum, Mr. Marranco may have been checked on more frequently than one time per hour based on the trial testimony, or even once every 30 minutes as Plaintiff argues was required.  There was no testimony establishing that he required a respite room visible from the nurses' station or that different placement of his room would have enabled medical staff to prevent his fall.  To conclude that Pine Lodge breached its duty in providing inadequate supervision or subpar incontinence care, and/or that Pine Lodge therefore caused Mr. Marranco's first fall and related injuries, would amount to speculation that the Court may not engage in as the trier of fact.

### 8. Fall and Injury Prevention Devices

Plaintiff contends that Pine Lodge failed to meet the standard of care because it did not provide him adequate assistive devices to prevent him from falling.  Specifically, Plaintiff argues that Pine Lodge did not (1) place floor mats next to Mr. Marranco's bed, (2) lower Mr. Marranco's bed to the ground, or (3) use a curved and/or perimeter mattress to secure and position Mr. Marranco in bed.  (Dkt. No. 100, No. 85; Dkt. No. 101, ¶¶ 30-32).  Because these arguments essentially criticize Mr. Marranco's initial fall protection plan and fall risk measures that were omitted from the plan, the Court

concludes that they sound in medical malpractice as they require special skills and knowledge not possessed by a layperson.

Nevertheless, to the extent they could be construed as ordinary negligence, it is undisputed that Mr. Marranco did not fall from his bed.  Rather, Mr. Marranco had to use the restroom and slipped on his own urine.  It is thus unclear how modifications to Mr. Marranco's bed itself could have prevented his falls.

In addition, there was no testimony at trial explaining how any of the listed interventions or devices work or are implemented, in general or specific to Mr. Marranco.  One witness testified that prior to the fall, Mr. Marranco did not have floor mats next to his bed, a bed sitting on the ground, or a curved mattress to help him stay in bed.  (Tr. 780-781).  However, that testimony was not expanded upon in any way.

### F.  First Fall at Pine Lodge

#### 1.  First Fall

Mr. Marranco's first fall at Pine Lodge occurred on September 10, 2013 at approximately 1:15 a.m.  (Tr. 560, 582; Joint Tr. Ex. 47-C, p. 516).

Registered Nurse Barbara Crispell worked as the "full-time charge night nurse" at Pine Lodge, supervising aides and licensed practical nurses, and she reported to a nursing supervisor for the three CLC lodges.  (Tr. 768-769).  RN Crispell performed hourly checks on the residents, as did her supervisees.  (Tr. 809-810).  She knew that Mr. Marranco, whose room was about halfway down the hall from the nurses' station, was at high risk for falls.  (Tr. 774-775).  Bed check rounds would have first taken place during her shift at around 1:00 a.m.  (Tr. 776).

At around 1:15 a.m., RN Crispell was at the nurses' station when she heard Mr. Marranco's bed alarm go off, triggering a light over his door.  When she entered the doorway, she saw him heading towards the bathroom.  He was right next to his bed but slipped on his urine and fell on the floor, lying on his right side.  (Tr. 776-777; Joint Tr. Ex. 47-C, p. 516).  Mr. Marranco told RN Crispell, "'I fell.'", and, "'Why is that man in my room?' (referring to his roommate.)".[17]   (Joint Tr. Ex. 47-C, p. 516).  The floor was "uncluttered but had wet areas" because Mr. Marranco "had been incontinent of bladder dribbling small amounts of urine on his way to the toilet".  (Joint Tr. Ex. 47-C, p. 517).

Mr. Marranco did not hit his head when he fell.  RN Crispell did not call a doctor; she notified her nursing supervisor, who would have determined whether they needed to contact a doctor.  (Tr. 782; Joint Tr. Ex. 47-C, pp. 517-518).  Mr. Marranco independently moved to a sitting position and was able to move all his extremities without pain; RN Crispell had him raise his arms, bend his knees, and straighten his leg. (Tr. 779; Joint Tr. Ex. 47-C, p. 516).  He complained of back pain after the fall.  (Tr. 779).  RN Crispell did not regard his back pain as new because he had complained of back pain on admission.  (Tr. 781; *see* Joint Tr. Ex. 47-C, p. 516).  She gave Mr. Marranco Tylenol for his pain, and Lorazepam because he "became agitated when vital signs [were] performed".  (Tr. 779; Joint Tr. Ex. 47-C, p. 516; *see infra* Appendix).

RN Crispell assessed Mr. Marranco for injuries, and then she and her staff placed him on a "maxi-lift" to take all stress off his body and extremities, placing him

---

[17] Mr. Marranco was in a four-person capacity room, but RN Crispell could not recall how many patients were staying in the room.  (Tr. 777).  Based on the post-fall note and Paul's testimony that when he saw Mr. Marranco's room upon admission it had multiple beds and three or four patients in it (Tr. 392-395, 829), the Court concludes that Mr. Marranco was sharing his room with one to three other patients.

back in bed.  (Tr. 777; Joint Tr. Ex. 47-C, p. 516).  They then provided incontinence

care.  (Tr. 777; Joint Tr. Ex. 47-C, p. 516).  RN Crispell noted a long, red area on the

back of Mr. Marranco's right, upper arm.  His mentation was within baseline—he was

"alert but confused".  (Tr. 777-778; Joint Tr. Ex. 47-C, pp. 516-517).

Following this fall, RN Crispell assessed Mr. Marranco at a score of 50 on the

Morse Fall Scale, indicative of high risk for falls.  (Joint Tr. Ex. 47-C, p. 517).  She

prepared a post-fall note at 1:40 p.m. (Joint Tr. Ex. 47-C, p. 515-519).  Dr. Maller was

alerted of all post-fall notes, and the nursing staff were also notified of the fall and that

Mr. Marranco was at risk to fall again.  (Tr. 582, 787; Joint Tr. Ex. 47-C, p. 518).

### 2. Post-Fall Condition

After the fall, RN Crispell noted Mr. Marranco's weakness with gait and

transferring from his earlier records, but she did not test his gait/ transferring.

Weakness means a "minor" restriction, as compared with impaired.  (Tr. 785; Joint Tr.

Ex. 47-C, p. 517).

From the time of Mr. Marranco's first fall at Pine Lodge on September 10, 2013 at

1:15 a.m., until his arrival at the VAMC on September 11, 2013 at around 7:39 p.m., the

following occurred with regard to Mr. Marranco's condition:  (1) there were periods when

he made no complaints of pain, no pain behaviors were observed, and he exhibited no

apparent distress; (2) at other times, he complained of back pain, moaned and

grimaced with pain, and moaned with any movement and palpation of his lower back;

(3) staff reported much difficulty transferring him due to pain; (4) he was given

Lorazepam for agitation and anxiety; (5) his "as needed" prescription for Tylenol was

discontinued because it was ineffective for treating his pain, and he was prescribed

47

increasingly stronger pain medication, *i.e.* Lortab, and later, Oxycodone; (6) his oxygen level decreased so he was put on supplemental oxygen for the first time on the evening of September 10th; and (7) staff observed toes on his left foot were bruised.  (*See* Tr. 561-563, 788-789, 810-812, 854, 857-860, 886-887; Joint Tr. Ex. 38, pp. 7-9; Joint Tr. Ex. 47-C, pp. 507-508, 510, 512-513; *infra* Appendix).

      3.  <u>Imaging Studies</u>

On September 11, 2013 at 2:35 p.m., NP Kowalski ordered an x-ray of Mr. Marranco's lumbar spine due to his worsening, severe back pain.  (Tr. 860, 862; Joint Tr. Ex. 47-C, p. 508; Joint Tr. Ex. 50, p. 123).  The lumbar x-ray was performed shortly thereafter, followed by a pelvis x-ray added by the radiology technician due to the severe level of pain.  (Cook Tr., p. 24; Joint Tr. Ex. 50, p. 123).

According to Michele Cook, M.D.,[18] the radiologist at the VA who interpreted Mr. Marranco's x-rays, a plain film x-ray can show if a vertebral disc is "compressed" (if there is a "compression fracture" or loss of vertebral body height, on either side of the vertebral discs), as well as "retropulsion" (misalignment of the vertebral body).  (Cook Tr., 12-13, 15-16).  The lumbar x-ray showed no signs of recent trauma, no evidence of fracture, and no retropulsion.  Other than degenerative changes and a prior surgery at L-3, it was a normal study.  (Cook Tr., 38-40; Joint Tr. Ex. 50, p. 122).  An x-ray of Mr. Marranco's pelvis, however, showed a fracture of the left hip.  (Cook Tr., 41-42; Joint Tr. Ex. 50, p. 123; Joint Tr. Ex. 51).

---

[18] Dr. Cook's trial testimony was conducted on August 13, 2019 and videotaped.  The videotaped testimony was played at trial, and the associated transcript is separate from the combined trial transcript.  (Tr. 345-346).  Citations to that transcript are designated (Cook Tr. __).

After the pelvis x-ray was taken, Dr. Cook recommended that Mr. Marranco have dedicated hip films done because they would result in better pictures and resolution of the hips. (Cook Tr., 30). Dr. Cook's reading of the pelvis x-ray prompted NP Kowalski to call Orthopedics Physician Assistant Sean Metz at the VAMC, for advice on next steps. PA Metz did not work in the emergency room; however, Orthopedics performed certain consults for the emergency department. Like Dr. Cook, PA Metz suggested obtaining another pelvic x-ray from a different view. (Tr. 723-724, 862-864).

The second pelvic x-ray was negative for fracture. Due to the conflicting x-rays, PA Metz suggested that Pine Lodge send Mr. Marranco to the VAMC for a CT scan of his hips and advice from Orthopedics. (Tr. 865; Joint Tr. Ex. 51, p. 121).

### G. Treatment at the VAMC

Mr. Marranco was transferred from Pine Lodge to the VAMC for a CT scan of his left hip and an evaluation of the possible left hip fracture. He arrived at the VAMC around 7:39 p.m. on September 11, 2013. (Tr. 611, 643-644; Joint Tr. Ex. 47-C, pp. 497, 501-502). Nurse Practitioner Nancy Arbeiter treated Mr. Marranco in the emergency room that evening. (Tr. 609-610). PA Metz was the provider who decided to send him back to Pine Lodge after his CT scan was complete. (Tr. 640, 757-758).

Plaintiff alleges that the following actions and omissions by the VAMC deviated from the standard of care: (1) the review of Mr. Marranco's medical records, (2) the examination in the emergency room, (3) the lack of an emergency MRI, and (4) the return of Mr. Marranco to Pine Lodge. Unlike the allegations directed at Pine Lodge, it is undisputed that those against the VAMC sound in medical malpractice. The Court concludes that the VAMC breached the standard of care in multiple respects. It will

address each issue, in turn. The Court will later address the element of causation. (*See infra*, at III).

      1.  <u>Jeremiah Schuur, M.D.</u>

Preliminarily, Defendant argues that Dr. Schuur's testimony was conclusory and contradicted by the record, and thus should not be given any evidentiary value. (Dkt. No. 103, ¶¶ 53-62; Dkt. No. 106, p. 15). In response, Plaintiff points out that Defendant offered no opposing emergency room expert to repudiate Dr. Schuur's testimony about the requisite standards of care and breaches thereof. She argues that Dr. Schuur is qualified to offer these opinions, testimony from fact witnesses cannot discredit his expert opinions, and there is no justification for wholly discounting his testimony. (Dkt. No. 104, ¶¶ 19-29).

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony in an action pending in federal court. The Court must first determine "the threshold question of whether a witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions." *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (internal quotations marks and citations omitted). "Courts in the Second Circuit liberally construe the expert qualifications requirement" (*Gjini*, 2019 U.S. Dist. LEXIS 20978, at *13), in that "a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience" (*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. Mar. 15, 2004)).

If the Court determines that an expert is so qualified, it then determines whether the expert's "specialized knowledge will assist the trier of fact to understand the

evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Indeed, "the trial court

performs a gatekeeping function to ensure that the expert's testimony both rests on a

reliable foundation and is relevant to the task at hand."  *Biernacki v. United States*, 2014

U.S. Dist. LEXIS 29237, *6 (W.D.N.Y. Mar. 6, 2014), citing *Daubert v. Merrell Dow*

*Pharms.*, 509 U.S. 579, 597 (1993).  "The admission and qualification of experts

pursuant to Federal Rule of Evidence 702 is in the broad discretion of the district court."

*Stagl v. Delta Air Lines*, 117 F.3d 76, 81 (2d Cir. 1997).

The Court rejects Defendant's effort to discount Dr. Schuur's testimony *in toto*.

Rather, it finds that he is qualified to testify about the VAMC's alleged deviations from

the emergency room standard of care.  Any deficiencies  in the proof go to weight rather

than admissibility.

Dr. Schuur is board-certified by the American Board of Emergency Medicine.

(Tr. 650-651).  He is licensed to practice medicine in Rhode Island, Connecticut, and

Massachusetts.  (Tr. 654).  Dr. Schuur treats patients in the emergency room

department, and he focuses on quality of care in emergency care.  (Tr. 648, 653).  He

authored the chapter on geriatric trauma in the preeminent textbook for emergency

medicine, Rosen's Emergency Medicine, which addresses caring for older adults when

they are injured by falls, vehicle accidents, and other types of traumatic injuries.  (Tr.

653-654).  Dr. Schuur has had frequent experience evaluating and treating older

patients (generally over 65 or 75 years old) in the emergency room who have dementia

and similar mental conditions.  (Tr. 654-655).  He has seen thousands of older adults in

the emergency room who suffered from suspected hip fractures or back injuries.  (Tr.

656).  Dr. Schuur testified that falls are one of the most common reasons older individuals come to the emergency room.  (Tr. 655-656).

With this background and training, Dr. Schuur is qualified to provide expert testimony in this case as to standard of care and alleged deviations from that standard. Defendant did not contest his qualifications at trial and does not attempt to do so in its post-trial submissions.

The general standard of care in New York requires "a physician to exercise 'that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices . . . The law holds [the physician] liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment.'"  *Perez v. United States*, 85 F. Supp. 2d 220, 226 (S.D.N.Y. 1999), quoting *Pike v. Honsinger*, 155 N.Y. 201 (N.Y. 1898); *see Sitts*, 811 F.2d at 739 (same).

Dr. Schuur testified that the standard of care in this case would be "a reasonable level of knowledge and skills that an average emergency room physician in the region would apply."  (Tr. 657).  Dr. Schuur testified that states may vary on some specific standards of care, such as for a patient with a stroke, but standards are "national" for general emergency room medical treatment.  (Tr. 658).  Although Dr. Schuur is not board certified in New York State (*see* Tr. 654), he testified that his opinions in this case were based on national standards (Tr. 658).  Moreover, Defendant does not contest Dr. Schuur's testimony on this basis.  As such, Dr. Schuur's lack of board certification in New York impacts the weight the Court gives to his testimony, not its admissibility.

2.   <u>Review of Medical Records and Communication Between the VAMC and Pine Lodge</u>

Dr. Schuur testified that Pine Lodge should have contacted the VAMC to provide a more detailed status of Mr. Marranco, because he had dementia and could not fully articulate the reason why he was sent to the VAMC.  (Tr. 664-666).  In a related fashion, he testified that the VAMC emergency room staff should have reviewed Mr. Marranco's medical records from the days leading up to his admission to the VAMC to familiarize themselves with the fact that he had a traumatic injury, dementia, and difficulty ambulating.  (Tr. 666).  Dr. Schuur explained that it would have been important for the VAMC to know of any new pain or change in Mr. Marranco's mobility or ability to walk to "determine [its] suspicion about a new injury".  (Tr. 665).

It is disputed exactly how much information Pine Lodge conveyed to the VAMC about Mr. Marranco or how that information was relayed, primarily that his chief complaint prior to admission had been severe back pain.

NP Kowalski sent an SBAR report (a brief synopsis of what is going on with the patient) to the M.D. at the emergency room, and NP Arbeiter received a secondhand account of Mr. Marranco's reason for his transfer to the emergency room, either a verbal or written synopsis of the SBAR report.  (Tr. 625-627; 865-867).  Although NP Kowalski could not recall at trial if he had conveyed Mr. Marranco's complaints of severe back pain to PA Metz, he testified that it was his normal practice to do so and at his deposition he had testified that the SBAR report would have included that information.  (862-864).  PA Metz had no further contact with Pine Lodge after the decision was made to send Mr. Marranco to the emergency room.  (Tr. 729).

Even assuming the SBAR report informed the VAMC's M.D. of Mr. Marranco's back pain (and that NP Arbeiter also received that message), testimony at trial revealed that information was lost in the chain of communication between the medical staff.

PA Metz, who ultimately determined that Mr. Marranco could return to Pine Lodge from the VAMC after his CT scan was complete, testified that he was unaware of Mr. Marranco's ongoing complaints of back pain prior to his admission to the VAMC, and was also unaware of the fall on September 8th before his admission to Pine Lodge. (Tr. 736-738).  He believed that the only fall he was aware of was one that led to the initial set of x-rays.  (Tr. 737).  Because PA Metz was on call during this encounter and therefore did not have access to Mr. Marranco's electronic medical records at the time, he had to rely on NP Arbeiter to convey any information about Mr. Marranco. (Tr. 731). In turn, although NP Arbeiter had full access to all of Mr. Marranco's electronic VA medical files, including those from Pine Lodge, she was not "specifically" aware of the conflicting hip x-rays that led to Mr. Marranco's transfer to the emergency room and she could not recall if she knew about his severe back pain.  (Tr. 610-612, 614-615).  NP Arbeiter agreed that she would have liked to know if the original x-rays were ordered due to complaints of severe back pain because she considered that knowledge necessary to help her properly evaluate the patient.  (Tr. 616-617).

The Court concludes that the VAMC staff either failed to properly review Mr. Marranco's medical records concerning his falls before admission to Pine Lodge and his severe back pain that precipitated the x-rays at Pine Lodge, or failed to proactively obtain further information from Pine Lodge.  Most telling in this somewhat confusing part of the record is PA Metz's affirmative testimony that he did not know about Mr.

Marranco's ongoing complaints of back pain before he was admitted to the VAMC, despite his role in ultimately deciding to send Mr. Marranco back to Pine Lodge.

### 3. Examination in the Emergency Room

Defendant argues that Dr. Schuur's testimony about the alleged deficiencies of NP Arbeiter's physical examination in the emergency room is belied by Dr. Schuur testifying in "great detail" about the thorough and comprehensive examination that she performed.  (Dkt. No. 102, ¶ 352).

Dr. Schuur testified that, overall, Mr. Marranco's evaluation at the VAMC fell below the standard of care.  (Tr. 674-675).  It was the VAMC's responsibility to complete a "global assessment" of the patient, "not just to carry out the request of the referring individual or facility", a standard that is cited in the Emergency Medicine Treatment and Active Labor Act.  (Tr. 675).  The emergency room must determine if there was an injury because of a fall and try to identify the patient's pain to see if any treatment is available, not just administer medications.  (Tr. 676).  The medical professional must tailor his or her history-taking and physical examination based on the patient's complaint, his conditions, and the reasons he came in.  (Tr. 676-678).

An older patient with dementia who has fallen needs to be assessed globally because he is unable to clearly state his symptoms and he is increasingly susceptible to injury after a fall.  (Tr. 677).  For a patient like Mr. Marranco, an assessment would include gathering additional information on history from the family, conducting a thorough examination, and performing imaging testing.  (Tr. 677).  Dr. Schuur testified that the VAMC's assessment of Mr. Marranco was deficient in several specific respects.

NP Arbeiter testified that she recalled treating Mr. Marranco that evening; she spent 30 minutes examining him.  (Tr. 642-643; Joint Tr. Ex. 47-C, p. 499).  She remembered that when she entered his room, Mr. Marranco was sitting up in bed and he conversed with her.  (Tr. 642-643).  Her note from that date revealed that Mr. Marranco had no shortness of breath, weakness, or numbness; and his pain score was 99 meaning he could not convey his pain level to the nurse.  (Tr. 644; Joint Tr. Ex. 47-C, pp. 497-498).  Her note also indicated, however, that Mr. Marranco did not make any complaints of pain when she saw him, and she testified that if he had complained of pain she would have given him some pain medication and there was no record of that.  (Tr. 646; Joint Tr. Ex. 47-C, pp. 497-501).  Mr. Marranco was also in "no acute distress" ("NAD") and he was comfortable at rest.  (Tr. 645; Joint Tr. Ex. 47-C, p. 498).

NP Arbeiter further testified that she must have examined Mr. Marranco's legs because she had written "no bony tenderness or deformity, right leg mildly shorter than left".  (Tr. 645; Joint Tr. Ex. 47-C, p. 498).  The former observation meant that wherever she touched Mr. Marranco, his bones were not tender and there were no gross deformities.  (Tr. 630-631; Joint Tr. Ex. 47-C, pp. 497-501).  When performing a musculoskeletal examination on a patient (a "head-to-toe" involving "palpation, touching, and looking"), NP Arbeiter's pattern and practice was to examine the patient's back.  (Tr. 629-631, 645).  She could not recall where she touched Mr. Marranco or if she touched his lumbar spine or not.  (Tr. 630-631).  NP Arbeiter did not check whether he was able to bear his own weight or walk; she did not test his gait because of the possibility that he had a hip fracture.  (Tr. 638-639, 645-646; Joint Tr. Ex. 47-C, p. 499).

Dr. Schuur first criticized NP Arbeiter's note, stating that it should have been more detailed as to what parts of Mr. Marranco's body did or did not have injuries, because an older patient with dementia cannot express exactly where he hurts.  (Tr. 683).  Dr. Schuur pointed to discrepancies in the record, including Pine Lodge's note that Mr. Marranco's foot had "abnormalities" after the first fall at Pine Lodge (*i.e.* bruised toes on his left foot) but NP Arbeiter's note failed to capture that issue, as well as the VAMC assessment both listing Mr. Marranco's pain at "99" (indicating inability to access or articulate pain) but also noting he did not complain of any pain.  (Tr. 683-684, 715).

Dr. Schuur's primary critique of the physical examination,[19] however, was that NP Arbeiter did not meet the standard of care because she did not test Mr. Marranco's gait, and Dr. Schuur could not discern whether she pressed down on his back during the musculoskeletal examination to determine whether he had back pain at any of the vertebra.  (Tr. 682-684, 707-708).  His gait should have been tested to "determin[e] the level of injury and [his] safety, meaning [his] ability to safely walk," to evaluate neurological function, muscle strain, and skeletal function in the lower back and legs. The ability to walk "tells you that a lot of things are working well."  (Tr. 665-666, 683).

Defendant argues that Dr. Schuur's opinion that NP Arbeiter should have tested Mr. Marranco's gait lacks credibility; she explained she did not test his gait because he possibly had a hip fracture.  Defendant further argues that there is unrebutted proof that Mr. Marranco's gait was intact on September 12th after he returned to Pine Lodge, reasoning that even if NP Arbeiter had tested his gait on the 11th that test would have

---

[19] The heading "review of systems" in NP Arbeiter's note does not summarize a physical examination, but is a collection of information gathered from caregivers, the patient, or other records.  (Tr. 678-679; Joint Tr. Ex. 47-C, pp. 497-498).  Dr. Schuur explained that the heading "physical exam" on the note refers to the actual physical examination of the patient.  (Tr. 678-679).

only confirmed the CT's findings that there was no fracture.  (Dkt. No. 102, ¶¶ 353-355, citing Tr. 446-447; Joint Tr. Ex. 47-C, p. 447).

Dr. Schuur clarified, however, that following the CT scan, the VAMC should have either (1) arranged for an emergency MRI (if there was still a high suspicion of a hip fracture) because testing Mr. Marranco's gait would have been dangerous then, or (2) tested Mr. Marranco's gait before sending him back to Pine Lodge.  It did neither, which deviated from the standard of care.  (Tr. 684-685).

The Court finds, based on Dr. Schuur's credible expert testimony and the testimony of NP Arbeiter, that the VAMC breached the standard of care by failing to test Mr. Marranco's gait.  NP Arbeiter testified that she did not test his gait because of the possibility that his hip was fractured; however, she admitted that even when the CT scan was negative for a hip fracture, she did not check whether Mr. Marranco could walk or bear his own weight.  (Tr. 645-646).

Defendant contends that any testing of Mr. Marranco's gait at the VAMC would have been meaningless because Mr. Marranco could walk after he returned to Pine Lodge.  Thus, Defendant deduces that if Mr. Marranco could walk later, testing his gait or other measures at the VAMC would have failed to identify any fracture or other possible medical issues.  But no evidence suggested that Mr. Marranco's limited ability to walk after he returned to Pine Lodge established that he had no hip fracture or other conditions that made bearing his own weight an unreasonable risk.

As to the allegedly flawed musculoskeletal examination, though, NP Arbeiter testified that while she could not recall if she touched Mr. Marranco's lumbar spine or not, her pattern and practice was to examine a patient's back during a musculoskeletal

examination, which involved "palpation, touching, and looking".  Based on this evidence

of NP Arbeiter's routine practice in conducting musculoskeletal examinations, the Court

finds that the VAMC did not stray from the standard of care in this respect.[20]

### 4. Lack of Emergency MRI

The CT scan of Mr. Marranco's left hip was taken on September 11, 2013, the

same evening he arrived at the VAMC.  (Joint Tr. Ex. 52, pp. 119-120).  The impression

on the CT scan was: "No definite fracture is identified.  Underlying bone changes most

suggestive of Paget's[21] or possibly metastatic disease,[22] as discussed above.  These

findings in addition to osteopenia[23] limit assessment for nondisplaced fracture, an MRI

is advised if there is persistent clinical concern".  (Joint Tr. Ex. 52, p. 121).  PA Metz

testified that "limited assessment for nondisplaced fracture" meant that with the potential

Paget's disease and decreased bone density, there may have been a nondisplaced

fracture that was not evident on the CT scan.  (Tr. 735-736).  Mr. Marranco was sent

back to Pine Lodge after NP Arbeiter reported the results of the CT scan to PA Metz.

(Tr. 636-638, 640, 724-725, 729, 731, 757-758; Joint Tr. Ex. 52, pp. 119-121).

---

[20] Rule 406 of the Federal Rules of Evidence ("Habit; Routine Practice") reads, "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice.  The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness."

[21] Paget's disease is "a chronic disease that is characterized by one or more enlarged, weak bones (such as of the pelvis, spine, or skull) and may be marked by bone pain but is often asymptomatic."  Paget's Disease, Merriam-Webster.com: Medical Dictionary, https://www.merriam-webster.com/dictionary/Paget%27s%20disease#medicalDictionary.

[22] Bone metastasis "occurs when cancer cells spread from their original site to a bone.  Nearly all types of cancer can spread (metastasize) to the bones.  But some types of cancer are particularly likely to spread to bone, including breast cancer and prostate cancer.  Bone metastasis can occur in any bone but more commonly occurs in the spine, pelvis and thigh.  Bone metastasis may be the first sign that you have cancer, or bone metastasis may occur years after cancer treatment.  Bone metastasis can cause pain and broken bones."  "Bone metastasis", Mayo Clinic:  Symptoms & causes, available at https://www.mayoclinic.org/diseases-conditions/bone-metastasis/symptoms-causes/syc-20370191.
[23] Osteopenia is a decrease in bone density.  (Tr. 759).

The evaluation of Mr. Marranco's suspected hip fracture, according to Dr. Schuur, did not meet the standard of care because a CT scan does not definitively rule out a "nondisplaced" fracture, where the bones have not moved apart or broken into two pieces.  (Tr. 662-663).  Dr. Schuur explained that some fractures can manifest with pain and disability, and it is important to try and diagnose that before a nondisplaced fracture becomes a complete displaced fracture.  (Tr. 663).  If Mr. Marranco had a nondisplaced fracture and tried to bear weight, he could have injured himself further by it turning into a displaced fracture.  (Tr. 672).  There is a relatively simple procedure to put a pin in a nondisplaced fracture to keep it in place.  (Tr. 672).

The best available test for Mr. Marranco would have been an MRI, the "gold standard", which should have been performed.  (Tr. 663, 673-674).  Dr. Schuur explained that if all Mr. Marranco needed was a CT scan, he could have just been sent to a radiological facility instead of the emergency room.  (Tr. 700).  Dr. Schuur would have had a "high suspicion" that Mr. Marranco had a hip fracture due to his hip and back pain, fall, and recent change in his ability to walk; he would have wanted to administer a very accurate test to confirm Mr. Marranco did not have a hip fracture.  (Tr. 671).

Defendant argues that Dr. Schuur's opinion that an MRI should have been conducted is contradictory and is undermined by the CT scan radiologist's recommendation regarding when a future MRI should be conducted; Dr. Schuur also admitted that "persistent clinical concern" looked to the future.  (Dkt. No. 102, ¶¶ 348-350; Dkt. No. 103, ¶ 55).  However, Dr. Schuur thoroughly explained what first appears as a discrepancy between the radiologist's recommendation and Dr. Schuur's opinion.

Dr. Schuur testified that the fact an emergency MRI was not performed or scheduled for Mr. Marranco after the results of the CT scan were assessed was a deviation from the standard of care, even though the impression from the radiologist read, "An MRI is advised if there is persistent clinical concern."  To Dr. Schuur, "persistent clinical concern" means that if the clinician persisted in having clinical concern about the fracture, then an MRI should have been conducted.  (Tr. 705-706).  A radiologist's information concerning the patient is limited (the radiologist only knows what is in the report and "indication"), in comparison to that of a physician.  (Tr. 672-674).  He explained that a radiologist does not see the patient in question, and it is the attending physician's responsibility to care for the patient and decide what to do with the patient based on information from the radiologist.  (Tr. 715-716).

In addition, Dr. Schuur testified that more liberal use of imaging was warranted in this case because Mr. Marranco was elderly and had osteopenia (weakened bones), and therefore the likelihood he had a fracture was higher.  He also had dementia and could have been "distracted" by one source of pain and unable to articulate whether another part of his body hurt.  (Tr. 663, 685-686).  Even though Mr. Marranco's CT scan was negative for fracture, and even though he was not complaining of any pain at the time of NP Arbeiter's evaluation, an MRI was still required because Mr. Marranco had dementia and inability to ambulate, and his reported pain was the reason why he was at the VAMC in the first instance.  (Tr. 685-686, 701-703).

The Court credits Dr. Schuur's detailed, well-reasoned testimony regarding the VAMC's failure to conduct an emergency MRI on Mr. Marranco after the CT scan at the

VAMC, and concludes that the VAMC breached the standard of care in conducting no MRI before sending Mr. Marranco back to Pine Lodge.

     5. <u>Return of Mr. Marranco to Pine Lodge</u>

After the results of the CT scan came back negative (for a displaced fracture), Mr. Marranco was transferred back to Pine Lodge. (Tr. 401-402, 417).

Paul testified that when he and Loretta's husband visited Mr. Marranco at the VAMC after his first fall, he observed him in "excruciating pain": he was bedridden and groaning; could not move or sit up; and when asked what was hurting him, Mr. Marranco rubbed the bottom side of his hip and said his back was "killing" him and that his leg hurt. (Tr. 397, 400-401). Paul asked the VAMC medical staff if they were doing anything about Mr. Marranco's back pain, after he heard that the CT scan indicated no hip fracture. (Tr. 416-417). He testified, "[s]he (the unidentified individual he spoke with, who could have been NP Arbeiter) didn't seem very concerned about it at all and said, you know, that's not what he was sent here for. I don't think there's anything -- anything concerning about it. It's probably a referred pain from his front. And she said we're going to release him (send him back to Pine Lodge)." (Tr. 417).

It bears repeating that PA Metz told NP Arbeiter that it was fine to send Mr. Marranco back to Pine Lodge (without any MRI), but he was unaware of Mr. Marranco's severe back pain before admission to the VAMC and the September 8th fall at home. He testified that the CT scan report revealed there may have been a nondisplaced fracture that was not evident on the CT scan. (Tr. 735-736).

When asked if he would have not agreed to send Mr. Marranco back to Pine Lodge if he known about Mr. Marranco's severe back pain prior to his admission to the

VAMC, PA Metz testified, "lumbar spine pathology is outside the scope of the orthopedic attendings that I work with", so he could not say whether he would have sent Mr. Marranco back to Pine Lodge.  (Tr. 738).  At his deposition, however, PA Metz's testimony was somewhat conflicting—he would not have sent Mr. Marranco back after the CT scan if he had known of the persistent low back pain, but also he was unsure what he would have done, it was outside his area of practice, and he could not say whether he would have requested an MRI or evaluated him further before sending him back to Pine Lodge if he had known about his persistent lower back pain.  (Tr. 741-742).

Nevertheless, the VAMC called Rural Metro Medical Services on September 11, 2013, at 11:12 p.m.  The ambulance arrived at 1:21 a.m. on September 12, 2013 to pick up Mr. Marranco, and he was sleeping in no acute distress ("NAD").  (Joint Tr. Ex. 58, p. 2709, 2711).  Even so, ambulance records reflect that he was hypoxic[24] with oxygen levels in the mid- to upper-80's so he was increased from three to four liters of supplemental oxygen, and he had tachycardia[25] and high blood pressure.  (Joint Tr. Ex. 58, p. 2711).  Ambulance staff were concerned about his stability and whether he was medically clear for transfer back to Pine Lodge.  VA staff assured ambulance staff he was safe for transfer.  (Joint Tr. Ex. 58, p. 2711).  Mr. Marranco left the VAMC in the ambulance at 2:11 a.m.  (Joint Tr. Ex. 58, p. 2709).  His vitals were monitored en route, and they returned "closer to normal levels upon arrival".  (Joint Tr. Ex. 58, p. 2711).

---

[24] Hypoxia is "a deficiency of oxygen reaching the tissues of the body."  Hypoxia, Merriam-Webster.com: Medical Dictionary, https://www.merriam-webster.com/dictionary/hypoxia.

[25] Tachycardia is "relatively rapid heart action whether physiological (as after exercise) or pathological". Tachycardia, Merriam-Webster.com: Medical Dictionary, https://www.merrriam-webster.com/dictionary/tachycardia#medicalDictionary.

Dr. Schuur testified, and Plaintiff argues, that the VAMC deviated from the standard of care in discharging Mr. Marranco and sending him back to Pine Lodge. (Tr. 686-687, 690-691; *see* Dkt. No. 101, ¶¶ 97-98, 100). Because the Court concludes that the VAMC's open-ended discharge of Mr. Marranco to Pine Lodge was a breach of the applicable duty of care, the Court is not relying on Dr. Schuur's opinion that the VAMC deviated from the standard of care by sending Mr. Marranco back to Pine Lodge because Pine Lodge had a lower level of care than a skilled nursing facility. (Tr. 691, 711; Dkt. No. 102, ¶¶ 356-358; Dkt. No. 103, ¶¶ 56-57). The Court likewise need not resolve the dispute concerning Pine Lodge's classification/ designation, as those distinctions were irrelevant to the actual level of care Pine Lodge could provide and was in fact providing. (*See* Tr. 119, 191, 259-261, 662, 691, 710-711, 871).

First, according to Dr. Schuur, it was important for the VAMC to "assign a reason" for pain and disability after a fall, yet Mr. Marranco's underlying pain and change in ability to ambulate was not considered or addressed. (Tr. 686-687). The information Dr. Schuur knew about Mr. Marranco's condition before and upon his admission to Pine Lodge supplied even more reason why the emergency room should have figured out the source of Mr. Marranco's problems. (Tr. 713-714; *see* Tr. 696-699).

Defendant contests that there was a deviation from the standard of care in the VAMC returning Mr. Marranco to Pine Lodge until the source of his underlying pain was discovered, because he made no complaints of pain to NP Arbeiter. However, considering that NP Arbeiter noted Mr. Marranco's pain at a "99" (meaning he could not express his level of pain to her), and the inherent difficulty for dementia patients in accurately divulging locality and level of pain, the Court cannot conclude that Mr.

Marranco's lack of complaint to NP Arbeiter freed the VAMC from its obligation, as testified to by Dr. Schuur, to probe into the issue of Mr. Marranco's continuous (yet fluctuating) back pain he had just before admission to the VAMC.

Second, no physician (*i.e.* medical doctor) was involved in the decision to discharge Mr. Marranco, which Dr. Schuur opined deviated from the standard of care. (Tr. 689-690).  Even though NP Arbeiter had the licensure to discharge a patient, that is not "synonymous" with the standard of care; it does not mean that is what a "reasonably trained professional in a similar situation would do."  (Tr. 689-690).

Third, Dr. Schuur testified that the VAMC did not appear to consider Mr. Marranco's "disposition" post-VAMC visit, which entails evaluating the setting of the patient's next destination and ensuring it is an appropriate environment.  (Tr. 690).  The VAMC's "open-ended" discharge without further instruction or a scheduled MRI was unsafe.  (Tr. 691).  Dr. Schuur noted the ambulance staff's concerns about Mr. Marranco's abnormally low oxygen level, elevated heart rate, elevated blood pressure, and inability to walk on his own.  (Tr. 661.)  Yet Mr. Marranco was sent back to Pine Lodge without any direction or any further expected diagnostic testing.

The Court finds this testimony credible and concludes that the VAMC's open-ended discharge of Mr. Marranco back to Pine Lodge breached the standard of care.

### H.  Return to Pine Lodge, Before the Second Fall

Mr. Marranco arrived at Pine Lodge from the VAMC at around 3:00 a.m. on September 12, 2013.  (Tr. 792-794; Joint Tr. Ex. 47-C, pp. 489-491; Joint Tr. Ex. 58, p. 2712).  Upon his return, RN Crispell observed Mr. Marranco groaning and he was given a dose of Oxycodone.  Additionally, his mobility was noted as "very limited", his Foley

catheter was "patent and intact", and his oxygen level was 93% on two liters.  (Tr. 791-794, 799; Joint Tr. Ex. 47-C, p. 491).  Ambulance staff and "multiple nursing staff" moved Mr. Marranco "to VA bed via sheet slide".  (Joint Tr. Ex. 47-C, p. 2711).  Mr. Marranco's second fall at Pine Lodge was less than three hours after his return.

Plaintiff alleges that Defendant is liable for the following actions and omissions by Pine Lodge following Mr. Marranco's first fall at Pine Lodge and preceding his second fall, and therefore injuries associated with the second fall:  (1) the failure to update Mr. Marranco's fall protection plan after his first fall at Pine Lodge; (2) the failure to update the level of supervision after the first fall at Pine Lodge; (3) the failure to place Mr. Marranco at the nurses' station while staff determined if he was medically stable, a decision that had to be elevated to a medical doctor; and (4) improper readmission of Mr. Marranco to Pine Lodge from the emergency room.  (Dkt. No. 101, ¶¶ 63-68). Plaintiff argues that all these allegations constitute ordinary negligence and thus, no medical expert testimony was required.  The Court agrees that most of these allegations constitute negligence, not medical malpractice, and concludes that Pine Lodge breached the applicable standard of care and was negligent in causing the second fall at its facility.  Each of the allegations will be addressed sequentially.

　　1.   Improper Readmission

Plaintiff argues that, upon Mr. Marranco's re-admission to Pine Lodge, he should have been placed at the nurses' station with direct observation by the nurses while staff determined if he was medically stable, and that a medical doctor would need to make that final decision.  (Dkt. No. 101, ¶¶ 64-65).  This allegation, concerning the need for a physician's involvement to reassess a patient's stability for coming back to Pine Lodge

66

from an emergency room, concerns medical treatment for which there is no corresponding medical expert opinion.

    2.  <u>"Updated" Fall Protection Plan and Level of Supervision</u>

Plaintiff argues that Pine Lodge failed to sufficiently update or modify Mr. Marranco's initial fall protection plan after his first fall, with the sole addition of "hipsters" failing to comport with the standard of care.  (Dkt. No. 101, ¶¶ 39-42).  In a related fashion, Plaintiff argues that Mr. Marranco required "much closer supervision" after his first fall at Pine Lodge and that Pine Lodge was negligent in failing to update or modify his level of supervision.  (Dkt. No. 101, ¶¶ 43-47).  Defendant merely argues in opposition that Plaintiff improperly relies on the opinion of a non-medical expert and that these claims sound in medical malpractice.  (Dkt. No. 106, pp. 7-8).  The Court concludes that Plaintiff's allegations, instead, sound in negligence and that no medical expert testimony is required as to Pine Lodge's omissions after the first fall at its facility and prior to the second fall there.

After Mr. Marranco's fall and before he was admitted to the VAMC, "hipsters", *i.e.* extra padding to protect the hips, were placed on Mr. Marranco.  RN Crispell agreed that hipsters are an injury prevention rather than a fall prevention device.  **Other than hipsters, the fall protection plan remained unaltered**, including the approach of checking on Mr. Marranco once per hour.  (Tr. 785-786; Joint Tr. Ex. 47-C, p. 516; Joint Ex. 9, p. 5 ["Approach" added on September 10, 2013, "To wear hipsters continuously b/c recently fell and have hx of falls.  To change when become soiled."]).

RN Crispell explained that no additional precautions were instituted because, as to the first fall at Pine Lodge, "he slipped in urine . . . his ability hadn't changed".

However, she did not know that at home, Mr. Marranco got up to use the restroom independently and he was not catheterized there (Tr. 786-787), with the first fall at Pine Lodge showing to the contrary that his ability had changed.

The Court finds that Pine Lodge breached its duty in failing to update Mr. Marranco's fall protection plan after his first fall at Pine Lodge and/or in failing to heighten his level or frequency of supervision.   At this juncture, Mr. Marranco had now fallen twice within a matter of days—the first time at home on September 8th, and the second time at Pine Lodge on September 10th.   Despite Mr. Marranco's records showing he had fallen just before his admission to the facility, the nurse in charge of him overnight when his two falls at Pine Lodge occurred was not aware of the September 8th fall even though she had access to his records.

After Mr. Marranco's first fall at Pine Lodge, the only change that was made to his fall risk plan was to place "hipsters" on him, which do not even function to prevent falls.   The evidence at trial reflects that Mr. Marranco was demonstrating confusion, poor awareness of safety, and increasingly concerning physical issues.   For example, following his first fall at Pine Lodge, Mr. Marranco asked RN Crispell, "Why is that man in my room?", referencing his roommate.   Moreover, between the first and second fall, Mr. Marranco's condition deteriorated in various ways; for example, he now required supplemental oxygen and stronger pain medication.   All these indicators signaled the need for different and greater interventions on the part of Pine Lodge—instead, basically no new interventions were added.

The record reflects that Pine Lodge did have other tactics to address Mr. Marranco's fall risk at its disposal.   RN Webster testified that more steps to prevent falls

may be added following an assessment of a patient during his stay at Pine Lodge.  (Tr. 548-549).  The VA medical records reveal that there were at least 48 different "Fall Prevention and Management Interventions" available that included the measures listed in Mr. Marranco's Care Plan, but also, among others, moving his room closer to the nurse's station and placing him on 1 to 1 staff observation for safety.  (*See* Joint Tr. Ex. 7, pp. 13-14).  While 1:1 observation may not have been practical in a unit with other dementia patients who were also at high risk of falling, Mr. Marranco's room could have minimally been moved closer to the nurses' station.  His was halfway down the hall from the nurses' station while some respite rooms are visible from the station, and patients can be brought out to the nurses' station temporarily if needed.  (Tr. 559-560, 775).

Surely, a layperson may conclude that Pine Lodge, in failing to make a single, substantive change to Mr. Marranco's fall risk plan following his first fall there (and second fall within a few days) or make any alteration to the level or frequency of supervision provided was a breach of Pine Lodge's duty to safeguard Mr. Marranco from avoidable injury.  The Court determines that Plaintiff established this breach of the standard of care by a preponderance of the evidence.

### 3. Continued "Updated" Fall Protected Plan and Level of Supervision

Upon his return from Pine Lodge to the VAMC, Mr. Marranco was sent back to the same room he had previously been in at Pine Lodge, and as before no additional fall protections were implemented such as floor mats, curved mattresses, or non-slip socks. The post-fall note from Mr. Marranco's second fall at Pine Lodge does not indicate whether he was wearing anything on his feet at the time of that fall (*i.e.* the non-slip socks), and there was no such testimony concerning the second fall.  (Tr. 795).

However, testimony is clear that the only "new" intervention implemented was that RN Crispell put hipsters back on Mr. Marranco.  (Tr. 795; Joint Tr. Ex. 47-C, p. 487; Joint Tr. Ex. 9, pp. 4-5).  She did not check Mr. Marranco's gait, ability to walk, or ability to transfer due to his pain.  (Tr. 796).

The Court concludes that Pine Lodge again breached its duty of care in continuing Mr. Marranco's initial fall protection plan upon his return from the emergency room without implementing any new fall prevention measures or adjusting its level of his supervision, and sending him back to the same exact room he had previously been in.

## I.  Second Fall at Pine Lodge

### 1.  Second Fall

Less than three hours after his return to Pine Lodge from the VAMC, on September 12, 2013, at 5:35 a.m., Mr. Marranco fell for the second time at Pine Lodge. RN Crispell prepared another post-fall note.  (Tr. 799; Joint Tr. Ex. 47-C, pp. 484-485).

In contrast to the first fall, RN Crispell did not witness this fall.  When she arrived at Mr. Marranco's room, he was sitting on the floor and leaning onto his left side (although her note said right side), with a "large swelling" on the left side of his forehead.  The swelling was not there prior to the fall.  He was alert but confused.  (Tr. 800; Joint Tr. Ex. 47-C, p. 485).  As to this fall, Mr. Marranco "stated he thought he had to urinate", even though his Foley catheter was working properly.[26]  (Tr. 800-801; Joint

---

[26] The evening of September 11, 2013, before Mr. Marranco had been transferred to the VAMC, it was noted that he had not voided in approximately eight hours; he was bladder scanned and the scan showed more than 400 milliliters of urine in the bladder.  A Foley catheter was ordered and inserted.  Thus, it appears Mr. Marranco had not been wearing a catheter during his first fall at Pine Lodge, but he was during his second fall at Pine Lodge.  (Joint Tr. Ex. 47-A, p. 197; *see also* Joint Tr. Ex. 31, p. 72 [CT scan noting, "The bladder is decompressed by a Foley catheter."]).  A foley catheter is "a thin, flexible catheter used especially to drain urine from the bladder by way of the urethra."  Foley catheter, Merriam-Webster.com: Medical Dictionary, https://www.merriam-webster.com/dictionary/Foley%20catheter#medicalDictionary.

Tr. Ex. 47-C, p. 485).  RN Crispell recognized that even if a resident has a Foley

catheter, if he has the urge to have a bowel movement there is a good chance he will

get up to use the bathroom if that is what he is used to doing.  (Tr. 802).  Her post-fall

note stated, "[f]loor had moderate amount of liquid stool due to resident had just been

incontinent of bowel".  (Joint Tr. Ex. 47-C, p. 485).

RN Crispell's post-fall note also indicated Mr. Marranco had a small abrasion on

his right upper armpit, a "small pinpoint area" on his left upper leg near his groin with a

small amount of bleeding, and a red "abraised" area (*i.e.* "minor skin opening") on his

left shoulder blade from the previous fall.  (Tr. 803; Joint Tr. Ex. 47-C, p. 485).  RN

Crispell testified that the post-fall note was incorrect, in that it was Mr. Marranco's *right*

shoulder blade that was injured in the first fall.  (Tr. 813).

2.  Post-Fall Condition and Events

RN Crispell assessed Mr. Marranco at 75 on the Morse Fall Scale, indicative of

high risk for falls.  (Joint Tr. Ex. 47-C, p. 486).  Mr. Marranco's gait and transferring were

now "impaired", which was more restricted than the "weakness" in gait and transferring

that she indicated he had earlier.  (Tr. 805; Joint Tr. Ex. 47-C, p. 487).  RN Crispell

noted her recommendation that Mr. Marranco be moved nearer to the nurses' station for

closer observation; however, they did not have time to get permission to do so before

he was sent back to the emergency room.  (Tr. 805-806; Joint Tr. Ex. 47-C p. 482-487;

Joint Tr. Ex. 9, pp. 4-5 ["Approach" for September 12, 2013 was "(1) Need low bed w/

floor mats and (2) Need room moved closer to nurse's station for close observation and

fall prevention."]).[27]  Mr. Marranco now required total assistance with activities of daily

---

[27] Plaintiff appears to have abandoned arguments that Pine Lodge deviated from the standard of care by
(1) failing to implement measures noted in Mr. Marranco's Care Plan on September 12, 2013, to have a

71

living; he was not a total assist with care when he first arrived at Pine Lodge.  He now needed staff assistance with transfers, whereas before he was independent with bed mobility and "one assist" with transfers.  Mr. Marranco remained on supplemental oxygen; he was not on supplemental oxygen during his initial admission to Pine Lodge.  (Tr. 313-318; Joint Tr. Ex. 47-C, pp. 482-484).

RN Crispell made a Long-Term Care Nursing Transfer Note, at 6:28 a.m., to transfer Mr. Marranco back to the VAMC, with the reason, "Resident fell and large lump on left upper forehead".  (Joint Tr. Ex. 47-C, p. 482).  He was transported shortly thereafter to the VAMC by Mercy Flight WNY, Mercy EMS.  The Mercy Flight record has a primary impression of "head injury", and a secondary impression of "blunt trauma" described as a "Fall of 1-6 Feet".  He was on supplemental oxygen and had "swelling and bruising" on the left side of his forehead.  He "denie[d] any head or neck pain or any pain at all", "denie[d] any SOB (shortness of breath)" and was "Able to move all four extremities".  (Joint Tr. Ex. 47, pp. 2640, 2645-2646, 2648).

**J.  Treatment at the VAMC**

1.  <u>X-Rays</u>

On September 12, 2013, x-rays were taken of Mr. Marranco's left shoulder and left foot.[28]  (Joint Tr. Ex. 54, pp. 113-114; Joint Tr. Ex. 53, pp. 114-115).  The impression from the left shoulder x-rays was as follows: (a) generalized osteopenia, (b) suspected nondisplaced subchondral glenoid fracture, (c) otherwise intact remaining left shoulder

---

low bed with floor mats and a room near the nurses' station for close observation and fall prevention, both before and after the second fall at Pine Lodge; and (2) failing to notify a physician immediately after Mr. Marranco's second fall at Pine Lodge.  (*See* Tr. 241-243 [Mr. Levine's testimony]).

[28] PA Metz did not order these shoulder or foot x-rays.  Rather, the x-rays were completed prior to an orthopedic consultation PA Metz had with Mr. Marranco on September 16th.  (Tr. 749-750).

with acromiodavicular DJD and early subaromion DJD, (d) no evidence of glenohumeral DJD or subraspinatus (rotator cuff) calcific tendinitis, and (e) CT of the left scapula is suggested for more complete evaluation.  (Joint Tr. Ex. 54, p. 114).  The impression from the x-ray of Mr. Marranco's left foot was "Highly suspicious of fracture at proximal phalanges of the third and fifth digits".  (Joint Tr. Ex. 53, p. 115).

In short, these x-rays revealed (1) a "suspected" nondisplaced subchondral glenoid (shoulder) fracture (as well as generalized osteopenia [a "decrease in bone density"] and DJD ["degenerative joint disease"], both typically associated with age rather than caused by acute trauma such as a fall); and (2) a possible fracture of the third and fifth left toes.  (Tr. 752-753, 759-761; Joint Tr. Ex. 47-C, pp. 369-371).  PA Metz's x-ray assessment was: "Left hip pain.  Rule out fracture.  Left shoulder pain, possible glenoid fracture.  Probable fracture of the 2nd and 3rd toes left foot."  (Tr. 753; Joint Tr. Ex. 47-C, p. 371).  The Court notes the discrepancy between the records and trial testimony regarding what toes on Mr. Marranco's left foot may have been fractured.

### 2.  Neurology and Orthopedic Consults

Sherry Withiam-Leitch, M.D., a neurologist and one of Mr. Marranco's treating physicians in September 2013, is the Chief of Neurology at the VAMC, an Assistant Professor of Neurology at University at Buffalo, and residency site director at the VA. (Tr. 432-434, 436).  As a part of her neurology practice, Dr. Withiam-Leitch routinely treats patients with neck, mid-back, low back, and spinal cord problems.  (Tr. 434).  As a neurologist, she can read and interpret MRIs.  (Tr. 435).

Dr. Naeem Mahfooz, a resident at the time, performed a neurology consult/ examination of Mr. Marranco on September 12, 2013, at 4:36 p.m. to assess Mr.

Marranco's gait and its correlation with normal pressure hydrocephalus.[29]  (Tr. 442,

446; Joint Tr. Ex. 47-C, pp. 445-450).  Under motor strength, his note states, "upper

extremity power was 4/5 and Mr. Marranco complained of severe pain while he was

doing the upper extremity testing.  Lower extremity, the power was 3/5 and he was

having severe back pain while doing that testing, too".  (Tr. 446-447; Joint Tr. Ex. 47-C,

p. 447).  His gait was "intact", which meant Mr. Marranco was able to walk.  The

notation "unable to move secondary to back pain" possibly meant that he could move

but had pain while doing so.  (Tr. 447-449; Joint Tr. Ex. 47-C, p. 447).

On September 13th at 1:18 p.m., Dr. Withiam-Leitch evaluated Mr. Marranco for

normal pressure hydrocephalus.  (Tr. 452).  She became involved with his spine pain

because he appeared visibly uncomfortable (she characterized it as "excruciating" low

back pain), and he was now unable to move his leg due to the pain.  Based on her

review of Dr. Mahfooz's September 12th record, Mr. Marranco's condition and pain

appeared to have worsened.  (Tr. 450-451; Joint Tr. Ex. 47-C, p. 413).

Dr. Withiam-Leitch was concerned that Mr. Marranco had either acute

radiculopathy or a spinal cord lesion.  (Tr. 454; Joint Tr. Ex. 47-C, p. 414).

Radiculopathy is caused by compression of one of the nerves coming out of the spinal

cord, and a spinal cord lesion / injury is a disc herniation, bone spur, or fracture pushing

on the spinal cord.  (Tr. 454).  She ordered an MRI of the thoracic and lumbar spine

"ASAP: TODAY", as soon as possible.  She was concerned about the amount of pain

---

[29] Hydrocephalus is "an abnormal increase in the amount of cerebrospinal fluid within the cranial cavity
(as from obstructed flow, excess production, or defective absorption) that is accompanied by expansion of
the cerebral ventricles and often increased intracranial pressure, skull enlargement, and cognitive
decline."  Hydrocephalus, Merriam-Webster.com: Medical Dictionary, https://www.merriam-
webster.com/dictionary/hydrocephalus#medicalDictionary.

Mr. Marranco was in; there was no diagnosis yet and she was concerned about a spinal cord injury.  (Tr. 454-455; Joint Tr. Ex. 47-C, p. 414).  An MRI of Mr. Marranco's lumbar spine was performed on September 14, 2013.  (Joint Tr. Ex. 55, pp. 108-110).

Between the evening of September 13th and the afternoon of September 15th, Mr. Marranco received Tramadol for his pain; at points, he made no complaints of pain.  (*See* Joint Tr. Ex. 47-C, pp. 387, 389-391, 395, 400-403, 408).

During an orthopedic consult with PA Metz on September 16, 2013 at 10:44 a.m., PA Metz performed a physical examination of Mr. Marranco's left hip and shoulder.  PA Metz found pain in his left hip with internal and external rotation, pain in his left shoulder during passive range of motion testing, and bruises on the second and third toes of his left foot.  (Tr. 747-748, 750-752; Joint Tr. Ex. 47-C, pp. 369-370).  When PA Metz palpated Mr. Marranco's toes he did not complain of pain; there was no tenderness to palpation of his left shoulder; and there was no evidence of deformity, rotation, or shortening in his left hip.  (Tr. 759; Joint Tr. Ex. 47-C, p. 370).  PA Metz ordered an MRI of Mr. Marranco's left hip because he did not know for certain whether Mr. Marranco had a hip fracture, and he thought an additional test was warranted.  (Tr. 753-754).  However, it appears that radiology was unable to perform the MRI of his pelvis due to his level of pain.  (*See* 422-423; *see also* Joint Tr. Ex. 47-C, p. 388).

### 3.  MRI and 9/16/2013 Treatment Note

At 11:35 a.m. on September 16th, Dr. Withiam-Leitch performed a routine check-up of Mr. Marranco, after she received results from his lumbar spine MRI she ordered.  (Tr. 456; Joint Tr. Ex. 47-C, p. 364; Joint Tr. Ex. 55, pp. 108-110).  He remained in severe lower back pain.  (Tr. 456; Joint Tr. Ex. 47-C, p. 364).  The impression from the

MRI was, in part: "#1. Mild compression deformity involving L1 vertebral body involving the superior endplate.  Edema involving the end plates suggests an acute or subacute process.  #2. Marked compression deformity involving L3 vertebral body which has undergone a kyphoplasty.  An area of edema appears to be present involving the superior endplate suggesting an acute or subacute process…" (Joint Tr. Ex. 55, p. 110).

Dr. Withiam-Leitch explained the MRI report showed compression deformities at L-1 and L-3 (mild at L-1), meaning the bone/ vertebrae had collapsed to some extent, with mild edema (swelling).  (Tr. 456, 459, 460-462; Joint Tr. Ex. 55, p. 109).  Edema can manifest from issues other than trauma; here, possibly from Mr. Marranco's underlying arthritis, a spiral infarct,[30] or a multiple sclerosis lesion.[31]  (Tr. 467-468).

The MRI also showed a disc fragment "retropulsion", which means a piece of the disc (*i.e.* fibrocartilage) had broken off and moved.  (Tr. 457-458; Joint Ex. 55, p. 109).  At L-3, a piece of vertebral bone itself had broken off.  (Tr. 461; Joint Tr. Ex. 55, p. 109).  The bone fragment had protruded into the spinal canal, making the spinal cord mildly narrower, which did not affect the spinal cord in any way.  (Tr. 465).  The broken-off disc fragment and broken-off bone are conditions that "can" be painful and can be caused by either trauma or degeneration.  (Tr. 458, 461-463).

---

[30] An infarct is "an area of necrosis in a tissue or organ resulting from obstruction of the local circulation by a thrombus or embolus".  Infarct, Merriam-Webster.com: Medical Dictionary, https://www.merriam-webster.com/dictionary/infarct#medicalDictionary.

[31] Multiple sclerosis is "a demyelinating disease marked by patches of hardened tissue in the brain or the spinal cord and associated especially with partial or complete paralysis and jerking muscle tremor." Multiple sclerosis, Merriam-Webster.com: Medical Dictionary, https://www.merriam-webster.com/dictionary/multiple%20sclerosis#medicalDictionary.

It was only "possible" that the lumbar compression fractures and deformities seen on the MRI could show up or be detectable on an x-ray, depending on their severity; hence, why Dr. Withiam-Leitch had ordered an MRI here.  (Tr. 461, 466).

Edema at the same level of retropulsion suggested the compression fractures at L-1 and L-3 were "more recent finding[s]".  (Tr. 460, 463).  While the MRI noted "acute to subacute" compression fractures at L-1 and L-3, Dr. Withiam-Leitch had noted: "MRI shows <u>acute</u> compression deformities with edema".  (*Compare* Joint Tr. Ex. 55, pp. 108-110 *with* Joint Tr. Ex. 47-C, p. 364 [emphasis added]).  When she used the word "acute" in her progress note, she meant "recent" (relative to the timing), not traumatic (relative to the cause).  (Tr. 466-467).  An "acute" event usually means an event within 24 to 48 hours, as compared with a "subacute" event within several weeks.  The MRI report states this fell between an acute or subacute period.  (Tr. 499-500).  It is "possible" that acute compression deformities can be caused by an 87-year-old's fall.  (Tr. 467).

Plaintiff argues that the "plain import" of Dr. Withiam-Leitch's testimony is that the compression fractures were caused by a recent fall, meaning a fall at Pine Lodge.  In the alternative, she argues that Dr. Withiam-Leitch testified "in direct contradiction" to her note and the "plain language" in her note is "obvious"—that the falls at Pine Lodge caused Mr. Marranco's compression fractures.  (Dkt. No. 101, ¶ 190; Dkt. No. 104, ¶¶ 94-95, 98, 102, 105).

However, after assessing Dr. Withiam-Leitch's demeanor and conduct and finding that her explanation does not directly contradict her treatment note, the Court credits Dr. Withiam-Leitch's testimony that she did not determine whether Mr. Marranco's falls caused his back pain.

Dr. Withiam-Leitch testified that it was unclear whether the fall on September 12th caused the lumbar compression fractures that appeared on the September 14th MRI, because the x-rays negative for lumbar fracture on the 11th were not accurate enough to rule out that the fracture was already present.  (Tr. 473).  She knew that there was a history of a fall, but she never determined what caused his pain.  (Tr. 449-452, 486; Joint Tr. Ex. 47-C, p. 413).  In her treatment of Mr. Marranco, Dr. Withiam-Leitch was never made aware that he fell in July 2013, six weeks prior to his admission to Pine Lodge.  (Tr. 496).  All she knew was that Mr. Marranco had fallen twice; she did not know how he fell or when he fell.  (Tr. 444-445, 451, 472).  When Dr. Withiam-Leitch was treating Mr. Marranco, she never tried to determine the source of his pain, which could have been from his arthritis, prior kyphoplasty, or the fact that he was lying in bed for a couple of days immobilized.  (Tr. 489-490).  A chronic injury like arthritis can cause edema even years following the initial injury; that is "very common".  (Tr. 496).

Mr. Marranco was in pain both times that she saw him, on September 13th and September 16th.  (Tr. 471).  Dr. Withiam-Leitch ordered a pain management and neurological consult to examine the fractures/ compression deformity from a neurosurgical point of view.  (Tr. 469; Joint Tr. Ex. 47-C, p. 364).  Later that day (the 16th), at 1:29 p.m. during a pain consultation, it was noted, "according to son, pt. only complains of back pain".  (Joint Tr. Ex. 47-C, pp. 356-357).

### 4.  Palliative Care and 9/17/2013 Treatment Note

Jaclyn Schneider, M.D., practices hospice (end-of-life) and palliative medicine at the VAMC.  (Tr. 507-508).  She is the Interim Chief of Geriatrics and Extended Care and manages all the nursing homes and home-based primary care on palliative medicine.

(Tr. 508-509).  In 2013, Dr. Schneider was a fellow (already a doctor), training for eligibility to take the Hospice and Palliative Medicine Board Examination.  (Tr. 509). She was working under Michelle Walter, D.O., her attending physician, who ensured the care she provided to her patients was correct.  (Tr. 509).

On September 16, 2013 at around 2:00 p.m., Dr. Schneider scored Mr. Marranco a "10" on the Karnofsky palliative scale, which measures general function.  The scale spans zero to 100, with zero meaning dead, and 10 meaning "imminently dying".  (Tr. 526-527; *see* Joint Tr. Ex. 47-C, pp. 352-353).  Based on a score of 10, Mr. Marranco was unable to walk at that point.  (Tr. 527).

Dr. Schneider's assessment after seeing Mr. Marranco was, "87-year-old male with frontal temporal [sic] dementia, who was admitted on 9/12 <u>after a fall which resulted in</u> L-1/L-3 compression fractures and possible left hip fracture and PE, who is experiencing acute nociceptive somatic pain, delirium, myoclonus[32]".  Dr. Walter signed off on this note.  (Tr. 529; Joint Tr. Ex. 47-C, p. 355 [emphasis added]).  Dr. Schneider testified that in this assessment, she was merely reiterating the history of Mr. Marranco's care; she did not form any opinion on what caused the L-1/L-3 compression fractures, the possible left hip fracture, or the pulmonary embolism.  (Tr. 534-535).

Plaintiff argues that Dr. Schneider's testimony to that effect is "rebutted by the plain language in the note" that Mr. Marranco's second fall at Pine Lodge caused his compression fractures.  (Dkt. No. 101, ¶ 191; Dkt. No. 104, ¶¶ 96-98, 102, 105).

---

[32] Myoclonus is "irregular involuntary contraction of a muscle usually resulting from functional disorder of controlling motor neurons."  <u>Myoclonus</u>, Merriam-Webster.com: Medication Dictionary, available at https://www.merriam-webster.com/dictionary/myoclonus#medicalDictionary.

The Court finds, however, that Dr. Schneider was credible in explaining why her note did not constitute an opinion on causation.  She also testified that the compression fractures and possible left hip fracture are outside her area of expertise, competence, and background; she did not have the qualifications to form an opinion on what caused those alleged injuries.  (Tr. 535).  Moreover, Dr. Schneider was aware that Mr. Marranco had one witnessed and one unwitnessed fall but was not aware that he fell prior to his admission to Pine Lodge.  (Tr. 518).

5.  <u>Observations by Staff and Family</u>

In response to reading Dr. Schneider's September 16th assessment of Mr. Marranco, NP Kowalski agreed that Mr. Marranco was not in that condition on September 9th when he was admitted at Pine Lodge or when NP Kowalski examined him after his first fall at Pine Lodge.  (Tr. 894-895).  NP Arbeiter likewise agreed that Mr. Marranco was not in this condition at the VAMC on September 11th.  (Tr. 647). Moreover, Dr. Witham-Leitch testified that there was an apparent decline in Mr. Marranco's condition between September 13th and 16th; he appeared to be in more pain on the 16th.  (Tr. 482-483).  When she spoke with Paul, he described Mr. Marranco as "highly functional" before his hospitalization.  He was able to walk, for example.  (Tr. 477-478).  Dr. Schneider testified that on September 12th, Mr. Marranco stood up and walked, but after that he refused to move his legs as he said he was in pain.  (Tr. 478).

Defendant argues that the Court should disregard the testimony of Paul and Loretta concerning their observations of Mr. Marranco's condition and his pain, because they minimized his physical condition before he was admitted to Pine Lodge.  (Dkt. No. 103, ¶¶ 118-136).  The Court declines to do so, and generally credits Mr. Marranco's

family's testimony about their observations of his physical condition after the second fall at Pine Lodge, as it is at least partly corroborated by the medical records and observations of VA staff.

Following the second fall at Pine Lodge, Paul had notified Loretta that she and Mrs. Marranco needed to come home from Florida because Mr. Marranco was not doing well, and he was in a "really bad" condition. (Tr. 76). While Mr. Marranco was at the VAMC, the family observed a big black and blue mark on the left side of his head and face. (Tr. 77-78, 419). He had a deep gash on his left arm and his toes on his left foot were "screwed up" and black/ bruised. (Tr. 419). Paul and Loretta testified that he was in too much pain to move his arms or legs; he could not get comfortable; he was in "agony", moaning and groaning; and he looked "broken". (Tr. 78-79, 419). Loretta was present every day between September 13 and 17, 2013 at the VAMC for hours with her mother to visit Mr. Marranco, and his condition "kept getting worse" and his pain was "uncontrolled". (Tr. 79). According to Paul, the pain was "all over", and excruciating. (Tr. 418-419, 421-423). Mr. Marranco told Loretta, "they hurt me, honey". (Tr. 78-79).

RN Susan Brecker noted that Mr. Marranco had a level 10 pain intensity at 6:41 p.m. on September 16th, described as "sharp", approximately seven hours before Mr. Marranco's death. (Tr. 897-899; Joint Tr. Ex. 47-C, pp. 344-346).

On September 16th, per Dr. Schneider's note (which she wrote at 4:55 p.m.), Mr. Marranco was still experiencing "acute" pain, meaning he was "in front of" her and in pain. (Tr. 531-532; Joint Tr. Ex. 47-C, p. 349). If a patient is unable to verbalize his pain, she determines that the patient is in acute pain by observing moaning, grimacing, brow furrowing, or shifting in bed. (Tr. 532; see Joint Tr. Ex. 8, p. 3).

6.  Do Not Intubate and Pain Control

Mr. Marranco's family decided to have a DNI ("Do Not Intubate") in place for Mr. Marranco, meaning if he stopped breathing the physician could not put him on a breathing tube.  This directive limited Dr. Withiam-Leitch's ability to treat his pain with narcotics, in the event administering narcotics decreased his breathing.  Because of the DNI, the VAMC was not able to control Mr. Marranco's pain quickly.  (Tr. 497-499; Joint Tr. Ex. 47-C, p. 348-349).  Dr. Withiam-Leitch wanted to remove the DNI status temporarily so that she could "aggressively control" his pain with narcotics until he was stable, and then the DNI status could be reinstated and they would use medications or injections without narcotics.  (Tr. 498).  On September 16, 2013, at 1:29 p.m., it was noted that due to Mr. Marranco's DNI status along with his respiratory compromise, he was not a candidate for a long-acting opioid regimen.  (Joint Tr. Ex. 47-C, pp. 356, 363).

On September 16, 2013, Dr. Schneider noted, "Patient is imminently dying from hypoxia related to his PE [pulmonary embolism] and in acute pain from lumbar compression fractures".  (Tr. 531; *see* Joint Tr. Ex. 47-C, p. 349).  It appears from a nursing note on that date that medical staff were having "[d]ifficulty raising O2 saturation out of low 80s" so the delivery of oxygen was switched to a "ventimask" at 50% with the oxygen set at 90%.  (*See* Joint Tr. Ex. 47-C, p. 344).  When she assessed Mr. Marranco at 2:00 p.m. on the 16th, Dr. Schneider had a discussion with Mr. Marranco's family, who decided that Mr. Marranco's pain and symptoms were going to be treated to allow him to pass away naturally instead of instituting more aggressive measures such as lab draws, mechanical ventilation, and CPR.  (Tr. 524-525; *see* Tr. 423-424; Joint Tr. Ex. 47-C, pp. 352, 355-356).  Once the decision is made to institute comfort care measures,

providers will not intubate or perform chest compressions or other life-sustaining measures.  (Tr. 530-531).  At 5:10 p.m., it had been accepted that Mr. Marranco was passing away.  (Tr. 533; Joint Tr. Ex. 47-C, p. 347).

The family delayed instituting comfort care measures for several hours on September 16th, "probably" from late afternoon to evening.  Loretta testified they decided to delay giving Mr. Marranco more potent pain medications as they were concerned that he would not be able to communicate with the family.  (Tr. 108-110).  When comfort care measures were eventually instituted (it appears the DNI was lifted), he was given Dilaudid, an opioid stronger than morphine, for his pain, and greater than the typical dosage due to his pain level.  (Tr. 529-530; Joint Tr. Ex. 47-C, p. 348).

### K.  Death

It is undisputed that Mr. Marranco died on September 17, 2013 at 1:45 a.m. (Dkt. No. 100, p. 69; Dkt. No. 102, ¶ 327).  Mr. Marranco's Certificate of Death was entered into evidence at trial, which states that he died as a result of a pulmonary embolism, due to or as a result of a lumbar fracture, due to or as a result of a fall.  (Joint Tr. Ex. 47, Bates No. 2616 [Certificate of Death]; *see* Joint Tr. Ex. 47-A, pp. 196-198 [Discharge Summary by NP Kowalski]; Joint Tr. Ex. 47-A, pp. 198-199 [Discharge Summary by Resident Sidra Anwar])  However, there was no testimony at trial regarding the death certificate or the cause of Mr. Marranco's death, and the wrongful death cause of action did not proceed to trial because Plaintiff conceded there were no actionable damages on that claim.

III.    **CONCLUSIONS OF LAW AS TO LIABILITY**

   A. **Plaintiff did not establish by a preponderance of the evidence that Defendant is liable for Mr. Marranco's first fall at Pine Lodge.**

As previously discussed, the so-called actions and omissions by Pine Lodge with respect to Mr. Marranco's first fall at the facility were not proven to be negligent by a preponderance of the evidence.  To reiterate, these allegations criticized (1) failing to adhere to a timely pre-admission medical assessment; (2) prescribing two medications to Mr. Marranco upon admission that increased his fall risk; (3) instituting an inadequate or inappropriate initial fall protection plan; (4) failing to provide appropriate incontinence care and level of supervision; (5) failing to institute proper fall and injury prevention devices; and, in the alternative, (6) failing to diagnose Mr. Marranco's injuries and/or provide proper treatment for those injuries.

The Court has already analyzed each of these allegations at length and concluded that they all constitute claims of medical malpractice, as "aris[ing] from the physician-patient relationship or [being] substantially related to medical treatment". *Gjini*, 2019 U.S. Dist. LEXIS 20978, *9.  As a matter of law, the failure to diagnose or treat theory is a medical malpractice allegation (*see Whitfield v. State of N.Y.*, 162 A.D.3d 1098, 1099 (N.Y. App. Div. 2018)).  The other allegations are intricately tied to the medical assessment of Mr. Marranco and his unique medical needs, including his dementia, and Pine Lodge's corresponding determination of how to craft his initial fall protection plan and what to include—or not—as action items in the plan.

Plaintiff did not have a medical expert opine to Pine Lodge's purported liability, thus presenting an insurmountable obstacle to proving most of these claims by a preponderance of the evidence.  As the Court discussed, however, application of New

York State law is conflicting in that certain claims by Mr. Marranco could possibly be construed as allegations of ordinary negligence.  To the extent that is the case, the Court analyzed those allegations along with the proof set forth at trial.

With respect to the timing of Mr. Marranco's medical assessment, Plaintiff has not shown by a preponderance of the evidence that a full physical evaluation of Mr. Marranco approximately 45 days before his admission to Pine Lodge, rather than within 30 days, was a breach of a standard of care—or that the failure to conduct that pre-admission physical within the typical timeframe designated by Pine Lodge proximately caused Mr. Marranco's falls at Pine Lodge.  NP Kowalski, in any event, conducted a "head-to-toe" physical examination of Mr. Marranco the day he arrived at Pine Lodge.

As discussed above, Plaintiff did have a medical professional testify concerning the purported breach by NP Kowalski for prescribing two medications (Lorazepam and Lortab) to Mr. Marranco that increased his fall risk.  However, NP Kowalski weighed the risk and benefit of prescribing the medications that he did to Mr. Marranco, including (1) alternative medications that would have had greater, possibly fatal, side effects; (2) the need to alleviate Mr. Marranco's pain because of how dementia behaviors and a patient's quality of life can worsen if pain is uncontrolled; and (3) Mr. Marranco's heightened anxiety due to his family leaving him at Pine Lodge.  Even more telling is Dr. Schuur's testimony that it is a "judgment call" to determine whether to prescribe particular pain medications even though they may increase an individual's fall risk, as an error in medical judgment, alone, does not equate to malpractice liability.  *See Blake*, 2017 U.S. Dist. LEXIS 58354, at *4.

85

Even assuming, *arguendo*, that Pine Lodge breached its duty in prescribing certain medications to Mr. Marranco that increased his fall risk, there is no testimony from a medical expert establishing that those medications proximately caused his falls. Mr. Marranco was already on a complex medication regimen when he was admitted to Pine Lodge, taking approximately eleven different medications and several that would increase his risk of falls and possibly increase his urinary incontinence and confusion. Mr. Marranco was taking the newly prescribed medications, along with his original medications, at the time of his falls.  Plaintiff did not address whether medications prescribed after his admission further increased his fall risk, considering the continued medications that already increased his fall risk.  It is therefore impossible for the Court to determine, without expert proof to this effect, that it was the Lorazepam and/or Lortab that proximately caused Mr. Marranco's falls and injuries.

Moreover, the Court cannot conclude, for reasons discussed at length above, that the initial fall risk plan was inappropriate, that the frequency and level of supervision of Mr. Marranco prior to the first fall was inadequate, that Mr. Marranco did not receive routinely-scheduled incontinence care, or that certain fall prevention techniques or devices should have been implemented but were not.  It was Plaintiff's burden to prove these allegations by a preponderance of the evidence, although in Plaintiff's post-trial submissions she frequently points to Defendant's failure to mount a defense at trial.  It was Plaintiff who did not put forth testimonial or documentary evidence of the non-slip socks, the room's flooring, certain details of the fall, what particular fall prevention devices are or how they are used, or what incontinence care was or was not provided.

Accordingly, there was simply not enough proof at trial, from a medical expert or otherwise, to allow the Court to infer or conclude without speculation that the alleged actions or omissions by Pine Lodge fell below the applicable standard of care, and/or proximately caused Mr. Marranco's first fall at the facility.

**B. Plaintiff established by a preponderance of the evidence that Defendant is liable for Mr. Marranco's second fall at Pine Lodge.**

The Court first concludes that the VAMC committed medical malpractice that contributed to, and proximately caused, Mr. Marranco's second fall at Pine Lodge.

As the Court addressed earlier, Plaintiff alleges that the VAMC deviated from the standard of care when it (1) reviewed Mr. Marranco's medical records and communicated with Pine Lodge, (2) examined Mr. Marranco in the emergency room, (3) failed to order or perform an emergency MRI, and (4) returned Mr. Marranco to Pine Lodge. The Court has concluded that the VAMC deviated from the applicable standard of medical care when it either failed to properly review Mr. Marranco's medical records, including information about his falls before his admission to Pine Lodge and severe back pain prompting his x-rays, or when it failed to solicit further information about Mr. Marranco's recent medical history from Pine Lodge. The Court has also concluded that the VAMC breached the standard of care in either failing to test Mr. Marranco's gait or arranging for an emergency MRI before sending him back to Pine Lodge (but it did not deviate from the standard of care in its musculoskeletal examination of Mr. Marranco's lumbar spine). Furthermore, the VAMC sent Mr. Marranco back to Pine Lodge without assigning a reason for his underlying pain, involving a medical doctor in the decision to discharge Mr. Marranco, or including further instruction to Pine Lodge concerning Mr. Marranco's status and medical needs.

The VAMC's breaches of the standard of care are largely related to Plaintiff's argument that Mr. Marranco injured his back while in the care of the VA, such as the failure to perform an emergency MRI when the CT scan indicated there was a possibility Mr. Marranco had a nondisplaced lumbar fracture. However, the Court concludes below that Plaintiff did not prove by a preponderance of the evidence that Mr. Marranco fractured his lumbar spine during his stay at Pine Lodge.

Even so, the Court concludes that the VAMC's "open-ended" discharge of Mr. Marranco and its decision to send him back to Pine Lodge without further evaluation constituted medical malpractice and proximately caused Mr. Marranco's second fall at Pine Lodge. Just before Mr. Marranco was discharged from the VAMC and sent back to Pine Lodge, ambulance records note that the ambulance staff questioned whether he was medically stable enough for the transfer. For example, Mr. Marranco's oxygen levels were so low, *i.e.* **in the mid- to upper-80's**, that they increased the amount of supplemental oxygen he was given from three to four liters, and he had a rapid heartbeat and high blood pressure. Yet, the VAMC determined he was safe for transfer without conducting additional testing, involving a medical doctor in the decision of whether to transfer him, or assigning a reason to his pain and medical issues. PA Metz, who informed NP Arbeiter that she could send Mr. Marranco back to Pine Lodge when she did, was unaware of Mr. Marranco's severe levels of pain before he was admitted to the VAMC and was also unaware of his fall at home just before his admission to Pine Lodge. NP Arbeiter was also unaware of certain information from Mr. Marranco's very recent medical history.

Mr. Marranco was returned to Pine Lodge despite his multiple, recent falls; history of dementia that could obfuscate his level and location of pain; age; myriad medical conditions; and deteriorating and concerning vital signs.  He was transferred to Pine Lodge with no specific instructions about his condition or how to manage his care. According to Dr. Schuur, the onus was at least partly on the VAMC to provide direction to Pine Lodge when Mr. Marranco returned to Pine Lodge, yet it failed to do so.

The Court concludes the timing of Mr. Marranco's discharge from the VAMC and his second fall at Pine Lodge, in addition to the evidence discussed above, is sufficient evidence of the VAMC's liability for his second fall at Pine Lodge.  The Court concludes that the fact Dr. Schuur did not testify about causation does not preclude the Court, as the trier of fact, from concluding the VAMC committed malpractice in this respect.

Plaintiff has likewise proven by a preponderance of the evidence that Pine Lodge was negligent in failing to prevent Mr. Marranco's second fall at Pine Lodge.

Considering the circumstances of the first fall at Pine Lodge and the events leading up to the second fall, the Court concludes that the following New York State law proposition applies:  "[w]hen a risk of harm has been identified through the exercise of medical judgment, a failure to take measures to prevent the harm may constitute actionable ordinary negligence."  *Gjini*, 2019 U.S. Dist. LEXIS 20978, at *26.  As discussed at length above, Plaintiff has proven that after Mr. Marranco's first fall at Pine Lodge, the facility breached its duty to protect Mr. Marranco from avoidable injury.  The Court also concludes that Pine Lodge proximately caused the second fall, through a confluence of actions and omissions, *i.e.* (1) it failed to adjust Mr. Marranco's initial fall protection plan and continued that same plan and measures following his return from

89

the VAMC; (2) it failed to update his level of supervision, even after he had now suffered two falls within the span of a few days; and (3) it readmitted Mr. Marranco to Pine Lodge from the emergency room and returned him to the same room he had been in before.

After Mr. Marranco fell the first time at Pine Lodge, he exhibited confusion and greater physical issues.  He was administered increasingly stronger pain medication and needed supplemental oxygen.  There were many indications that Mr. Marranco's initial fall protection plan should have been reassessed, and new interventions introduced to prevent another fall.  Pine Lodge had numerous additional actions it could have taken to update/ modify Mr. Marranco's fall prevention after his first fall at Pine Lodge to prevent a second fall, as noted in the medical records.  A nurse also testified that more preventative steps may be taken following an assessment of a patient during his stay at Pine Lodge.  However, no substantive re-assessment was done here.  Pine Lodge simply added hipsters, which were admittedly not a fall prevention device; they only soften the impact of a fall.

Moreover, Mr. Marranco's condition upon returning to Pine Lodge from the VAMC appeared even more deteriorated.  He was observed groaning, it was necessary to administer Oxycodone due to his level of pain, and he had "very limited" mobility and was on two liters of oxygen.  Records show that Mr. Marranco had trouble transferring to his bed, necessitating the assistance of multiple nurses and the ambulance staff to move him to his bed using a "sheet slide".

Aside from the documented deterioration in Mr. Marranco's physical condition leading up to his second fall at Pine Lodge, the Court also considers the multitude of changes he had experienced in less than 72 hours, and the likely effect that these

changes had on him due to his dementia, and increased level of confusion and thereby risk for further falls.  The Court infers from the medical records that Mr. Marranco was anxious not only when his family left him on September 9th (he was given the anti-anxiety medication, Lorazepam, that evening), but after that point as well.  He was also administered Lorazepam on the 10th directly after the first fall and then later that afternoon, and in the early morning and later afternoon on the 11th—it is reasonably inferred that he was anxious relative to his first fall at Pine Lodge and the aftermath of that fall.  In addition, Mr. Marranco was first coping with a new setting upon admission to Pine Lodge, which his caretakers were concerned about.  He then experienced even further changes in his environment when he was taken to the VAMC and then back to Pine Lodge, and when he underwent multiple rounds diagnostic testing.

The nurse practitioner in this case acknowledged that anxiety resulting from changes in a dementia patient's environment can be expected.  A registered nurse testified that it is critical to consider a patient's dementia diagnosis when a devising a fall protection plan because of that patient's lack of awareness of his surroundings and resulting confusion and risk of falls.  However, only the need for Mr. Marranco to continuously wear hipsters was added to his initial fall protection plan following his first fall.  Not one substantive change to prevent falls was made to the plan until after Mr. Marranoco's second fall (*i.e.* a low bed with floor mats, and a room near the nurses' station for close observation).  (Joint Tr. Ex. 9, pp. 4-5).  The plan was not altered to account for his increased anxiety and distress from the first fall, or to take into consideration his dementia in the context of the many events and alterations to Mr. Marranco's environment after his admission.

**Mr. Marranco fell a second time less than three hours** after his return to Pine

Lodge from the VAMC.  The Court concludes that the timeframe of Mr. Marranco's

arrival back at Pine Lodge from the VAMC on September 12th (3:00 a.m.) and his

second fall (5:35 a.m.), in conjunction with the other evidence presented at trial, is

sufficient evidence of Pine Lodge's liability for the second fall.  An expert is not needed

to conclude that Pine Lodge should have made specific adjustments to Mr. Marranco's

fall risk plan and implemented additional measures to prevent a further fall.  The Court

concludes that Pine Lodge proximately caused Mr. Marranco's second fall, and that

Pine Lodge is liable for failing to prevent that fall and his injuries and accompanying

pain and suffering sustained because of that fall.

The Court also concludes that it was Pine Lodge's and the VAMC's *collective*

negligence that proximately caused the second fall at Pine Lodge.  Not only did each

entity singularly commit acts/ omissions constituting negligence or malpractice, but they

also breached the applicable standards of care in failing to effectively communicate with

each other about Defendant's medical history and care.  Even though VA medical

records are electronic and accessible to medical staff at both Pine Lodge and the

VAMC, the record illuminates the somewhat fractured communication between them.

The change-over of Mr. Marranco's care was frequent, between providers (*e.g.*

nursing staff, physician assistants, and medical doctors) and locations of care (*i.e.* Pine

Lodge and the VAMC).  Because of these recurrent changes, Mr. Marranco's somewhat

complex medical issues including dementia, and his difficulty in expressing his levels

and location of pain, it was that much more important to review Mr. Marranco's recent

medical history when he saw a new provider or was introduced to a new environment/

location.  However, testimony from medical staff at both Pine Lodge and the VAMC

revealed the view that Mr. Marranco's care was compartmentalized despite critical

information about Mr. Marranco from other providers and departments that would

enhance their current care of Mr. Marranco.  Multiple nurses and providers testified to

the effect that they were not responsible for certain medical issues or they were told

only particular information, in effect passing blame for Mr. Marranco's issues to others.

For example, Pine Lodge documented that Mr. Marranco was experiencing, at

times, severe lower back pain after his first fall at Pine Lodge and just hours before he

was seen at the VAMC, which prompted the multiple x-rays taken at Pine Lodge.

Defendant was then sent to the VAMC for an evaluation and CT scan of his hip due to

x-rays that were inconclusive about whether he had a hip fracture.  However, the VAMC

physicians and staff did not appear to have reviewed (or have carefully reviewed) Mr.

Marranco's relevant and recent medical history, and instead focused somewhat

exclusively on his hip and did not conduct a great enough inquiry into the cause of his

back pain.  NP Arbeiter testified that "back pain can be referred to the hip and hip pain

can be referred to the back", and that she would have liked to know if complaints of

severe back pain were the reason the x-rays were ordered.  However, it is apparent

from the record that many witnesses, NP Arbeiter included, did not know the extent of

Mr. Marranco's history of falls.

The Court concludes that the lack of communication between Pine Lodge and

the VAMC, particularly in regard to Mr. Marranco's return to Pine Lodge, was negligent

and proximately caused his second fall.  The Court reasonably infers from the record

that Pine Lodge and the VAMC did not adequately or actively communicate about Mr.

Marranco's medical history and condition when he was admitted to the VAMC, and also failed to sufficiently communicate about what was required and how to prevent further falls when he returned to Pine Lodge.

### C. Plaintiff did not prove by a preponderance of the evidence that Mr. Marranco fractured his lumbar spine while in the care of the VA.

"Causation is an essential element of any negligence claim." *Nealy v. United States Surgical Corp.*, 587 F. Supp. 2d 579, 583 (S.D.N.Y. 2008). The plaintiff must establish that "her injuries were proximately caused by the defendant's conduct." *Id.*

With respect to medical malpractice, to establish proximate causation a plaintiff must prove by a preponderance of the evidence that the physician's negligence was "a substantial factor" in causing the plaintiff's injuries. *Wild v. Catholic Health Sys.*, 21 N.Y.3d 951, 954-955 (N.Y. 2013) (internal quotation marks and citations omitted). The term "substantial factor" means that the alleged negligence "'had such an effect in producing the injury that reasonable people would regard it as a cause of the injury.'" *Id.* at 955, quoting N.Y. Pattern Jury Instr., Civil, 2:70.

#### 1. Lumbar Compression Fractures

The compression fractures to Mr. Marranco's lumbar spine were the main injuries that Plaintiff focused her proof on at trial. The parties offer diametrically opposed viewpoints on which fall (or falls) caused Mr. Marranco's fractures to his back, and whether medical expert testimony is required on this issue.

Plaintiff argues that expert testimony is not necessary to establish a bone fracture in this instance, citing *Fane v. Zimmer, Inc.*, 927 F.2d 124, 131 (2d Cir. 1991). (Dkt. No. 101, ¶¶ 111, 114-115). In that case, the Second Circuit held expert testimony was required in that "complicated medical case" where the question of causation was

whether an implanted medical device that broke caused plaintiff's femur to refracture. *Fane*, 927 F.2d at 126-127, 131.  The Court explained, however, that "[w]hat causes a bone to fracture . . . [i]n many instances . . . might be a matter within the experience and observation of the ordinary juryman."  *Id.* at 131.

Defendant contends in opposition that Plaintiff failed to establish the necessary causal connection between Mr. Marranco's falls at Pine Lodge and the injuries to his back because Mr. Marranco experienced multiple falls prior to his admission to Pine Lodge.  He also complained of severe back pain before any fall at Pine Lodge.  Thus, Defendant reasons, Mr. Marranco's injuries may be preexisting but Plaintiff failed to provide expert proof eliminating that possibility; thus, Plaintiff has not proven causation as to the lumbar compression fractures.  (Dkt. No. 103, ¶¶ 65-68).

In turn, Plaintiff further argues that "Mr. Marranco's previous falls are too remote to be a possible cause of his injuries and decline in condition at Pine Lodge.  At most, they increase Mr. Marranco's susceptibility to injury as a result of Pine Lodge's negligence."  (Dkt. No. 104, ¶ 86).

The Court concludes that the compression fractures in this case are a complex injury and therefore a medical expert was required to opine on the cause of Mr. Marranco's compression fractures, but no expert or treating physician did so.  This is not the "rare" case where no expert medical testimony is required to establish medical malpractice for the compression fractures.  *Sitts*, 811 F.2d at 739-740.

As to Plaintiff's "remote in time" theory, the Court concludes that Mr. Marranco's prior falls were not so remote that expert testimony is not necessary to establish causation.  Mr. Marranco fell a total of three times before he was admitted to Pine

Lodge:  in 2007, a fall which resulted in back surgery; in early July 2013, approximately

two months before his admission to Pine Lodge; and on September 8, 2013, only one

day before his admission.

It is undisputed that the 2007 fall caused injury to Mr. Marranco's lower back,

necessitating surgery.  Even though there was testimony that he received no further

treatment thereafter, there was also testimony that the kyphoplasty surgery repaired a

vertebral dysfunction at L-3.  Kyphoplasty is associated with reducing pain from

vertebral compression fractures.  The September 14, 2013 MRI of Mr. Marranco's

lumbar spine performed after his two falls at Pine Lodge showed a "[m]arked"

compression deformity at the L-3 vertebrae, **the same vertebrae that had undergone**

**the kyphoplasty**, and a "[m]ild" compression deformity involving L-1 vertebrae.

In addition, as outlined above, Mr. Marranco fell in July 2013, and Paul told NP

Hennessy that the fall resulted in some bruising and that he hit his flank or lower area of

his back during the fall.  Even though NP Hennessy did not indicate any back injury or

suspected back injury when he examined him, a physical examination would not detect

or conclusively rule out a compression fracture, especially when there was testimony

that an even x-ray is not an accurate enough test to do so.

In addition, as focused on by the parties, on September 8, 2013, just one day

prior to Mr. Marranco's admission, he fell at home.  Paul reported observing redness on

his lower back and that Mr. Marranco complained of back pain.  Directly upon admission

and throughout that first day at Pine Lodge, Defendant complained of back pain

including severe back pain, and medical staff observed other indicators that he was in

pain. These complaints and indicators of back pain cannot be disregarded by the trier of fact, alone, as disconnected from Mr. Marranco's falls before he arrived at Pine Lodge.

Even with these three, prior falls, no expert witness testified about the 2007 surgery and its possible relation to Mr. Marranco's compression fractures identified on his September 14, 2013 MRI, and no expert testimony excluded the possibility that back pain from a compression fracture can manifest itself months, days, or years after a fracture occurs.

Plaintiff's argument that the medical records from Mr. Marranco's admission themselves establish that there was "no evidence of fracture from any recent fall" (Dkt. No. 101, ¶¶ 179-180) is belied by the records and related trial testimony. No provider who saw Mr. Marranco at that time performed diagnostic testing to rule out a back fracture. Plaintiff is presumably referring RN Webster's testimony concerning her assessment of Mr. Marranco upon admission and arguing that she diagnosed with Mr. Marranco no fracture then, based on her nursing note; however, she testified unequivocally that her notation was not a diagnosis and she could not perform testing to rule out a fracture, in any event.

Plaintiff reasons that a layperson can conclude Mr. Marranco's back was injured by the second fall at Pine Lodge, by comparing diagnostic testing taken of his back before and after that fall. (Dkt. No. 101, ¶¶ 181-184). In other words, Plaintiff's theory is that the lumbar x-ray taken on September 11th after his first fall at Pine Lodge but before his second fall, which was negative for fracture, leads to the reasonable inference that he had no compression fracture before the second fall. Because the MRI after the second fall on September 12th identified the lumbar compression fractures and

the x-ray before the second fall did not, Plaintiff reasons that one can deduce Mr. Marranco's back was injured by the second fall at Pine Lodge.

This reasoning is flawed in several respects.  Dr. Cook, who interpreted Mr. Marranco's lumbar x-ray, did testify that the lumbar x-ray showed no signs of recent trauma, no evidence of fracture, and was a normal study other than indicating degenerative changes and the prior surgery at L-3.  She also testified, however, that a plain film x-ray "can" show a compression fracture; she did not testify that a lumbar x-ray will eliminate any possibility of a compression fracture.  Moreover, Dr. Witham-Leitch's credible testimony was that the lumbar x-ray taken on September 11th and that showed no evidence of fracture was not an accurate enough test to rule out that Mr. Marranco already had the compression fracture on the 11th.

In sum, the Court concludes that Mr. Marranco's multiple falls before his admission to Pine Lodge and his complaints of severe back pain before any fall at Pine Lodge necessitated expert testimony from Plaintiff to establish that the compression fractures were caused by the falls or a fall at Pine Lodge, and were not preexisting.  The fractures could have been caused by any of the falls before Defendant's admission, or those pre-admission falls could have exacerbated a prior compression fracture or fractures.  While the parties focus almost singularly on Mr. Marranco's fall at home the day before his admission, he had a fall six years before that undisputedly resulted in lower back surgery, the kind of surgery that is associated with a vertebral compression fracture.  His MRI revealed a compression fracture and deformities in that same location on his back.  Yet, no expert testified about the 2007 fall or resulting injury and surgery, or its possible relation to the compression fractures that showed up on Defendant's

98

MRI.  Moreover, records and testimony concerning Mr. Marranco's condition upon admission to Pine Lodge did not conclude he had not sustained any compression fracture in his pre-admission falls.  A simple comparison of the lumbar x-ray showing no fracture (after the first fall at Pine Lodge, but before the second) and the MRI showing compression fractures (after the second fall at Pine Lodge) cannot categorically confirm that the second fall at Pine Lodge caused the compression fractures.

Alternative theories regarding causation advanced by Plaintiff are addressed forthwith.

### 2.   Law of the Case Doctrine

Defendant argues that the Court has previously ruled that expert testimony or testimony of a treating physician is required to establish causation.  Thus, Defendant reasons, the Court is barred from reopening the issue under the law of the case doctrine and Plaintiff failed to prove her case because there was no such testimony on causation at trial.  (Dkt. No. 103, ¶¶ 16-19).  Plaintiff asserts that Defendant misinterprets the prior ruling at the summary judgment stage.  She also argues that this Court is nevertheless free to determine this issue because the record has now been developed fully at trial, and the Court previously signaled that Plaintiff could establish causation through methods other than expert testimony.  (Dkt. No. 104, ¶¶ 50-65).

The principle of the law of the case doctrine is that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case."  *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991), citing *Arizona v. California*, 460 U.S. 605, 618 (1983).  The doctrine aims to "ensure fair treatment of the parties and to promote judicial efficiency and finality of the proceedings

by avoiding duplicative decisionmaking." *Natural Resources Defense Council v. Fox*, 30 F. Supp. 2d 369, 374 (S.D.N.Y. Nov. 12, 1998).  However, "it does not limit or prohibit the court's power to revisit those issues; it 'merely expresses the practice of courts generally to refuse to reopen what has been decided.'" *Casey v. United States*, 161 F. Supp. 2d 86, 91 (D. Conn. 2001), quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912).  In other words, "[t]he law of the case doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992).

Generally, a Court may reconsider a prior ruling under "limited exceptions made for compelling reasons, such as [1] an intervening change of controlling law, [2] the availability of new evidence, or [3] the need to correct a clear error or prevent manifest injustice." *Teoba v. Trugreen Landcare LLC*, 2013 U.S. Dist. LEXIS 52831, *13, 2013 WL 1560208 (W.D.N.Y. Apr. 10, 2013) (internal quotation marks and citations omitted); *see DiLaura v. Power Auth. of State of New York*, 982 F.2d 73, 76 (2d Cir. 1992) (same).

It is within the Court's discretion to decline to apply the law of the case doctrine in the first instance, as "courts have declined to apply the law-of-the-case doctrine where a more complete record was developed after the prior ruling was rendered." *Harris v. Key Bank N.A.*, 193 F. Supp. 2d 707, 711 (W.D.N.Y. Jan. 15, 2002).

The Court's prior Decision upon which Defendant's law of the case argument is predicated was issued following Defendant's motion for summary judgment, before the bench trial in this case.  As such, the Court could elect to reconsider the Decision at this later stage of the proceedings, after the proof developed at trial.  "A court may revisit the

law of the case where new evidence has surfaced or a more complete record has developed." *Washington v. Nat'l Life Ins. Co. v. Morgan Stanley & Co.*, 974 F. Supp. 214, 219 (S.D.N.Y. May 9, 1997); *see e.g. Surlock v. Delaney*, 2016 U.S. Dist. LEXIS 74360, *28, 2016 WL 3200273 (N.D.N.Y. June 8, 2016) ("the law of the case doctrine does not preclude the Court from granting summary judgment simply because Plaintiffs have now produced evidence they claim supports the allegations the Court found sufficient in denying Defendants' motion to dismiss") (collecting cases); *Casey*, 161 F. Supp. 2d at 92 ("Here, a more complete record was developed through the trial process.") (collecting cases).

In any event, the Court's prior holding in this case is narrower than Defendant's characterization of it.  Magistrate Judge McCarthy's Report and Recommendation (Dkt. No. 31) concerning Defendant's motion for summary judgment, which the Court adopted in its Decision and Order (Dkt. No. 43), held that a lay person could not determine *whether either of the two falls at Pine Lodge caused Mr. Marranco's compression fracture and subsequent death*, as supported by the fact that "neither of the plaintiff's experts . . . offered a medical opinion as to causation."  Mr. Levine admitted at his deposition that he did not have the expertise to render an opinion on medical causation, and Dr. Schuur admitted at his deposition that "he could not determine which of Mr. Marranco's falls resulted in the fracture."  *Greasley v. United States*, 2018 U.S. Dist. LEXIS 9113, *7-8 (W.D.N.Y. Jan. 18, 2018), *adopted by* 2018 U.S. Dist. LEXIS 109106 (W.D.N.Y. June 29, 2018).  The Court acknowledged, however, that another possible avenue to Plaintiff establishing causation of the lumbar fracture was if Mr. Marranco's

treating physicians testified at trial as fact witnesses regarding purported evidence of causation in the medical record.  *Id.* at *8-12.  This issue is addressed in detail below.

The earlier determination on causation, then, was solely with respect to Mr. Marranco's compression fracture and death.  The Court did *not* conclude that any other alleged injuries or pain and suffering required expert proof.  Indeed, the Magistrate Judge noted that while the Complaint mentioned other injuries, Defendant's motion "focuse[d] on plaintiff's alleged inability to prove that it caused the lumbar fracture which, in turn, led to Mr. Marranco's death."  *Greasley*, 2018 U.S. Dist. LEXIS 9113, at *5 n.4. The Magistrate Judge further concluded that "[e]ven without establishing causation for Mr. Marranco's compression fracture and death, plaintiff may still be able to establish liability for the other injuries Mr. Marranco sustained from his two falls at Pine Lodge." *Id.* at *11 n.7; *see also* Dkt. No. 31; *Greasley v. United States*, 2019 U.S. Dist. LEXIS 130442, *8 (W.D.N.Y. Aug. 5, 2019), Dkt. No. 68 (Decision and Order granting Defendant's motion to preclude Dr. Schuur's new opinion testimony on causation, as set forth in a supplemental report, and noting that Plaintiff could still prove her case without Dr. Schuur opining on causation).

The Court concludes that Defendant misreads the earlier ruling in this case to mean that Plaintiff needs an expert to establish all questions of causation.  Rather, the ruling held, narrowly, that Plaintiff generally needs an expert to opine on whether one or both of Mr. Marranco's falls at Pine Lodge caused his compression fractures and death. The Court concludes, then, that the law of the case doctrine does not apply in this context.  Even if it applied, the Court would have the discretion to reconsider the

previous ruling because "a more complete record was developed through the trial process." *Casey*, 161 F. Supp. 2d at 92.

### 3. Notes and Testimony by Treating Physicians

The Magistrate Judge concluded in the Report and Recommendation that Plaintiff could still possibly prove causation as to the compression fractures at trial through testimony by Jaclyn Schneider, M.D. or Michelle Walter, D.O., as fact witnesses, that the inferred "opinion" in a September 17, 2013 treatment note was "based strictly on their care and treatment of Mr. Marranco." *Greasley*, 2018 U.S. Dist. LEXIS 9113, at *8-12.

To that end, Plaintiff's argument in the alternative is that Defendant and its "agents" established causation of the compression fractures in the medical records, specifically in contemporaneous notes by two of Mr. Marranco's treating physicians, which were admitted into evidence at trial. She also argues that "admissions" from those physicians were reliable opinions on causation. (Dkt. No. 101, ¶¶ 183, 186-187, 189-194; Dkt. No. 104, ¶¶ 92-106). Defendant argues, among other things, that Plaintiff failed to elicit testimony from Mr. Marranco's treating physicians that they made conclusions about causation. (Dkt. No. 103, ¶¶ 63-64, 73-88).

The Court determines that Plaintiff did not establish that the notes in the record standing alone, or in conjunction with testimony from Mr. Marranco's treating physicians, proved that either of the two falls at Pine Lodge caused Mr. Marranco's lumbar compression fractures.

a.  *9/16/13 note by Dr. Withiam-Leitch*

The first note at issue, dated September 16, 2013, is by treating physician and neurologist Dr. Withiam-Leitch during a routine check-up of Mr. Marranco after his September 14, 2013 MRI results came back.  It reads, "MRI shows *acute* compression deformities with edema."  (Joint Tr. Ex. 47-C, p. 364 [emphasis added]).  The impression from the MRI itself, that Dr. Withiam-Leitch had ordered, stated that the compression deformities at L-1 and L-2, and at L-3, and the edema (swelling) present in specific areas suggested "an *acute or subacute* process."  (Joint Tr. Ex. 55, p. 110 [emphasis added]).  Plaintiff's allegation that the note constitutes a medical opinion on the causation of Mr. Marranco's compression fracture hinges on the term "acute".

At trial, Dr. Withiam-Leitch testified that an "acute" event usually means "recent" or an event that occurred within 24 to 48 hours, as compared to a "subacute" event that means one that occurred within several weeks.  Plaintiff essentially argues that because the MRI report states "acute or subacute" and Dr. Withiam-Leitch's note states "acute", she must have concluded that the fracture occurred as a result of a fall at Pine Lodge rather than from the fall just prior to Mr. Marranco's admission.  Dr. Withiam-Leitch was insistent at trial, however, that she did not conclude which fall caused Mr. Marranco's back pain or lumbar compression fracture.  She explained that "acute" in her progress note meant "recent", with respect to timing, rather than "traumatic", with respect to the cause of the fall.  The Court has credited Dr. Withiam-Leitch's testimony that she made no conclusion about causation in her treatment of Mr. Marranco.

Dr. Withiam-Leitch also explained that she knew only that Mr. Marranco had fallen twice, *not how or where* he fell.  Therefore, even if "acute" had referred to

causation, Dr. Witham-Leitch lacked essential information about Mr. Marranco's history to come to a conclusion about causation; she did not know about the circumstances of the falls prior to his admission to Pine Lodge or the falls at Pine Lodge, or even where his falls occurred.  She also stated she knew about only two falls, not the five total falls that Mr. Marranco experienced.

Although Dr. Witham-Leitch tested that the location of the edema (swelling) as identified on the MRI suggested that the compression fractures were "more recent finding[s]", she also named many other possible causes of edema other than trauma from a fall, such as a spiral infarct, a multiple sclerosis lesion, or arthritis.  Other possible causes of Mr. Marranco's back pain were Mr. Marranco's arthritis, the prior kyphoplasty, or lying in bed for two days immobilized.

      b.  *9/17/13 note by Dr. Schneider*

The second note at issue, dated September 17, 2013, by then-hospice and palliative medicine fellow states, "87-year-old male with frontal temporal [sic] dementia, *who was admitted on 9/12 after a fall which resulted in* L-1/L-3 compression fractures and possible left hip fracture and PE, who is experiencing acute nociceptive somatic pain, delirium, myoclonus".  (Joint Tr. Ex. 47-C, p. 355 [emphasis added]; *see* Tr. 529). Plaintiff argues that this note reflects an opinion by Dr. Schneider that the fall on September 12th caused the compression fractures (and other injuries) because no back injury was noted during Mr. Marranco's emergency room visit to the VAMC on September 11th.

Dr. Schneider, however, testified that in her assessment of Mr. Marranco on the 17th, she did not form any opinion on what caused the L-1/L-3 compression fractures,

possible left hip fracture, or pulmonary embolism.  She was not qualified to form an

opinion on causation for those injuries are they were outside of her area of expertise,

competence, and background.  She also only knew that Mr. Marranco had one

witnessed and one unwitnessed fall; she did not even know that he fell prior to his

admission to Pine Lodge.  Dr. Schneider clarified that her note merely reflected Mr.

Marranco's medical history, and it is apparent from her testimony that she was

administering end of life care rather than treating Mr. Marranco's condition.

Although a treating physician may "express an opinion regarding the cause of

any medical condition presented in a patient . . . so long as the opinion is based upon

the medical provider's care and treatment of the patient" (*Franz v. New England

Disposal Technologies, Inc.*, 2011 U.S. Dist. LEXIS 129671, 2011 WL 5443856, *2

(W.D.N.Y. 2011)), the Court concludes that neither provider formed the necessary

opinion on causation.  Thus, the Court need not resolve the parties' contentions

regarding the admissibility of the treatment notes under Rule 801 of the Federal Rules

of Evidence.

4. Failure to Treat or Diagnose

Plaintiff argues in the alternative that Defendant is liable even if the compression

fractures were caused by a fall prior to Mr. Marranco's admission to Pine Lodge, on a

failure to diagnose or treat theory (Dkt. No. 101, ¶¶ 195-201; Dkt. No. 104, ¶¶ 120-127),

as she did in opposition to Defendant's motion for summary judgment.  As noted by

Magistrate Judge McCarthy, however, and as was the same at trial, "plaintiff offers no

medical opinion that the alleged failure to diagnose and treat the compression fracture

caused plaintiff's death."  *Greasley*, 2018 U.S. Dist. LEXIS 9113, at *11 n.6.  Without

question, a theory predicated on failure to treat or diagnose necessitates testimony from a medical expert.  *See Whitfield*, 162 A.D.3d at 1099; *Russo*, 278 A.D.2d at 475.

     5.  <u>Liability for the Lumbar Compression Fractures</u>

In sum, Plaintiff did not prove by a preponderance of the evidence that Mr. Marranco fractured his lumbar spine while in the care of the VA.  Mr. Marranco fell just before he was admitted to Pine Lodge and he was experiencing back pain upon admission.  He therefore could have plausibly fractured his lumbar spine during the fall at home, with the injury not manifesting itself until he was at Pine Lodge.  Neither of Plaintiff's experts at trial testified about causation, and neither of Mr. Marranco's treating physicians could opine—with respect to their care of Mr. Marranco—about the cause or timing of the compression fractures.  Last, no failure to diagnose or treat theory was developed at trial by the opinion of a medical expert.

**D.  Plaintiff proved by a preponderance of the evidence that Defendant caused injury, and pain and suffering to Mr. Marranco, as a result of the second fall at Pine Lodge.**

Plaintiff argues that the actions and omissions of Pine Lodge and the VAMC proximately caused Mr. Marranco's injuries, "general decline", and death.  She chronicles Mr. Marranco's "rapid decline" in the eight days he was in the VA's care and asserts that there are no temporal gaps creating questions about causation and no possible intervening causes.  Plaintiff further argues that Mr. Marranco's injuries are "precisely the type for which a lay person can determine causation without an expert", analogizing Mr. Marranco's injuries and the question of causation in this case to, among others, a leg that is broken when it is struck by an automobile, and a person who is dropped face-first from three feet in the air to the ground and immediately sustains

physical injury.  (Dkt. No. 101, pp. 25-32).  In addressing Mr. Marranco's fluctuating pain, Plaintiff argues, "[t]hough Mr. Marranco's pain may have fluctuated, it was clearly not as bad when he arrived at Pine Lodge as after his falls at the facility.  It is therefore not speculation to find that the falls at Pine Lodge, not previous falls, caused that dramatic increase in pain."  (Dkt. No. 104, ¶ 85).

Defendant argues that there is no causal link between Mr. Marranco's complained of symptoms/ injuries and the falls at Pine Lodge, because he raised those same complaints upon admission and before any fall at Pine Lodge (noting the 10/10 "severe" back pain the day he was admitted).  (Dkt. No. 103, ¶¶ 65-68).  Defendant further argues that even if a layperson could make a conclusion on causation (of the lumbar fractures), Mr. Marranco's medical history would preclude a liability verdict other than one based on speculation.  Defendant points to Mr. Marranco's waxing and waning pain, and periods in the medical records where Mr. Marranco made no complaints of pain, and the inability for the trier of fact to conclude which fall or falls caused which injuries.  (Dkt. No. 103, ¶¶ 89-92).  Defendant parses out Mr. Marranco's asserted injuries other than the lumbar compression fractures (*i.e.* left shoulder fracture, toe fractures, left hip fracture, or pain and suffering) and asserts that Plaintiff has not proven those injuries by a preponderance of the evidence, precluding any award of damages. (Dkt. No. 103, ¶¶ 93-117).

As the Court has concluded above, Defendant is liable for injuries resulting from Mr. Marranco's second fall at Pine Lodge.  The Court determines that Plaintiff proved by a preponderance of the evidence increased pain, without proving a specific clinical diagnosis for the conditions causing that pain.

Plaintiff did not prove that Mr. Marranco fractured his left shoulder, toes on his left foot, or left hip. The x-rays taken on September 12th after the second fall at Pine Lodge ultimately revealed the following—a "suspected" left shoulder fracture, and "highly suspicious" or "probable" left toe fractures. As to Mr. Marranco's left hip, he had two x-rays taken on September 11th, one showing a possible fracture and another indicating no fracture, with a later CT scan that day confirming no "definite" fracture and a "limit[ed] assessment for nondisplaced fracture". No MRI was conducted even though one was later ordered by PA Metz after the second fall at Pine Lodge.

The Court cannot conclude without speculation that Mr. Marranco had a fractured left shoulder and/or fractured toes. Moreover, while it is possible Mr. Marranco had a left hip fracture on the 11th or on the 12th after he fell the second time at Pine Lodge, absent further diagnostic testing, the Court cannot conclude Plaintiff fractured his hip.

Even so, from comparing testimony and medical records from both before and after the second fall, the Court concludes that the observable injuries Mr. Marranco sustained as a result of the second fall but not as a result of the first were a swollen and bruised forehead, an abrasion to his right upper armpit, and a "small pinpoint area" that was minimally bleeding on his left upper leg near his groin. He also had pain in his left hip and left shoulder that were not noted before the second fall.

As to Mr. Marranco's pain and suffering, Defendant argues that because Mr. Marranco had a 10/10 pain upon admission and because there are some periods when he was experiencing no pain after his falls, Plaintiff has not proven any increase in his pain level so as to assign liability to Defendant for his pain. To the contrary, the Court concludes that Mr. Marranco's pain increased overall after his second fall at Pine

Lodge.  Just because there were times when his pain was noted as zero or low (possibly by the usage of pain medication), does not mean he did not experience greater pain in general.  Moreover, the ebbing and flowing of Mr. Marranco's pain as documented in the record is partly explained by his diagnosis of dementia and how dementia patients express their pain.  At times, there are "99" pain notes, meaning Mr. Marranco could not express his pain level.  At other times, Mr. Marranco was able to give a rating for his pain out of 10.

The record also reflects periods where Mr. Marranco did not express pain, with Defendant seeking to conclude that means he was not in any pain.  However, there was testimony at trial that dementia patients may fixate on one area of pain and have difficulty expressing that they are in pain in other areas of their body.  Indeed, while the record reflects that Mr. Marranco's complaints of pain were largely regarding his back, that does not mean he did not have pain elsewhere.

In addition, Mr. Marranco's gait and transferring were more restricted after his second fall at Pine Lodge, and he later could not move his arms or legs.  He was in severe pain and his pain worsened, necessitating administration of Tramadol and later, Dilaudid.[33]  (*See infra*, Appendix).  He had pain at a level 10/10 up to at least seven hours before his death.  Mr. Marranco further experienced delirium and myoclonus.

The Court concludes that Plaintiff is entitled to damages for Mr. Marranco's pain and suffering, and injuries, caused or exacerbated by his second fall.  It will not conclude the extent of his damages, however, without further briefing by the parties.

---

[33] Tramadol is "a synthetic opioid analgesic administered orally . . . to treat moderate to severe pain." Tramadol, Merriam-Webster.com: Medical Dictionary, https://www.merriam-webster.com/dictionary/tramadol#medicalDictionary.

**E. Defendant's Motion for Judgment on Partial Findings**

At the close of Plaintiff's liability case, Defendant made an oral motion for judgment on partial findings, pursuant to Federal Rule of Civil Procedure 52(c), arguing that Plaintiff had failed to establish causation. (Tr. 899-917). The Court reserved decision on the motion. (Tr. 917). Defendant then did not call any witnesses and rested, stating, "[i]t's our contention that the plaintiff has not proven her case". (Tr. 917). "When issuing a judgment on partial findings the trial judge is not required to draw any special inferences in favor of the non-moving party. A trial judge must evaluate and weigh all the evidence, make determinations regarding credibility, and resolve the case on the basis of the preponderance of the evidence." *Blake*, 2017 U.S. Dist. LEXIS 58354, at *5 n.2 (internal quotation marks and citation omitted). The Court finds that "the case is properly resolved at this time, on consideration of all the evidence adduced to date." *Dalton v. United States*, 2014 U.S. Dist. LEXIS 178896, *2 n.1 (E.D.N.Y. Dec. 31, 2014). In accordance with the Court's findings and conclusions as outlined above, the Court grants in part and denies in part Defendant's motion.

**IV.    CONCLUSION**

As set forth above in the Findings of Fact and Conclusions of Law, it is hereby

ORDERED that Plaintiff's First Cause of Action against the United States for medical malpractice is GRANTED, in part, with respect to the VAMC sending Mr. Marranco back to Pine Lodge on September 12, 2013 just prior to his second fall without adequate instructions concerning his status and medical needs, but is otherwise DENIED; and it is

ORDERED, that Plaintiff's Second Cause of Action against the United States for negligence is GRANTED, in part, with respect to Mr. Marranco's second fall at Pine Lodge on September 12, 2013, and injuries relative to that fall, but is otherwise DENIED; and it is

ORDERED that Defendant's Rule 52(c) motion, interposed at the close of Plaintiff's case, is hereby GRANTED in part and DENIED in part as ordered in the preceding two paragraphs; and it is further

ORDERED that the parties shall appear for a status conference before the Court on April 21, 2021 at 11:00 a.m.  The proceeding will be held remotely via Zoom for Government unless otherwise notified.  The Zoom invitation will be provided on the business day before the proceeding.

**IT IS SO ORDERED.**

_s/Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:  March 11, 2021
        Buffalo, New York

APPENDIX

| Date | Approximate Time | Medication Administered/ Event | Record Citation(s) |
|---|---|---|---|
| 9/9/13 | 8:48 p.m. | Lorazepam | Joint Tr. Ex. 47, #2455 |
| **9/10/13** | **1:15 a.m.** | **First fall at Pine Lodge** | |
| 9/10/13 | 1:25 a.m. | Lorazepam | Joint Tr. Ex. 47, #2456 |
| 9/10/13 | 1:07 p.m. | Lortab | Joint Tr. Ex. 47, #2459 |
| 9/10/13 | 2:55 p.m. | Tylenol "as needed discontinued; Lortab prescribed | Tr. 857, 886-887 |
| 9/10/13 | 4:20 p.m. | Lorazepam | Joint Tr. Ex. 47, #2460 |
| 9/10/13 | 5:08 p.m. | Lortab | Tr. 886; Joint Tr. Ex. 47-C, p. 512 |
| 9/10/13 | 11:31 p.m. | Lortab | Tr. 788-789; Joint Tr. Ex. 47-C, pp. 512-513 |
| 9/11/13 | 1:28 a.m. | Lorazepam | Joint Tr. Ex. 47, #2461 |
| 9/11/13 | 10:38 a.m. | Lortab | Tr. 859; Joint Tr. Ex. 47-C, p. 507; Joint Tr. Ex. 47, #2465 |
| 9/11/13 | 2:35 p.m. | Lortab discontinued; Oxycodone prescribed | Tr. 860, 887; Joint Tr. Ex. 47-C, p. 508 |
| 9/11/13 | 2:56 p.m. | Oxycodone | Joint Tr. Ex. 47, #2465 |
| 9/11/13 | 4:28 p.m. | Lorazepam | Joint Tr. Ex. 47, #2466 |
| 9/12/13 | 3:26 a.m. | Oxycodone | Joint Tr. Ex. 47, #2468 |
| **9/12/13** | **5:35 a.m.** | **Second fall at Pine Lodge** | |
| 9/13/13 | 6:43 p.m. | Tramadol | Joint Tr. Ex. 47, #2477 |
| 9/13/13 | 8:44 p.m. | Tramadol | Joint Tr. Ex. 47, #2477 |
| 9/16/13 | 4:35 a.m. | Tramadol | Joint Tr. Ex. 47, #2491 |
| 9/16/13 | 11:12 a.m. | Tramadol refused | Joint Tr. Ex. 47, #2496 |
| 9/16/13 | 2:42 p.m. | Hydromorphone, cont'd until death | Joint Tr. Ex. 47, #2498 |